**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **NORTH AMERICAN CATHOLIC EDUCATIONAL PROGRAMMING FOUNDATION, INC.,** | : | |
| ***Plaintiff,*** | : | |
| **v.** | : | **C.A. No.: 06-** |
| **GERRY CARDINALE, ROB GHEEWALLA, JACK DALY, GOLDMAN SACHS GROUP, INC., GS CAPITAL PARTNERS ITI, L.P., GS CAPITAL PARTNERS III OFFSHORE, L.P and GOLDMAN, SACHS & CO. VERWALTUNGS GmbH** | : | |
| ***Defendants.*** | : | |

**COMPLAINT**

Plaintiff, by and through its undersigned counsel, and based upon knowledge, information, and belief, hereby aver and allege the following:

**THE NATURE OF THE ACTION**

1. Clearwire Holdings, Inc. ("Clearwire" or "Holdings") is a company that was created to acquire wireless radio licenses known as spectrum, with the intent to develop a wireless internet access. Defendants made fraudulent misrepresentations in order to induce the execution of a Master Use and Royalty Agreement between the ITFS Spectrum Development Alliance, Inc. (the "Alliance"), of which Plaintiff was and continues to be a member. These misrepresentations included, without limitation, representations made by the Defendants regarding the present intent of Goldman Sachs to financially back the obligations under the Agreement thereunder and to invest in the spectrum contemplated under the Agreement. During the course of the business relationship with Plaintiff, Defendants acted fraudulently to interfere

with prospective business opportunities of the Plaintiff and otherwise acted to defraud Plaintiff of the benefits of the Master Agreement with Holdings.

2. Plaintiff is also a shareholder who owned Preferred shares of Clearwire on or about August 15, 2003, the date of the initial "C" round offering ("the C Round Financing"), through and including November 14, 2003, the date of Clearwire's sale of a majority of its assets, represented by Clearwire's shares of stock in its wholly owned subsidiaries, Clearwire Technologies, Inc. ("CTI"), Clearwire Communications, Inc. ("CCI") and Clearwire Spectrum Corp., to Flux U.S. Corporation, a Craig O. McCaw-related entity (the "McCaw Sale"). The C Round Financing and subsequent McCaw Sale, with its related transactions and surrounding facts, was the product of wrongful and unfair self-dealing by Defendants and others. The financing was in fact part of a scheme to defraud the minority stockholders by diluting certain stockholder interests and by limiting participation in the C Round Financing to Goldman Sachs and the individual Defendants in anticipation of the pending McCaw Sale so that they might obtain the benefits of that transaction for themselves.

## THE PARTIES AND JURISDICTION

3. Plaintiff North American Catholic Educational Programming Foundation, Inc. ("NACEPF") is an independent lay organization that is a non profit corporation formed under the laws of Rhode Island with a principal place of business in Johnston, Rhode Island. The mission of NACEPF is to provide educational and religious oriented programming to nonprofit agencies, such as schools, non profit agencies and other government entities.

4. Plaintiff is also a Preferred Shareholder who owned, according to Clearwire's records, approximately 1% of the outstanding stock of Clearwire on or about August 15, 2003. Defendants by their duplicity and deceit thwarted Plaintiff from its claim to substantially more shares of Clearwire.

5. Defendant Rob Gheewalla ("Gheewalla") at all times relevant hereto was an officer and/or member of the Board of Directors of Clearwire Holdings, Inc., a corporation

formed under the laws of Delaware that is a holding company for various subsidiaries (collectively "Clearwire"). Gheewalla directed substantial contacts toward NACEPF in Rhode Island related to the allegations set forth herein.

6. Defendant Gerry Cardinale ("Cardinale") at all times relevant hereto was an officer and/or member of the Board of Directors of Clearwire. Cardinale participated in numerous correspondences and communications directed toward NACEPF in Rhode Island related to the allegations set forth herein.

7. Defendant Jack Daly ("Daly") at all times relevant hereto was an officer and/or member of the Board of Directors of Clearwire. Daly participated in numerous correspondences and communications directed toward NACEPF in Rhode Island related to the allegations set forth herein. In addition, Daly met with the President of NACEPF in Rhode Island on at least one occasion in Spring 2003, whereby Daly attempted to induce NACEPF to settle its claims under the Master Agreement, based upon fraudulent misrepresentations regarding the funding and future of Clearwire as further alleged herein.

