# EXHIBIT A

2 of 3

of a Delaware corporation and because the exercise of jurisdiction otherwise comports with traditional notions of fairness and justice.[68]

NACEPF argues that this Court also has personal jurisdiction over the Defendants with regard to the other claims asserted in the Complaint because they are "sufficiently related" to NACEPF's fiduciary duty claim. Indeed, "once jurisdiction is obtained pursuant to Section 3114, nonresident directors are properly before the court with respect to any claims that are sufficiently related to the cause of action asserted against such directors in their capacity as directors."[69] As alluded to above, however, NACEPF has expressly premised its arguments for personal jurisdiction over the Defendants for Counts I and III (*i.e.*, the non-fiduciary duty claims) on the Court's first determining that Count II (*i.e.*, the fiduciary duty claim) survives the Defendants' motion to dismiss.[70] In setting forth why the Court has personal jurisdiction over the Defendants with respect to Counts I and III, NACEPF contends:

> [Section 3114] contemplates jurisdiction over directors of a Delaware Corporation "where the cause of action is grounded on such individuals' breach of the fiduciary duties owed to the corporation and

---

[68] *See, e.g.*, *Canadian Commercial Workers Indus. Pension Plan*, 2006 WL 456786, at *12; *see also Carlton Invs. v. TLC Beatrice Int'l Holdings, Inc.*, 1996 WL 608492, at *5 (Del. Ch. Oct. 16, 1996); WOLFE & PITTENGER, *supra* note 65, § 3-3; *cf. Cornerstone Techs. LLC*, 2003 WL 1787959, at *13.

[69] *Canadian Commercial Workers Indus. Pension Plan*, 2006 WL 456786, at *11 (quoting WOLFE & PITTENGER, *supra* note 60, § 3-5[a]).

[70] The standard applicable to dismissal under Court of Chancery Rule 12(b)(6) is the subject of the introduction to Part III(B), below.

> its owners." When a breach of fiduciary duty is *well pled*, this Court may join "sufficiently related" causes of action.[71]

Although perhaps likely correct,[72] the Court notes that this statement could arguably also be viewed as overly-restrictive.[73] NACEPF has not argued

[71] Ans. Br. at 46 (quoting *Armstrong v. Pomerance*, 423 A.2d 174, 176 n.5 (Del. 1980)) (emphasis added). At oral argument, NACEPF did not address further the consequences of dismissing the fiduciary duty claim under Court of Chancery Rule 12(b)(6) on NACEPF's "related," non-fiduciary duty claims; instead, NACEPF, in substance, reiterated its contention that jurisdiction over Counts I and III depends, in the general case, "upon whether those claims are sufficiently related to the fiduciary claim." *See* Tr. 49:20-50:3; *see also id.* at 50:3-8.

[72] NACEPF has not offered case law standing squarely for the proposition that only a well-pleaded fiduciary duty claim will be sufficient to sustain personal jurisdiction with respect to other "sufficiently related" causes of action.

[73] The notion that a plaintiff might be permitted to continue to pursue litigation in which personal jurisdiction is premised upon the consent-to-service statute for claims that are merely "sufficiently related" to a fiduciary duty claim which has been dismissed under Court of Chancery Rule 12(b)(6) would seem, at least upon initial examination, to violate the understanding implicit in our jurisprudence's narrow interpretation of Section 3114. *Cf. Norman v. Paco Pharm. Servs., Inc.*, 1989 WL 110648 (Del. Ch. Sept. 22, 1989) (appearing to dismiss claims against particular directors for lack of personal jurisdiction under Section 3114 after dismissing the fiduciary duty claim against all defendants for lack of standing); *Van de Walle v. L.F. Rothschild Holdings, Inc.*, 1994 WL 469150, at *3 (Del. Ch. Aug. 2, 1994) (dismissing suit against defendant directors because they "ha[d] been sued based solely upon their status as directors of a Delaware corporation" when no cause of action for breach of fiduciary duty was alleged); *compare Hana Ranch, Inc.*, 424 A.2d at 31 ("[A] valid cause of action against a non-resident defendant for acts within the scope of a directorship [is] a sine qua non to the successful assertion of a claim against such a non-resident in his capacity as a stockholder."). On the other hand, that the averments fail to state a claim upon which relief can be granted does not determine whether the Court has personal jurisdiction with respect to any claim, as an initial matter. *Cf. Carlton Invs. v. TLC Beatrice Int'l Holdings, Inc.*, 1995 WL 694397, at *13 (Del. Ch. Nov. 21, 1995) ("The ability of a shareholder to invoke Section 3114 cannot turn upon whether the facts allege[d] constitute a valid claim. If they do not, the director may have the case dismissed on its merits under Rule 12(b)(6), not under 12(b)(2) or (4)."); *see also id.* (quoting *Bell v. Hood*, 327 U.S. 678, 682 (1946)). It is important, however, to recognize that the immediately preceding proposition perhaps more properly relates to the fiduciary duty claim, in the context of Section 3114, and is at least arguably distinct from the multiple complications raised by non-fiduciary duty claims for which plaintiffs seek to obtain statutory personal jurisdiction over non-resident directors solely because those claims are "sufficiently related" to the putative breach of fiduciary duty. *See, e.g., Manchester v. Narragansett Capital, Inc.*, 1989 WL 125190, at *7 (Del. Ch. Oct. 19, 1989) ("The issue is whether plaintiff's contract claims are sufficiently related to the claims alleging breach of fiduciary duty by the nonresident director defendants so as to require

