# EXHIBIT A

3 of 3

The Court has traditionally been reluctant to expand existing fiduciary duties, including the range of persons by whom those duties may be enforced and, therefore, whom fiduciaries might feel compelled to consider.[120] As a consequence, the rationale advanced in support of imposition of unique or additional duties should be relatively compelling in order for such recognition to be extended. In this instance, however, the arguments opposing recognition of

---

applying so-called "trust fund doctrine," holding that "[a]lthough *no trust exists while the corporation is solvent*, the fact which creates the trust is the insolvency, and, when that fact is established, *at that instant* the trust arises" (emphasis added)))). *But cf. infra* note 148 (noting the narrow, *potential* issue of "acts committed in contemplation of insolvency").

*Credit Lyonnais* does not support the application of "trust fund theory" principles to conduct of directors in the zone of insolvency. Instead, the language employed in footnote fifty-five of *Credit Lyonnais* suggests that, in the zone of insolvency, directors may act to obtain what (in the narrow sense, *i.e.*, insofar as the interests of the corporate collective are concerned) could be described as a "socially optimal" outcome. 1991 WL 277613, at *34 n.55. This does not implicate "trust fund theory," however, which seeks to compel conduct, as presented in *McDonald*, directed toward the best interests of creditors as a particular constituency of residual risk-bearers.

For perspective, also compare *Asmussen v. Quaker City Corp.*, 156 A. 180, 181 (Del. Ch. 1931) ("The word 'trust' in [the] phrase ['trust fund doctrine'] has given rise to some confusion due to the fact that some courts have carried the logic of its connotations to a degree quite beyond the length to which its aptness as descriptive of the relations between the corporation and its creditors would warrant.").

[120] *See, e.g.*, *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 872 A.2d 611, 625 (Del. Ch. 2005) ("The Delaware courts have been reluctant to extend too broadly the applicability of fiduciary duties. . . . Furthermore, while some cases in Delaware have found certain aspects of a commercial relationship to implicate fiduciary duties, these cases should not be read so broadly as to engulf in fiduciary duties ordinary commercial relationships."), *aff'd in part and rev'd in part on other grounds*, 901 A.2d 106 (Del. 2006); *Bird's Constr. v. Milton Equestrian Ctr.*, 2001 WL 1528956, at *4 (Del. Ch. Nov. 16, 2001) ("Our courts have been cautious when evaluating entreaties to expand the number and kinds of relationships that are denominated as 'fiduciary.'"); *see also Heller v. Kiernan*, 2002 WL 385545, at *3 (Del. Ch. Feb. 27, 2002). *See also infra* note 156.

Among the reasons underlying the Court's reluctance is the recognition that any additional duty may subject fiduciaries to greater risk (or liability), which may, in turn, have an undue chilling effect on conduct—a result that may be especially troubling in the context of corporate directors who must make business decisions on the behalf of a financially troubled, but solvent, corporation.

direct claims by creditors in the zone of insolvency are both substantial and persuasive. In *Production Resources*, the Court remarked that recognition of fiduciary duties in the "zone of insolvency" context may involve:

> using the law of fiduciary duty to fill gaps that do not exist. Creditors are often protected by strong covenants, liens on assets, and other negotiated contractual protections. The implied covenant of good faith and fair dealing also protects creditors. So does the law of fraudulent conveyance. With these protections, when creditors are unable to prove that a corporation or its directors breached any of the specific legal duties owed to them, one would think that the conceptual room for concluding that the creditors were somehow, nevertheless, injured by inequitable conduct would be extremely small, *if extant*.[121]

Indeed, it would appear that creditors' existing protections—among which are the protections afforded by their negotiated agreements, their security instruments, the implied covenant of good faith and fair dealing, fraudulent conveyance law, and bankruptcy law—render the imposition of an additional, unique layer of protection through direct claims for breach of fiduciary duty unnecessary.[122] Moreover, any

[121] 863 A.2d at 790 (emphasis added). The Court also posited: "Having complied with all legal obligations owed to the firm's creditors, the board would, in that scenario, ordinarily be free to take economic risk for the benefit of the firm's equity owners, so long as the directors comply with their fiduciary duties to the firm by selecting and pursuing with fidelity and prudence a plausible strategy to maximize the firm's value." *Id.*; *see also id.* at 790 n.57. Of course, this Subpart addresses only direct claims in the vicinity of insolvency.

