# F

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

WILLIAM STRITZINGER, C. DWIGHT MITCHUM, STEVEN MICHAELS, MARGARET J. MICHAELS, PETER HULICK, MARY J. HULICK, JOHN S. STRITZINGER, III, STEVE JIN, ERIC CHALLENGER, KEVIN, C. BUCKMAN, DENISE L. BLACKWELL, JAMES ROBERT MAGAW, CLAUDIA PETERS, JENNIFER L. STRITZINGER, Custodian for Allaire P. Stritzinger and Olivia G. Stritzinger, EDWARD J. GEIST, EDWARD J. GEIST, JR., JAMES R. STRITZINGER, Trustee, RUDOLPH J. GEIST, ZINGER CORP., GOLDBERG AND FINNEGAN, O1 COMMUNICATIONS, INC., DAVID A. STRITZINGER, BRICE DROGOSCH, DIANE L DROGOSCH, BOBBY N. PRIESTLEY, DONNA P. PRIESTLEY, BILL PRIESTLEY, JODY PRIESTLEY, ALAN H. MICHAELS, MARY P. S. MICHAELS, THOMAS L. DeEMEDIO, CINDY R. DeEMEDIO, ROBERT G. LITZENBERG, CANDACE LITZENBERG, RONALD R. CHANCE, JUDY S. CHANCE, JAMES W. BAXTER, JR., KRISTIN C. BAXTER, WALTER D. BRISTOL, DELBRA W. BRISTOL, MARK FRUEHAN, CHERIE A. FRUEHAN, HARVEY SUGERMAN, ELIZABETH SUGERMAN, RICHARD LACEY, MARY ANN D. LACEY, JAMES J. LACEY, CAROLE LACEY, CHARLES SWARTOUT, SHARON SWARTOUT, TIMOTHY R. DAVIS, CYNTHIA DAVIS, and MATTHEW BRENAN,

Plaintiffs,

v.

CLEARWIRE HOLDINGS, INC., BOB GHEEWALLA, GERRY CARDINALE, JACK DALY, JAMES MANSOUR, LEO J. CYR, JAMES A. KIRKLAND, DAVID BERKMAN, M. BEAU PARADOWSKI, GOLDMAN SACHS GROUP, INC., GS CAPITAL PARTNERS III, L.P., GS CAPITAL PARNTERS III OFFSHORE, L.P and GOLDMAN, SACHS & CO.

C.A. No. 2337-N

VERWALTUNGS GmbH., )
)
Defendants. )

## COMPLAINT

Plaintiffs, by and through their undersigned counsel, and based upon knowledge, information, and belief, hereby aver and allege the following:

## THE NATURE OF THE ACTION

1. Plaintiffs are a group of shareholders who owned common stock of Defendant Clearwire Holdings, Inc. ("Holdings" or "the Company") on or about August 15, 2003, the date of the initial "C" round offering ("the C Round Financing"), through and including November 13, 2003, the date of Holdings' sale of a majority of its assets, represented by Holdings' shares of stock in its wholly owned subsidiaries, Clearwire Technologies, Inc. ("CTI"), Clearwire Communications, Inc. ("CCI") and Clearwire Spectrum Corp., to Flux U.S. Corporation, a Craig O. McCaw-related entity (the "McCaw Sale"). Plaintiffs have sustained damages as a result of the wrongful actions complained of herein. The C Round Financing and subsequent McCaw Sale, with its related transactions and surrounding facts, were the product of wrongful and unfair self-dealing by various officers, directors and controlling shareholders of Holdings. In breach and derogation of their fiduciary duties to Holdings' minority common stockholders, the Defendants perpetrated breaches of duty by representing to stockholders that the Company was on the brink of bankruptcy and was in need of emergency bridge financing while failing to disclose the real reason for the financing and the pending transaction with the McCaw Group. The financing was in fact part of a scheme to defraud the minority stockholders by diluting certain stockholder interests and by limiting participation in the C Round Financing to Goldman Sachs, the Director Defendants and their family members in anticipation of the

pending McCaw Sale so that they might obtain the benefits of that transaction for themselves.

## THE PARTIES AND JURISDICTION

2. Plaintiffs are a group of common shareholders who owned, collectively, approximately 5% of the outstanding stock of Defendant Holdings on or about August 15, 2003.

3. Defendant Rob Gheewalla ("Gheewalla") at all times relevant was an officer and/or member of the Board of Directors of Holdings.

4. Defendant Gerry Cardinale ("Cardinale") at all times relevant was an officer and/or member of the Board of Directors of Holdings.

5. Defendant Jack Daly ("Daly") at all times relevant was an officer and/or member of the Board of Directors of Holdings.

6. Defendant James Mansour ("Mansour") at all times relevant was an officer and/or member of the Board of Directors of Holdings.

7. Defendant Leo J. Cyr ("Cyr") at all times relevant was an officer and/or member of the Board of Directors of Holdings.

8. Defendant James A. Kirkland ("Kirkland") at all times relevant was an officer and/or member of the Board of Directors of Holdings.

9. Defendant M. Beau Paradowski ("Paradowski") at all times relevant was an officer and/or member of the Board of Directors of Holdings.

10. Defendant David Berkman ("Berkman") at all times relevant was an officer and/or member of the Board of Directors of Holdings.

11. Holdings is a corporation organized under the laws of the State of Delaware. At all times relevant, Holdings was a provider of broadband wireless services offering high speed internet access and related services to businesses and residences. Holdings'

principal executive offices are located at 19111 N. Dallas Parkway, Suite 200, Dallas, TX 75287.

12. Defendants Goldman Sachs Group, Inc., GS Capital Partners III, L.P., GS Capital Partners III, Offshore L.P. and Goldman, Sachs & Co. Verwaltungs GmbH (collectively "Goldman Sachs") at all times relevant were the primary investors in Holdings and its majority stockholder, and as such, exercised direct and indirect influence and control over the Holdings Board of Directors and directly participated in the management of Holdings.

13. Defendants Gheewalla, Cardinale and Daly at all times relevant were employed by Goldman Sachs and served on the Board of Directors of Holdings at the direction of Goldman Sachs. Goldman Sachs was the principal source of compensation for Gheewalla, Cardinale and Daly (collectively the "Goldman Directors"), and they followed the instructions of Goldman Sachs.

14. As the representative of Goldman Sachs on the Holdings Board of Directors, the Goldman Directors were able to and did control the Holdings Board of Directors even when the three of them were together a minority of the Holdings Board. They were able to do so because:

(a) Goldman Sachs had invested $47 million in Holdings, representing 84% of the total sums invested in Holdings in March 2001;

(b) Holdings had significant financial obligations but did not have the ability to raise sufficient cash from operations to pay its debts as they became due. Thus, Holdings was dependent on Goldman Sachs to make additional investments to fund Holdings' operations for the foreseeable future;

(c) Goldman Sachs controlled the majority of the votes of Holdings' stock entitled to vote after November 2001, and had rights to acquire a majority of the shares

after March 2001; and

(d) Goldman Sachs had the power to cast the tie-breaking vote if necessary.

