# G

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| NORTH AMERICAN CATHOLIC EDUCATIONAL PROGRAMMING FOUNDATION, INC., | ) | |
| Plaintiff, | ) | C.A. No. 1456-N |
| v. | ) | |
| ROB GHEEWALLA, GERRY CARDINALE AND JACK DALY, | ) | |
| Defendants. | ) | |

**PLAINTIFF NORTH AMERICAN CATHOLIC EDUCATIONAL PROGRAMMING FOUNDATION, INC.'S ANSWERING BRIEF IN RESPONSE TO THE DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

MORRIS, JAMES, HITCHENS & WILLIAMS LLP

Edward M. McNally (#614)
222 Delaware Avenue
P.O. Box 2306
Wilmington, DE 19899
(302) 888-6800
Attorneys for Plaintiff, North American Catholic Educational Programming Foundation, Inc.

Dated: October 28, 2005

TABLE OF CONTENTS

TABLE OF AUTHORITIES ..... iii

STATEMENT OF THE NATURE OF THE PROCEEDINGS ..... 1

STATEMENT OF FACTS ..... 2

1. The Parties ..... 2

2. The Background To The Current Dispute ..... 3

3. Facts Related To Insolvency ..... 11

QUESTIONS PRESENTED ..... 15

SUMMARY OF ARGUMENT ..... 16

I. THE DIRECTORS OF A DELAWARE CORPORATION HAVE A FIDUCIARY DUTY TO ITS CREDITORS WHEN THE CORPORATION IS INSOLVENT OR IN THE VICINITY OF INSOLVENCY ..... 17

1. Introduction ..... 17

2. Upon Insolvency Directors Owe Creditors A Duty ..... 17

3. Complaint Sufficiently Alleges That Defendants Breached Fiduciary Duties Owed to Plaintiff ..... 19

4. Complaint Sufficiently Alleges That Clearwire Was Either Insolvent Or In The Vicinity Of Insolvency ..... 21

5. Complaint Sufficiently Alleges That Plaintiff Was A Creditor Of Clearwire ..... 26

6. Conclusion ..... 29

II. PLAINTIFF HAS PLED SUFFICIENT FACTS TO WITHSTAND DEFENDANTS' MOTION TO DISMISS THE FRAUDULENT INDUCEMENT CLAIM ..... 30

1. Introduction ..... 30

2. The Merger Clause Does Not Bar The Fraud Claim ..... 30

3. Complaint Pleads Sufficient Facts For The Claim Of Fraudulent Inducement ....32

4. Plaintiff's Complaint Is Pled With Particularity Pursuant To Rule 9(b) ....35

5. Conclusion ....38

III. THE COMPLAINT PLEADS SUFFICIENT FACTS FOR THE CLAIM OF INTERFERENCE WITH PROSPECTIVE BUSINESS OPPORTUNITY ....39

1. Introduction ....39

2. Count III States A Claim ....39

3. Defendants Incorrectly Argue That They Are Immune From Tort Liability ....42

4. Conclusion ....44

IV. JURISDICTION UNDER SECTION 3114 INCLUDES CLAIMS SUFFICIENTLY RELATED TO BREACH OF FIDUCIARY DUTY CLAIMS ....45

1. Introduction ....45

2. Delaware Courts Have Personal Jurisdiction Over Defendants Under Section 3114 For Breach Of Fiduciary Duty And Associated "Sufficiency Related" Claims ....46

3. Plaintiff Sufficiently Alleges That Section 3114 Contemplates Joining Of "Sufficiently Related" Claims When That Section Otherwise Attaches ....47

4. Conclusion ....49

CONCLUSION ....50

TABLE OF AUTHORITIES

Case | Page

*American Home Products Corporation v. Norden Laboratories, Inc.*,
1991 Del.Ch. LEXIS 130 (Del. Ch. 1991) .......... 35

*Armstrong v. Pomerance*,
423 A.2d 174 (Del. 1980) .......... 46

*BAE Systems North America Inc. v. Lockheed Martin Corp.*,
2004 Del.Ch. LEXIS 119 (Del.Ch. Aug. 3, 2004) .......... 30

*Browne v. Robb*,
583 A.2d 949 (Del. 1990),
*cert. denied*, 499 U.S. 952 (1991) .......... 35

*CP Kelco U.S., Inc. v. Pharmacia Corp.*,
2002 WL 31230816 (D. Del. Oct. 2, 2002) .......... 34

