# C

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

NORTH AMERICAN CATHOLIC EDUCATIONAL PROGRAMMINING FOUNDATION, INC.,

Plaintiff,

v.

ROB GHEEWALLA, GERRY CARDINALE and JACK DALY,

Defendants.

C.A. No. 04C-02-157 MMJ

(JURY TRIAL DEMANDED)
(NON-ARBITRATION CASE)

**PLAINTIFF NORTH AMERICAN CATHOLIC EDUCATIONAL PROGRAMMING FOUNDATION, INC.'S COMPLAINT FOR MISREPRESENTATION, BREACH OF DUTY AND INTERFERENCE WITH PROSPECTIVE BUSINESS OPPORTUNITY AGAINST DEFENDANTS ROB GHEEWALLA, GERRY CARDINALE AND JACK DALY**

The Parties

1. Plaintiff North American Catholic Educational Programming Foundation, Inc. ("NACEPF"), is an independent lay organization that is a corporation formed under the laws of Rhode Island.

2. Defendant Rob Gheewalla ("Gheewalla") at all relevant times was a member of the Board of Directors of Clearwire Holdings, Inc., a corporation formed under the laws of Delaware that is a holding company for various subsidiaries (collectively "Clearwire").

3. Defendant Gerry Cardinale ("Cardinale") at all relevant times was a member of the Board of Directors of Clearwire.

4. Defendant Jack Daly ("Daly") at all relevant times was a member of the Board of Directors of Clearwire.

Director Defendants' Control Over Clearwire

5. Defendants Gheewalla, Cardinale and Daly at all relevant times were employed by Goldman Sachs & Co. ("Goldman Sachs") and served on the Board of Directors of Clearwire at the direction of Goldman Sachs. Goldman Sachs was the principal source of compensation for Gheewalla, Cardinale and Daly (collectively the "Goldman Directors") and they followed the instructions of Goldman Sachs.

6. As the representative of Goldman Sachs on the Clearwire Board of Directors, the Goldman Directors were able to and did control the Clearwire Board of Directors even when the three of them were together a minority of the Clearwire Board. They were able to do so because:

(a) Goldman Sachs had invested $47 million in Clearwire, representing 84% of the total sums invested in Clearwire in March 2001,when Clearwire was otherwise virtually out of funds;

(b) After March 2001, Clearwire had financial obligations related to its agreement with NACEPF and others that potentially exceeded $134 million, did not have the ability to raise sufficient cash from operations to pay its debts as they became due and was dependent on Goldman Sachs to make additional investments to fund Clearwire's operations for the foreseeable future;

(c) Clearwire was unable to borrow money or obtain any other significant financing after March 2001, except from Goldman Sachs;

(d) Goldman Sachs controlled the majority of the votes of Clearwire's stock entitled to vote after November 2001 and had rights to acquire a majority of the shares after March 2001;

(e) Goldman Sachs was virtually Clearwire's sole source of investment banking advice, contacts with potential acquisition candidates and legal advisors, and

(f) It was understood at all times by all the members of the Clearwire Board of Directors that unless the instructions of Goldman Sachs were followed that Clearwire would cease to receive the assistance from Goldman Sachs that it needed to continue to function. As recently as June 2003 Clearwire admitted to potential third-party investors that its "Board of Directors ... is led by Goldman Sachs."

7. The senior management of Clearwire at all times understood that their employment was dependent on the decisions of Goldman Sachs, as conveyed by the Goldman Directors. Other than Clearwire's Chairman, James Mansour, each of the Clearwire senior executives was dependent upon their employment by Clearwire for their income. As the wireless industry continued into a rescission after March 2001, those senior executives did not have employment opportunities outside of Clearwire that were comparable in value to their positions at Clearwire. The Compensation Committee of the Clearwire Board of Directors consisted only of Cardinale and James Mansour. That Committee had to approve all bonuses and senior executive contracts for Clearview employees. Thus, Goldman Sachs, through its representative Cardinale, had to consent to all compensation decisions regarding Clearwire's senior executives.