8. Defendants Goldman Sachs Group, Inc., GS Capital Partners III, L.P., GS Capital Partners III, Offshore L.P. and Goldman, Sachs & Co. Verwaltungs GmbH (collectively "Goldman Sachs") at all times relevant were the primary investors in Holdings and its majority stockholder, and as such, exercised direct and indirect influence and control over the Holdings Board of Directors and directly participated in the management of Holdings.

9. Defendants Gheewalla, Cardinale and Daly at all times relevant were employed by Goldman Sachs and served on the Board of Directors of Holdings at the direction of Goldman Sachs (collectively the "Goldman Directors"). Goldman Sachs was the principal source of compensation for Gheewalla, Cardinale and Daly , and they followed the instructions of Goldman Sachs.

21. The "wireless" internet business faced many technological and regulatory obstacles when Clearwire was started in the 1990s. At that time, the necessary technology was still under development to permit access to the internet without a physical connector to an internet service provider. Furthermore, because of the amount of data transmitted by persons accessing the internet, use of the narrow wave spectrum typically utilized by wireless telephone systems was not practical.

22. Radio wave spectrum use is subject to regulation and licensing by the Federal Communications Commission ("FCC"). The FCC discourages interference between users and, in the case of applicants for a license to use spectrum, the FCC will not permit a new licensee to interfere with the signal of an existing licensee. This results in limiting access by new licensees.

23. Companies like Sprint and WorldCom realized the potential future value of the ITFS spectrum and began an aggressive acquisition campaign in 1999 to acquire rights to use existing licenses to operate in that spectrum from license holders who could not afford to continue operating their unsuccessful wireless businesses. Sprint and WorldCom did not generally own the spectrum rights directly, but rather held the spectrum through lease arrangements with owners.

24. By 2000 it was apparent that some of the technological problems with wireless internet could be solved by the use of radio wave spectrum if more spectrum became available from the FCC. This spectrum, known as "Instruction Television Fixed Service" or "ITFS" spectrum, was used by various educational entities. Some commercial entities also had licenses for use of the spectrum and used it for "wireless" cable television before the advent of satellite television.

10. Defendants Gheewalla, Cardinale and Daly had direct personal involvement in the actions and fraudulent conduct alleged herein which is causally related to the substantial damages sustained by NACEPF in Rhode Island.

11. Defendants Gheewalla, Cardinale and Daly knowingly directed, actively participated in or made false statements intending that they be relied upon by NACEPF in Rhode Island.

12. As the representative of Goldman Sachs on the Clearwire Board of Directors, the Goldman Directors were able to and did control the Clearwire Board of Directors even when the three of them were together a minority of the Clearwire Board. They were able to do so because:

(a) Goldman Sachs had invested $47 million in Holdings, representing 84% of the total sums invested in Holdings in March 2001;

(b) Holdings had significant financial obligations but did not have the ability to raise sufficient cash from operations to pay its debts as they became due. Thus, Holdings was dependent on Goldman Sachs to make additional investments to fund Holdings' operations for the foreseeable future;

(c) Goldman Sachs controlled the majority of the votes of Holdings' stock entitled to vote after November 2001, and had rights to acquire a majority of the shares after March 2001;

(d) Goldman Sachs was virtually Clearwire's sole source of investment banking advice, contacts with potential acquisition candidates and legal advisors; and

(e) It was understood at all times by all members of the Clearwire Board of Directors that unless the instructions of Goldman Sachs were followed that Clearwire would cease to receive the assistance from Goldman Sachs that it needed to continue to function.

13. Each of the Defendants, by virtue of their high-level positions with Clearwire and its controlling shareholders and affiliates, their stock ownership, their insider dealings, and their direct and indirect influence and control over the Holdings Board of Directors, directly participated in the management of Holdings, were directly involved in the day-to-day operations of Holdings at the highest levels, were privy to confidential and proprietary information

regarding the financial condition of Clearwire, and were directly and extensively involved in negotiating and structuring the C Round Financing and subsequent McCaw Sale as alleged herein.

14. The fraudulent and tortious conduct alleged herein was either directed toward NACEPF in Rhode Island, occurred in Rhode Island and caused injury to NACEPF in Rhode Island.

15. Defendants have deliberately engaged in significant activities within the State of Rhode Island and have continuing obligations to NACEPF in Rhode Island.

16. Each of the Defendants, by virtue of their activities within the state, have the necessary and minimum contacts with the State of Rhode Island to confer jurisdiction on this Court pursuant to R.I. Gen. Laws § 9-5-33, as amended, and subjecting said Defendants to the personal jurisdiction of the courts of the State of Rhode Island.