them to appear and defend the contract claims in Delaware."); *see also id.* (finding contract claims "sufficiently related" to plaintiff's "breach of fiduciary duty and corporate waste claims" such that defendants "should expect to answer in a Delaware court for the contract actions related to plaintiff's breach of fiduciary duty claims"); *cf. Armstrong*, 423 A.2d at 176 n.5 (explaining that [Section] 3114 authorizes service "where the cause of action is grounded on such individuals' breach of the fiduciary duties owed to the corporation and its owners"); *id.* ("Thus, [Section] 3114 authorizes jurisdiction only in actions which are inextricably bound up in Delaware law and where Delaware has a strong interest in providing a forum for redress of injuries inflicted upon or by a Delaware domiciliary, i.e., the Delaware corporation."). Additionally, it should perhaps be noted that the legislative synopsis accompanying § 3114 might arguably inform, and lend support to, the restrictive view of personal jurisdiction over "related" claims assumed by NACEPF in this context. *See* 61 Del. Laws, c. 119 (July 7, 1977) (explaining, in pertinent part: "Delaware has a substantial interest in defining, regulating and enforcing the fiduciary obligations which directors of Delaware corporations owe to such corporations and the shareholders who elected them. In promoting that interest, it is essential that Delaware afford a convenient and available forum for supervising the affairs of Delaware corporations and the conduct of directors of Delaware corporations. This legislation is designed to accomplish that objective.").

Moreover, consideration of these issues "might lead to an interesting procedural conundrum." WOLFE & PITTENGER, note 65, *supra*, § 3-5[a], at 3-63. One might argue that once personal jurisdiction is obtained, it is at least unusual to say that it could be lost. Such difficulties arguably arise, however, because personal jurisdiction under Section 3114, unlike 10 *Del.C.* § 3104, has been interpreted, for special reasons, *see* WOLFE & PITTENGER, note 65, *supra*, § 3-5[a], to require not only a demonstration of facts in existence regardless of the cause of action pursued, but also the existence of a relationship that is itself the premise of a cause of action. *Compare* 4A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE: *Civil* § 1069.7 (in discussing the doctrine of "pendent personal jurisdiction," stating: "Of course, if the only jurisdictionally sufficient claim is dropped or dismissed, particularly if that occurs early in the litigation, the pendent claim should be dismissed as well." (citing *Olin Corp. v. Fisons PLC*, 47 F. Supp. 2d 151, 155 (D. Mass. 1991))).

Notwithstanding this, it should also be noted that "Delaware courts have tended to construe the scope of a director's fiduciary duties broadly in assessing whether jurisdiction is properly premised under Section 3114." *Id.* at § 3-5[a], at 3-59 (citing *Hoover Indus., Inc. v. Chase*, 1988 WL 73758 (Del. Ch. July 13, 1988)); *see also id.* at § 3-5[a], at 3-60 (stating that "Delaware courts . . . have similarly construed broadly the classes of persons to whom fiduciary duties are owed by the directors of a Delaware corporation" in applying Section 3114 (citing, *inter alia*, *Geyer*, 621 A.2d at 787-90)). Thus, the potential difficulty here is not so much whether the Defendants are properly before the Court on NACEPF's claim for breach of fiduciary duty, but, instead, the consequences to NACEPF's putatively "sufficiently related" claims of a finding that NACEPF has failed to state a claim for breach of fiduciary duty upon which relief can be granted. Given the lack of briefing by the parties on the implications of this question and, more importantly, that NACEPF has expressly adopted the more restrictive view, as described in the text above, this question need not be resolved for purposes of the present litigation.

otherwise, however; and, therefore, at least for purposes of this litigation, the Court employs the rule for which NACEPF has argued.

Thus, should the Court find that Count II must be dismissed under Court of Chancery Rule 12(b)(6), then the Court will conclude that it is without personal jurisdiction over the Defendants for purposes of moving forward with the merits of Counts I and III. Therefore, in order to resolve the lingering questions of personal jurisdiction, the Court must first examine whether Count II properly states a claim upon which relief can be granted.

B. *Motion to Dismiss under Court of Chancery Rule 12(b)(6)*

The standards governing motions to dismiss under Court of Chancery Rule 12(b)(6) are well-settled:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate unless the "plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof."[74]

A number of considerations flow from these general criteria:

> Although the Court must "accept as true all of the well-pleaded allegations of fact and draw reasonable inferences in the plaintiff's favor," it is "not . . . required to accept as true conclusory allegations 'without specific supporting factual allegations.'" Instead, the Court must "accept only those 'reasonable inferences that logically flow

---

[74] *In re General Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006) (quoting *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002)).

> from the face of the complaint' and 'is not required to accept every strained interpretation of the allegations proposed by the plaintiff.'"[75]

These principles guide the Court's analysis, below, with respect to the Defendants' motion to dismiss under Court of Chancery Rule 12(b)(6).

In this action, the Court is confronted with the question of whether a corporation's creditors may assert direct claims against directors for breach of fiduciary duties when the corporation is insolvent or in the zone of insolvency. The Court need only answer this question on two narrow lines of approach. First, the Court examines whether a *direct* claim may be asserted by creditors for breach of fiduciary duty if the corporation is in the zone of insolvency. Second, assuming *arguendo* that a direct claim may be asserted against directors by creditors of an insolvent corporation in this context, the Court turns to the narrow question of whether NACEPF has satisfied its burden of alleging the requisite unusual facts necessary to maintain such a claim.