[122] *See, e.g., Big Lots Stores, Inc.*, 2006 WL 846121, at *8 (remarking, in the context of an insolvent corporation: "As numerous commentators have observed, creditors are usually better able to protect themselves than dispersed shareholders." (citing Stephen M. Bainbridge, *Much Ado About Little? Directors' Fiduciary Duties in the Vicinity of Insolvency*, J. BUS. & TECH. L. (forthcoming) http://ssrn.com/abstract=832504 at 30)); *cf. id.* at *8 n.50 (noting contrary commentary providing that "the greater protection generally due to debt-holders over shareholders is not an inherent characteristic of either instrument, because such distinctions may not apply to closely held corporations, or public corporations held substantially by institutional shareholders who can act collectively or through intermediaries" (citing Larry E. Ribstein &

benefit to be derived by the recognition of such additional direct claims appears minimal, at best, and significantly outweighed by the costs to economic efficiency. One might argue that an otherwise solvent corporation operating in the "zone of insolvency" is one in most need of effective and proactive leadership—as well as the ability to negotiate in good faith with its creditors—goals which would likely be significantly undermined by the prospect of individual liability arising from the pursuit of direct claims by creditors.[123] NACEPF has not persuasively argued otherwise.

These considerations compel the conclusion that no direct claim for breach of fiduciary duties may be asserted by creditors of a solvent corporation operating in the zone of insolvency. Therefore, the Court concludes that Count II of the Complaint fails as a matter of law to the extent that it attempts to state a direct claim for breach of fiduciary duty while Clearwire was in the zone of insolvency.

3. <u>NACEPF's failure to allege facts necessary to plead a direct claim during insolvency</u>

As described above, NACEPF has predicated its argument in favor of personal jurisdiction over the Defendants on the Court's first concluding that

---

Kelli Alces, *Directors' Duties in Failing Firms*, J. Bus. & Tech. L. (forthcoming) http://ssrn.com/abstract=880074 at 8)).

[123] Certainly this is true of corporations that were once solvent but have entered the zone of insolvency; however, the same may also be said of, for example, start-up firms that may often operate in the zone of insolvency until their business plan succeeds. The negative consequences to innovation potentially resulting from an expansion of possible individual liability through direct claims for breach of fiduciary duties, in that context, should give considerable pause to any court contemplating an expansion of direct claims.

NACEPF has sufficiently alleged a direct claim for breach of fiduciary duty by the Defendants in their capacity as directors of Clearwire.[124] Therefore, the Court must now turn to the question of whether NACEPF has adequately alleged a direct claim for breach of a fiduciary duty occurring during insolvency, to the extent that NACEPF has alleged insolvency, as well.

In its Complaint, NACEPF states that, because Clearwire was either insolvent or in the zone of insolvency "from March 2001 until it went out of business," "[a]t all times after March 2001, the . . . Defendants owed a fiduciary duty to NACEPF, as a substantial creditor of Clearwire."[125] As recited above, NACEPF alleges that a breach of fiduciary duty by the Defendants occurred either by:

> (1) not preserving the assets of Clearwire for its benefit and that of its creditors when it became apparent that Clearwire would not be able to continue as a going concern and would need to be liquidated and (2) holding on to NACEPF's ITFS license rights when Clearwire would not use them, solely to keep Goldman Sachs's investment "in play."[126]

Additionally, NACEPF alleges that the Defendants:

> engaged in self-dealing by: (1) keeping Clearwire in business to preserve the ability of Goldman Sachs to carry its investment without

---

[124] *See supra* note 76 and accompanying text.

[125] Compl. ¶ 44. Of course, to the extent that Clearwire was merely in the zone of insolvency, no direct claim may be asserted. *See* Part III(B)(2). Additionally, as explained above, the allegations do not support the inference that Clearwire was insolvent at the time the Master Agreement was executed. *See supra* note 97. Thus, to the extent that a direct claim properly might be asserted during insolvency—an issue discussed in detail, below—the underlying breach of fiduciary duty would have had to have occurred during a period of insolvency.

[126] Compl. ¶ 45.

> admitting Clearwire was a failure and (2) investing Clearwire assets in a wireless business in Jacksonville, Florida that had no reasonable likelihood of succeeding but whose existence was utilized as a justification for the strategy of the . . . Defendants to not honor the Alliance members' rights.[127]

In formulating its argument, NACEPF has placed heavy reliance on this Court's analysis in *Production Resources.*[128] In that case, the Court denied, in part, the defendants' motion to dismiss the plaintiff-creditor's fiduciary duty claims on

---

[127] *Id.* at ¶ 46. The only additional information provided in the Complaint regarding the Jacksonville investment is set forth in Paragraph 47, which states:

> The Jacksonville business: (1) never had sufficient assets to build out the suppositional technology with its complex network of towers and sectors that were required to adequately service potential wireless customers, (2) never had the technology necessary to provide mobile wireless access to the internet, and (3) involved extraordinary expenses not justified by a customer base.