15. The senior management of Holdings at all times understood that their employment was dependent on the decisions of Goldman Sachs, as conveyed by the Goldman Directors. Other than Holdings' Chairman, James Mansour, each of the Holdings senior executives was dependent upon their employment by Holdings for their income. Those senior executives did not have employment opportunities outside of Holdings that were comparable in value to their positions at Holdings.

16. The Compensation Committee of the Holdings Board of Directors consisted only of Cardinale and Mansour. That Committee had to approve all bonuses and senior executive contracts for Holdings' employees. Thus, Goldman Sachs, through its representative, Cardinale, had to consent to all compensation decisions regarding Holdings' senior executives.

17. As a group, the Defendants constituted the controlling stockholders and the controlling directors and officers of Holdings at the time of the C Round Financing and the McCaw Sale. As such, and for the reasons stated below, these Defendants owed Holdings' minority stockholders, including Plaintiffs, fiduciary obligations to further the best interests of all of the Holdings stockholders, to provide full, fair and complete disclosures to Holdings' stockholders, to maximize value for all of Holdings' stockholders in any sale of the Company or Company assets, to refrain from abusing their positions of control, and to refrain from favoring their own (or their family's) interests at the expense of Holdings and its minority stockholders. It is appropriate to treat all of the Defendants as a group for pleading purposes, and to presume that

the wrongful self-dealing in the C Round Financing and the false, misleading and incomplete information conveyed to Plaintiff in the offering statements are the collective actions of the defined group of Defendants identified above. Each of the insider defendants, by virtue of their high-level positions with the Company and its controlling shareholders and affiliates, their stock ownership, their insider dealings, and their direct and indirect influence and control over the Holdings Board of Directors, directly participated in the management of Holdings, were directly involved in the day-to-day operations of Holdings at the highest levels, were privy to confidential and proprietary information regarding the financial condition of the Company, and were directly and extensively involved in negotiating and structuring the C Round Financing and subsequent McCaw Sale as alleged herein. Accordingly, each of the Defendants breached their duties and obligations to the minority shareholders by, among other things, failing to disclose the pending McCaw Sale while engaging in a series of self-dealing transactions designed to dilute certain stockholders so that they might limit the benefits of the transaction amongst themselves.

## The Background to the Claims

18. Holdings was created to take advantage of the business opportunity in providing internet access without the use of wires or cables. Holdings intended to provide internet access by using electronic signals, broadcast much like radio or television signals, over a range of wavelengths (known as "spectrum").

19. The "wireless" internet business faced many technological and regulatory obstacles when Holdings was started in the 1990s. At that time, the necessary technology was still under development to permit access to the internet without a physical connector to an internet service provider. However, by 2000 it was apparent that some of the technological problems with wireless internet could be solved by the use of radio wave spectrum if more

spectrum became available from the FCC. This spectrum, known as "Instruction Television Fixed Service" or "ITFS" spectrum, was used by various educational entities. Some commercial entities also had licenses for use of the spectrum and used it for "wireless" cable television before the advent of satellite television.

20. Companies like Sprint and WorldCom realized the potential future value of the ITFS spectrum and began an aggressive acquisition campaign in 1999 to acquire rights to use existing licenses to operate in that spectrum from license holders who could not afford to continue operating their unsuccessful wireless businesses. Sprint and WorldCom did not generally own the spectrum rights directly, but rather held the spectrum through lease arrangements with owners.

21. In or about 2000, Goldman Sachs, like Sprint and WorldCom, saw a potential use of the ITFS spectrum in the telecommunications industry and sought to capitalize on the floundering wireless business. Goldman Sachs knew that Sprint and WorldCom only held leases that would expire at some point, and those entities generally did not own the rights to use ITFS spectrum permanently. Therefore, Goldman Sachs determined to invest in the market for wireless radio spectrum to connect to the internet and did so by investing in Holdings, then a small, unprofitable wireless company, as the vehicle for its internet business investment.

22. To achieve its plan, Goldman Sachs decided to acquire a significant number of educational licenses whose current leases had termination dates. Specifically, Goldman Sachs consummated a deal with the ITFS Spectrum Development Alliance, Inc. (the "Alliance"), which consisted of three of the largest networks of educational licensees for the use of ITFS spectrum in March 2001. Goldman Sachs' intention, through Holdings, was to develop the spectrum assets into an operating national system of wireless connections to the internet.

23. Following Goldman Sachs' initial investment in Holdings in March 2001, the Company began to focus exclusively on providing broadband wireless services, utilizing licensed spectrum, and determined to divest its equipment vendor subsidiary, Holdings Equipment, LLC. All of Holdings' efforts in 2002 and 2003 were directed at developing broadband wireless network technology and effecting regulatory changes at the Federal Communications Commission (FCC). Specifically, Holdings sought to favorably modify the orientation and regulation of the 2.5 GHz spectrum band in order to ease the path to building profitable wireless networks with these radio frequencies, thereby positioning Holdings to launch a broadband wireless network in a major U.S. market. Holdings undertook its activities and its business, upon the divestiture of the equipment subsidiary, primarily through another wholly-owned subsidiary, CTI.

24. Holdings' efforts began to bear fruit in April 2003, when the FCC issued a Notice of Proposed Rule Making (NPRM) recommending approval of a set of proposed rules co-authored by Holdings and Sprint, which proposed to restructure the 2.5 GHz spectrum band to improve its commercial utility.

25. Although gaining ground in its attempts to remove some of the regulatory barriers to development of a business based ITFS spectrum, Holdings' financial resources were dwindling. As of the Spring of 2003, Holdings' "burn" rate was $2.1 million per month, and it then had no significant revenue. The process of acquiring spectrum upon expiration of existing leases was both time consuming and expensive. In addition, the Company continued to compensate its management on a highly lucrative basis, notwithstanding that it had little or no revenues and a high burn rate. It did so, apparently, as part of a marketing strategy of attempting to build a high-profile management team in the hope of attracting additional capital, and to

position the Company as a preeminent force in the forefront of the wireless internet business once all barriers were removed. While the Defendants believed that it was only a matter of time before the need for wireless broadband would take off, they also recognized that Holdings must raise additional capital given its financial decline.

26. In a memorandum to investors dated May 6, 2003 (the "Investor Update"), the Company notified the shareholders that it had engaged UBS Warburg to assist the Company in raising additional capital. The memo warned that "the capital markets remain very tight and there are no assurances that we will be successful in our efforts. In connection with any fund raising into Holdings we will notify you with the specifics of an investment and provide you the opportunity to invest. The Company's cash position at the date of this letter is approximately $3.6 million and we anticipate needing to conclude on our capital raising efforts within the next 30-60 days." In light of the memorandum, the investors clearly understood Holdings' financial position to be critical.

THE "C" ROUND FINANCING

27. Around the same time of the Investor Update, in or about the Spring of 2003, the Defendant Directors began discussing a possible sale of the Company, or a sale of substantially all of the Company's assets, with the McCaw Group, which sale is referred to herein as the McCaw Sale. Craig O. McCaw, described by industry media as "one of the most celebrated of the telco tycoons" and "the wireless industry's most prominent entrepreneur," became well-known in the mid-1990s for his creation of the first national wireless network, which he later sold to AT&T for a substantial sum. The negotiations for the McCaw Sale led to a scheme concocted by the defendants, which was consummated in or about November 2003, whereby the Company agreed to sell the common shares of Holdings' subsidiaries, CTI, CCI and

Clearwire Spectrum Corp., to Flux, which later changed its name to Clearwire. Defendants recognized the significant and immediate impact a transaction with McCaw was likely to have, and undertook to develop a scheme which would allow them to capture the benefit of the McCaw Sale for themselves.