*Cable/Home Communication Corp. v. Network Prods., Inc.*,
902 F.2d 829 (11th Cir. 1990) .......... 46

*Carlton Investments v. TLC Beatrice International Holdings, Inc.*,
1996 WL 608492 (Del. Ch. Oct. 16, 1996) .......... 47

*Chandler v. Ciccoricco*,
2003 WL 21040185 (Del. Ch. May 5, 2003) .......... 45

*Chesapeake and Potomac Telephone Co. of Md. v. Chesapeake Utilities Corp.*,
436 A.2d 314 (Del. 1981) .......... 35

*Cooper's Home Furnishings v. Rittenhouse Investment Associates, Inc.*,
1977 WL 9542 (Del. Ch. Nov. 1, 1977) .......... 27

*Cornerstone Technologies, LLC v. Conrad*,
2003 WL 1787959 (Del. Ch. 2003) .......... 45

*Credit Lyonnais Bank Nederland, N.V. v. Pathe Communications Corp.*,
1991 WL 277613 (Del. Ch. Dec. 30, 1991) .......... 21

*Crescent/Mach I Partners, L.P. v. Turner*,
846 A.2d 963 (Del. Ch. 2000) .......... 36, 45

*DeBonaventura v. Nationwide Mut. Ins. Co.*,
419 A.2d 942 (Del. Ch. 1980), *aff'd*
428 A.2d 1151 (Del. 1981) .......... 39

*Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*,
624 A.2d 1199 (Del. 1993) ....................35

*Donsco, Inc. v. Casper Corp.*,
587 F.2d 602 (3d Cir. 1978)....................43

*E.I. duPont de Nemours & Co. v. Fl. Evergreen Foliage*,
744 A.2d 457 (Del. 1999) ....................32

*First State Staffing Plus v. Montgomery Mut. Ins. Co.*,
2005 Del. Ch. LEXIS 132 (Del. Ch. Sept. 7, 2005) ....................32

*Fox v. Fox*,
729 A.2d 825 (Del. 1999) ....................35

*Francotyp-Postalia AG & Co. v. On Target Technology, Inc.*,
1998 WL 928382 (Del. Ch. Dec. 24, 1998)....................26

*Gaffin v. Teledyne, Inc.*,
1990 Del.Ch. LEXIS 198 (Del. Ch. Dec. 4, 1990) ....................32

*Gans v. MDR Liquidating Corp.*,
1990 Del. Ch. LEXIS (Del. Ch. Jan. 10, 1990) ....................47,48,49

*Geyer v. Ingersoll Publications Co.*,
621 A.2d 784 (Del. Ch. 1992)....................21,26

*Gillenardo v. Connor Broadcasting State Co.*,
1999 Del. Super. LEXIS 530 (Del. Super. Oct. 27, 1999)....................41

*Goldman v. Pogo.com Inc.*,
2002 Del. Ch. LEXIS 71 (Del. Ch. June 14, 2002) ....................42

*Great Lakes Chemical Corp. v. Pharmacia Corp.*,
788 A.2d 544 (Del. Ch. 2001)....................34

*Greenly v. Davis*,
486 A.2d 669 (Del. 1984) ....................45

*H-M Wexford LLC v. Encorp, Inc.*,
832 A.2d 129 (Del. Ch. 2003)....................35,36,38

*Hart Holding Co. Inc. v. Drexel Burnham Lambert Inc.*,
593 A.2d 535 (Del. Ch. 1991)....................45

*In re Buckhead Am. Corp.*,
178 B.R. 956 (D. Del. 1994) .....26

*In re Cambridge Financial Group*,
1987 WL 19677 (Del. Ch. Nov. 9, 1987) .....47,48,49

*In re Healthco Int'l, Inc.*,
208 B.R. 288 (Bankr.D.Mass. 1997) .....27

*In re NCS Healthcare, Inc., S'holders Litig.*,
825 A.2d 240 (Del. Ch. 2002) .....27

*Infinity Investors Ltd., v. Takefman*,
2000 WL 130622 (Del. Ch. Jan. 28, 2000) .....47,49

*International Association of Heat and Frost Insulators and Asbestos Workers Local Union 42 v. Absolute Environmental Service, Inc.*,
814 F.Supp. 392 (D. Del. 1993) .....42,43

*Kronenberg v. Katz*,
872 A.2d 568 (Del. Ch. 2004) .....31

*Lazard Debt Recovery GP, LLC v. Weinstock*,
864 A.2d 955 (Del. Ch. 2004) .....36