8. The CEO of Clearwire, James Mansour, had invested over $1 million in Clearwire, prior to Goldman Sachs providing the funding that Clearwire needed to survive

on March 12, 2001. While Goldman Sachs repaid Mansour some of his investment in Clearwire, he would have lost any possibility of recovering the unpaid part of that investment if Clearwire ceased to operate. Clearwire did not have assets sufficient to pay its debts after March 2001. Thus, Mansour's investment was dependent upon the assistance of Goldman Sachs to Clearwire.

The Background To The Claims

9. Clearwire was created to take advantage of the business opportunity in providing internet access without the use of wires or cables. In effect, Clearwire intended to do for internet users what cell telephones have done for persons making telephone calls. Clearwire intended to provide internet access by using electronic signals broadcast much like radio or television signals, over a range of wavelengths (known as "spectrum").

10. The "wireless" internet business faced many technological and regulatory obstacles when Clearwire was started in the 1990s. At that time, the necessary technology was still under development to permit access to the internet without a physical connector to an internet service provider. Furthermore, because of the amount of data transmitted by persons accessing the internet, use of the narrow wave spectrum typically utilized by wireless telephone systems was not practical.

11. Radio wave spectrum use is subject to regulation and licensing by the Federal Communication Commission ("FCC"). The FCC discourages interference between users and, in the case of applicants for a license to use spectrum, the FCC will not permit a new licensee to interfere with the signal of the existing licensee. This results in limiting access by new licensees. In addition, the FCC permits the use of some bands of spectrum

to anyone, such as manufacturers of wireless TV systems whose customers wish to use it. This is the "unlicensed" spectrum where signal interference is common.

12. By 2000, it was apparent that some of the technological problems with wireless internet could be solved by the use of radio wave spectrum if more spectrum became available from the FCC. There existed a large band of "microwave" spectrum that was traditionally authorized by the FCC for wireless video signals similar to the "VHF" and "UHF" television bands. This other spectrum was used by various educational entities and for that reason was known as "Instruction Television Fixed Service" or "ITFS" spectrum. Some commercial entities also had licenses for use of this spectrum and used it for "wireless" cable television. Those commercial entities became insolvent when satellite television became the preferred and dominant competitor to cable television.

13. Sprint and WorldCom realized that this band of ITFS spectrum had value and began an aggressive acquisition campaign in 1999 to acquire rights to use existing licenses to operate in that spectrum. At a cost exceeding $2 billion, their acquisitions resulted in obtaining a good portion of the commercial radio wave licenses that were available from license holders who often could not afford to continue operating the unsuccessful wireless business.

14. Much of the telecommunications investment community assumed Sprint and WorldCom had "acquired" that spectrum and "owned" it. However, about two thirds of that spectrum was licensed to the educational entities whom in turn leased up to 75% (and later for internet purposes up to 95%) of their ITFS spectrum to commercial interests. Sprint and WorldCom only acquired the rights to continue the current leases with those educational entities and at the conclusion of those leases Sprint and WorldCom faced the

need to renegotiate. The Sprint and WorldCom acquisitions caused an increase in the value of ITFS spectrum, largely because of its potential uses. However, this band was configured for video or television use and not in the form the telecommunications industry needed. This ITFS spectrum was configured in blocks of only "6 MHZ" of spectrum called a "channel." Moreover, the "channels" were separately licensed so that it was difficult to combine channels from different license holders to broaden the band of spectrum available. Below is a chart depicting the way in which this spectrum was divided up or "configured."




15. Because these channels were close together, acquiring rights to use adjacent channels (a process known as "rationalizing" the spectrum) was desirable, but not achieved by 2000.