17. Goldman Sachs has engaged in continuous and systematic activity within the Sate of Rhode Island to subject them to the jurisdiction of this Court.

18. Subject matter jurisdiction is conferred upon this Court pursuant to 28 U.S.C. § 1332, as the parties are diverse and the matter in controversy exceeds, exclusive of interest and costs, the sum of Seventy-Five Thousand Dollars ($75,000.00).

19. Venue is proper under 28 U.S.C. § 1391, as a substantial part of the events giving rise to the claims occurred in this District.

**THE BACKGROUND TO THE CLAIMS**

20. Clearwire was created to take advantage of the business opportunity in providing internet access without the use of wires or cables. In effect, Clearwire intended to do for internet users what cell telephones have done for making telephone calls. Clearwire intended to provide internet access by using electronic signals, broadcast much like radio or television signals, over a range of wavelengths (known as "spectrum").

25. In or about 2000, Goldman Sachs, like Sprint and WorldCom, saw a potential use of the ITFS spectrum in the telecommunications industry and sought to capitalize on the floundering wireless business. Goldman Sachs knew that Sprint and WorldCom only held leases that would expire at some point, and those entities generally did not own the rights to use ITFS spectrum permanently. Therefore, Goldman Sachs determined to invest in the market for wireless radio spectrum to connect to the internet and did so by investing in Clearwire, then a small, unprofitable wireless company, as the vehicle for its internet business investment.

26. To achieve its plan, Goldman Sachs decided to acquire a significant number of educational licenses whose current leases had termination dates. Specifically, in March 2001 Goldman Sachs consummated a deal with the ITFS Spectrum Development Alliance, Inc. (the "Alliance"), which consisted of three of the largest networks of educational licensees for the use of ITFS spectrum: NACEPF, Hispanic Information and Telecommunications Network, Inc. ("HITN") and Instructional Telecommunications Foundation, Inc. ("ITF") and various affiliates of ITF. The terms of this deal are contained in a Master Use and Royalty Agreement between Clearwire and the members of the Alliance (the "Master Agreement"). Plaintiff is the remaining entity constituting the Alliance. Goldman Sachs' stated intention, through Clearwire, was to develop the spectrum assets into an operating national system of wireless connections to the internet.

27. The Goldman Defendants directed the negotiations with the Alliance members and Clearwire was the conduit Goldman Sachs used to further its objectives.

28. By gaining control over a significant amount of the educational licenses whose current leases had termination dates, Goldman Sachs could achieve a substantial advantage over Sprint and WorldCom, two competitors in the wireless spectrum market.

29. The business plan reflected in the terms of the Master Agreement involved Clearwire obtaining the rights to use the Alliance members' ITFS spectrum licenses when those licenses became available for transfer to Clearwire. At the time the Master Agreement was

signed, most of the Alliance member licenses were already licensed to third parties, such as Sprint. The transfers to Clearwire were to occur when those licenses expired if the then current licensees did not exercise their rights of first refusal.

30. Throughout the negotiations with the Alliance from 2000 into March 2001, the Goldman Defendants emphasized that Goldman Sachs was committed through Clearwire to providing adequate capital and management to develop the spectrum assets of the Alliance members into an operating, national system of wireless connections to the internet.

31. For example, on June 7, 2000, Defendant Cardinale on Goldman Sachs' behalf sent a memo to the Alliance that, inter alia, stated:

> As part of our proposal, we wanted to reiterate again our philosophy in partnering with the alliance to meet the objectives of both sides, alleviate any material upfront concerns, and provide as much assurance as possible that the partnership going forward represents the best interests of the Alliance and its constituencies. As we tried to articulate in our last two meetings, we take a long-term view to wealth creation in these type of projects.
>
> ***
>
> As we mentioned in our meeting, we believe in being fair and are absolutely prepared to not only pay competitive market prices for the assets which you can deliver but also finance the acquisition cost for your entire portfolio of spectrum (i.e., all 140 million channel POPs, as well as any additional affiliated channel POPs which you can deliver).
>
> ***
>
> This results in upfront cash payment to the Alliance of $8 million (assuming 20 million channel POPs), which together with our funding of the engineering study and related legal/upfront development costs to be determined, establishes our commitment to the Alliance of a long-term partnership for the development of the ITFS spectrum via an ongoing, fully funded operating vehicle.
>
> ***
>
> [A Goldman Sachs affiliate], with the assistance of Jimmy Mansour and Goldman Sachs, will manage the engineering project and ensure timely completion under FCC guidelines.
>
> ***
>
> Based on our current projections, the purchase and build-out costs associated with the delivery and operationalization of 140 million channel POPs will require approximately $350 million over the build-out period. (Emphasis added.)