NACEPF has waived any basis it may have had for pursuit of its claim derivatively; instead, it has made it clear that it seeks to assert only a direct claim for breach of fiduciary duties.[76] It contends that direct claims by creditors have

---

[75] *Khanna*, 2006 WL 1388744, at *29 (quoting *Hughes*, 897 A.2d at 168).

[76] *See* Pl. N. American Catholic Educ. Programming Found., Inc.'s Ans. Br. in Resp. to the Defs.' Mot. to Dismiss Pl.'s Compl. ("Ans. Br.") at 19 ("Here, NACEPF is asserting just such a direct claim on its own behalf."); *see also id.* at 19 n.16 ("While the Defendants do not mention it, the NACEPF claim also constitutes a 'direct' claim under *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031 (Del. 2004), and its progeny.").

been recognized, in the context of both insolvency and the zone of insolvency by prior decisions of this Court.[77] Furthermore, NACEPF argues that the challenged conduct, here, is "similar to the hypothetical conduct used . . . to illustrate when directors have violated their duty to creditors" in the now-famous footnote fifty-five of *Credit Lyonnais Bank Nederland, N.V. v. Pathe Communications Corp.*[78] Similarly, NACEPF contends that the Defendants' conduct constitutes the "sort of self-dealing that is actionable under the decisions cited in *Production Resources*."[79]

NACEPF argues that the Defendants "breached their fiduciary duties by engaging in self-dealing to further the plans of their employer, Goldman Sachs. This self-dealing occurred in the pursuit of a business that 'had no reasonable likelihood of succeeding,' but rather depleted Clearwire's assets to NACEPF's

---

Although derivative claims and direct claims may arise out of the same conduct, *cf. Gentile v. Rossette*, 2006 WL 2388934, at *6 n.19 (Del. Aug. 17, 2006); *Grimes v. Donald*, 673 A.2d 1207, 1212 (Del. 1996) ("Courts have long recognized that the same set of facts can give rise both to a direct claim and a derivative claim."), a claim that is fairly characterized as derivative is just that: one that must, if at all, be brought on behalf of the corporation. The waiver of any derivative claim deprives NACEPF of the broad opportunity to recover for the Clearwire entity—perhaps the principal victim of the Defendants' alleged faithless conduct in favoring Goldman Sachs over Clearwire—and leaves it with a narrower claim which it may or may not be able to assert on its own behalf.

Also, because NACEPF disavows assertion of any derivative claim, the procedural questions linked to the requirements of Court of Chancery Rule 23.1 need not be contemplated. *See, e.g.*, *Production Resources Group, L.L.C. v. NCT Group, Inc.*, 863 A.2d 772, 795-96 (Del. Ch. 2004).

[77] *See* Ans. Br. at 17-19 (quoting *Production Resources*, 863 A.2d at 790-91, 796-98 (assuming, without deciding, that a direct claim may be asserted by creditors of an insolvent corporation)); *see also* Ans. Br. at 21 n. 31 (identifying *Penn. Co. for Ins. on Lives & Granting Annuities v. S. Broad St. Theatre Co.*, 174 A. 112 (Del. Ch. 1934); *Geyer*, 621 A.2d 784).

[78] Ans. Br. at 21 (citing *Credit Lyonnais Bank Nederland, N.V. v. Pathe Commc'ns Corp.*, 1991 WL 277613, at *34 n.55 (Del. Ch. Dec. 30, 1991) (discussing conduct of directors in the zone of insolvency)).

[79] Ans. Br. at 21 (identifying *Penn. Co. for Ins. on Lives & Granting Annuities*, 174 A. 112; *Geyer*, 621 A.2d 784).

detriment."[80] NACEPF contends that Goldman Sachs controlled the Clearwire board through its financing and that the Defendants negotiated the Master Agreement while under the control of Goldman Sachs. "[The Defendants] provided assurances that Goldman Sachs would infuse adequate capital and management assistance to develop the spectrum assets into a national system of wireless connections to the internet benefiting NACEPF."[81] NACEPF argues that it justifiably relied on the Defendants' "commitments on behalf of Goldman Sachs" in entering into the Master Agreement.[82] Counsel for NACEPF, at oral argument, cogently summarized the basis for his client's claim:

> The idea that was sold to us, as an owner of some of this educational spectrum, was that when the licenses that had previously been given to the Sprints and WorldComs of this world expired, then Clearwire would come in, acquire those licenses, pay us the additional consideration that the [M]aster [A]greement required, and develop a system of wireless internet services that—Clearwire already had some technology, would permit them to do this. And then we would be better off and running with a much better deal than we had with Sprint and WorldCom at that point in time.
>
> The key thing is that Clearwire, through the financial strength of Goldman Sachs, would actually develop this network. . . . We say that on days after the [M]aster [A]greement was signed in March of 2001, rather than pursue the development of this wireless network, the defendants had a secret plan, which is that instead of paying us for

---

[80] Ans. Br. at 19 (quoting Compl. ¶ 46). These allegations might have provided NACEPF with a solid foundation for a derivative action, but it did not pursue that strategy.

[81] Ans. Br. at 20.