Based on NACEPF's answering brief, it appears that the allegations concerning Clearwire's investment in the "Jacksonville business" are intended as support for NACEPF's first argument for breach of fiduciary duty (*i.e.*, failure to "preserve" the assets of Clearwire). *See* Ans. Br. at 19, 21; text accompanying note 126, *supra*. To the extent that this is intended as a stand-alone claim, it is a derivative claim under the test of *Tooley*. The alleged harm is one to the corporation (a diminution of the pool of available assets), and any recovery would flow to the corporation. *Cf. Trenwick Am. Litig. Trust*, 2006 WL 2333201, at *22 n.75 (in discussing related academic arguments, suggesting that, "if the directors of an insolvent firm commit a breach of fiduciary duty reducing the value of the firm, any claim belongs to the entity and . . . creditors would benefit from the recovery derivatively, based on their claim on the firm's assets"). Indeed, it would appear to be a classically derivative claim for waste. Because NACEPF has chosen not to pursue a derivative claim in this litigation, *see supra* note 76 and accompanying text, the Court does not address it further.

However, to the extent that these allegations are offered to demonstrate, in support of its claim that the Defendants breached a duty in "holding on to" NACEPF's license rights, *see* text accompanying note 126, *supra*, that the alleged "self-dealing occurred in the pursuit of a business that had 'no reasonable likelihood of succeeding,'" *see* Ans. Br. at 19, the allegations might implicate conduct material to analysis of a direct claim in this context. *Cf. Production Resources*, 863 A.2d at 800 (denying motion to dismiss where facts pleaded involved allegations that board was, *inter alia*, "engaging in preferential treatment of the company's primary creditor and de facto controlling stockholder (and perhaps of its top officers, who are also directors) without any legitimate basis for the favoritism"). The Court need not reach this question, however, given the analysis, below.

[128] 863 A.2d 772 (Del. Ch. 2004).

the "*conservative assumption* that there *might, possibly* exist circumstances in which directors display such a marked degree of animus towards a particular creditor with a proven entitlement to payment that they expose themselves to a direct fiduciary duty claim by that creditor."[129] The Court emphasized its reluctance to offer a definitive statement of law, especially given the limited briefing of the issues by the parties,[130] remarking instead that it would "resolve the [defendants'] motion without making any broad pronouncements that would have large policy implications."[131] In addition, the Court explained merely that it was "not prepared to rule out" the possibility that the plaintiff had alleged conduct that "might support" a limited direct claim.[132] Importantly, the Court noted that the

---

[129] *Id.* at 798 (emphasis added).

[130] The Court noted that it had addressed a number of issues without the benefit of input from counsel. *See id.* at 797-98 ("Another question the parties do not confront is what the direct/derivative claim distinction means when a firm is insolvent."); *see also id.* at 798-99 ("To at least my mind, there are a myriad of policy considerations that would arise by the indulgence or non-indulgence of a fiduciary duty claim of this type and I am reluctant to ponder their viability without better help from briefing by adversarial parties.").

[131] *Id.* at 798.

[132] *Id.* at 800. The Court reserved "the opportunity . . . to revisit some of these questions with better input from the parties." *Id.* at 801. The Court explained:

> In particular, it will be important to better understand the precise justification for equity's role in cases like this, an understanding that needs to be informed by the scope of the legal rights that PRG possesses as a creditor against NCT and its directors and officers. Evaluating a creditor's claim that directors have breached fiduciary duties owed to the firm involves no novel inquiry, as the court can draw deeply on the principles that apply in typical derivative cases. The extent of the fiduciary obligations directors and officers owe in their dealings with specific creditors of insolvent firms is a far less settled matter. In general, equity is reluctant to create remedies when adequate legal remedies already exist. It may well be, for example, that upon close examination, existing principles of tort or contract law are sufficient when applied with the understanding that directors bear a fiduciary relation to creditors when a firm is insolvent.

plaintiff's complaint sufficiently alleged a derivative claim, as well—rendering it unnecessary to resolve the question of the existence of direct claims in the insolvency context.[133]

In light of the Court's analysis in *Production Resources*, its decision to permit the plaintiff's direct claim to continue is perhaps best described as tentative. The Court, however, largely focused on the notion that—in most, if not all, instances—claims for breach of fiduciary duty in the insolvency context would be asserted derivatively by creditors.[134] In response to the plaintiff's contention that

---

*Id.* (citations omitted).

[133] In *Production Resources*, the Court held that the plaintiff's allegations with respect to the surviving fiduciary duty claim (*i.e.*, its claim regarding conscious, faithless conduct) set forth sufficient particularized facts to allege a derivative claim for breach of fiduciary duty. *See id.* at 800 (explaining that the plaintiff had set forth an "unusual set of particularized facts" and that it "*might* prevail on either a derivative *or* individual claim" (emphasis added)).

It should also be noted that, with respect to the Court's earlier decision in *Geyer*, although not addressed, *see* 621 A.2d at 790-91 (analyzing claim for breach of fiduciary duty under general standards of Court of Chancery Rule 12(b)(6)), the plaintiff's claim in that case would likely be characterized as derivative under the test prescribed in *Tooley*.

[134] The Court stated:

> The reason for this bears repeating—the fact of insolvency does not change the primary object of the director's duties, which is the firm itself. . . . Put simply, when a director of an insolvent corporation, through a breach of fiduciary duty, injures the firm itself, the claim against the director is still one belonging to the corporation.