28. The Defendants' scheme included, among other things, amendments to existing executive employment agreements with Mansour, Cyr, and Kirkland providing for new options with an accelerated vesting schedule in contemplation of the upcoming funding and sale.

29. Despite having been in negotiations for the McCaw Sale, on or about August 15, 2003 (the "August 15, 2003 Notice"), the Company announced a proposal to raise emergency bridge financing (the "Bridge Financing") in the form of convertible notes (the "Original Offer"). The August 15, 2003 Notice did not mention the McCaw Sale, but rather pointed to failed negotiations with AT&T as the reason for the emergency financing, and stated that "[t]he Bridge Financing will provide the Corporation with additional time to pursue a new round of financing and to pursue other strategic alternatives, which may include a sale or merger of the Corporation."

30. On or about August 20, 2003, the Company sent a second notice to shareholders (the "August 20, 2003 Notice") terminating the Original Offer and replacing it with the new Preemptive Rights Offer, as described in that letter (the "Preemptive Rights Offer"). The stated reason for terminating the Original Offer was that the Company had learned that "certain stockholders may not be able to purchase Convertible Notes pursuant to the Original Offer due to certain state law restrictions." Thus, the new Preemptive Rights Offer proposed to issue an equity security in the form of Series C Preferred Stock.

31. However, the real impetus for terminating the Original Offer was that the

sale of Company assets, as contemplated by the pending McCaw Sale, did not constitute a liquidation event and would not trigger the liquidation preferences as set forth in the Original Offer. Therefore, the Preemptive Rights Offer amended the Original Offer by altering the definition of "Liquidation Events" to include "a strategic transaction (including a sale of the Corporation)" as a triggering event. Effecting this change also required that the articles of organization be amended to reflect the new definition of "Liquidation Event" as a sale of "all or substantially all of the Corporation's assets . . ." *See* Fourth Amended and Restated Certificate of Incorporation at §3.4, attached hereto as Exhibit 1, which amendment coincided with the amended Preemptive Rights offer. These amendments were effectuated by Defendants with the intent to give themselves a major liquidation preference in the upcoming McCaw Sale.

32. In the Preemptive Rights Offering, the Company proposed to sell and issue Series C Convertible Preferred Stock for consideration equal to $600,000, plus additional consideration. Shareholders were entitled to purchase up to their pro rata share of Series C Preferred Stock, although provisions for additional purchases were also included.

33. Like the Original Offer, the Preemptive Rights Offer proposed severely lopsided conversion preferences to Series A and B shareholders, significantly diluting the common shares, unlike all other financing rounds done to date wherein the common shareholders were given the same preemptive rights as the preferred shareholders. Instead, the offer gave a $22 conversion preference into Series D stock to Holdings' Series A and B Preferred shareholders for each dollar of Series C stock purchased, while providing only a $2 conversion multiple to common shareholders for each dollar of Series C stock purchased. At a time when the purported value of the Company was modest at best, the Preemptive Rights Offer purported to effectuate antidilution protections for Series A and B stock in the amount of more than $120

million. No directors, beholden to Goldman and the insiders, looked after or negotiated for or on behalf of the common stockholders in connection with the new Series C issuance, which issuance was intended to dilute existing common stockholders to nominal amounts.

34. Neither the Original Offer nor the Preemptive Rights Offer disclosed the pending McCaw Sale or any details of that transaction to the minority shareholders. Participation by investors, including the defendants, in the C Round of financing raised a mere $600,000 (given the burn rate, this was an inconsequential sum, not intended or able to continue the operations of the Company), but it had the effect of severely diluting the existing common stockholders to insiders who would take advantage of that offer.

35. Thus, without information or notice of the pending McCaw Sale, many of the existing common shareholders did not participate in the C Round Financing in reliance on the representations set forth in the Investor Update, the C Round offerings and other related materials regarding the Company's dim financial picture. This is not surprising. For years, Holdings had been unsuccessful and had been in a cash drain position. Without knowledge or understanding that Holdings' business was about to engage in the McCaw Sale, the stockholders would not have seen anything favorable in the recent history of Holdings to warrant further investment. Defendants, of course, knew that to be the case and capitalized upon it.[1]

36. Information of the pending McCaw Sale was, however, shared with a few limited investors, including members of the management team and their immediate families, who obtained additional shares of stock by subscribing into the Series C Round, thereby diluting the existing shareholders. Failure to disclose the pending McCaw Sale to all shareholders served to

[1] Some of the Plaintiffs undertook to participate in the C Round Financing by purchasing of the Series C Preferred Stock. Although some Plaintiffs did participate, their participation was less than what they would have otherwise sought to purchase had they known about the McCaw Sale and had the allocation of consideration and rights to participate in the transaction otherwise been fair.

bolster the ownership position of Holdings' controlling shareholders, the management team and their families. *See* list of investors in Series C Preferred Stock, attached hereto as Exhibit 2. The $600,000 was, in fact, not necessary to be raised in order to keep the Company afloat for the couple of months needed to get to a closing with McCaw (other means were available such as deferring exorbitant executive compensation), but instead, the Series C Round was undertaken as a means to dilute existing stockholders for the benefit of the insiders.

37. On November 14, 2003, the long awaited McCaw Sale, and related transactions, was approved by the Board of Directors. As noted, the transaction involved the sale of the Company's ownership in CTI, the Company's operating entity, in exchange for a combination of cash and stock in Flux (now Clearwire), and the creation of a new Holdings entity. The Company has never notified its shareholders of the sale of assets. Moreover, the shareholders have received no information concerning the details of the McCaw Sale or the distribution of stock and consideration from that sale. So far, Holdings appears to have taken no steps to liquidate the Company or distribute the consideration received in the McCaw Sale.

38. Since the McCaw Sale, the entity that purchased Holdings' business, Clearwire, has attracted numerous investments and has significantly increased in value. That is not surprising, given McCaw's successful track record. Most recently, Clearwire has announced a $900 million strategic investment from Intel Corporation and Motorola. As a result of this significant financing, the Company has withdrawn its Preliminary Registration Statement, filed on May 11, 2006 under the Securities Act of 1933, to raise additional capital from the public markets.

## CLAIMS FOR RELIEF

### COUNT I
### Breach of Fiduciary Duties of Loyalty and Care

39. Plaintiffs reallege and incorporate by reference paragraphs 1 through 38 as though fully set forth herein.

40. The Defendants, by reason of their majority stock ownership of Holdings and their control of Holdings' Board of Directors, officers and agents, owed the Plaintiffs the fiduciary duties of loyalty, care and full disclosure.