*Manchester v. Narragansett Capital, Inc.*,
1989 Del. Ch. LEXIS 141 (Del. Ch. Oct. 18, 1989) .....47,49

*Marketing Products Management, LLC v. HealthandBeautyDirect.com, Inc.*,
2004 WL 249581 (Del. Super. Jan. 28, 2004) .....45

*Metro Communication Corp. BVI v. Advanced Mobilecomm Technologies Inc.*,
854 A.2d 121 (Del. Ch. 2004) .....36

*Mid-Atlantic Machine & Fabric, Inc. v. Chesapeake Shipbuilding, Inc.*,
492 A.2d 250 (Del. Super. 1985) .....45

*Newspan, Inc. v. Hearthstone Funding Corp.*,
1994 WL 198721 (Del. Ch. May 10, 1994) .....45,46

*Outokumpu Eng'g Enter. Inc. v. Kvaerner EnviroPower, Inc.*,
685 A.2d 724 (Del. Super 1996) .....45

*Pennsylvania Co. Insurances on Lives and Granting Annuities v. South Broad St. Theatre Co.*,
174 A. 112 (Del. Ch. 1934) ..... 21

*Plummer & Co. Realtors v. Crisafi*,
533 A.2d 1242 (Del. Super. 1987) ..... 45

*Production Resources Group LLC v. NCT Group Inc.*,
863 A.2d 772 (Del. Ch. 2004) ..... 17,18,21,26,43

*Progressive International Corporation v. E.I. DuPont de Nemours & Co.*,
2002 Del.Ch. LEXIS 91 (Del. Ch. July 9, 2002) ..... 30,33,34

*Richards v. Jones*,
142 A. 832 (Del. Ch. 1928) ..... 27

*Rolo v. City Investing Co. Liquidating Trust*,
155 F.3d 644 (3d Cir. 1998) ..... 36

*St. James Rec. LLC v. Rieger Opportunity Ptnrs.*,
2003 Del. Ch. LEXIS 126 (Nov. 5, 2003) ..... 33,43

*Scott-Douglas Corp. v. Greyhound Corp.*,
304 A.2d 309 (Del. 1973) ..... 30

*Seville Indus. Machinery v. Southmost Machinery*,
742 F.2d 786 (3d Cir. 1984) ..... 36

*Siple v. S & K Plumbing and Heating, Inc.*,
1982 WL 8789 (Del. Ch. Apr. 13, 1982) ..... 26

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.*,
845 A.2d 1031 (Del. 2004) ..... 19

*U.S. Bank National Ass'n v. U.S. Timberlands Klamath Falls*,
864 A.2d 930 (Del. Ch. 2004) ..... 27

*Wallace v. Wood*,
752 A.2d 1175 (Del. Ch. 1999) ..... 43

*Weaver v. Kellogg*,
216 B.R. 563 (S.D.Tex. 1997) ..... 27

Statutes and Other Authorities


Black's Law Dictionary 375 (7th ed. 1999)....27

2 *James Wm. Moore et al.*, Moore's Federal Practice
§ 9.03[1][a] (Matthew Bender 3d ed.)....36

Restatement (Second) of Torts § 767)....41

Restatement (Second) of Torts § 770)....42,43

1 Donald J. Wolfe, Jr. & Michael A. Pittenger,
*Corporate and Commercial Practice in the Delaware Court of Chancery*, § 3-3 (2003)....45

18B Am.Jur.2d *Corporation* § 1877 (2004)....42

6 *Del. C.* § 1301(3)....27

6 *Del. C.* § 1301(4)....27

11 U.S.C.A. § 101(5)(A)....27

11 U.S.C.A. § 101(5)(B)....27

## STATEMENT OF THE NATURE OF THE PROCEEDINGS

This action arises out of the partial collapse of the telecommunications industry in 2002. The Complaint alleges that the three Defendants as directors of Clearwire Holdings, Inc. ("Clearwire") caused the Plaintiff to put its valued telecommunications licenses under their control by falsely representing Clearwire would develop those licenses. When Clearwire promptly defaulted on its obligation, the Defendants nonetheless kept the Plaintiff's licenses tied up for no valid reason. This resulted in losing the value of those licenses when the telecommunications industry went into a depression in 2002. Originally, Plaintiff North American Catholic Educational Programming Foundation, Inc. ("NACEPF") filed its complaint in the Delaware Superior Court on February 12, 2004, and sought a jury trial. After the Defendants argued only this Court of Chancery had jurisdiction over them as fiduciaries, NACEPF agreed and consented to the transfer of this action to this Court, which occurred on June 24, 2005. Defendants, nonetheless, still argue there is no jurisdiction over them, even as directors of a Delaware corporation, and, eventually, they filed their opening brief in support of their motion to dismiss on September 16, 2005. This is NACEPF's answering brief.[1]