16. Goldman Sachs saw an opportunity to capitalize on these problems. Goldman Sachs knew Sprint and WorldCom only held leases that would expire at some point and did not own the rights to use that ITFS spectrum permanently. By at least 2000,

Goldman Sachs determined to invest in the market for wireless radio spectrum to connect to the internet. It chose Clearwire, then a small, unprofitable wireless company, as the vehicle for its internet business investment since it had a technology that might be used in the "unlicensed" band of spectrum to limit signal interference, and as this educational band became more "rationalized," Clearwire could transition those customers from its unlicensed "free-for-all" band into the "protected" licensed band.

17. To achieve such a plan Goldman Sachs decided to get control over a significant number of educational licenses whose current leases, for example with Sprint or WorldCom, had termination dates. WorldCom and Sprint, having already spent over $2 billion between them to acquire this band of spectrum, was attempting to renew these educational leases for as little as possible and under restrictive lease terms that limited the educators' access to the spectrum. If Goldman Sachs could: (a) create a high enough price with more liberal access terms in their lease "offering" to these educators, (b) that neither Sprint nor WorldCom would want to match, (c) then in the traditional right of first refusal contained in these leases, (d) when Sprint and WorldCom would not match Clearwire's "offer", Goldman Sachs could position Clearwire to acquire the spectrum, (e) at a small fraction of the investment that WorldCom and Sprint had invested.

18. In the United States, there are a few networks of educational licensees in the microwave ITFS band. Three of the largest of these networks in 2000 joined together to form ITFS Spectrum Development Alliance, Inc. (the "Alliance").

19. The funding members of the Alliance were NACEPF, Hispanic Information and Telecommunications Network, Inc. ("HITN"), Instructional Telecommunications

Foundation, Inc. ("ITF") and various affiliates of ITF. Together, they held licenses for a significant portfolio of the ITFS spectrum in the United States.

20. To obtain the ITFS spectrum it desired, Goldman Sachs in 2000 began negotiations with the Alliance and its members. Those negotiations continued throughout 2000 and in March 2001, when Clearwire and the Alliance and its members executed a Master Use and Royalty Agreement (the "Master Agreement"). The Goldman Defendants directed the negotiations with the Alliance members and Clearwire was the vehicle Goldman Sachs used to contract with the Alliance and its members.

21. The business plan reflected in the terms of the Master Agreement involved Clearwire obtaining the rights to use the Alliance members' ITFS spectrum licenses as and when those licenses became available for transfer to Clearwire. At the time the Master Agreement was signed, most of the Alliance member licenses were already licensed to third parties, such as Sprint. The transfers to Clearwire were to occur when those licenses expired if the then current licensees did not exercise their rights of first refusal..

22. Throughout the negotiations with the Alliance from 2000 into March 2001, the Goldman Defendants emphasized that Goldman Sachs was committed through Clearwire to providing adequate capital and management to develop the spectrum assets of the Alliance members into an operating, national system of wireless connections to the internet.

23. For example, on June 7, 2000, Cardinale on Goldman Sachs' behalf sent a memo to the Alliance that, inter alia, stated:

> As part of our proposal, we wanted to reiterate again our philosophy in partnering with the alliance to meet the objectives of both sides, alleviate any material upfront concerns, and provide as much assurance as possible that the partnership going forward represents the best interests of the

> Alliance and its constituencies. As we tried to articulate in our last two meetings, we take a long-term view to wealth creation in these type of projects.
>
> ***
>
> As we mentioned in our meeting, we believe in being fair and are absolutely prepared to not only pay competitive market prices for the assets which you can deliver but also finance the acquisition cost for your entire portfolio of spectrum (i.e., all 140 million channel POPs, as well as any additional affiliated channel POPs which you can deliver).
>
> ***
>
> This results in upfront cash payment to the Alliance of $8 million (assuming 20 million channel POPs), which together with our funding of the engineering study and related legal/upfront development costs to be determined, establishes our commitment to the Alliance of a long-term partnership for the development of the ITFS spectrum via an ongoing, fully funded operating vehicle.
>
> ***
>
> [A Goldman Sachs affiliate], with the assistance of Jimmy Mansour and Goldman Sachs, will manage the engineering project and ensure timely completion under FCC guidelines.
>
> ***
>
> Based on our current projections, the purchase and build-out costs associated with the delivery and operationalization of 140 million channel POPs will require approximately $350 million over the build-out period. (underlining supplied)