32. This stated commitment of Goldman Sachs to develop the wireless network using the licenses of the Alliance members was important to and relied upon by NACEPF when it signed the Master Agreement in March, 2001. The proposal made by Clearwire provided the Alliance members with additional use of the wireless spectrum so that the Alliance members and NACEPF would have an increased ability to provide its services on a high speed internet platform to further expand their services.

33. Following the closing of the Master Agreement, Clearwire publicly confirmed what it and the Goldman Defendants had told the Alliance members prior to the closing to induce them to enter into the Master Agreement. For example, Clearwire announced the recent funding should "take us well into 2002" in expanding into new markets and Goldman Sachs stated, "we identified Clearwire as the ideal platform for delivering data and voice services."

34. Within days of the March 13, 2001 closing of the Master Agreement, the Goldman Directors secretly began a series of meetings without the Alliance's prior knowledge with the Alliance commercial lessees. In addition to other potential acquirers, on April 12, 2001, Goldman Sachs/Clearwire met with WorldCom; on April 3, 2001, they met with Sprint; on April 14, 2001 they met with Bell South.

35. The Defendants' message at these meetings was that under the Master Agreement they had acquired "topping leases" covering much of the spectrum under leases that would expire and by virtue of the structure of the consideration to be paid to the Alliance members that Clearwire would likely be the successor to those leases upon their expiration. Defendants urged the other wireless operators to agree to cooperate with Clearwire to rationalize spectrum for their material benefit as they otherwise could face the loss of valuable spectrum or interference with any spectrum they held next to the ITFS channels acquired by Clearwire.

36. The visits were part of the hidden agenda of the Goldman Directors to use the rights granted Clearwire in the Master Agreement to extract concessions from Sprint, WorldCom and other wireless operators for ITFS spectrum or for collaboration with Clearwire in operating in that spectrum band without interference. In effect, rather than fulfill their representations to

the Alliance and its members to build out a network of ITFS-based wireless operations, the Goldman Directors tried to "flip" the spectrum rights they had acquired from the Alliance members.

37. The Goldman Defendants never intended to do the build out that they had promised to the Alliance members and publicly proclaimed as the business plan of Clearwire. Instead, the undisclosed plan of Goldman Sachs was to leverage the Alliance's spectrum licenses when the market for spectrum improved as demand for internet access increased, while maintaining the pretense of an industry participant.

38. From the initial Alliance closing in March 2001 until May 2002, the Defendants caused Clearwire to continue to assert to the Alliance members that Clearwire had the right to acquire from them any of their spectrum licenses that became available. This had the effect of precluding Alliance members generally and NACEPF specifically, from offering those licenses to third parties or extending the term of any expiring licenses. Throughout this period there were ready, willing and able acquirers for those expiring licenses, but none of those potential acquisitions went forward because of the Defendants' continued misrepresentations.

39. The Defendants' representations regarding Clearwire's claims were not made in good faith. The Defendants directed Clearwire to continue to claim entitlement to those licenses to pressure Sprint, WorldCom and others to agree to cooperate with Clearwire in dividing the wireless market. The Goldman Directors directed Clearwire to make its claims to the Alliance's ITFS spectrum, while knowing that Clearwire lacked the funding to acquire and use that spectrum and that Goldman Sachs would not provide that funding.

40. In June 2002, the market for wireless spectrum collapsed when WorldCom announced its accounting problems and it appeared that there was or soon would be a surplus of spectrum available, such as from WorldCom.

41. At the Defendants' direction, Clearwire thereafter began negotiations with the members of the Alliance to end Clearwire's obligations to the members. Clearwire failed in this attempt and on September 11, 2002, effectuated a Board of Directors resolution that caused

Clearwire to breach the Master Agreement by denying the consideration due the Alliance members for delivered spectrum.

42. Thereafter, the Goldman Directors had Clearwire, in its Board book of February 12, 2003, outline explicitly a scheme to invert Holdings with a subsidiary of Holdings to allow the Goldman Directors to eradicate the claims of the Alliance against its investment in Clearwire. This explicit threat fragmented the Alliance so that eventually Clearwire paid over $2 million to HITN and ITF to settle their claims and limiting its payments to that amount by otherwise threatening to file for bankruptcy protection. These settlements left NACEPF as the sole remaining member of the Alliance.