[82] *Id.* It should be noted that, although not considered for purposes of resolving the Defendants' Motion to Dismiss, given the somewhat ambiguous allegations of timing contained in the Complaint, the issue of whether these statements were made before the Defendants became directors of Clearwire has been the subject of vigorous debate.

these licenses when they became off-licensed from Sprint and WorldCom, they instead went to Sprint and WorldCom . . . and said to them, "Look, we won't buy your license. We won't outbid you under our deal with the Alliance. Instead, we will stand by. You just pay us off to do that. Then, because we won't be competing with you to get the Alliance's licenses under our [M]aster [A]greement, you can do whatever you want, leaving us without the payments that we were supposed to get, but leaving Clearwire enriched by the deals they were going to make with the Sprints and the WorldComs of this world."

We didn't say that stayed the same thereafter, forever, as part of their scheme. We say that failed. Thereafter, when they became increasingly insolvent, they simply held on to the rights that they had under the [M]aster [A]greement, with knowledge that they could not fulfill those rights and knowledge that we could have renewed our licenses with Sprint and WorldCom if they had gotten out of the way, and thereby made some real money with Sprint and WorldCom.

That continued not in March of 2001, but after March of 2001, into 2002, when Clearwire was clearly insolvent, or certainly in the vicinity of insolvency. And at that point in time, rather than acknowledge to us that they were not going to be able to fulfill their contractual obligations, they, instead, insisted on asserting those rights and precluded us from going out in the market when they were not able to do so. With some details, that is the outline of the theory here behind what was going on.[83]

---

[83] Tr. 33:14-35:20. NACEPF's briefing also elaborates on its theory of the case:

> Contrary to the Defendants' commitments to develop Clearwire into a national wireless internet provider, [the Defendants] began secretly meeting with leading wireless providers to extract concessions based on Clearwire's claims to be able to interfere with their spectrum licenses. The Defendants continued to assert, after they took positions on Clearwire's Board and after it was clear that Clearwire was insolvent, that Clearwire had the right to acquire the spectrum licenses from NACEPF. These claims prevented NACEPF from offering the same licenses to other parties and were not undertaken to further Clearwire's legitimate business plan, but to hold NACEPF's spectrum hostage until the other wireless providers gave in to Defendants' scheme.

The Complaint alleges that the directors did not take steps to "preserv[e] the assets of Clearwire for its benefit . . . when it became apparent that Clearwire

NACEPF argues that, "[t]aken together, these acts instrumented by the Defendants during the Clearwire insolvency, violated the good faith required by their fiduciary duties to NACEPF."[84]

The Defendants counter that NACEPF improperly seeks to assert "a direct creditor claim more akin to one for breach of contract by Clearwire than for breach of directorial duty by individual directors . . . ."[85] The Defendants contend that they owed no fiduciary duty to Clearwire's creditors and, therefore, no claim for breach of fiduciary duty may be asserted against them directly.[86] Instead, the Defendants argue that Delaware jurisprudence recognizes only that a corporation's creditors are, in the context of insolvency or the "vicinity of insolvency," permitted standing to assert fiduciary duty claims derivatively on behalf of the corporation.

---

> would not be able to continue as a going concern and would need to be liquidated." The Defendants' act of keeping the spectrum 'in play' for Goldman Sachs's benefit without any prospect of Clearwire actually using those licenses, deprived NACEPF of the ability to sell the spectrum. That self-dealing includes the [Defendants'] knowledge that Clearwire was in danger of liquidation and that Goldman Sachs would not carry through the grand plans it trumpeted. . . . Such acts were pernicious to NACEPF's economic rights.

Ans. Br. at 20-21. NACEPF also mentions that the "Defendants' further act of investing the spectrum licenses in a Florida business that had no reasonable likelihood of success jeopardized NACEPF's prospects of recovery on its debts owed by Clearwire." *Id.* at 21 (citing Compl. ¶¶ 46, 47). This matter is discussed in greater detail, below. *See infra* note 127 and accompanying text.

[84] Ans. Br. at 21.

[85] Defs.' Reply Br. in Supp. of Their Mot. to Dismiss Pl.'s Compl. ("Reply Br.") at 2.

[86] *Id.* at 3-5.

Specifically, the Defendants maintain that the Court's opinion in *Production Resources*—on which NACEPF has placed particular reliance—acknowledged merely the *possibility* that a direct claim could be asserted by creditors of an insolvent corporation, but that the Court by no means definitively resolved this question.[87] The Defendants argue that, notwithstanding the Court's prior reluctance to preclude the possibility of a direct claim by creditors in this context, NACEPF's direct claim for breach should not now be permitted to continue.

Below, the Court examines whether either insolvency or zone of insolvency has been adequately pleaded for these purposes; the Court then briefly describes the background for determining the critical question, in the general case, of what constitutes a direct or derivative claim. Next, the Court turns to the narrow question of whether a direct claim asserted by creditors of a corporation in the zone of insolvency is cognizable under Delaware law. Finally, the Court examines whether, assuming *arguendo* that a direct claim might be asserted in the context of insolvency, NACEPF has satisfied the demanding pleading burden required to set forth such a claim.

1. <u>Allegations of insolvency or zone of insolvency</u>

In support of its claim that Clearwire was either insolvent or in the zone of insolvency during the relevant periods, NACEPF alleges that Clearwire needed

[87] *See* Defs.' Br. in Supp. of Their Mot. to Dismiss Pl.'s Compl. ("Opening Br.") at 16, 24.