*Production Resources*, 863 A.2d at 792; *see also id.* (explaining that "the transformation of a creditor into a residual owner does not change the nature of the harm in a typical claim for breach of fiduciary duty by corporate directors"). As a consequence, the Court in essence reasoned that recognition of standing for creditors, at least in order to assert derivative claims in the context of insolvency, "does not completely turn on its head the equitable obligations of the directors to the firm itself." *Id.* at 791. *See generally id.* at 792-93 (describing how most potential claims foreseeable by the Court would be derivative in nature). *Cf. Trenwick Am. Litig. Trust*, 2006 WL 2333201, at *22 n.75.

all its claims for breach transformed into direct claims upon insolvency, the Court emphasized:

> The fact that the corporation has become insolvent does not turn [derivative] claims into direct creditor claims, it simply provides creditors with standing to assert those claims. At all times, claims of this kind belong to the corporation itself because even if the improper acts occur when the firm is insolvent, they operate to injure the firm in the first instance by reducing its value, injuring creditors only indirectly by diminishing the value of the firm and therefore the assets from which the creditors may satisfy their claims.[135]

NACEPF argues that "[w]hat the Court *did not rule out*, however, is that those fiduciary duties may also include the obligation to not unreasonably hurt the creditors—a direct claim."[136]

NACEPF has left ambiguous—perhaps intentionally—the issue of whether it predicates its present argument on allegations of "animus" of the type described in *Production Resources*, or whether it alleges breach of some additional or unique duty owed by the Defendants that is remediable through a direct claim.[137] To the extent that NACEPF argues that it may assert a potential direct claim for breach of

---

135 *Production Resources*, 863 A.2d at 776; *see also Trenwick Am. Litig. Trust,* 2006 WL 2333201, at *22 n.75.

136 Ans. Br. at 18 (emphasis added).

137 Although our understanding of the duties of corporate fiduciaries does (and should) evolve, stability and predictability are, nonetheless, important objectives. *See, e.g., Harff v. Kerkorian*, 324 A.2d 215, 220 (Del. Ch. 1974), *aff'd in part and rev'd in part on other grounds*, 347 A.2d 133 (Del. 1975). To embrace NACEPF's approach would increase the uncertainty of directors (already challenged by the financial difficulties of the corporations they serve) as to: the scope of their duties; to whom they owe those duties; how to accommodate potentially competing interests; and how to discharge their duties without an unwarranted risk of becoming ensnarled in litigation regardless of the choices they may make.

fiduciary duty beyond the realm mapped in *Production Resources*, however, this Court's recent ruling in *Big Lots Stores, Inc. v. Bain Capital Fund VII, LLC*[138] precludes such a claim. In dismissing the plaintiff's direct claim for breach of fiduciary duty, the Court, in substance, held that the scope of *potentially* cognizable direct claims assertible by creditors in the insolvency context is restricted to instances in which invidious conduct toward a particular "creditor" with a clear "entitlement to payment" has been alleged.[139] As a consequence, assuming, *arguendo*, that a direct claim may be asserted, NACEPF's allegations need only be analyzed, in this instance, to determine whether this restricted type of claim has been adequately alleged.

In *Big Lots Stores, Inc.*, the Court emphasized the unusual nature of the direct claim described in *Production Resources*—"a decision which relied heavily on its unique facts."[140] The Court explained that the "unusual allegations of the plaintiff in *Production Resources* vividly illustrate" how a direct claim might be pleaded:

---

[138] 2006 WL 846121 (Del. Ch. Mar. 28, 2006).

[139] *See, e.g., id.* at *6 (granting that there "might nonetheless" exist a direct claim in "some circumstances" and reciting only the narrow language mentioning "animus" set forth in *Production Resources* (quoting 863 A.2d at 798)).

[140] 2006 WL 846121, at *7; *see also id.* at *7 n.47 ("As the court noted, it was the 'odd' circumstances of *Production Resources* in concert that were 'suggestive of . . . bad faith on the part of the NCT board members.'"). It perhaps bears repeating that the Court's decision in *Production Resources* describes circumstances in which "*such a marked degree* of animus" is alleged. 863 A.2d at 798 (emphasis added).

> As the court's opinion [in *Production Resources*] sets out, the plaintiff had obtained a judgment against the defendant for $2 million in 1999, and had attempted to compel payment since that time. The facts alleged in the complaint established that the defendant had been insolvent for several years and, yet, had gone to extreme lengths both to avoid paying its judgment creditor and to misuse corporate power for the purpose of improperly benefiting itself and others in control. In the face of such extraordinary machinations, the court was unwilling to dismiss the creditor's claims of specific injury as derivative because it seemed possible that the creditor in question was the only one that had been injured, and was thus the only one to which recovery was due.[141]