41. By the course of misconduct set forth above, including, among other things, the modification of the liquidation preferences; engaging in a series of self-dealing transactions designed to benefit Goldman Sachs, the Director Defendants and their family members; and failing to disclose the nature of those transactions, the Defendants have breached their fiduciary duties owed to the Plaintiffs.

42. As a direct and proximate result of the foregoing unfair and self-dealing transactions by Defendants, Plaintiffs have incurred damages in an amount to be determined at trial.

### COUNT II
### Breach of Fiduciary Duty of Disclosure

43. Plaintiffs reallege and incorporate by reference paragraphs 1 through 42 as though fully set forth herein.

44. The Defendants, by reason of their majority stock ownership of Holdings and their control of Holdings' Board of Directors, officers and agents, owed the Plaintiffs the fiduciary duties of loyalty, care and full disclosure.

45. As set forth above, the Defendants misrepresented and/or concealed the details or facts of the pending McCaw Sale and the real reason for the transactions described

above.

46. The Defendants acted with the intent to deceive, or with reckless disregard for the truth, and designed to create the false impression that any investment made in the C Round Financing would be in jeopardy due to the deteriorating financial condition of the Company, and to discourage Plaintiffs from exercising their rights to fully participate in the C Round Financing.

47. The Plaintiffs, to their detriment, relied on such misrepresentations and facts which the Defendants knew to be false.

48. Plaintiffs have incurred damages as a result of the Defendants' breaches of their duties of loyalty, care and full disclosure in an amount to be determined at trial.

**COUNT III**
**Unjust Enrichment**

49. Plaintiffs reallege and incorporate by reference paragraphs 1 through 48 as though fully set forth herein.

50. The Defendants, by reason of their majority stock ownership of Holdings and their control of Holdings' Board of Directors, officers and agents, and consequently over the C Round Financing and negotiation and execution of the McCaw Sale, wrongfully and unjustly obtained benefits to which they were not entitled, principally in the form of the above-described bolster of their ownership position in Holdings by diluting certain stockholder interests and limiting participation in the C Round Financing to Goldman Sachs, the Director Defendants and their family members in light of the pending McCaw Sale. Plaintiffs have no adequate remedy at law.

COUNT IV
Fraud/Misrepresentation

51. Plaintiffs reallege and incorporate by reference paragraphs 1 through 50 as though fully set forth herein.

52. As set forth above, the Defendants caused to be issued, and participated in the issuance of, materially false and misleading statements to Plaintiffs, and omitted material facts necessary to make the statements made not misleading, including any information about the pending McCaw Sale.

53. The above-mentioned conduct of Defendants constitutes common-law negligent misrepresentation and/or fraud in that Defendants made, participated in or permitted the making of materially false and misleading statements, and omitted material facts necessary to make the statements made not misleading, which statements and omissions were made negligently and without exercising due care.

54. Defendants disseminated the materially false and misleading statements and material omissions described herein with the knowledge that the statements would be reviewed and relied upon by Plaintiffs in deciding whether or not to participate in the C Round Financing.

55. At the time of these material misrepresentations and omissions, Plaintiffs and the other members of the Class reasonably and justifiably relied upon the misstatements and omissions, and upon the superior knowledge and expertise of Defendants in connection with the financial condition of the Company. If the Defendants had made full and adequate disclosures, Plaintiffs would have participated, or had greater participation, in the C Round Financing. As a result of Defendants' fraudulent scheme to dilute certain shareholders and to bolster their ownership position in Holdings, Plaintiffs were deceived as to the benefits of participating in

light of the pending McCaw Sale.

56. Plaintiffs have suffered damages as a result of the Defendants' foregoing negligent material misrepresentation and material omissions and/or equitable fraud in an amount to be determined at trial.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment against Defendants as follows:

A. Declaring that the Defendants have breached their fiduciary duties of loyalty, care and full disclosure to Plaintiffs;

B. Awarding compensatory damages against the Defendants, individually and severally, in an amount determined at trial, including without limitation, compensatory damages for the self-dealing actions taken by the Defendants that diluted certain existing shares owned by Plaintiffs, together with prejudgment and post-judgment interest at the maximum rate allowed by law;

C. Awarding Plaintiffs their costs and expenses incurred in this action, including reasonable allowance of fees for Plaintiffs' attorneys, accountants, and experts, and reimbursement of Plaintiffs' expenses;

D. Granting Plaintiffs such other and further relief as the Court may deem just, proper and equitable.

[SIGNATURE ON FOLLOWING PAGE]

MORRIS, JAMES, HITCHENS & WILLIAMS LLP

Michael A. Weidinger (Del. ID# 3330)
Amy A. Quinlan (Del. ID# 3021)
222 Delaware Avenue, 10th Floor
P.O. Box 2306
Wilmington, DE 19899-2306
Tel. (302) 888-6800
Fax: (302) 571-1750
Attorneys for Plaintiffs

Dated: August 11, 2006

# EXHIBIT 1

# FOURTH AMENDED AND RESTATED CERTIFICATE OF INCORPORATION

# OF

# CLEARWIRE HOLDINGS INC.

Clearwire Holdings Inc., a corporation organized and existing under the laws of the State of Delaware, hereby certifies as follows:

FIRST: The name of the corporation is Clearwire Holdings Inc. (the "Corporation"). The original Certificate of Incorporation of the Corporation was filed with the Secretary of State of the State of Delaware on February 16, 2001.

SECOND: The Corporation certifies that amendments effected by this Third Amended and Restated Certificate of Incorporation have been adopted in accordance with Sections 228, 242, and 245 of the General Corporation Law of the State of Delaware.

THIRD: The text of the Corporation's Certificate of Incorporation as heretofore amended or supplemented is hereby restated and further amended to read in its entirety as follows:

## ARTICLE I

The name of the Corporation is Clearwire Holdings Inc.

## ARTICLE II

The address of the Corporation's registered office in the State of Delaware is Corporation Trust Center, 1209 Orange Street in the City of Wilmington, County of New Castle, Delaware 19801. The name of its registered agent at such address is The Corporation Trust Company.

## ARTICLE III

The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware (the "GCL").

ARTICLE IV

1. Authorized Capital. The total number of shares of all classes of capital stock which the Corporation has authority to issue is 260,000,000 shares, consisting of (i) 145,000,000 shares of Common Stock, par value $.01 per share (the "Common Stock") and (ii) 115,000,000 shares of Preferred Stock; par value $.01 per share (the "Preferred Stock"). Except as provided to the contrary in the provisions establishing a class or series of stock, the amount of the authorized stock of this Corporation of any class or classes may be increased or decreased by the affirmative vote of the holders of a majority of the stock in this Corporation entitled to vote.

2. Terms of the Common Stock. Subject to the powers, preferences, and rights of any Preferred Stock, including any series thereof, having any preference or priority over, or rights superior to, the Common Stock and except as otherwise provided by law, the holders of the Common Stock shall have and possess all powers and voting and other rights pertaining to the stock of this Corporation and each share of Common Stock shall be entitled to one vote.

3. Terms of the Preferred Stock.

3.1 Series A Preferred.

3.1.1 Designation and Number. The designation of Preferred Stock created by this Section 3.1 shall be a series of Preferred Stock to be known as "Series A Preferred Stock." The number of shares constituting Series A Preferred Stock that the Corporation shall be authorized to issue shall be 85,000,000.