---

[1] To support their motion to dismiss on jurisdictional grounds, the Defendants have filed affidavits of Jimmy M. Mansour ("Mansour Aff. __") and Richard P. Rollo, Esq. ("Rollo Aff. __"). The Plaintiff has rebutted those affidavits with the affidavit of John Primeau ("Primeau Aff. __") or "Primeau Affidavit" filed with this brief. The Primeau Affidavit and the Complaint are also included in the Appendix filed with this brief for the Court's convenience.

## STATEMENT OF FACTS

1. The Parties

The Plaintiff, NACEPF, is an independent lay organization incorporated under the laws of Rhode Island. (Compl. ¶ 1.) In 2000, NACEPF joined with Hispanic Information and Telecommunications Network, Inc. ("HITN"), Instructional Telecommunications Foundation, Inc. ("ITF"), and various affiliates of ITF to form the ITFS Spectrum Development Alliance, Inc. (the "Alliance"). (*Id.* ¶¶ 18-19.) Collectively, the Alliance owned a significant percentage of FCC-approved licenses for microwave signal transmissions ("spectrum") that were known as Instruction Television Fixed Service spectrum ("ITFS") licenses. (*Id.* ¶ 18.)

The Defendants, Rob Gheewalla ("Gheewalla"), Gerry Cardinale ("Cardinale"), and Jack Daly ("Daly") (collectively "Defendants") were directors of Clearwire Holdings, Inc., a Delaware corporation that is a holding company for various subsidiaries (collectively "Clearwire"). (*Id.* ¶¶ 2-4.)

The Defendants were also all employed by Goldman Sachs & Co. ("Goldman Sachs") and served on the Clearwire board of directors at the behest of Goldman Sachs. Defendants effectively controlled Clearwire through the financial and other influence that Goldman Sachs had over Clearwire. (*Id.* ¶¶ 6-9.)

The Defendants represented to NACEPF and the other Alliance members that Clearwire's stated business purpose was to create a national system of wireless connections to the internet. (*Id.* ¶ 22.) Between 2000 and March 2001, Clearwire negotiated a Master Use and Royalty Agreement ("Master Agreement") with the Alliance, which Clearwire and the Alliance members entered into in March 2001. (*Id.*) NACEPF negotiated the terms of the Master Agreement with Messrs. Gheewalla, Cardinale, and Daly, among others. Gheewalla, Cardinale,

and Daly all purported to be acting on the behalf of Goldman Sachs and the entity that became Clearwire Holdings, Inc. (*See* Affidavit of John Primeau filed herewith ("Primeau Aff.") ¶ 3.)[2]

Under the terms of the Master Agreement, Clearwire had rights to the Alliance members' ITFS spectrum licenses when those licenses became available. (Compl. ¶ 21.) Clearwire was then obligated to pay NACEPF and other Alliance members $0.90 for every Channel "POP"[3] of spectrum through "a combination of a cash commitment royalty, equity in Clearwire, an earnout, use agreement execution and usage royalties." (Primeau Aff. Ex. M at 2, 11-17.) What the Defendants did not tell NACEPF was that Goldman Sachs did not intend to carry out the business plan that was the stated rationale for NACEPF to enter into the Master Agreement. (Compl. ¶ 28.) As a result, Clearwire was in no position to pay what it owed NACEPF under the terms of the Master Agreement.

2. <u>The Background To The Current Dispute</u>

Clearwire was created to take advantage of the business opportunity in providing internet access without the use of wires or cables. In effect, Clearwire was supposed to do for internet users what cellular telephones have done for telephone users, providing mobile access. Clearwire was to provide internet access by using electronic signals broadcasting much like radio or television signals, over a range of wavelengths. (Compl. ¶ 10.)

---

[2] Defendants argue that they did not actually become directors of Clearwire until March 5, 2002. (Mansour Aff. Ex. E). Nonetheless, the Master Agreement was signed (and key misrepresentations were made) on March 13, 2002, seven days after they became directors. (Rollo Aff. Ex. B).