24. This commitment of Goldman Sachs to develop the wireless network using the licenses of the Alliance members was important to and relied upon by NACEPF when it signed the Master Agreement in March, 2001. The mission of NACEPF is to provide educational and religious oriented programming to non-profit agencies, such as schools and other government entities. The proposal made by Clearwire provided the Alliance members with additional use of the wireless spectrum so that the Alliance members and

NACEPF would have an increased ability to provide its services on a high speed internet platform to further expand their services.

25. Following the closing of the Master Agreement, Clearwire publicly confirmed what it and the Goldman Defendants had told the Alliance members prior to the closing to induce them to enter into the Master Agreement. For example, Clearwire announced the recent funding should "take us well into 2002" in expanding into new markets and Goldman Sachs stated, "we identified Clearwire as the ideal platform for delivering data and voice services."

26. Within days of the March 13, 2001 closing of the Master Agreement, the Goldman Directors secretly began a series of meetings without the Alliance prior knowledge with the Alliance commercial lessees. In addition to other potential acquirers, on April 12, 2001, Goldman Sachs/Clearwire met with Worldcom; on April 3, 2001, they met with Sprint; on April 14, 2001 they met with Bell South.

27. The Goldman Sachs/Clearwire message at these meetings was that under the Master Agreement they had acquired "topping leases" covering much of the spectrum under leases that would expire and by virtue of the structure of the consideration to be paid to the Alliance members that Clearwire would likely be the successor to those leases upon their expiration. For example, the Clearwire consideration included a substantial equity component in the form of preferred stock in Clearwire and greater access rights to Alliance members to the spectrum post-acquisition, for services offered by Alliance members. Thus, Goldman Sachs/Clearwire urged the other wireless operators to agree to cooperate with Clearwire to rationalize spectrum for their material benefit as they otherwise could

face the loss of valuable spectrum or interference with any spectrum they held next to the ITFS channels acquired by Clearwire.

28. The visits were part of the hidden agenda of the Goldman Directors to use the rights granted Clearwire in the Master Agreement to extract concessions from Sprint, WorldCom and other wireless operators for ITFS spectrum or for collaboration with Clearwire in operating in that spectrum band without interference. In effect, rather than fulfill their representations to the Alliance and its members to build out a network of ITFS-based wireless operations, the Goldman Directors tried to "flip" the spectrum rights they had acquired from the Alliance members.

29. The various meetings failed to accomplish Goldman Sachs' intention to secure cooperation of the major holders of spectrum rights. Sprint, for example, did not believe Goldman Sachs would provide the financing Clearwire needed to actually acquire Spectrum leases upon lease expiration and to acquire the infrastructure needed to operate a wireless system. WorldCom did not believe the current equipment was technologically viable to justify large investments.

30. The Goldman Defendants understood that Clearwire would need substantially more financial support than it had obtained in March 2001. For example, upon the closing of the Master Agreement, Clearwire had approximately $29.2 million in cash and of that $24.3 million would be needed for future payments for spectrum to the Alliance members. Clearwire's "burn" rate was $2.1 million per month and it had then no significant revenues. The process of acquiring spectrum upon expiration of existing licenses was both time consuming and expensive, particularly if existing licenseholders

contested the validity of any Clearwire offer that those license holders were required to match under their rights of first refusal.

31. The Goldman Defendants, however, never intended to do the build out that they had promised to the Alliance members and publicly proclaimed as the business plan of Clearwire. Instead, the undisclosed plan of Goldman Sachs was to leverage the Alliance's spectrum licenses when the market for spectrum improved as demand for internet access increased, while maintaining the pretense of an industry participant.