43. The Defendants, by its fraudulent conduct and misrepresentations, fragmented the Alliance and destroyed its collective value and prevented Plaintiff from obtaining the benefits to which it was entitled under the Master Agreement and further caused Plaintiff to lose substantial opportunities the Alliance provided as well as opportunities to acquire additional spectrum at low cost with a high rate of return, by reducing its leverage in the market.

44. Following Goldman Sachs' initial investment in Clearwire in March 2001, Clearwire began to focus exclusively on providing broadband wireless services, utilizing licensed spectrum, and determined to divest its equipment vendor subsidiary. All of Clearwire's efforts in 2002 and 2003 were directed at developing broadband wireless network technology and effecting regulatory changes at the FCC.

45. Although gaining ground in its attempts to remove some of the regulatory barriers to development of a business based ITFS spectrum, Clearwire's financial resources were dwindling. As of the Spring of 2003, Clearwire's "burn" rate was $2.1 million per month, and it then had no significant revenue.

46. In a memorandum to investors dated May 6, 2003 (the "Investor Update"), Clearwire notified the shareholders that it had engaged UBS Warburg to assist Clearwire in

raising additional capital. The memo warned that "the capital markets remain very tight and there are no assurances that we will be successful in our efforts. In connection with any fund raising into Holdings we will notify you with the specifics of an investment and provide you the opportunity to invest. The Company's cash position at the date of this letter is approximately $3.6 million and we anticipate needing to conclude on our capital raising efforts within the next 30-60 days." In light of the memorandum, the investors clearly understood Clearwire's financial position to be critical.

**THE "C" ROUND FINANCING**

47. Around the same time of the Investor Update, in or about the Spring of 2003, the Defendant Directors began discussing a possible sale of Clearwire, or a sale of substantially all of Clearwire's assets, with the McCaw Group, which sale is referred to herein as the McCaw Sale. Craig O. McCaw, described by industry media as "one of the most celebrated of the telco tycoons" and "the wireless industry's most prominent entrepreneur," became well-known in the mid-1990s for his creation of the first national wireless network, which he later sold to AT&T for a substantial sum.

48. The negotiations for the McCaw Sale led to a scheme concocted by the Defendants, which was consummated in or about November 2003, whereby Clearwire agreed to sell the common shares of Clearwire's' subsidiaries, CTI, CCI and Clearwire Spectrum Corp., to Flux, which later changed its name to Clearwire. Defendants recognized the significant and immediate impact a transaction with McCaw was likely to have, and undertook to develop a scheme which would allow them to capture the benefit of the McCaw Sale for themselves.

49. Despite having been in negotiations for the McCaw Sale, on or about August 15, 2003 (the "August 15, 2003 Notice"), Clearwire announced a proposal to raise emergency bridge financing (the "Bridge Financing") in the form of convertible notes (the "Original Offer"). The August 15, 2003 Notice did not mention the McCaw Sale, but rather pointed to failed negotiations with AT&T as the reason for the emergency financing, and stated that "[t]he Bridge

Financing will provide the Corporation with additional time to pursue a new round of financing and to pursue other strategic alternatives, which may include a sale or merger of the Corporation."

50. On or about August 20, 2003, Clearwire sent a second notice to shareholders (the "August 20, 2003 Notice") terminating the Original Offer and replacing it with the new Preemptive Rights Offer. The stated reason for terminating the Original Offer was that the Company had learned that "certain stockholders may not be able to purchase Convertible Notes pursuant to the Original Offer due to certain state law restrictions." Thus, the new Preemptive Rights Offer proposed to issue an equity security in the form of Series C Preferred Stock.

51. However, the real impetus for terminating the Original Offer was that the sale of Clearwire assets, as contemplated by the pending McCaw Sale, did not constitute a liquidation event and would not trigger the liquidation preferences as set forth in the Original Offer. Therefore, the Preemptive Rights Offer amended the Original Offer by altering the definition of "Liquidation Events" to include "a strategic transaction (including a sale of the Corporation)" as a triggering event. These modifications were effectuated by Defendants with the intent to give themselves a major liquidation preference in the upcoming McCaw Sale.

52. In the Preemptive Rights Offering, Clearwire proposed to sell and issue Series C Convertible Preferred Stock for consideration equal to $600,000, plus additional consideration. Shareholders were entitled to purchase up to their pro rata share of Series C Preferred Stock, although provisions for additional purchases were also included.

53. Neither the Original Offer nor the Preemptive Rights Offer disclosed the pending McCaw Sale or any details of that transaction to the minority shareholders. Participation by investors, including the Defendants, in the C Round of financing raised a mere $600,000 (given the burn rate, this was an inconsequential sum, not intended or able to continue the operations of Clearwire), and as the McCaw name was withheld, little reason existed to participate on the part of the shareholders. NACEPF filed a formal action for Books & Records under Delaware law and the information provided circumvented this seminal fact.