"substantially more financial support than it had obtained in March 2001."[88] As described above, Goldman Sachs had invested $47 million in Clearwire, which "represent[ed] 84% of the total sums invested in Clearwire in March 2001, when Clearwire was otherwise virtually out of funds."[89]

> *After March 2001*, Clearwire had financial obligations related to its agreement with NACEPF and others that *potentially* exceeded $134 million, did not have the ability to raise sufficient cash from operations to pay its debts as they became due and was dependent on Goldman Sachs to make additional investments to fund Clearwire's operations for the foreseeable future.[90]

The Complaint also alleges:

> For example, upon the closing of the Master Agreement, Clearwire had approximately $29.2 million in cash and of that $24.3 million would be needed for future payments for spectrum to the Alliance members. Clearwire's "burn" rate was $2.1 million per month and it had then no significant revenues. The process of acquiring spectrum upon expiration of existing licenses was both time consuming and expensive, particularly if existing licenseholders contested the validity of any Clearwire offer that those license holders were required to match under their rights of first refusal.[91]

Elsewhere in the Complaint, NACEPF alleges that, "[b]y October 2003, Clearwire had been unable to obtain any further financing and effectively went out of

[88] Compl. ¶ 30.
[89] *Id.* at ¶ 7(a). Simple arithmetic provides that the total amount invested in Clearwire in March 2001 was, therefore, approximately $56 million.
[90] *Id.* at ¶ 7(b) (emphasis added). NACEPF also asserts that "Clearwire was unable to borrow money or obtain any other significant financing after March 2001, except from Goldman Sachs." *Id.* at ¶ 7(c).
[91] *Id.* at ¶ 30.

business. Except for money advanced to it as a stopgap measure by Goldman Sachs in late 2001, Clearwire was never able to raise any significant money."[92]

Insolvency may be demonstrated by either showing (1) "a deficiency of assets below liabilities with no reasonable prospect that the business can be successfully continued in the face thereof,"[93] or (2) "an inability to meet maturing obligations as they fall due in the ordinary course of business."[94] Applying the standards applicable to review under Court of Chancery Rule 12(b)(6), the Court accepts that NACEPF has satisfactorily pleaded facts permitting a reasonable inference that Clearwire operated in the zone of insolvency[95] during at least a substantial portion of the relevant periods for purposes of this motion to dismiss.[96]

---

[92] *Id.* at ¶ 36.

[93] *Production Resources*, 863 A.2d at 782 (quoting *Siple v. S & K Plumbing & Heating, Inc.*, 1982 WL 8789, at *2 (Del. Ch. Apr. 13, 1982)); *see also Geyer*, 621 A.2d at 789 (explaining that corporation is insolvent if "it has liabilities in excess of a reasonable market value of assets held"); *McDonald v. Williams*, 174 U.S. 397, 403 (1899) (defining insolvent corporation as an entity with assets valued at less than its debts).

[94] *Production Resources*, 863 A.2d at 782 (quoting *Siple*, 1982 WL 8789, at *2).

[95] In light of the Court's ultimate ruling, here, the Court does not attempt to set forth a precise definition of what constitutes the "zone of insolvency." It is sufficient, for purposes of this litigation, merely to state that NACEPF has pleaded facts permitting a reasonable inference that, during at least some portions of the relevant period, Clearwire operated at the brink of insolvency. *Cf. Credit Lyonnais*, 1991 WL 277613, at *34; *see also Production Resources*, 863 A.2d at 789 n.56 (describing the difficulties presented in identifying "zone of insolvency").

[96] Although not considered for purposes of the insolvency inquiry under Court of Chancery Rule 12(b)(6), affidavits submitted by the Defendants for purposes of the Court's potentially broader examination of personal jurisdiction under Court of Chancery Rule 12(b)(2) indicate that Clearwire may not have become insolvent or, if it did, then only for limited periods.

Similarly, insolvency has been adequately pleaded, for these purposes, for at least a portion of the relevant periods following execution of the Master Agreement.[97]

2. Whether direct claims for breach of fiduciary duties may be asserted by creditors of corporations in the zone of insolvency

Analysis of NACEPF's putative direct claim first requires an understanding of the distinction between direct and derivative claims—a distinction drawn with the assistance of the test set forth in *Tooley v. Donaldson, Lufkin, & Jenrette, Inc.*[98] In *Tooley*, the Delaware Supreme Court held that the relevant inquiry in determining whether a claim is direct or derivative "must be based solely on the following questions: Who suffered the alleged harm—the corporation or the suing stockholder individually—and who would receive the benefit of the recovery or other remedy?"[99] In other words, "[a] direct claim . . . is a claim on which the stockholder can prevail without showing an injury or breach of duty to the

[97] NACEPF's allegation that "*[a]fter March 2001*, Clearwire had financial obligations related to its agreement with NACEPF and others that *potentially* exceeded $134 million," Compl. ¶ 7(b) (emphasis added), does not permit the reasonable inference that Clearwire was insolvent *at the time of contract*, especially given the context of the contract entered into and the substantial influx of capital provided to Clearwire in March 2001. *See also id.* at ¶¶ 30, 36 (indicating that Clearwire was insolvent, if ever, after the contract was executed). The conclusory allegations contained in Paragraph 7(b) do not aid in drawing this inference, either.

[98] 845 A.2d 1031 (Del. 2004). The fact of insolvency or entry into the zone of insolvency does not impinge upon the applicability of the test setting forth the derivative/direct distinction recognized by our jurisprudence. *See, e.g.*, *Big Lots Stores, Inc. v. Bain Capital Fund VII, LLC*, 2006 WL 846121, at *6 (Del. Ch. Mar. 28, 2006); *Production Resources*, 863 A.2d at 792; *see also Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 2006 WL 2333201, at *22 n.75 (Del. Ch. Aug. 10, 2006) (explaining that, in the Court's "short answer" view, the "substantive effect the question of insolvency should have . . . on the application of the derivative/direct claim distinction" is "none").