Among other things, the Court, in *Big Lots Stores, Inc.*, pointed out that the plaintiff-creditor in *Production Resources* was, in fact, a judgment creditor. The Court reasoned that "[t]he immediacy of the *Production Resources* defendant's debt was a necessary underpinning of the court's finding that the debtor's recalcitrance might have been motivated by targeted animus towards the plaintiff."[142] The Court distinguished the plaintiff's claim in *Big Lots Stores, Inc.* from the *Production Resources* defendant's debt on the ground that the credit agreement benefiting the plaintiff in *Big Lots Stores, Inc.* consisted of an unsecured note "due eight years after the 2002 transaction was set to close."[143] Moreover, the Court emphasized that, while, in *Production Resources*, "all the challenged transactions occurred in the context of an already insolvent company,"[144] in *Big*

---

[141] 2006 WL 846121, at *7.
[142] *Id.*
[143] *Id.*
[144] *Id.*

*Lots Stores, Inc.*, the complained-of breaches of fiduciary duty were alleged to have caused the insolvency, which the Court found to be "classically derivative."[145] The Court concluded that such claims "do not become direct simply because they are raised by a creditor, who alleges that the breaches of fiduciary duty caused it specific harm by preventing it from recovering a debt outside of bankruptcy."[146] Assuming, *arguendo*, that a direct claim may potentially be asserted in these circumstances, the Court follows this approach in analyzing NACEPF's claim.

The analysis employed by the Court in *Big Lots Stores, Inc.* effectively limits direct claims, assuming *arguendo* that they are cognizable, by creditors of insolvent firms for breach of fiduciary duty to allegations of fact substantially similar to those pleaded by the plaintiff in *Production Resources*. Indeed, *Big Lots Stores, Inc.* suggests a two-step approach for determining whether a creditor has properly asserted a direct claim for breach of fiduciary duty in the insolvency context. First, the Court must determine whether the plaintiff-creditor has pleaded facts demonstrating, with a high degree of certainty, that the creditor is entitled to payment and that the entitlement is either currently or imminently due.[147] If the Court concludes that the pleadings satisfy the demanding burden set forth by this initial requirement, the Court must then consider whether the claimant's allegations

---

[145] *Id.*

[146] *Id.*

[147] *See also Production Resources*, 863 A.2d at 798 (positing that a direct claim might exist when directors display "marked degree of animus towards a particular creditor with a *proven entitlement* to payment" (emphasis added)).

satisfy the second step of the analysis, which asks whether a direct claim implicating invidious conduct or, in the words of *Production Resources*, "such a marked degree of animus" has been properly pleaded.

In this instance, NACEPF has failed to allege facts satisfying the first step of the above analysis. Put simply, the pleadings neither identify an entitlement to payment that is *clearly and immediately* due nor do they permit a reasonable inference to that effect. As a consequence, the Court need not consider whether the Complaint properly sets forth allegations satisfying the second element of the analysis.[148]

First, NACEPF has failed to allege the existence of an entitlement that is "clearly" due. Instead, NACEPF's theory of the case assumes *a priori* the

---

[148] Because of its conclusion below, the Court does not attempt to define "animus" in this context. "Animus," of course, is only a convenient (and, one hopes, helpful) label for a concept that likely will require iterative development. More specifically, the Court need not resolve the question, posed in *Production Resources*, of whether "pure self-dealing is the only fiduciarily-invidious reason that might justify a direct claim by a disadvantaged creditor." 863 A.2d at 798. The Court notes that this question is likely to be answered affirmatively—*i.e.*, that in determining whether the second-step of the analysis in this context has been satisfied, the Court should examine whether, during the period of insolvency and for self-dealing purposes, collection of the entitlement at issue has been wrongfully made more difficult or other creditors have been wrongfully preferred. *Cf. Production Resources*, 863 A.2d at 800 (noting the unique and "suspicious pattern of dealing" alleged permitting an inference of preferential treatment benefiting insiders and the "de facto controlling stockholder" over plaintiff-creditor).

It should also be noted that, although the Court uses the term "self-dealing" for convenience, this claim would conceivably also extend to wrongful preferences by directors for the benefit of persons controlling the directors. Additionally, there is the possibility that a direct claim might lie for "acts committed in contemplation of insolvency." *McDonald*, 174 U.S. at 404-05 (applying principles of so-called "trust fund doctrine"). Of course, this notion is very distinct from (and substantially more limited than) the broader "zone of insolvency." The Court only notes the possibility that this narrow exception *might* apply in very limited circumstances, given our case law's previous, intermittent citation to *McDonald*.

existence of a fiduciary duty, upon Clearwire's entry into insolvency, requiring that the Defendant Directors variously preserve certain assets or relinquish Clearwire's claimed rights in those assets. This assumption is made without first carefully delineating the nature of Clearwire's obligations which make NACEPF a creditor holding a clear and immediate claim.[149] For their part, the Defendants have vigorously denied that NACEPF should be considered a "creditor" at all for purposes of this litigation. In *Production Resources*, the plaintiff-creditor was a judgment creditor. In this instance, in support of its status as a "creditor" of Clearwire, NACEPF merely identifies a clause of the Master Agreement providing:

> WHEREAS, Clearwire is prepared, and the Alliance Members are prepared to accept, as royalties, the payments . . . for access to the Commercial Spectrum Capacity of the Channels . . . which payments and transfers are intended to generate an aggregate value, as of Initial Closing, of $0.90 for each Channel POP through a combination of cash commitment royalty, equity in Clearwire, an earn-out, use agreement execution and usage royalties.[150]

NACEPF argues that "[t]his shows that Clearwire had financial obligations towards NACEPF and Alliance members, rendering NACEPF a creditor of Clearwire with a right to demand its monetary dues for license usage."[151] NACEPF also seeks to rely on financial projections prepared for the Clearwire

---

[149] It may be that NACEPF considers itself a creditor simply because of the obligations that flow in both directions between NACEPF and Clearwire under the Master Agreement.

[150] Master Agreement at 2.

[151] Ans. Br. at 28.

board of directors that projected certain outlays payable to NACEPF and Alliance members.[152]

As an initial matter, the financial projections referenced by NACEPF are not contained within the allegations of the Complaint and therefore lie outside the scope of matters that may be considered by the Court. Moreover, even if the Court could consider them, the budgets of anticipated future expenditures fail here to demonstrate a clear entitlement to payment, much less one that is currently due. Significantly, the Defendants argue that NACEPF recites the "WHEREAS" clause of the Master Agreement, in its answering brief, "[p]resumably [in order to] draw[] the conclusion that [P]laintiff 'had a right to payment' under the terms of the Master Agreement."[153] The Defendants rightly point out that NACEPF has failed to demonstrate, through the facts pleaded in the Complaint or even in its brief, that "it was not paid what it was owed under the Master Agreement, or that [NACEPF] performed under the terms of the Master Agreement in some way that triggered an unfulfilled obligation of Clearwire to pay [P]laintiff."[154] As a consequence, the

---

[152] *Id.*

[153] Reply Br. at 12.

[154] *Id.* at 12-13. On February 12, 2004, NACEPF voluntarily dismissed a separate action, filed on November 20, 2003, against Clearwire for breach of contract. *See N. Am. Catholic Educ. Programming Found., Inc. v. Clearwire Holdings, Inc.*, C.A. No. 03C-11-172 (RRC) (Del. Super.).

Court cannot, based on the arguments advanced by NACEPF, conclude that NACEPF has met its burden of alleging a clear entitlement to payment.[155]

---

[155] The Court notes that, at oral argument, NACEPF's counsel only briefly stated: "At the time when we get to 2002, . . . the agreements with Sprint and WorldCom, some of them had expired or come to their end. At that point, there was an immediate cash obligation on the part of Clearwire." Tr. 41:1-5; *see also* Tr. 40:1-7 (citing Master Agreement, Preamble Clause (a)); Tr. 40:7-14. As an initial matter, it does not appear that the Complaint sets forth facts supporting this particular proposition—nor was it referenced in NACEPF's answering brief. The Complaint's principal allegations related (perhaps only tangentially, at best) to this proposition state, *inter alia*, that the market for wireless spectrum "collapsed" in June 2002 and that Clearwire "thereafter" entered into negotiations with Alliance members to "end Clearwire's obligations to the members." Compl. ¶¶ 34-35. The Complaint also provides that Clearwire ultimately settled with HITN and ITF and that, "by October 2003," Clearwire "effectively went out of business;" but the Complaint never alleges that a monetary obligation of Clearwire to NACEPF, coming due under the terms of the Master Agreement, actually arose and was left unpaid. Certainly, it is difficult to view these suppositions as satisfying the requirement that allege a clear entitlement to payment.

By scouring the terms of the Master Agreement, the Court, of its own accord, is able to pick up a basis from which an obligation to pay *potentially* could have arisen. *See, e.g.*, Master Agreement, §§ 1.2(a) (describing a process by which "Individual Use Agreements" would be subsequently entered into upon the occurrence of an "Availability Event," as those terms are defined in the Master Agreement); § 9.3. NACEPF, however, has failed to place this argument before the Court, instead making only general references to obligations for payment, as described above. Indeed, it is unclear precisely when these obligations may have arisen, if ever. For example, NACEPF has identified no information which the Court may consider for purposes of this motion to dismiss regarding whether an "Availability Event" occurred during the relevant periods, whether obligations arising pursuant to such an occurrence were left unmet by Clearwire, and, most importantly, the extent to which Clearwire may have had discretion in entering into additional agreements. Even assuming that an obligation to enter into additional "Individual Use Agreements" (or any other unidentified obligation) arose, the bare pleadings of NACEPF (and its references, in briefing and at oral argument, to the introductory provisions of the Master Agreement) leave the Court unable to infer that any of those obligations was not fulfilled. At best, NACEPF's arguments in this regard could be described as only conclusory allegations (if they are allegations, at all), which do not aid in making the necessary inferences in NACEPF's favor.