3.1.2 Dividends. (a) The holders of Series A Preferred Stock shall be entitled, subject in all cases to the prior rights of the holders of the Series C Preferred Stock and only after the holders of the Series C Preferred Stock have received all amounts and dividends to which they are then entitled under the terms of the Series C Preferred Stock, on a pari passu basis with the holders of Series B Preferred Stock, and in preference to the holders of any shares of Junior Stock (as defined in Section 3.4 below), to receive on each share of Series A Preferred Stock, out of funds legally available therefor, cumulative cash dividends payable at the rate of 8% per annum on the Preferred Amount Per Series A Share (as defined in Section 3.1.5(b) below). Holders of Series A Preferred Stock shall receive payment of dividends with respect to shares of Series A Preferred Stock only if, as, and when such payment of such dividends is declared by the Board of Directors, except as specified below upon the occurrence of a Liquidation Event (as defined in Section 3.1.5 below). Such dividends will be calculated and compounded annually in arrears on December 31 of each year in respect of the prior twelve-month period (prorated on a daily basis for partial periods). Such dividends shall commence to accrue on each share of Series A Preferred Stock from the date of issuance thereof whether or not declared by the Board of

Directors and whether or not there are profits, surplus or other funds of the Corporation legally available for the payment of dividends, and shall continue to accrue until the Series A Liquidation Preference (as defined in Section 3.1.5 below) with respect to such share is paid in full in cash or until the conversion of the Series A Preferred Stock in accordance with Section 3.1.6 (such dividends being referred to as the "Series A Preferred Dividends"). To the extent the Corporation has assets legally available therefor and the Board of Directors has not declared the payment of nor has the Corporation paid the dividends pursuant to this Section 3.1.2, Series A Preferred Dividends shall be due and payable with respect to each share of Series A Preferred Stock upon the occurrence of a Liquidation Event in accordance with Section 3.1.5. Series A Preferred Dividends and Series B Preferred Dividends (as defined in Section 3.2.2 below) paid in cash in an amount less than the total amount of such dividends at the time accumulated and payable on all outstanding shares of Series A Preferred Stock and Series B Preferred Stock shall be allocated on a pari passu basis among holders of Series A Preferred Stock and holders of Series B Preferred Stock pro rata in accordance with the relative amount of Series A Preferred Dividends and Series B Preferred Dividends accrued on the Series A Preferred Stock and the Series B Preferred Stock, respectively, held by such holders. At any time when shares of Series A Preferred Stock are outstanding and the Series A Preferred Dividends have not been paid in full in cash, no dividend whatsoever shall be paid or declared, and no distribution shall be made, on any share of Junior Stock and no monies shall be paid into or set aside or made available for a sinking or other analogous fund for the purchase, redemption or acquisition thereof, except such purchase, redemption or acquisition is permitted when approved by holders of a majority of the Series A Preferred Stock, voting as a separate series; provided, however, that the Corporation may purchase, redeem or acquire shares of Common Stock (as defined in Section 3.4 below) and Common Stock Equivalents (as defined in Section 3.4 below) issued to employees, officers or directors of, or consultants or other service providers to, the Corporation pursuant to equity incentive plans or other arrangements approved by the Board of Directors.

(b) Notwithstanding anything in this Section 3.1.2 to the contrary, upon the conversion of shares of Series A Preferred Stock into Common Stock in accordance with Section 3.1.6, all accumulated and unpaid Series A Preferred Dividends shall be canceled with respect to such shares of Series A Preferred Stock that have been converted.

(c) All numbers relating to the calculation of dividends pursuant to this Section 3.1.2 shall be equitably adjusted to reflect any stock split, stock dividend, combination, reorganization, recapitalization, reclassification or other similar event involving Series A Preferred Stock or Common Stock.

(d) The holder of each share of Series A Preferred Stock shall be entitled to receive the dividends declared by the Board of Directors; provided, however, that, in addition to the Series A Preferred

Dividends, the holder of each share of Series A Preferred Stock shall be entitled to receive dividends per share of Series A Preferred Stock equal to the dividends per share a holder of shares of Common Stock into which a share of Series A Preferred Stock is convertible pursuant to the provisions of Section 3.1.6 would be entitled to, at the record date for the determination of stockholders entitled to such dividends, or, if no such record date is established, at the date such dividend is declared.

3.1.3 Voting Rights. (a) In addition to any voting rights provided by law or set forth elsewhere in this Certificate of Incorporation, the holders of shares of Series A Preferred Stock shall be entitled to vote on all matters, and with respect to any matter shall be entitled to the number of votes per share of Series A Preferred Stock equal to the number of shares of Common Stock into which a share of Series A Preferred Stock is convertible pursuant to the provisions of Section 3.1.6, at the record date for the determination of the stockholders entitled to vote on such matter, or, if no such record date is established, at the date such vote is taken or any written consent of stockholders is solicited. Except as required by law, or as otherwise provided in this Certificate of Incorporation, the holders of shares of Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock and Common Stock shall vote together as a single class and series and not as separate classes or series.

(b) Series A Directors.

(i) The holders of Series A Preferred Stock shall be entitled to vote as a separate series to elect five persons to the Board of Directors. Each person elected to be a director by the holders of Series A Preferred Stock pursuant to this Section 3.1.3(b) shall be referred to as a "Series A Director."

(ii) At any meeting (or in a written consent in lieu thereof) held for the purpose of electing directors, the presence in person or by proxy (or the written consent) of the holders of a majority of the shares of Series A Preferred Stock then outstanding shall constitute a quorum for the election of each Series A Director. Any Series A Director may be removed only with the prior approval (by vote or written consent, as provided by law) of the holders of a majority of the outstanding shares of the Series A Preferred Stock.

(iii) (A) So long as Section 7.1(a) of the Stockholders Agreement dated as of March 13, 2001 (as amended from time to time, the "Stockholders Agreement") is in effect, if on any matter on which the directors of the Corporation are entitled to vote, the number of directors for and against are equal, the voting power of the Series A Director who is the Tie Breaker Designee, as

defined in the Stockholders Agreement, shall be increased to two (2) votes ("Tie-breaking Power"). The Corporation shall take such actions and execute such documents as may be necessary or advisable to give effect to the provisions of this Section 3.1.3(b)(iii)(A).

(B) The Tie-breaking Power of the Series A Director who is the Tie Breaker Designee shall terminate after a final vote on the matter the consideration of which gave rise to the Tie-breaking Power.

3.1.4 Reacquired Shares. Any shares of Series A Preferred Stock converted, purchased or otherwise acquired by the Corporation in any manner whatsoever shall be retired and canceled promptly after the acquisition thereof. None of such shares of Series A Preferred Stock shall be reissued by the Corporation.