[3] Under the terms of the Master Agreement, the royalties paid to the Alliance members are dependent on the number of Channel POPs. (Primeau Aff. ¶ 7 n.1.) A POP (point of presence) represents the number of households in a Market Area. "'<u>Channel POPs</u>' in a Market Area . . . are the number of total service area households times the number of Channels an Alliance Member is licensed to operate in a protected service area . . . ." (Primeau Aff. ¶ 7 n.1, Ex. M at 9) (alteration in original).

The "wireless" internet business faced many technological and regulatory obstacles when Clearwire was started in the 1990s. At that time, the necessary technology was still under development to permit access to the internet without a physical connector to an internet service provider. Furthermore, because of the amount of data transmitted by persons accessing the internet, use of the narrow wave spectrum typically utilized by wireless telephone systems was not practical. (*Id.* ¶ 11.)

Radio wave spectrum use is subject to regulation and licensing by the Federal Communication Commission ("FCC"). The FCC discourages interference between users and, in the case of applicants for a license to use spectrum, the FCC will not permit a new licensee to interfere with the signal of the existing licensee. This results in limiting access by new licensees. In addition, the FCC permits the use of some bands of spectrum to anyone, such as manufacturers of wireless television systems whose customers wish to use it. This is the "unlicensed" spectrum where signal interference is common. (*Id.* ¶ 12.)

By 2000, it was apparent that some of the technological problems with wireless internet could be solved by the use of radio wave spectrum if more spectrum became available from the FCC. There existed a large band of "microwave" spectrum that was traditionally authorized by the FCC for wireless video signals similar to the "VHF" and "UHF" television bands. This other spectrum was used by various educational entities and for that reason was known as "Instruction Television Fixed Service" or "ITFS" spectrum. (*Id.* ¶ 13.)

Sprint and WorldCom realized that this band of ITFS spectrum had value and in 1999 began an aggressive acquisition campaign to acquire rights to use existing licenses to operate in that spectrum. At a cost exceeding $2 billion, their acquisitions resulted in obtaining a good portion of the commercial radio wave licenses available from license holders who often could

not afford to continue operating the unsuccessful wireless business. (*Id* ¶ 14.) The spectrum is illustrated by the chart below:




(*Id.*)

Because these channels were close together, acquiring rights to use adjacent channels (a process known as "rationalizing" the spectrum) was desirable, but not achieved by 2000. Goldman Sachs saw an opportunity to capitalize on these problems. Goldman Sachs knew Sprint and WorldCom only held leases that would expire at some point and did not own the rights to use that ITFS spectrum permanently. Thus, if someone could acquire rights to those leases upon their expiration, Sprint and WorldCom would have to deal with that person or lose their billion dollar investment.

By at least 2000, Goldman Sachs determined to invest in the market for wireless radio spectrum to connect to the internet. It chose Clearwire, then a small, unprofitable wireless company, as the vehicle for its internet business investment because it also had a technology usable in the "unlicensed" band of spectrum to limit signal interference, and as the ITFS

spectrum became more "rationalized," Clearwire could transition those customers from its unlicensed "free-for-all" band into the "protected" licensed band. (*Id.* ¶¶ 15-16.)

To achieve its plans Goldman Sachs decided to get control over a significant number of educational licenses whose current leases, for example with Sprint or WorldCom, had termination dates. WorldCom and Sprint, having already spent over $2 billion between them to acquire this band of spectrum, were attempting to renew these educational leases for as little as possible and under restrictive lease terms that limited the Alliance members' access to the spectrum. If Goldman Sachs could create a high enough price with more liberal access terms in their lease "offering" to these educators, which neither Sprint nor WorldCom would want to match, then upon Sprint and WorldCom not matching Clearwire's "offer" (in the traditional right of first refusal contained in these leases), Goldman Sachs could position Clearwire to acquire the spectrum at a small fraction of the investment of WorldCom and Sprint. (*Id.* ¶ 17.)

To obtain the ITFS spectrum it desired, Goldman Sachs began negotiations with the Alliance members in 2000. Those negotiations continued throughout 2000 and into March 2001, when Clearwire and the Alliance members executed a Master Agreement. The Defendants directed the negotiations with the Alliance members, and Clearwire was the vehicle Goldman Sachs used to contract with the Alliance. (*Id.* ¶ 20.)

The business plan reflected in the terms of the Master Agreement involved Clearwire obtaining the rights to use the Alliance members' ITFS spectrum licenses as and when those licenses became available for transfer to Clearwire. At the time the Master Agreement was signed, most of the Alliance members' licenses were already licensed to third parties, such as Sprint. The transfers to Clearwire were to occur when those licenses expired if the then current licensees did not exercise their rights of first refusal. (*Id.* ¶ 21.)