32. From the initial Alliance closing in March 2001 until May 2002, the Director Defendants caused Clearwire to continue to assert to the Alliance members that Clearwire had the right to acquire from them any of their spectrum licenses that became available. This had the effect of precluding Alliance members generally and NACEPF specifically, from offering those licenses to third parties or extending the term of any expiring licenses. Throughout this period there were ready, willing and able acquirors for those expiring licenses, but none of those potential acquisitions went forward because of Clearwire's claims.

33. The Clearwire claims were not made in good faith. Clearwire knew it lacked funding to acquire and operate the spectrum involved in expiring licenses. Nonetheless, it continued to claim entitlement to those licenses to pressure Sprint, WorldCom and others to agree to cooperate with Clearwire in dividing the wireless market. The Goldman Directors directed Clearwire to make its claims to the Alliance's ITFS spectrum, while knowing that Clearwire lacked the funding to acquire and use that spectrum and that Goldman Sachs would not provide that funding.

34. In June 2002, the market for wireless spectrum collapsed when WorldCom announced its accounting problems and it appeared that there was or soon would be a surplus of spectrum available, such as from WorldCom.

35. Clearwire thereafter began negotiations with the members of the Alliance to end Clearwire's obligations to the members. Eventually, Clearwire paid over $2 million to HITN and ITF to settle their claims and was only able to limit its payments to that amount by otherwise threatening to file for bankruptcy protection. These settlements left the NACEPF as the sole remaining member of the Alliance.

36. By October 2003, Clearwire had been unable to obtain any further financing and effectively went out of business. Except for money advanced to it as a stopgap measure by Goldman Sachs in late 2001, Clearwire was never able to raise any significant money.

COUNT ONE

(Fraudulent Inducement)

37. The allegations of paragraphs 1-36 are incorporated herein.

38. The Goldman Defendants represented to the NACEPF between June 2000 and May 2002 that Goldman Sachs would do what was necessary to cause Clearwire to: (1) continue to expand its existing markets with its proprietary technology, (2) acquire the NACEPF's license rights in spectrum as the existing licenses for that spectrum expired and the licenses were not renewed, and (3) use the then-available technology of Clearwire or its equivalent to incorporate in its expanding unlicensed band build-outs, the Alliance spectrum as it became rationalized in an operating wireless network to access the internet while permitting the NACEPF to offer its services to its clients and to otherwise use that

spectrum to maintain the NACEPF licenses. These representations were also confirmed by the preamble to the Master Agreement that notes that the agreement with "Clearwire will best facilitate the development of wireless access to (the Alliance's planned nationwide broadband educational network) and will maximize the financial and other resources available to the Alliance Members to provide an innovative and comprehensive package of services ..." and that "Clearwire desires to expand its business [of providing wireless services] to a national platform utilizing the Commercial Spectrum Capacity of the [Alliance] Channels ... to the maximum extent provided for herein...." The Master Agreement further confirmed that "Clearwire is prepared to make ... the payments ... provided for herein in consideration for access to the" Alliance's spectrum.

39. At the time those representations were made by the Goldman Defendants, they owed a fiduciary duty to NACEPF because: (1) the Goldman Defendants had assumed control of NACEPF assets that they agreed to manage for the benefit of NACEPF, (2) Clearwire was either then insolvent or in the vicinity of insolvency and (3) they had represented to NACEPF that they would undertake a fiduciary relationship to NACEPF in their capacity as directors of Clearwire.

40. NACEPF relied upon the representations of the Goldman Defendants in entering into the Master Agreement and thereafter in preserving its spectrum licenses for acquisition by Clearwire.

41. The representations of the Goldman Directors were not true when they were made and the Goldman Directors knew those representatives were not true when they were made, but intended NACEPF to rely upon those false representations. To the extent the representations of the Goldman Directors were stated as their opinions of what Clearwire

would do after the Master Agreement was signed, they did not actually hold those opinions at the time. For example, the Goldman Directors at and before the Master Agreement was signed knew that: (1) Clearwire would not acquire NACEPF's spectrum licenses as they became available or build out an operating wireless network because it lacked the resources to do so and Goldman Sachs did not intend to provide the funding required and (2) Clearwire's equipment subsidiary (that was to supply the technology it needed) was for sale.