54. Thus, without information or notice of the pending McCaw Sale, many of the existing shareholders, including the Plaintiff, did not participate in the C Round Financing in reliance on the representations set forth in the Investor Update, the C Round offerings and other related materials regarding Clearwire's dim financial picture. Without knowledge or understanding that Clearwire's business was about to engage in the McCaw Sale, the stockholders would not have seen anything favorable in the recent history of Clearwire to warrant further investment. Defendants, of course, knew that to be the case and capitalized upon it.

55. Information of the pending McCaw Sale was, however, shared with a few limited investors, including members of the management team and their immediate families, who obtained additional shares of stock by subscribing into the Series C Round, thereby diluting the existing shareholders. Failure to disclose the pending McCaw Sale to all shareholders served to bolster the ownership position of Clearwire's controlling shareholders, the management team and their families. The $600,000 was, in fact, not necessary to be raised in order to keep Clearwire afloat for the couple of months needed to get to a closing with McCaw (other means were available such as deferring exorbitant executive compensation), but instead, the Series C Round was undertaken as a means to dilute existing stockholders for the benefit of the insiders.

56. On November 14, 2003, the long awaited McCaw Sale, and related transactions, was approved by the Board of Directors. As noted, the transaction involved the sale of Clearwire's ownership in CTI, Clearwire's operating entity, in exchange for a combination of cash and stock in Flux (now Clearwire), and the creation of a new Holdings entity. Clearwire has never notified its shareholders of the sale of assets. Moreover, the shareholders have received no information concerning the details of the McCaw Sale or the distribution of stock and consideration from that sale. To date, Holdings appears to have taken no steps to liquidate Clearwire or distribute the consideration received in the McCaw Sale.

57. The filing of a complaint by other minority shareholders against the Defendants and other officers and directors of Clearwire in the Delaware Court of Chancery on August 11, 2006 placed in the public domain the fact of the McCaw Sale and the scheming by the Defendants.

58. Since the McCaw Sale, the entity that purchased Holdings' business, Clearwire, has attracted numerous investments and has significantly increased in value. That is not surprising, given McCaw's successful track record.

## CLAIMS FOR RELIEF

### COUNT I
***(Fraudulent Inducement)***

59. Plaintiff realleges and incorporates by reference paragraphs 1 through 58 as though fully set forth herein.

60. Defendants represented to NACEPF between June 2000 and May 2002 that Goldman Sachs would do what was necessary to cause Clearwire to: (1) continue to expand its existing markets with its proprietary technology, (2) acquire NACEPF's license rights in spectrum as the existing licenses for that spectrum expired and the licenses were not renewed, and (3) use the then-available technology of Clearwire or its equivalent to incorporate in its expanding unlicensed band build-outs, the Alliance spectrum as it became rationalized in an operating wireless network to access the internet while permitting NACEPF to offer its services to its clients and to otherwise use that spectrum to maintain NACEPF licenses.

61. NACEPF relied upon the representations of the Defendants in entering into the Master Agreement and thereafter in preserving its spectrum licenses for acquisition by Clearwire.

62. The representations of the Defendants were not true when they were made and the Defendants knew those representations were not true when they were made, but intended NACEPF to rely upon those false representations.

63. To the extent the representations of the Defendants were stated as their opinions of what Clearwire would do after the Master Agreement was signed, they did not actually hold those opinions at the time. For example, the Defendants at and before the Master Agreement was signed knew that: (1) Clearwire would not acquire NACEPF's spectrum licenses as they became available or build out an operating wireless network because it lacked the resources to do so and Goldman Sachs did not intend to provide the funding required, and (2) Clearwire's equipment subsidiary (that was to supply the technology it needed) was for sale.

64. NACEPF lost the opportunity to license its spectrum and was otherwise damaged as a proximate result of the Defendants' conduct.

**COUNT II**
***(Fraud)***

65. Plaintiff realleges and incorporates by reference paragraphs 1 through 64 as though fully set forth herein.

66. The Defendants acted fraudulently to induce Plaintiff to continue its business relationship with Clearwire with respect to the ITFS spectrum, notwithstanding the fact that Defendants had no intention of permitting Clearwire funds to be utilized to purchase additional spectrum from NACEPF at any time.