[99] 845 A.2d at 1035.

corporation, and one in which no relief flows to the corporation."[100] Thus, in order to assert a direct claim for relief, a plaintiff must satisfy the requirements of *Tooley*; but, more fundamentally, a plaintiff, in order to succeed in that effort, must also demonstrate that its claim is one that is cognizable under our jurisprudence.[101] This latter point, then, frames the question raised by the present litigation.

"Typically, creditors may not allege fiduciary duty claims against corporate directors."[102] When a corporation has become insolvent, however, directors have been "said to owe fiduciary duties to the company's creditors."[103] The extent to which such statements may, in the context of *insolvency*, confer rights to assert

---

[100] *Big Lots Stores, Inc.*, 2006 WL 846121, at *6. Although the Plaintiff in this action claims status as a creditor, the direct/derivative distinction would not vary because the claim was asserted by a creditor instead of a stockholder.

[101] *Cf. Tooley*, 845 A.2d at 1039 ("In this case it cannot be concluded that the complaint alleges a derivative claim. . . . But, it does not necessarily follow that the complaint states a direct, individual claim. While the complaint purports to set forth a direct claim, in reality, it states no claim at all. The trial court analyzed the complaint and correctly concluded that it does not claim that the plaintiffs have any rights that have been injured.").

[102] *Production Resources*, 863 A.2d at 787; *see also Geyer*, 621 A.2d at 787 ("[T]he general rule is that directors do not owe creditors duties beyond the relevant contractual terms.").

[103] *See Production Resources*, 863 A.2d at 790-91 (citing *Geyer*, 621 A.2d at 787 ("[W]hen the insolvency exception [arises], it creates fiduciary duties for directors for the benefit of creditors.")). As the Court observed in *Production Resources*:

> When a firm is *insolvent*, the directors are said to owe fiduciary duties to the creditors, much like the directors of solvent firms owe such duties to the stockholders. The important unanswered question is precisely what the contents of those duties are. As Justice Frankfurter famously stated: "But to say that a man is a fiduciary only begins analysis; it gives direction to further inquiry. To whom is he a fiduciary? What obligations does he owe as fiduciary? In what respects has he failed to discharge these obligations? And what are the consequences of his deviation from duty?"

863 A.2d at 797 (quoting *Sec. & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 85-86 (1943) (emphasis added)).

claims for breach of fiduciary duties, as traditionally understood, perhaps remains the subject of legitimate debate.[104]

Some have interpreted prior opinions of the Court[105] to authorize fiduciary duty claims by creditors in what is referred to as the "zone of insolvency," as well.[106] Indeed, in this instance, NACEPF contends that the Defendants, as directors of Clearwire, a corporation alleged to have been either insolvent or operating in the zone of insolvency, breached fiduciary duties allowing NACEPF, as its creditor, to seek to hold the Defendants individually liable for direct

---

[104] Regarding the effect of insolvency, if any, it is perhaps unclear whether, for example, such statements, in practice, only describe persons who may enforce duties or point to whom duties are owed. *See infra* note 108; Part III(B)(3).

[105] For example, the Court's analysis in *Credit Lyonnais*, *see* 1991 WL 277613, at *34 n.55, has been interpreted by some commentators (and jurisdictions) as suggesting the existence of a cognizable claim for relief which may be asserted by creditors, *see Production Resources*, 863 A.2d at 789 ("Creative language in a famous footnote in *Credit Lyonnais* was read more expansively by some . . . to expose directors to a new set of fiduciary duty claims, this time by creditors. . . . [S]ome read *Credit Lyonnais* as authorizing creditors to challenge directors' business judgments as breaches of fiduciary duty owed to them." (citations omitted)); however, the Court's language is, perhaps, better viewed merely as a shield for directors from stockholder claims, in this context. *See id.*; *see also Credit Lyonnais*, 1991 WL 277613, at *34 (explaining, in the text of the opinion, that the directors of a corporation operating in the vicinity of insolvency owe a duty to the corporate enterprise "to exercise judgment in an informed, good faith effort to maximize the corporation's long-term wealth creating capacity"); *Angelo, Gordon & Co., L.P. v. Allied Riser Commc'ns Corp.*, 805 A.2d 221, 229 (Del. Ch. 2002); *cf. Production Resources*, 863 A.2d at 791 (explaining that, when a firm has become insolvent, "[t]he directors continue to have the task of attempting to maximize the economic value of the firm").

A recent decision of this Court suggested that cases following *Credit Lyonnais*, which have been the subject of considerable academic debate, are "more a judicial method of attempting to reinforce the idea that the business judgment rule protects the directors of *solvent, barely solvent, and insolvent* corporations, and that the creditors of an insolvent firm have no greater rights to challenge a disinterested, good faith business decision than the stockholders of a solvent firm." *Trenwick Am. Litig. Trust*, 2006 WL 2333201, at *22 n.75 (emphasis added).