Additionally, even assuming that a clear entitlement were shown, NACEPF's claim in this respect would ultimately be derivative. The Court is required to make all *reasonable* inferences in favor of the plaintiff on a motion to dismiss under Court of Chancery Rule 12(b)(6); however, the only reasonable inference that may be drawn, based on the allegations, regarding non-payment of this obligation, assuming it existed and was adequately pleaded, was that no funds (or only inadequate funds) were available. NACEPF premises its claims on the theory that the Defendants failed to pursue adequately the ostensible business plan of Clearwire, which resulted

Indeed, it appears that the best argument in NACEPF's favor, given the allegations contained in the Complaint, would be that Clearwire breached its implied duty of good faith and fair dealing in failing to pursue aggressively build-out of the envisioned wireless internet network. Such a claim would not, on these facts, give rise to a clear entitlement to payment satisfying the first prerequisite for a cognizable direct claim in this context. NACEPF is one party to a contract, and its frustration is perhaps—indeed, likely—better characterized as a claim under contract or tort law.[156] Perhaps NACEPF has a colorable claim that Clearwire failed to abide, in good faith, by the terms of the Master Agreement;[157] however, this is the subject of legitimate debate and therefore fails to constitute a "clear" debt obligation of the firm.[158]

---

in its coffers being empty. Thus, the harm was to the corporation, and the benefit of any remedy would flow to the corporation.

[156] *Cf. Production Resources*, 863 A.2d at 801 (citing *RGC Int'l Investors, LDC v. Greka Energy Corp.*, 2001 WL 312454, at *10 n.45 (Del. Ch. Mar. 7, 2001) ("Equity historically 'follows the law' and does not create remedies where the parties' behavior is already closely regulated by the law.")); *Production Resources*, 863 A.2d at 801 n.88 ("In general, . . . there seems to be utility in applying fiduciary duty law quite cautiously, to avoid unduly benefiting creditors by enabling them to recover in equity when they could not prevail on legal tort or contract claims.").

[157] *But see supra* note 154.

[158] Similarly, NACEPF has not argued that Count I of the Complaint, for fraudulent inducement, is a proper basis for creditor status in this context. The bulk of its arguments with respect to that claim are directed toward allegedly fraudulent conduct of the Defendants, not Clearwire. Therefore, to the extent NACEPF might have a claim (regardless of its viability), it is against the Defendants. The Court notes, however, that NACEPF has briefly mentioned conduct that might be charged to Clearwire—principally, if not entirely, in reference to statements of intention contained in the Preamble of the Master Agreement. *See* Compl. ¶ 38. This argument, although not advanced by NACEPF in support of its creditor status, would, *inter alia*, obviously fail to set forth a clearly held entitlement to payment and therefore could not serve as the basis of a direct fiduciary duty claim in this context—assuming such a claim exists.

Second, given the Court's analysis above that NACEPF has failed to demonstrate a clear entitlement to payment, NACEPF has also necessarily failed to demonstrate that the alleged entitlement on which it seeks to premise its claim has the immediacy necessary to maintain a direct claim in this context. As in *Big Lots Stores, Inc.*, no claim of NACEPF has been reduced to judgment, even assuming that a breach of contract has occurred. Judgment creditor status might not be necessary in the face of an entitlement that is otherwise clearly and currently due.[159] In this instance, however, the pleadings fail to allege facts from which the existence of such a debt can be reasonably inferred.

The two-step approach followed here with respect to direct claims comports with the principal policy considerations that underlie analysis in this context. Foremost among these is the notion that directors of insolvent corporations must retain the freedom to engage in vigorous, good-faith negotiations with their creditors for the benefit of the firm.[160] To hold otherwise would, in the context of

---

Additionally, to the extent that Count III arguably, might theoretically serve as the basis for claiming creditor status in this context—an argument NACEPF has not advanced—such an argument fails, *inter alia*, for similar reasons in this context. Moreover, the "nexus" between the claimed breach of fiduciary duty and such an entitlement, even if it were adequately alleged, is not readily apparent.

[159] This is an issue that the Court need not resolve, however, given the other inadequacies of NACEPF's allegations described above. *But cf. Johnston v. Wolf*, 487 A.2d 1132, 1135-37 (Del. 1985) (holding that plaintiff was not a "creditor" (of pre-merger corporation) granted standing under 8 *Del.C.* § 174 to pursue claims against pre-merger directors for unlawful redemption of stock where plaintiff's claim had not been reduced to judgment prior to merger).