3.1.5 Liquidation, Dissolution or Winding Up.

(a) Series A Liquidation Preference. Upon a Liquidation Event, each holder of Series A Preferred Stock shall be entitled to be paid in cash or immediately available funds with respect to each share of Series A Preferred Stock out of the assets of the Corporation available for distribution to stockholders, whether such assets are capital, surplus or earnings, subject in all cases to the prior rights of the holders of the Series C Preferred Stock and only after the holders of the Series C Preferred Stock have received all amounts to which they are then entitled under the terms of the Series C Preferred Stock, on a pari passu basis with Series B Preferred Stock, and in preference to, and before any amount shall be paid or distributed to the holders of Junior Stock, an amount in cash of immediately available funds equal to the greater of (A) the Preferred Amount Per Series A Share, plus any accrued but unpaid dividends to which such holder of outstanding shares of Series A Preferred Stock is then entitled pursuant to Section 3.1.2 hereof (such sum as to each share of Series A Preferred Stock being referred to as the "Series A Liquidation Preference" of such share) and (B) the amount each such holder of Series A Preferred Stock would have been entitled to receive if all outstanding shares of Series A Preferred Stock and Series B Preferred Stock had been converted into Common Stock in accordance with Section 3.1.6 (in the case of Series A Preferred Stock) and Section 3.2.6 (in the case of Series B Preferred Stock) immediately prior to such Liquidation Event (the "Series A Conversion Amount"). For the avoidance of doubt, this Section 3.1.5 shall apply with respect to any Liquidation Event or deemed Liquidation Event notwithstanding that such Liquidation Event or deemed Liquidation Event also constitutes an Organic Change. In addition, a merger or consolidation of the Corporation into or with any other Person or Persons (other than a direct or indirect wholly owned subsidiary of the Corporation), as well as the sale of all or substantially all of the stock of the Corporation, shall also be

deemed a Liquidation Event and upon such an event, holders of Series A Preferred Stock will receive an amount equal to the Series A Liquidation Preference; provided, however, that the Series A Liquidation Preference paid in connection with such merger, consolidation or sale of all or substantially all of the stock of the Corporation must consist of cash or "registered" equity (i.e. freely tradable and liquid in accordance with applicable securities laws), or equity issued along with registration rights reasonably acceptable to a majority of the holders of the Series A Preferred Stock (unless the holders of a majority of Series A Preferred Stock then outstanding have voted to deem such merger, consolidation or sale of all or substantially all of the stock of the Corporation not to be a Liquidation Event), the holders of the Series B Preferred Stock (unless the holders of a majority of the Series B Preferred Stock then outstanding have voted to deem such merger, consolidation or sale of all or substantially all of the stock of the Corporation not to be a Liquidation Event) and the holders of a majority of the Series C Preferred Stock then outstanding, voting as a single class (such consideration, "Acceptable Consideration"), and if the consideration offered to be paid as the Series A Liquidation Preference is not Acceptable Consideration, such other form of consideration must be approved by the holders of a majority of the then outstanding shares of Series A Preferred Stock, Series B Preferred Stock and Series C Preferred Stock, voting as a single class; provided, further, that if immediately prior to such merger, consolidation or sale of all or substantially all of the stock of the Corporation the holders of a majority of the shares of Series A Preferred Stock then outstanding vote to deem such merger, consolidation or sale of all or substantially all of the stock of the Corporation not to be a Liquidation Event, then (i) each holder of Series A Preferred Stock shall thereafter have the right to acquire and receive, in lieu of or in addition to (as the case may be) the shares of Common Stock immediately theretofore acquirable and receivable upon the conversion of such holder's Series A Preferred Stock, such shares of stock, securities or assets as such holder would have received in connection with such merger, consolidation or sale of all or substantially all of the stock of the Corporation if such holder had converted its Series A Preferred Stock immediately prior to such merger, consolidation or sale of all or substantially all of the stock of the Corporation; or (ii) if Series A Preferred Stock is to remain outstanding following such merger, consolidation or sale of all or substantially all of the stock of the Corporation, the provisions of Section 3.1.6(i) shall apply. If upon any Liquidation Event, after the payment of any amounts payable with respect to the issued and outstanding Series C Preferred Stock, the amounts payable with respect to the issued and outstanding Series A Preferred Stock and Series B Preferred Stock are not paid in full, the amounts available for distribution shall be distributed ratably among the holders of Series A Preferred Stock and Series B Preferred Stock on a pari passu basis in accordance with the relative Series A Liquidation Preference of the Series A Preferred Stock and Series B Liquidation Preference of the Series B Preferred Stock held by such holders, and the holders of Junior Stock shall in no event be entitled to participate in the distribution of any assets of the Corporation in respect of their ownership thereof.

(b) "Preferred Amount Per Series A Share" shall mean, with respect to each share of Series A Preferred Stock, $1.167.

(c) Notice of Liquidation Event. Written notice of a Liquidation Event stating a payment date, the amount of the Series A Liquidation Preference and Series A Conversion Amount, and the place where said Series A Liquidation Preference or Series A Conversion Amount shall be payable, shall be delivered in person, mailed by certified or registered mail, return receipt requested, or sent by telecopier or telex, not less than twenty (20) days prior to the payment date stated therein, to the holders of record of shares of Series A Preferred Stock, such notice to be addressed to each such holder at its address as shown by the records of the Corporation.

3.1.6 Conversion of Series A Preferred Stock.

(a) Optional Conversion. Subject to the provision for adjustment set forth below, each share of Series A Preferred Stock shall be convertible, at the option of the holder thereof at any time and from time to time after the date hereof, into a number of shares of Common Stock equal to the then effective Series A Conversion Ratio (as defined in Section 3.4 below).

(b) Mandatory Conversion. Subject to the provision for adjustment set forth below, each share of Series A Preferred Stock shall be automatically (without any action on the part of the holder thereof or of the Corporation) converted into a number of shares of Common Stock at the Series A Conversion Ratio upon the occurrence of a Mandatory Conversion Event (as defined in Section 3.4 below).

(c) Conversion Procedure.

(i) Conversion of Series A Preferred Stock pursuant to Section 3.1.6(a) may be effected by any holder thereof upon the surrender to the Corporation at the offices of the Corporation, or at the office of any agent or agents of the Corporation, as may be designated by the Board of Directors (the "Transfer Agent"), of the certificates representing Series A Preferred Stock to be converted, accompanied by a written notice (a "Series A Conversion Notice") stating that such holder elects to convert all or, a specified portion of such Series A Preferred Stock in accordance with the provisions of this Section 3.1.6 and specifying the name or names in which such holder wishes the certificate or certificates for shares of Common Stock to be issued. The Corporation shall pay any issue and transfer taxes that may be payable in respect of any issue or delivery of shares of Common Stock on conversion of Series A Preferred Stock pursuant hereto. As promptly as practicable, and in any event within five business

days after the surrender of such certificates representing Series A Preferred Stock and the receipt of the Series A Conversion Notice relating thereto, the Corporation shall deliver or cause to be delivered (1) certificates representing the number of validly issued, fully paid and nonassessable shares of Common Stock to which the holder of Series A Preferred Stock being converted shall be entitled and (2) if less than all of the shares represented by the surrendered certificates are being converted, a new certificate representing the number of shares of Series A Preferred Stock which remains outstanding upon such partial conversion. Such conversion shall be deemed to have been made at the close of business on the date of the giving of such Series A Conversion Notice or such later date and time as may be specified in such Series A Conversion Notice so that the rights of the holder thereof as to Series A Preferred Stock being converted shall cease as of such close of business or such later date and time except for the right to receive shares of Common Stock in accordance herewith, and the person entitled to receive the shares of Common Stock shall be treated for all purposes as having become the record holder of such shares of Common Stock as of such close of business or such later date and time.