Throughout the negotiations with the Alliance from 2000 into March 2001, the Defendants emphasized that Goldman Sachs was committed, through Clearwire, to provide adequate capital and management to develop the spectrum assets of the Alliance members into an operating, national system of wireless connections to the internet. For example, on June 7, 2000, Cardinale sent a memo to the Alliance that, *inter alia*, stated:

> As part of our proposal, *we* wanted to reiterate again our philosophy in partnering with the alliance to meet the objectives of both sides, alleviate any material upfront concerns, and *provide as much assurance as possible* that the partnership going forward represents the best interests of the Alliance and its constituencies. As we tried to articulate in our last two meetings, we take a long-term view to wealth creation in these type of projects.
>
> ***
>
> As we mentioned in our meeting, *we* believe in being fair and *are absolutely prepared to not only pay competitive market prices for the assets which you can deliver but also finance the acquisition cost for your entire* portfolio *of spectrum* (i.e., all 140 million channel POPs, as well as any additional affiliated channel POPs which you can deliver).
>
> ***
>
> *This* results in upfront cash payment to the Alliance of $8 million (assuming 20 million channel POPs), which together with our funding of the engineering study and related legal/upfront development costs to be determined, *establishes our commitment to the Alliance of a long-term partnership* for the development of the ITFS spectrum via an ongoing, fully funded operating vehicle.
>
> ***
>
> [A Goldman Sachs affiliate], with the assistance of Jimmy Mansour and Goldman Sachs, will manage the engineering project and *ensure timely completion* under FCC guidelines.
>
> ***
>
> Based on our current projections, the purchase and build-out costs associated with the delivery and operationalization of 140 million channel POPs will require approximately $350 million over the build-out period. (*Id.* ¶ 23) (emphasis added).

This commitment of Goldman Sachs to develop the wireless network using the licenses of the Alliance members was important to and relied upon by NACEPF when it signed the Master Agreement in March 2001. The mission of NACEPF is to provide educational and religious oriented programming to non-profit agencies, such as schools and other government entities. The proposal made by Clearwire provided the Alliance members to share additional use of the wireless spectrum as developed by Clearwire, so that the Alliance members (including NACEPF) would have an increased ability to provide services on a high-speed internet platform to further expand their programs. (*Id.* ¶ 24.)

Following the closing of the Master Agreement, Clearwire publicly confirmed what it and the Defendants had told the Alliance members prior to the closing to induce them to enter into the Master Agreement. For example, the Defendants had Clearwire announce that the recent funding should "take us well into 2002" in expanding into new markets; Goldman Sachs stated, "we identified Clearwire as the ideal platform for delivering data and voice services." (*Id.* ¶ 25.)

Within days of the March 13, 2001 closing of the Master Agreement, the Defendants secretly began a series of meetings, without the Alliance's prior knowledge, with the Alliance's commercial lessees. In addition to other potential acquirers, on April 12, 2001, Goldman Sachs/Clearwire met with WorldCom; on April 3, 2001, they met with Sprint; on April 14, 2001, they met with Bell South. (*Id.* ¶ 26.)

The Goldman Sachs/Clearwire message at these meetings was that under the Master Agreement they had acquired "topping leases" covering much of the spectrum under leases that would expire and, by virtue of the structure of the consideration to be paid to the Alliance members, Clearwire would likely be the successor to those leases upon their expiration. For example, the Clearwire offer that Sprint and others would need to match included a substantial

equity component in the form of preferred stock in Clearwire and greater access rights for Alliance members to the spectrum post-acquisition. Thus, Goldman Sachs/Clearwire urged the other wireless operators to agree to cooperate with Clearwire. (*Id.* ¶ 27.)

The visits were part of the hidden agenda of the Defendants to use the rights granted to Clearwire in the Master Agreement to extract concessions from Sprint, WorldCom, and other wireless operators for ITFS spectrum or for collaboration with Clearwire in operating in that spectrum band without interference. In effect, rather than fulfill their representations to the Alliance and its members to build out a network of ITFS-based wireless operations, the Defendants tried to use the spectrum rights they had acquired from the Alliance members to profit from Sprint and the other wireless operators' desire to preserve their past investment. Their plan was to get Sprint and the other wireless operators to fund the system that Clearwire had promised to provide for the Alliance.[4] (*Id.* ¶ 28.)