42. NACEPF lost the opportunity to license its spectrum and was otherwise damaged as a result of the Goldman Directors' conduct.

COUNT TWO

(Breach of Fiduciary Duty)

43. The allegations of paragraphs 1-36 and 38-42 are incorporated herein.

44. At all times after March 2001, the Goldman Defendants owed a fiduciary duty to NACEPF, as a substantial creditor of Clearwire. Clearwire was, if not actually insolvent, then in the vicinity of insolvency from March 2001 until it went out of business.

45. The Goldman Defendants breached their duty to NACEPF by: (1) not preserving the assets of Clearwire for its benefit and that of its creditors when it became apparent that Clearwire would not be able to continue as a going concern and would need to be liquidated and (2) holding on to NACEPF's ITFS license rights when Clearwire would not use them, solely to keep Goldman Sachs's investment "in play."

46. The Goldman Defendants engaged in self-dealing by: (1) keeping Clearwire in business to preserve the ability of Goldman Sachs to carry its investment without admitting Clearwire was a failure and (2) investing Clearwire assets in a wireless business

in Jacksonville, Florida that had no reasonable likelihood of succeeding but whose existence was utilized as a justification for the strategy of the Goldman Directors to not honor the Alliance members' rights.

47. The Jacksonville business: (1) never had sufficient assets to build out the suppositional technology with its complex network of towers and sectors that were required to adequately service potential wireless customers, (2) never had the technology necessary to provide mobile wireless access to the internet and (3) involved extraordinary expenses not justified by a customer base.

COUNT THREE

(Interference with Prospective Business Opportunity)

50. The allegations of paragraphs 1-36, 38-42 and 44-47 are incorporated herein.

51. After March 2001 and until June 2002 NACEPF had the opportunity to convey its licenses to use wireless spectrum to a number of companies that sought to acquire that spectrum.

52. The Goldman Defendants during that period caused Clearwire to assert the right to acquire NACEPF wireless spectrum. As a result, NACEPF lost the opportunity to convey its licenses for spectrum to other buyers.

53. The action of the Goldman Directors in interfering with NACEPF's opportunity to convey its wireless spectrum was wrongful and not justified. The Goldman Defendants caused Clearwire to:

(a) use deceitful tactics to not acquire licenses from NACEPF by claiming Clearwire needed to do additional due diligence on licenses offered to it when that

due diligence had already been done or when Clearwire did not intend to actually do more due diligence and did not intend to acquire those licenses; and

(b) insist that NACEPF arbitrate any right of first refusal disputes with NACEPF's incumbent commercial lessee over who had the right to license NACEPF spectrum, when the arbitration was intended solely to obtain delay before the license was lost to Clearwire and not for the purpose of obtaining a license to operate, nor for the purpose of paying the Clearwire "offering" price to NACEPF.

54. The Goldman Defendants' actions were not justified by any legitimate business interest of Clearwire. The Goldman Defendants used Clearwire to speculate on the value of spectrum licenses by holding NACEPF's licenses captive under an improper claim of right under the Master Agreement. When Clearwire determined it financially could not pursue development of the wireless network that the Master Agreement contemplated, then it has no legitimate right to hold on to NACEPF's license rights.

WHEREFORE, NACEPF prays for the entry of a judgment against the Defendants:

1. Awarding NACEPF its damages assessing out of their misrepresentations, breaches of fiduciary duty and interference with business opportunities of NACEPF and

2. Awarding NACEPF such other relief as may be just and equitable in the circumstances including its attorneys' fees.

MORRIS, JAMES, HITCHENS & WILLIAMS LLP

Edward M. McNally

Edward M. McNally (#614)
222 Delaware Avenue, 10th Floor
Wilmington, Delaware 19899
(302) 888-6800
Attorneys for Plaintiff, North American Catholic Educational Programming Foundation, Inc.

February 12, 2004