67. The Defendants acted fraudulently toward NACEPF by: (1) not utilizing the assets of Clearwire for its benefit and that of its creditors, and (2) holding on to NACEPF's ITFS license rights when Clearwire would not use them, solely to keep Goldman Sachs' investment "in play."

68. The Defendants engaged in self-dealing by: (1) keeping Clearwire in business to preserve the ability of Goldman Sachs to carry its investment without admitting Clearwire was not continuing to acquire spectrum, and (2) investing Clearwire assets in a wireless business in Jacksonville, Florida that had no reasonable likelihood of succeeding but whose existence was

utilized as a justification for the strategy of the Defendants to not honor the Alliance members' rights.

**COUNT III**
***(Interference with Prospective Business Opportunity - Sale of Alliance Licenses)***

69. Plaintiff realleges and incorporates by reference paragraphs 1 through 68 as though fully set forth herein.

70. After March 2001 and until June 2002, NACEPF had the opportunity to convey its licenses to use wireless spectrum to a number of companies that sought to acquire that spectrum.

71. The Defendants during that period caused Clearwire to assert the right to acquire Alliance wireless spectrum. As a result, NACEPF lost the opportunity to convey its licenses for spectrum to other buyers.

72. The action of the Defendants in interfering with the NACEPF's opportunity to convey its wireless spectrum was wrongful and not justified.

73. The Defendants' actions were not justified by any legitimate business interest of Clearwire. The Defendants used Clearwire to speculate on the value of spectrum licenses by holding the Alliance's licenses captive under an improper claim of right under the Master Agreement. When the Defendants determined that Clearwire financially could not pursue development of the wireless network that the Master Agreement contemplated, then it had no legitimate right to hold on to NACEPF's license rights.

74. As a direct and proximate result of the foregoing tortious interference by Defendants, Plaintiff has incurred damages in an amount to be determined at trial which exceeds the jurisdictional requirements of this Court.

**COUNT IV**
***(Interference with Prospective Business Opportunity - Alliance Acquisitions)***

75. Plaintiff realleges and incorporates by reference paragraphs 1 through 74 as though fully set forth herein.

76. The Defendants further interfered with the Alliance itself, negotiating separate settlements with Alliance members HITN and ITF, based upon false misrepresentations of Clearwire's imminent bankruptcy, in order to break the strength of the Alliance.

77. The Defendants, by their fraudulent conduct and misrepresentations, fragmented the Alliance and destroyed its collective value by reducing its leverage in the market, thereby injuring NACEPF as a member.

78. During the relevant time period, NACEPF was ready, willing and able to acquire additional spectrum in the market, which opportunity was prevented by the Defendant's fraudulent conduct.

79. The actions of the Defendants in interfering with NACEPF's ability to acquire new spectrum was wrongful and unjustified.

80. As a direct and proximate result of the foregoing tortious interference by Defendants, Plaintiff has incurred damages in an amount to be determined at trial which exceeds the jurisdictional requirements of this Court.

## COUNT V
### (*Breach of Fiduciary Duties of Loyalty and Care - Bridge Financing*)

81. Plaintiff realleges and incorporates by reference paragraphs 1 through 80 as though fully set forth herein.

82. The Defendants, by reason of their majority stock ownership of Clearwire and their control of Clearwire's Board of Directors, officers and agents, owed the Plaintiff the fiduciary duties of loyalty, care and full disclosure.

83. By the course of misconduct set forth above, including, among other things, the modification of the liquidation preferences; engaging in a series of self-dealing transactions designed to benefit Goldman Sachs, the Director Defendants and their family members; and failing to disclose the nature of those transactions, the Defendants have breached their fiduciary duties owed to the Plaintiff.

84. As a direct and proximate result of the foregoing unfair and self-dealing transactions by Defendants, Plaintiff has incurred damages in an amount to be determined at trial which exceeds the jurisdictional requirements of this Court.

**COUNT VI**
**(*Breach of Fiduciary Duty of Disclosure - Bridge Financing*)**

85. Plaintiff realleges and incorporates by reference paragraphs 1 through 84 as though fully set forth herein.

86. Defendants, by reason of their majority stock ownership of Clearwire and their control of Clearwire's Board of Directors, officers and agents, owed the Plaintiff the fiduciary duties of loyalty, care and full disclosure.

87. As set forth above, the Defendants misrepresented and/or concealed the details or facts of the pending McCaw Sale and the real reason for the transactions described above.

88. The Defendants acted with the intent to deceive, or with reckless disregard for the truth, and designed to create the false impression that any investment made in the C Round Financing would be in jeopardy due to the deteriorating financial condition of the Company, and to discourage Plaintiff from exercising its right to fully participate in the C Round Financing.