[106] *See supra* note 95.

claims.[107] In the following passages of this Subpart, the Court discusses the two principal grounds, appearing in case law and potentially implicated here, for imposing liability. First, the Court addresses the "incentive-to-enforce rationale," described in greater detail below. This paradigm has been employed to support standing for creditors in their pursuit of derivative claims on the behalf of insolvent corporations. The principles underlying this doctrine are arguably compatible with its application in the zone of insolvency, as well; and, as a consequence, the doctrine may also, by analogy, lend support for the pursuit of derivative claims by creditors of corporations in the zone of insolvency. The incentive-to-enforce rationale, however, says little or nothing about whether direct claims should lie. Therefore, the Court next turns to so-called "trust fund theory," which is the only principled basis, appearing in case law, *potentially* supporting direct fiduciary duty claims by creditors (which is the subject of Part III(B)(3), below). Unlike the "incentive-to-enforce rationale," however, the principles of "trust fund theory," as described by our case law, do not support its extension, by analogy, to the zone of insolvency. Therefore, although "trust fund theory" *might* lend support to the notion that a limited direct claim could lie for creditors of an insolvent corporation,

---

[107] In this Subpart, the Court addresses *only* the narrow issue of whether direct claims may be asserted by creditors against directors of corporations operating in the zone of insolvency. To the extent that debate may remain over the existence of, scope of, or analysis applicable to derivative claims brought by creditors—whether arising in the context of insolvency or, presuming such claims may be asserted, in the zone of insolvency—the Court does not address these issues in this Memorandum Opinion.

so-called "trust fund theory" fails to provide an adequate, principled basis for the recognition of direct claims in the zone of insolvency.

The notion that creditors of an *insolvent* corporation are permitted standing to maintain derivative claims for breach of existing fiduciary duties on behalf of the corporation is relatively uncontroversial.[108] Indeed, the idea that an insolvent corporation's creditors (having been effectively placed "in the shoes normally occupied by the shareholders—that of residual risk-bearers"[109]) should be granted standing because they are the principal remaining constituency with a material incentive to pursue derivative claims on behalf of the corporation has significant intuitive and persuasive merit.[110] This exception for creditors in these limited circumstances arguably maintains the delicate balance achieved by the standing requirements for pursuit of derivative actions outside of this context—*i.e.*, balancing the "Delaware prerogative that directors manage the affairs of a

---

[108] That creditors of an insolvent corporation may assert derivative claims is generally accepted as a practical matter, even if the theoretical underpinnings for such a view may be fairly debated. *See Production Resources*, 863 A.2d at 776-77; *see also id.* at 792 (in explaining why creditors may be granted standing to pursue derivative claims in this context, reasoning that "[t]he firm's insolvency simply makes the creditors the principal constituency injured by any fiduciary breaches that *diminish the firm's value* and logically gives them standing to pursue these claims to rectify that injury" (emphasis added)); *id.* at 794 n.67. *Compare infra* notes 134.

This Court has recently suggested that the principal effect of insolvency is perhaps merely that "the creditors become the enforcement agents of fiduciary duties . . . ." *Trenwick Am. Litig. Trust*, 2006 WL 2333201, at *22 n.75 ("In other words, the fiduciary duty tool is transferred to the creditors when the firm is insolvent in aid of the creditor's contract rights."); *cf. id.* at *4.

[109] *Production Resources*, 863 A.2d at 791.

[110] *See id.* at 792 ("The firm's insolvency . . . makes the creditors the principal constituency injured by any fiduciary breaches that diminish the firm's value and logically gives them standing to pursue these claims to rectify that injury.").

corporation with the realization that shareholder policing, via derivative actions, is a necessary check on the behavior of directors that serve in a fiduciary capacity to shareholders."[111] It arguably follows, then, that this "incentive-to-enforce rationale" would, to a degree, be comparably applicable to derivative claims asserted on behalf of corporations operating in the zone of insolvency, as well.[112] As emphasized above, however, this is not the question framed by the present litigation, and, therefore, the Court expresses no conclusions about such arguments' validity.[113]

---

[111] *Agostino v. Hicks*, 845 A.2d 1110, 1117 (Del. Ch. 2004); *see also Tooley*, 845 A.2d at 1036 ("The derivative suit has been generally described as 'one of the most interesting and ingenious of accountability mechanisms for large formal organizations.'" (quoting *Kramer v. W. Pac. Indus., Inc.*, 546 A.2d 348, 351 (Del. 1988) (quoting R. CLARK, CORPORATE LAW 639-40 (1986)))); *Guttman v. Huang*, 823 A.2d 492, 500 (Del. Ch. 2003) (noting the "deterrence effects of meritorious derivative suits on faithless conduct"); *cf. Khanna*, 2006 WL 1388744, at *11 n.50 (describing the policy considerations underlying derivative-action standing requirements).

[112] It may bear noting that, although the reasons for standing to assert derivative claims in the insolvency context would arguably apply to the zone of insolvency, as well (*i.e.*, the incentive-to-enforce rationale may remain, countering any attempt to draw a bright-line distinction), the Court merely presumes, in the text above, that standing would be available to creditors of corporations in the vicinity of insolvency to assert derivative claims on behalf of the corporation. Indeed, this issue is not without some debate. *See, e.g., Production Resources*, 863 A.2d at 789 n.54, 790 n.56 (describing potential arguments against such standing); Laura Lin, *Shift of Fiduciary Duty Upon Corporate Insolvency: Proper Scope of Directors' Duty to Creditors*, 46 VAND. L. REV. 1485, 1510 (1993). *Cf.* E. Norman Veasey & Christine T. Di Guglielmo, *What Happened in Delaware Corporate Law and Governance from 1992 – 2004? A Retrospective on Some Key Developments*, 153 U. PA. L. REV. 1399, 1432 (2005) (citing *Kohls v. Kenetech Corp.*, 794 A.2d 1160 (TABLE), 2002 WL 529908 (ORDER) (Del. 2002) (affirming Court of Chancery decision "without reaching the general question of whether or to what extent directors of a corporation said to be in the so-called 'vicinity of insolvency' owe fiduciary duties to preferred stockholders")). This question, however, need not be resolved within the narrow ambit of the present litigation—*i.e.*, the existence of direct claims for breach of fiduciary duties in this context.