[160] *Cf. Production Resources*, 863 A.2d at 797 ("[D]irectors of an insolvent corporation must retain the right to negotiate in good faith with creditors and to strike fair bargains for the firm."); *id.* at 800 ("I do not rest my decision in any manner on the proposition that it is a breach of

insolvency, not only cast a cloud of uncertainty over directors' ordinary discretion to exercise freely their rational business judgment, but arguably also would diminish the potential that an insolvent corporation might emerge from insolvency on its own. Moreover, to some extent, albeit neither easily defined nor universally praised, the so-called "trust fund doctrine" may, however, inform analysis in this context.[161] Assuming the so-called "trust fund doctrine" does, to some degree, apply,[162] the initial requirement that a debt be both clearly and immediately due

---

fiduciary duty for the board of an insolvent company to engage in vigorous, good-faith negotiations with a judgment creditor. That, in fact, might be the *duty* of a board, which necessarily has to balance the interests of all those with a claim to the firm's inadequate assets.").

[161] In conceding that a direct claim for "animus" might exist, *Production Resources* suggests that, to some extent, semi-analogous trust principles *might* require that creditors not, in certain circumstances (*e.g.*, for self-dealing purposes), be wrongfully disadvantaged vis-a-vis other creditors. *See* 863 A.2d at 798 n.77. *Cf. supra* note 118.

[162] *But cf. Asmussen*, 156 A. at 181. The Court, in *Production Resources*, acknowledged that venerable case law holds that directors of an insolvent corporation may generally prefer one creditor over another. *See* 863 A.2d at 792, 798 (citing *Asmussen*, 156 A. 180). This line of case law, however, imposes the limitation that directors may not exercise this discretion for self-dealing purposes. *See Penn. Co. for Ins. on Lives & Granting Annuities*, 174 A. 112. This limitation would also most likely extend to preferences for the benefit of persons or entities by which the directors are controlled.

It may bear repeating that the analysis contained in the text above only assumes the existence of a direct claim which may be asserted by creditors for "animus." The venerable line of case law discussed above, however, arguably addresses only *distributions* of corporate assets—*i.e.*, dissipating the corporation's pool of available assets, which would presumably constitute a derivative claim under the modern test enunciated in *Tooley*. *See, e.g.*, *Penn. Co. for Ins. on Lives & Granting Annuities*, 174 A. at 116 (suggesting, through its "lifeboat" example, that recognition of claims for preference implicating directorial self-dealing may be limited to instances in which injury to the corporation occurs and that this doctrine is perhaps better viewed as flowing from "applied common honesty" than "so-called 'trust fund theory'").

arguably achieves a workable balance between the complex realities of serving as a director of an insolvent firm and the concerns implicit in "trust fund doctrine."[163]

Additionally, although NACEPF argues that Clearwire was insolvent or in the vicinity of insolvency from the moment the Master Agreement was entered into, when the Complaint is "shorn of excess verbiage," it becomes clear that the alleged conduct of the Defendants challenged by NACEPF is better viewed as the cause of Clearwire's approach to the brink of insolvency and, perhaps, slide into actual insolvency. The allegations in the Complaint suggest that, as of the time of contract, Clearwire had been provided with funds that, although not sufficient for the long-term, appear to have been sufficient for the purpose of developing the "intended" business opportunity in the short-term.[164] As in *Big Lots Stores, Inc.*, "claims of this type are classically derivative."[165]

Unlike in *Production Resources*, Clearwire's alleged debt obligation, as alleged in the Complaint, to NACEPF was neither clear nor immediate.[166]

---

[163] It should be noted that this Memorandum Opinion does not reach the applicability of the presumptions of the business judgment rule, because the Court concludes that NACEPF has failed, as an initial matter, to set forth allegations satisfying the elements of the underlying claim—assuming, *arguendo*, such a claim exists.

[164] *See supra* note 97 and accompanying text.

[165] 2006 WL 846121, at *7 (quoting *Production Resources*, 863 A.2d at 776). It is not as easy to fault Clearwire's directors as NACEPF suggests it should be for failing to relinquish Clearwire's claim to license rights under the Master Agreement—conduct which forms the principal basis for NACEPF's alleged breach of fiduciary duty claim—when that was the one significant asset Clearwire appears to have had.

[166] As noted above, because NACEPF's claim fails to satisfy the foundational requirements for a direct claim for breach of fiduciary duty in this context, the Court does not consider whether the pleadings properly allege facts supporting the second step of the analysis. Therefore, the Court

Therefore, even assuming that a limited direct claim might be asserted by a creditor of an insolvent corporation in this context, the Court concludes that NACEPF has failed to allege facts which set forth such a claim. NACEPF may not now recover for its own benefit what it perhaps could not have recovered through contract or tort by transforming its claims into one claim for breach of a fiduciary duty that it can directly pursue.

## IV. CONCLUSION

Accordingly, Count II of the Complaint fails to state a claim upon which relief can be granted and must be dismissed. Therefore, for reasons also set forth above, the Court is without personal jurisdiction over the Defendants with regard to Counts I and III, which must be dismissed. Accordingly, the Defendants' Motion to Dismiss is granted. An implementing order will be entered.

---

also does not reach the issue of whether "animus," *see supra* note 148, can supply the final ingredient for a direct claim for breach of fiduciary duty in this context.