(ii) On the Mandatory Conversion Date (as defined in Section 3.4 below), the holders of shares of the Series A Preferred Stock shall surrender the certificates evidencing such shares at the office of the Corporation or of its transfer agent for shares of the Common Stock. The Corporation shall then issue and deliver to each such holder a certificate or certificates for the number of shares of the Common Stock into which the shares of the Series A Preferred Stock surrendered were converted on the Mandatory Conversion Date. Such conversion shall be deemed to have occurred as of the Mandatory Conversion Date, whether or not the certificates evidencing such shares are surrendered to the Corporation or its transfer agent for shares of the Common Stock, so that the rights of the holder thereof as to Series A Preferred Stock which have been converted shall cease as of the Mandatory Conversion Date, except for the right to receive shares of Common Stock in accordance herewith, and the person entitled to receive the shares of Common Stock shall be treated for all purposes as having become the record holder of such shares of Common Stock as of the Mandatory Conversion Date. The Corporation shall pay any issue and transfer taxes that may be payable in respect of any issue or delivery of shares of Common Stock on mandatory conversion of Series A Preferred Stock pursuant to Section 3.1.6(b). Notwithstanding the foregoing, however, the

Corporation shall not be obligated to issue certificates evidencing the shares of the Common Stock issuable upon such conversion unless certificates evidencing the shares of the Series A Preferred Stock which have been converted are either delivered to the Corporation or any such transfer agent or the holder notifies the Corporation or any such transfer agent that such certificates have been lost, stolen or destroyed, and delivers, or causes to be delivered, to and for the benefit of the Corporation, in the discretion of the Board of Directors, a surety bond or other financial accommodation satisfactory to the Corporation, or executes an agreement to indemnify the Corporation satisfactory to the Corporation from any loss incurred by it in connection therewith.

(iii) The Corporation shall at all times reserve and keep available for issuance upon the conversion of Series A Preferred Stock, free from any preemptive rights, such number of its authorized but unissued shares of Common Stock as will from time to time be necessary to permit the conversion of all outstanding shares of Series A Preferred Stock into shares of Common Stock, and shall take all action required to increase the authorized number of shares of Common Stock if necessary to permit the conversion of all outstanding shares of Series A Preferred Stock. The Corporation shall take all actions as may be necessary to assure that all such shares of Common Stock may be so issued without violation of any applicable law (including, without limitation, applicable federal and state securities laws) or governmental regulation or any requirements of any domestic securities exchange upon which shares of Common Stock may be listed (except for official notice of issuance which shall be immediately delivered by the Corporation upon each such issuance).

(iv) The Corporation shall not close its books against the transfer of Series A Preferred Stock or of Common Stock issued or issuable upon conversion of Series A Preferred Stock in any manner which interferes with the timely conversion of Series A Preferred Stock. The Corporation shall assist and cooperate with any holder of shares of Series A Preferred Stock required to make any governmental filings or obtain any governmental approval prior to or in connection with any conversion of such shares hereunder (including, without limitation, making any filings required to be made by the Corporation).

(v) If the shares of Common Stock issuable by reason of such conversion of Series A Preferred Stock are

convertible into or exchangeable for any other stock or securities of the Corporation, the Corporation shall, at the converting holder's option, upon surrender of shares of Series A Preferred Stock to be converted by such holder as provided above together with any notice, statement or payment required to effect such conversion or exchange of Common Stock, deliver to such holder, or as otherwise specified by such holder, a certificate or certificates representing the stock or securities into which the shares of Common Stock issuable by reason of such conversion are so convertible or exchangeable, registered in such name or names and in such denomination or denominations as such holder has specified.

(d) Adjustments Upon Changes in Capitalization.

(i) Except with respect to Excluded Securities (as defined in Section 3.4 below), in case the Corporation shall issue any shares of Common Stock or Common Stock Equivalents after the date the first share of Series A Preferred Stock is issued (the "Series A Issue Date") at a price per share (or having a conversion or exercise price per share) of less than the Preferred Amount Per Series A Share, in each such case the Series A Conversion Ratio shall be appropriately adjusted by multiplying (1) the Series A Conversion Ratio in effect on the day immediately prior to the date of issuance of such shares of Common Stock or Common Stock Equivalents by (2) a fraction, the numerator of which shall be the sum of (x) the number of shares of Common Stock outstanding on such date prior to such issuance and (y) the number of additional shares of Common Stock issued (or issuable upon conversion, exchange or exercise of such Common Stock Equivalents), and the denominator of which shall be the sum of (i) the number of shares of Common Stock outstanding on such date prior to such issuance and (ii) the number of shares of Common Stock purchasable at the then Preferred Amount Per Series A Share with the aggregate consideration receivable by the Corporation for the total number of shares of Common Stock so issued (or, in the case of issuances of Common Stock Equivalents, issuable upon conversion, exchange or exercise of such Common Stock Equivalents). An adjustment made pursuant to this subparagraph (i) shall be made on the next business day following the date on which any such issuance is made and shall be effective retroactively to the close of business on the date of such issuance. For purposes of this subparagraph (i), the consideration receivable by the Corporation in connection with the issuance of additional shares of Common Stock or of Common Stock Equivalents shall

be deemed to be equal to (X) in the case the consideration received by the Corporation is cash, the sum of the aggregate purchase price, excluding any amounts paid or receivable for accrued interest or accrued dividends (before deduction of underwriting discounts or commissions and expenses payable to third parties, if any), of all such Common Stock and/or Common Stock Equivalents plus the minimum aggregate amount, if any, payable upon conversion, exchange or exercise of any such Common Stock Equivalents, and (Y) in the case the consideration received by the Corporation is other than cash, the fair market value of the consideration received by the Corporation as determined by the good faith judgment of the Board of Directors, which determination shall require the affirmative vote of at least two of the directors designated by a majority of the holders of Series A Preferred Stock. The issuance or reissuance of any shares of Common Stock (whether treasury shares or newly issued shares) pursuant to a dividend or distribution on, or subdivision, combination or reclassification of, the outstanding shares of Common Stock shall not be deemed to constitute an issuance of Common Stock or Common Stock Equivalents by the Corporation to which this subparagraph (i) applies. Upon the expiration or termination of any unconverted, unexchanged or unexercised Common Stock Equivalents for which an adjustment has been made pursuant to this subparagraph (i), the adjustments shall forthwith be reversed to effect such Series A Conversion Ratio as would have been in effect at the time of such expiration or termination had such Common Stock Equivalents, to the extent outstanding immediately prior to such expiration or termination, never been issued.

(ii) If the purchase price provided for in any Common Stock Equivalents, the additional consideration, if any, payable upon the conversion or exchange of any Common Stock Equivalents, or the rate at which any Common Stock Equivalents are convertible into or exchangeable for Common Stock, shall change at any time, the Series A Conversion Ratio in effect at the time of such change shall be readjusted to the Series A Conversion Ratio which would have been in effect at such time had such Common Stock Equivalents still outstanding provided for such changed purchase price, additional consideration or changed conversion rate, as the case may be, at the time initially granted, issued or sold.