The various meetings failed to accomplish Goldman Sachs's intention to secure cooperation from the major holders of spectrum rights. Sprint, for example, did not believe Goldman Sachs would provide Clearwire with the necessary financing to actually acquire Spectrum leases (upon lease expiration) and the infrastructure needed to operate a wireless system. WorldCom did not believe the current equipment was technologically viable to justify large investments. (*Id.* ¶ 29.) This situation created a dilemma for Defendants.

[4] Defendants argue that Section 1.5(a) of the Master Agreement permitted them to assign Individual Use Agreements and that this permitted action is what NACEPF is complaining about. (D. Br. 22.) That is incorrect. Section 1.5(a) only permits the transfer of an Individual Use Agreement after Clearwire has entered into that Agreement, paid NACEPF for that Agreement and become subject to the obligations of that Agreement, such as maintaining the license. What NACEPF is complaining about is that instead of Clearwire actually entering into Individual Use Agreements and building the network, it instead tried to get Sprint and the other wireless operators to cooperate with Clearwire to divide the spectrum in such a way as to benefit Clearwire to the detriment of NACEPF.

The Defendants understood that Clearwire would need substantially more financial strength than it had in March 2001. For example, upon the closing of the Master Agreement, Clearwire had approximately $29.2 million in cash and of that, $24.3 million would be needed for future spectrum payments to the Alliance members. Clearwire's "burn" rate was $2.1 million per month during a time with no significant revenues. The process of acquiring spectrum upon expiration of existing licenses was both time consuming and expensive, particularly if existing licenseholders contested the validity of any Clearwire offer that those licenseholders were required to match under their rights of first refusal. (*Id.* ¶ 30.)

The Defendants, however, never intended to complete the build out that they had promised to the Alliance members and publicly proclaimed as the business plan of Clearwire. Instead, the undisclosed plan of Goldman Sachs was to leverage the Alliance's spectrum licenses when the market for spectrum improved, as demand for internet access increased, while maintaining the pretense of an industry participant. (*Id.* ¶ 31.) When their initial attempts to leverage Sprint and the other wireless operators failed, Defendants did not give up, but continued to maintain that Clearwire was going to become a major license developer.

From the initial Alliance closing in March 2001 until May 2002, the Defendants caused Clearwire to continually assert to the Alliance members that Clearwire had the right to acquire from them any of their spectrum licenses that became available. This had the effect of precluding Alliance members generally, and NACEPF specifically, from offering those licenses to third parties or extending the terms of any expiring licenses. Throughout this period, there were ready, willing and able acquirers for those expiring licenses, but none of those potential acquisitions went forward because of Clearwire's claims. (*Id.* ¶ 32.)

The Clearwire claims were not made in good faith. Clearwire knew it lacked funding to acquire and operate the spectrum involved in expiring licenses. Nonetheless, it continued to claim entitlement to those licenses to pressure Sprint, WorldCom and others to agree to cooperate with Clearwire in dividing the wireless market. The Defendants directed Clearwire to make its claims to the Alliance's ITFS spectrum, while knowing that Clearwire lacked the funding to acquire and use that spectrum, and that Goldman Sachs would not provide that funding. (*Id.* ¶ 33.) This was done to keep the ITFS spectrum "in play" in the hope that the major wireless operators would give in and pay off Clearwire. (*Id.*).

In June 2002, the market for wireless spectrum collapsed when WorldCom announced its accounting problems and it appeared that there was or soon would be a surplus of spectrum available, such as from WorldCom. Clearwire thereafter began negotiations with the members of the Alliance to end Clearwire's obligations to the members. Eventually, Clearwire paid over $2 million to HITN and ITF to settle their claims and was only able to limit its payments to that amount by otherwise threatening to file for bankruptcy protection. These settlements left the NACEPF as the sole remaining member of the Alliance. (*Id.* ¶¶ 34-35.)

3. <u>Facts Related To Insolvency</u>

Even prior to entering into the Master Agreement, Clearwire was insolvent. At the end of 2000, Clearwire had total assets of $9,151,217, but total liabilities of $15,596,583. (Mansour Aff. ¶ 5, Ex. B at 2.) In March 2001, Clearwire received over $56,000,000 in equity financing from Goldman Sachs and others, but that was largely to help induce the Alliance members to sign the Master Agreement and to provide limited operating funds. (Primeau Aff. ¶ 6, Ex. A).