89. Plaintiff, to its detriment, relied on such misrepresentations and facts which the Defendants knew to be false.

90. Plaintiff has incurred damages as a proximate result of the Defendants' breaches of their duties of loyalty, care and full disclosure in an amount to be determined at trial.

**COUNT VII**
**(*Unjust Enrichment*)**

91. Plaintiff realleges and incorporates by reference paragraphs 1 through 90 as though fully set forth herein.

92. Defendants, by reason of their majority stock ownership of Clearwire and their control of Clearwire's Board of Directors, officers and agents, and consequently over the C Round Financing and negotiation and execution of the McCaw Sale, wrongfully and unjustly

obtained benefits to which they were not entitled, principally in the form of the above-described bolster of their ownership position in Holdings by diluting certain stockholder interests and limiting participation in the C Round Financing to Goldman Sachs and the Director Defendants in light of the pending McCaw Sale.

93. The Master Agreement with Holdings and the Shareholder Agreement provided that twenty percent (20%) of all payments to NACEPF was in Preferred shares of Holdings. The Defendants by their (i) failure to cure notices of default sent by NACEPF for which stock was mandated under the Master Agreement issue stock for spectrum NACEPF tendered pursuant to the Master Agreement and (ii) the notorious actions of the Defendants on September 11, 2002, which effectuated a Board of Directors resolution which denied the consideration due the Alliance members for delivered spectrum, denied NACEPF its rightful equity share in Holdings such that the Defendants have been unjustly enriched by the McCaw shares that they wrongfully acquired in derogation of NACEPF's rights.

**COUNT VIII**
***(Fraud/Misrepresentation - Bridge Financing)***

94. Plaintiff realleges and incorporates by reference paragraphs 1 through 93 as though fully set forth herein.

95. As set forth above, Defendants caused to be issued, and participated in the issuance of, materially false and misleading statements to Plaintiff, and omitted material facts, including any information about the pending McCaw Sale.

96. The above-mentioned conduct of Defendants constitutes common-law negligent misrepresentation and/or fraud in that Defendants made, participated in or permitted the making of materially false and misleading statements, and omitted material facts, which statements and omissions were made negligently and without exercising due care.

97. Defendants disseminated the materially false and misleading statements and material omissions described herein with the knowledge that the statements would be reviewed and relied upon by Plaintiff in deciding whether or not to participate in the C Round Financing.

98. At the time of these material misrepresentations and omissions, Plaintiff reasonably and justifiably relied upon the misstatements and omissions, and upon the superior knowledge and expertise of Defendants in connection with the financial condition of Clearwire. If the Defendants had made full and adequate disclosures, Plaintiff would have participated and was entitled to a participation substantially more than the books controlled by Clearwire indicated. As a result of Defendants' fraudulent scheme to dilute certain shareholders and to bolster their ownership position in Clearwire, Plaintiff was deceived as to the benefits of participating in light of the pending McCaw Sale.

99. Plaintiff has suffered damages as a proximate result of the Defendants' foregoing negligent material misrepresentation and material omissions and/or equitable fraud in an amount to be determined at trial and in excess of the jurisdictional requirements of this Court.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against Defendants as follows:

A. Declaring that the Defendants have breached their fiduciary duties of loyalty, care and full disclosure to Plaintiff;

B. Awarding NACEPF its damages assessing out of Defendants' misrepresentations, breaches of fiduciary duty and interference with business opportunities of NACEPF;

C. Awarding compensatory damages against the Defendants, individually and severally, in an amount determined at trial, including without limitation, compensatory damages for the self-dealing actions taken by the Defendants that diluted certain existing shares owned by Plaintiff, together with prejudgment and post-judgment interest at the maximum rate allowed by law;

D. Awarding Plaintiff its costs and expenses incurred in this action, including reasonable allowance of fees for Plaintiff's attorneys, accountants, and experts, and reimbursement of Plaintiff's expenses;

E. Granting Plaintiff such other and further relief as this Court may deem just, proper and equitable.

**PLAINTIFF DEMANDS TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

North American Catholic Educational
Programming Foundation, Inc.
By its Attorneys,

Matthew T. Oliverio (#3372)
Christine M. Curley (#4529)
OLIVERIO & MARCACCIO LLP
55 Dorrance Street, Suite 400
Providence, RI 02903
(401) 861-2900
(401) 861-2922 Fax

mto@om-rilaw.com

Dated: November 14, 2006