[113] *See* note 107, *supra*.

With respect to the narrow question presented here, the "incentive-to-enforce rationale" provides negligible, if any, analogous support for recognition of direct fiduciary duty claims brought by creditors of corporations in zone of insolvency. Put simply, in contrast to stockholder and (by analogy in this limited context) creditor derivative actions, *direct* claims by creditors would not help the corporate collective because the benefit would accrue to the creditor bringing the direct claim.[114] Any marginal benefit of such enforcement effort potentially accruing to the corporate collective would likely be outweighed by the disruption of the established corporate governance mechanism. NACEPF has neither offered any persuasive policy rationale favoring recognition of such claims which might mitigate or rebut these concerns nor has it identified any case law supporting its theory that claims are directly assertible by creditors in this context.[115]

[114] The focus on the distinction between derivative and direct claims is not without its limitations. For example, it is dependent upon a relatively consistent boundary line between the two categories. Also, the incentive for a creditor to bring a derivative claim may not be as great as the incentive to bring a direct claim because the fruits of his efforts as a derivative plaintiff would benefit the corporate entity first and whether any of the benefit would pass down to the creditor may be problematic.

[115] The principal case implicating the zone of insolvency, *Credit Lyonnais*, which NACEPF cites as authority, *see* Ans. Br. at 21 (contending that the Defendants' conduct is "similar to the hypothetical conduct" described in footnote fifty-five of *Credit Lyonnais*), does not provide the definitive support NACEPF seeks. *See supra* note 105 and accompanying text. The decision which arguably comes closest to providing support for NACEPF's position—one on which NACEPF has not relied—is *Bren v. Capital Realty Group Senior Housing, Inc.*, 2004 WL 370214, at *7 (Del. Ch. Feb. 27, 2004) (denying motion to dismiss claim by noteholder for breach of fiduciary duty because "the existence of a duty to disclose is sufficiently plausible to survive").

NACEPF cites a number of decisions, some from other jurisdictions, in support of the proposition that "[i]t is settled Delaware law that when a firm enters insolvency or its vicinity,

The source of some uncertainty in this regard may be the result of efforts to accommodate the so-called "trust fund doctrine"[116] within the zone of insolvency context.[117] Although "trust fund doctrine" to some extent arguably undergirds the Court's tentative recognition of a narrow direct claim by creditors in the context of insolvency,[118] these principles do not compel recognition of comparable direct claims in the zone of insolvency.[119]

---

'the firm's directors are said to owe fiduciary duties to the company's creditors.'" Ans. Br. at 26 n.59 (quoting *Production Resources*, 863 A.2d at 790-91 (addressing "[w]hen a firm has reached the point of insolvency")). This bare proposition, however, does little to resolve the questions at issue here. *See supra* note 103 and accompanying text. As this Court has recently suggested, "insolvency does not suddenly turn directors into mere collection agents" on the behalf of creditors, *see Trenwick Am. Litig. Trust*, 2006 WL 2333201, at *22 n.75; taken as accurate, this observation would apply, *a fortiori*, in the zone of insolvency.

[116] *See Production Resources*, 863 A.2d at 792 ("A strand of authority (*by no means universally praised*) therefore describes an insolvent corporation as becoming akin to a trust for the benefit of the creditors. This line of thinking has been termed the 'trust fund doctrine.' Under a trust fund approach, the directors become trustees tasked with preserving capital for the benefit of creditors who are deemed to have an equity-like interest in the firm's assets." (emphasis added) (citations omitted)).

[117] As explained above, the two principal theories implicated here are the "incentive-to-enforce rationale" and the "trust fund theory."

[118] *See, e.g., Production Resources*, 863 A.2d at 798 n.77 (noting duties owed by trustees under trust law, which might, possibly bear on analysis "[t]o the extent that the directors are analogized as becoming trustees of a corporate pool of assets for creditors when the corporation is insolvent"). *Compare Price v. Wilmington Trust Co.*, 1996 WL 560177, at *2 (Del. Ch. Sep. 3, 1996) (opinion granting interlocutory appeal) ("For example, while trustees, directors, administrators, partners, guardians, etc are all called fiduciaries from time to time because all an important element of dependency, all of these special relationships are institutionally somewhat different in the types of circumstances in which each sort of legal relationship occurs. A trustee of an express trust *is different* from a corporate director for example, in the degree of trust, passivity or diligent self protection that the law should encourage, *see Kahn v. Seaboard Corp.*, 625 A.2d 269 (Del. Ch. 1993), and different with respect to the length of the period in which the dependence is designed to continue.").

[119] "Trust fund theory," to the extent that it might apply, is not implicated until insolvency, as indicated by, for example, the cases cited in *Geyer*. *See* 621 A.2d at 787 (citing *Bovay v. H. M. Byllesby & Co.*, 38 A.2d 808, 813 (Del. 1944) (holding that "when [insolvency] is established," conduct may "thereafter" be analyzed differently) (citing *McDonald*, 174 U.S. at 404 (in