(iii) If the Corporation shall set a record date for the holders of its Common Stock for the purpose of entitling them

to receive a dividend or other distribution and shall thereafter, and before such dividend or distribution is paid or delivered to stockholders entitled thereto, legally abandon its plan to pay or deliver such dividend or distribution, then no adjustment in the Series A Conversion Ratio then in effect shall be made by reason of the taking of such record, and any such adjustment previously made as a result of the taking of such record shall be reversed.

(e) As used in this Section 3.1.6, the term "Common Stock" shall mean and include the Corporation's authorized Common Stock as existing on the date of filing this Certificate of Incorporation, and shall also include any capital stock of any class of the Corporation thereafter authorized which shall neither be limited to a fixed sum or percentage in respect of the rights of the holders thereof to participate in dividends nor be entitled to a preference in the distribution of assets upon the Liquidation of the Corporation, provided that the shares of Common Stock receivable upon conversion of shares of Series A Preferred Stock shall include only shares designated as Common Stock of the Corporation on the date of filing of this instrument, or in case of any reorganization or reclassification of the outstanding shares thereof, the stock, securities or assets to be issued in exchange for such Common Stock pursuant thereto.

(f) The Corporation will at no time close its transfer books against the transfer of any Series A Preferred Stock, or of any shares of Common Stock issued or issuable upon the conversion of any shares of such Series A Preferred Stock, except as may otherwise be required to comply with applicable securities laws.

(g) The Corporation will not, by amendment of its Certificate of Incorporation or through any reorganization, recapitalization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed hereunder by the Corporation, but will at all times in good faith assist in the carrying out of all the provisions of this Section 3.1.6 and in the taking of all such action as may be necessary or appropriate in order to protect the conversion rights of the holders of Series A Preferred Stock against impairment.

(h) If the Corporation at any time (i) pays any dividend, or makes any distribution, on the outstanding shares of Common Stock in shares of Common Stock without payment of any consideration by the holders of Common Stock, (ii) subdivides (by any stock split, stock dividend, recapitalization or otherwise) the outstanding shares of Common Stock, or (iii) combines (by reverse stock split or otherwise) the outstanding shares of Common Stock into a smaller number of shares, then, and in each such case, the Series A Conversion Ratio in effect immediately prior to such event or the record

date therefor, whichever is earlier, shall be adjusted so that the holder of any shares of Series A Preferred Stock thereafter convertible into Common Stock pursuant to this Section 3.1.6 shall be entitled to receive the number of shares of Common Stock which such holder would have owned or have been entitled to receive after the happening of any of the events described above, had such shares of Series A Preferred Stock been converted into Common Stock immediately prior to the happening of such event or the record date therefor, whichever is earlier.

(i) Prior to the consummation of any Organic Change (as defined in Section 3.4 below), the Corporation shall make appropriate provisions (in form and substance satisfactory to the holders of a majority of the Series A Preferred Stock then outstanding) to ensure that each of the holders of Series A Preferred Stock shall thereafter have the right to acquire and receive, in lieu of or in addition to (as the case may be) the shares of Common Stock immediately theretofore acquirable and receivable upon the conversion of such holder's Series A Preferred Stock, such shares of stock, securities or assets as such holder would have received in connection with such Organic Change if such holder had converted its Series A Preferred Stock immediately prior to such Organic Change. In each such case, the Corporation shall also make appropriate provisions (in form and substance satisfactory to the holders of a majority of the Series A Preferred Stock then outstanding) to ensure that the provisions of this Section 3.1.6 shall thereafter be applicable to the Series A Preferred Stock. The Corporation shall not effect any such Organic Change, unless prior to the consummation thereof, the successor corporation or other entity (if other than the Corporation) resulting from such Organic Change or the corporation or other entity purchasing assets pursuant to such Organic Change provides in its organizational documents (in form reasonably satisfactory to the holders of a majority of the Series A Preferred Stock then outstanding), the obligation to deliver to each such holder such shares of stock, securities or assets as, in accordance with the foregoing provisions, such holder may be entitled to acquire.

(j) If any recapitalization, conversion or exchange of shares or any other change in the Corporation's capitalization structure, or any other event occurs of the type contemplated by the provisions of this Section 3.1.6 but in any such case, which is not expressly provided for by the provisions of this Section 3.1.6 (including, without limitation, the granting of stock appreciation rights, phantom stock rights or other rights with equity features), then the Board of Directors shall make an appropriate adjustment in the Series A Conversion Ratio so as to protect the rights of the holders of Series A Preferred Stock; provided that no such adjustment shall decrease the number of shares of Common Stock issuable upon conversion of any share of Series A Preferred Stock.

3.1.7 Reports as to Adjustment. (a) Upon any adjustment of the Series A Conversion Ratio then in effect pursuant to the provisions of Section 3.1.6, then, and in each such case, the Corporation shall promptly deliver

to the Transfer Agent of Series A Preferred Stock and the Common Stock and to each of the holders of Series A Preferred Stock and the Common Stock, a certificate signed by the President or a Vice President and by the Treasurer or an Assistant Treasurer or the Secretary or an Assistant Secretary of the Corporation setting forth in reasonable detail the event requiring the adjustment, the method by which such adjustment was calculated and the Series A Conversion Ratio then in effect following such adjustment. Where appropriate, such notice to holders of Series A Preferred Stock may be given in advance.

(b) The Corporation shall also give written notice to the holders of Series A Preferred Stock at least twenty (20) days prior to the date on which any Organic Change takes place.

3.1.8 Protection of Rights. Any registered holder of Series A Preferred Stock may proceed to protect and enforce its rights with any and all remedies available at law or in equity.

3.1.9 Protective Provisions. So long as shares of Series A Preferred Stock are outstanding, the Corporation shall not without first obtaining the approval (by vote or written consent, as provided by law) of the holders of at least a majority of the then outstanding shares of Series A Preferred Stock:

(a) alter or change the rights, preferences or privileges of the shares of Series A Preferred Stock or otherwise amend the Certificate of Incorporation (including, without limitation, this Third Amended and Restated Certificate of Incorporation), including, in either case, whether by merger, consolidation or otherwise, so as to affect adversely the shares of Series A Preferred Stock;

(b) change the authorized number of shares of Series A Preferred Stock; or

(c) create or designate, or authorize the issuance of, any new class or series of stock (1) ranking senior or having a preference over, or being on a parity with, Series A Preferred Stock with respect to dividends or upon Liquidation, (2) having rights similar to any rights of Series A Preferred Stock under Section 3.1.3 or Section 3.1.6 or (3) convertible into or exercisable or exchangeable for any such class or series of stock.

3.2 Series B Preferred.

3.2.1 Designation and Number. The designation of Preferred Stock created by this Section 3.2 shall be a series of Preferred Stock to be known as "Series B Preferred Stock." The number of shares constituting Series B Preferred Stock that the Corporation shall be authorized to issue shall be 32,000,000.