Unfortunately, Clearwire had simply replaced one set of financial problems for another. The Defendants' desire to corner the market on ITFS spectrum outpaced Clearwire's ability to

meet its obligations under the Master Agreement. For example, upon the closing of the Master Agreement, Clearwire had approximately $27,718,000 in "cash available." (Primeau Aff. ¶ 7, Ex. A.) However, under the terms of the Master Agreement, Clearwire was obligated to pay the Alliance members payments in excess of $100 million. (Primeau Aff. ¶ 7, Ex. B.) Additionally, Clearwire had closing costs that amounted to $3,435,000. (Primeau Aff. ¶ 7, Ex. A.). Clearwire's burn rate was $2.1 million per month. (Primeau Aff. ¶ 7, Ex. C.) By the end of 2001, even the Clearwire board recognized the precarious financial situation of Clearwire. In December 2001, the board projected that it would have a $1,926,000 cash deficit by September 2002. (Primeau Aff. ¶ 8, Ex. D.) The Board believed that Clearwire needed to raise $20,000,000 to remain solvent. (Primeau Aff. ¶ 9, Ex. D.) This $20,000,000 was never raised. (Primeau Aff. ¶ 9.)

In December 2001, at the same time Clearwire was desperate for cash and projecting its own demise, Clearwire acknowledged its obligation to make spectrum/analog payments to NACEPF later in 2002. (Primeau Aff. ¶ 10, Ex. F.) In February 2002, the Board of Directors confirmed that unless $19,500,000 was raised by October 2002, Clearwire would run out of money. (Primeau Aff. ¶ 11, Ex. G.)

On May 1, 2002, the Alliance members met with Messrs. Cardinale and Gheewalla at Goldman Sachs headquarters in New York City. At that meeting, Gheewalla told the Alliance members that Clearwire could not pay its debts without concessions as to the amounts Clearwire was required to pay for the spectrum. (Primeau Aff. ¶ 13.) To avoid running out of cash, the Board of Directors repudiated Clearwire's obligation to pay NACEPF under the Master Agreement. (Primeau Aff. ¶ 16, Ex. I.) Put simply, Clearwire was unable to pay its debts as they came due. Despite realizing that Clearwire could not meet is obligations to NACEPF under

the Master Agreement, the Defendants prevented NACEPF from marketing its spectrum to other buyers. (Compl. ¶¶ 51-52.)

Clearwire's financial condition did not improve during the remainder of 2002. On May 30, 2002, the Clearwire board was again advised that it was close to insolvent. The company had a projected cash deficit of $1,955,000 for the fourth quarter of 2002. (Primeau Aff. ¶ 15, Ex. H.) Clearwire's prospects to survive in the following years were also dismal. Clearwire's cash flow forecast predicted a $50,000,000 cash flow deficit by the end of 2004. (*Id.*) At the end of 2002, the Clearwire board was advised it would be out of cash by August 2003 even if it did not honor its payment obligations under the Master Agreement. (Primeau Aff. ¶ 17, Ex. J.)

Clearwire's own independent auditors, KPMG, recognized the dire financial condition of the company during both the time period the agreement was adopted and the subsequent years. According to KPMG in the March 14, 2003 financial reports it prepared for Clearwire:

> The Company has incurred net losses since inception and there is no assurance that the Company will be able to achieve future revenue levels sufficient to support existing operations, generate positive cash flow from operations or recover its investment in its property, plant, and equipment. The Company has limited additional financial resources available to support its operations and in the past has been supported by certain major shareholders. There is no formal commitment for such shareholders to continue such support beyond the current investment. Also, as described in note 8, certain Alliance members have alleged that the Company is in default under the Master Agreement due to the Company's failure to enter into the requisite agreements regarding additional spectrum rights. The ultimate outcome of this issue is uncertain. These factors raise substantial doubt concerning the ability of the Company to continue as a going concern.

(Mansour Aff., Ex. A at 10.)

Unfortunately, 2003 proved to be no better for Clearwire. In February, the 2003 Budget Summary predicted a cash shortage of $1,076,000 by September 2003. (Primeau Aff. ¶ 18, Ex. K.) Faced with a cash flow emergency, the Clearwire board was forced to raise $600,000 from

its own stockholders. (Primeau Aff. ¶ 19, Ex. L.) That process took several months and Clearwire told its stockholders that their funding was necessary "to fund the Corporation's 'new financing . . .or a possible strategic transaction.'" (*Id.*). "As Clearwire told its own stockholders at the time, . . . in 2003 Clearwire was broke." (Primeau Aff. ¶ 20.)