# E

C
North American Catholic Educational Programming Foundation, Inc. v. Rob GheewallaDel.Ch.,2006.Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.
NORTH AMERICAN CATHOLIC EDUCATIONAL PROGRAMMING FOUNDATION, INC., Plaintiff,
v.
ROB GHEEWALLA, Gerry Cardinale, and Jack Daly, Defendants.
**No. Civ.A. 1456-N.**

Submitted March 16, 2006.
Decided Sept. 1, 2006.

Edward M. McNally, of Morris, James, Hitchens & Williams LLP, Wilmington, Delaware, for Plaintiff.
Samuel A. Nolen, and Richard P. Rollo, of Richards, Layton & Finger, P.A., Wilmington, Delaware, for Defendants.

MEMORANDUM OPINION

NOBLE, Vice Chancellor.

*1 Plaintiff North American Catholic Educational Programming Foundation, Inc. ("NACEPF" or the " Plaintiff") holds licenses to certain radio wave spectrum regulated by the Federal Communications Commission ("FCC"). In March 2001, NACEPF, together with other similar spectrum license-holders, entered into the Master Use and Royalty Agreement (the "Master Agreement") [FN1] with Clearwire Holdings, Inc. ("Clearwire"), a Delaware corporation, under which Clearwire could obtain rights to those licenses as then-existing leases of those licenses expired and the then-current lessees failed to exercise rights of first refusal. The Master Agreement did not work out well for NACEPF. NACEPF attributes its disappointment to Defendants Rob Gheewalla, Gerry Cardinale, and Jack Daly (collectively, the "Defendants"), who served as directors of Clearwire at the behest of Goldman Sachs & Co. ("Goldman Sachs"). The Defendants, even though they comprised less than a majority of the board, were able to control Clearwire because its only source of funding was Goldman Sachs, and, according to NACEPF, they used that power to favor Goldman Sachs' agenda in derogation of their fiduciary duties owed as directors of Clearwire. In addition to bringing fiduciary duty claims against the Defendants, NACEPF also asserts that they fraudulently induced it to enter into the Master Agreement with Clearwire and that they tortiously interfered with NACEPF's business opportunities.[FN2]

FN1. The Master Agreement may be found at Aff. of John Primeau, Ex. M and Aff. of Richard P. Rollo, Ex. B.

FN2. This action was initially filed in the Superior Court; it was dismissed without prejudice for lack of subject matter jurisdiction, *see* Compl. Ex. A, and transfer to this Court was permitted under 10 *Del.C.* § 1902.

NACEPF is not a shareholder of Clearwire. Instead, NACEPF has come to this forum as a putative creditor of Clearwire and brings direct, not derivative, fiduciary duty claims against the Defendants, who served as directors of Clearwire while it was either insolvent or in the "zone of insolvency."

Personal jurisdiction over the Defendants is premised solely upon 10 *Del.C.* § 3114, which subjects directors of Delaware corporations to this Court's personal jurisdiction over claims "for violation of a duty in [their] capacity of [directors of the corporation]." No other basis for personal jurisdiction over the Defendants has been asserted. Thus, NACEPF's efforts to bring its other claims in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

this venue will fall on jurisdictional grounds unless those other claims are adequately alleged to be "sufficiently related" to a viable fiduciary duty claim against the Defendants.

For the reasons set forth in this Memorandum Opinion, the Court concludes: (1) that creditors of a Delaware corporation in the "zone of insolvency" may not assert direct claims for breach of fiduciary duty against its directors; (2) that the Complaint fails to state a claim for the narrow, if extant, cause of action for direct claims involving breach of fiduciary duty brought by creditors against directors of insolvent Delaware corporations; and (3) that, with dismissal of its fiduciary duty claims, NACEPF has not offered the Court any basis for exercising personal jurisdiction over the Defendants with respect to NACEPF's other claims. Thus, the Defendants' Motion to Dismiss will be granted.

## I. BACKGROUND [FN3]

FN3. The background to this dispute is based primarily on the well-pleaded allegations of the Complaint.

*2 NACEPF, an independent lay organization incorporated under the laws of Rhode Island, provides educational programming. The Defendants served, "at all relevant times," as employees of Goldman Sachs and as members of Clearwire's board.[FN4]

FN4. The Complaint provides only that the Defendants served as directors of Clearwire "at all relevant times...." *See* Compl. ¶¶ 2-4. Although the Court is generally restricted to the allegations contained in the Complaint in considering the Motion to Dismiss, it should be noted that significant debate has arisen over whether the Defendants were members of the Clearwire board when the Master Agreement was entered into, or whether the Defendants only assumed their positions on the board thereafter.

The Complaint alleges that the Defendants were "able to and did control" the Clearwire Board of Directors even though they did not constitute a majority of the board.[FN5] This was possible because Goldman Sachs was the principal, if not exclusive, source of future financing for Clearwire. Goldman Sachs is alleged to have invested $47 million in Clearwire, which the Complaint explains "represent[ed] 84% of the total sums invested in Clearwire in March 2001, when Clearwire was otherwise virtually out of funds." [FN6] Moreover, it is alleged that, after March 2001, "Clearwire was unable to borrow or obtain any other significant financing ..., except from Goldman Sachs." [FN7] As a consequence of this state of affairs, Clearwire's board was almost entirely dominated by the Defendants because the much-needed financing from Goldman Sachs would cease if its directives were not followed.[FN8]

FN5. *Id.* at ¶ 7. The Complaint does assert, however, that Goldman Sachs "controlled the majority of the votes of Clearwire's stock entitled to vote after November 2001 and had rights to acquire a majority of the shares after March 2001." *Id.* at ¶ 7(d).

FN6. *Id.* at ¶ 7(a). The Complaint also alleges:
After March 2001, Clearwire had financial obligations related to its agreement with NACEPF and others that potentially exceeded $134 million, did not have the ability to raise sufficient cash from operations to pay its debts as they became due and was dependent on Goldman Sachs to make additional investments to fund Clearwire's operations for the foreseeable future.
*Id.* at ¶ 7(b).

FN7. *Id.* at ¶ 7(c). It is also alleged that Goldman Sachs "was virtually Clearwire's sole source of investment banking advice, contacts with potential acquisition candidates and legal advisors." *Id.* at ¶ 7(e).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN8. *Id.* at ¶ 7(f). Indeed, the Complaint alleges: "As recently as June 2003 Clearwire admitted to potential third-party investors that its 'Board of Directors ... is led by Goldman Sachs." ' *Id.*
According to the Complaint, Clearwire's senior management understood that continued employment was contingent on " the decisions of Goldman Sachs, as conveyed by the [Defendants]." *Id.* at ¶ 8; *see also id.* at ¶ 9.

The Complaint alleges that, "[b]y at least 2000," Goldman Sachs determined that it wanted "to invest in the market for wireless radio spectrum to connect to the internet." [FN9] Certain obstacles to the development of this market had arisen which Goldman Sachs "saw as an opportunity" on which it could "capitalize." [FN10] In order to implement its business plan, Goldman Sachs chose as the "vehicle for its internet business investment" Clearwire, " then a small, unprofitable wireless company...." [FN11]

FN9. *Id.* at ¶ 16.

FN10. *Id.* at ¶ 16.

FN11. *Id.* The Complaint alleges that Clearwire was chosen because it had certain useful technology that limited the interference of radio signals.

Clearwire had been established to "take advantage of the business opportunity in providing internet access without the use of wires or cables." [FN12] The company "intended to provide internet access by using electronic signals broadcast much like radio or television signals, over a range of wavelengths (known as 'spectrum')." [FN13]

FN12. *Id.* at ¶ 10.

FN13. *Id.*

In the 1990's, when Clearwire was created, "wireless " internet faced numerous technological and regulatory difficulties.[FN14] Most significant, for purposes of this litigation, was the relatively large amount of electronic data transmitted, which required the availability of ample spectrum in order to accommodate the technology's needs.

FN14. *Id.* at ¶ 11. Among these was the fact that the requisite technology for access to the internet in the absence of a "physical connector to an internet service provider" was still under development. *Id.*

Use of radio wave spectrum is subject to regulation and licensing by the FCC. In regulating use of spectrum, the FCC "discourages interference between users" and, in reviewing license applications, will not permit new licensees to interfere with the signals of preexisting licensees. [FN15] As a consequence of these policies, opportunities for access by new licensees are limited. [FN16]

FN15. *Id.* at ¶ 12.

FN16. The Complaint informs, however, that the FCC "permits the use of some bands of spectrum to anyone, such as manufacturers of wireless TV systems whose customers wish to use it. This is the 'unlicensed' spectrum where signal interference is common." *Id.*

By 2000, however, it had become clear that some of the difficulties facing wireless internet could be ameliorated by the use of additional radio wave spectrum as it became available "from the FCC." [FN17] This resulted in a focus on the "large band of 'microwave' spectrum," known as "Instructional Television Fixed Service" ("ITFS") spectrum.[FN18] In 1999, Sprint and WorldCom "realized that ... ITFS spectrum had value" and commenced an " aggressive campaign ... to acquire rights to use existing licenses to operate in [the] spectrum." [FN19] The Complaint alleges that this strategy, which " resulted in obtaining a good portion of the commercial radio wave licenses that were available,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

" cost Sprint and WorldCom more than $2 billion. FN20

FN17. *Id.* at ¶ 13.

FN18. Evidently, the ITFS channels were assigned to allow educational institutions to deliver video instruction to multiple sites. Wireless video signals "similar to the 'VHF' and 'UHF' television bands" were traditionally broadcast in the ITFS spectrum, which was so labeled because it was "used by various education entities." *Id.* ITFS spectrum had also been used by certain commercial entities to provide " ' wireless' cable television;" however, these entities "became insolvent when satellite television became the preferred and dominant competitor to cable television." *Id.*

FN19. *Id.* at ¶ 14.

FN20. *Id.* These licenses were purchased " from license holders who often could not afford to continue operating the unsuccessful wireless business." *Id.*

*3 NACEPF alleges that, "[b]ecause these channels were close together, acquiring rights to use adjacent channels (a process known as 'rationalizing' the spectrum) was desirable;" FN21 however, this had not occurred by 2000, when Goldman Sachs initiated its own investment strategy. FN22 Goldman Sachs "knew that Sprint and WorldCom only held leases that would expire at some point and did not own the rights to use that ITFS spectrum permanently." FN23

FN21. *Id.* at ¶ 15.

FN22. *Id.* at ¶¶ 15, 16.

FN23. *Id.* at ¶ 16.

In order to take economic advantage of the problems within the industry, Goldman Sachs looked for a "vehicle for its internet business investment...." FN24 Clearwire was chosen because "it had a technology that might be used in the ' unlicensed' band of spectrum to limit signal interference, and as this educational band became more 'rationalized,' Clearwire could transition those customers from its unlicensed 'free-for-all' band into the 'protected' license band." FN25

FN24. *Id.*

FN25. *Id.*

As NACEPF tells it, Goldman Sachs's strategy was to obtain "control over" a number of ITFS licenses " whose current leases, for example with Sprint or WorldCom," would eventually terminate. FN26 Because Sprint and WorldCom, the current lessees, had already spent over $2 billion to acquire their initial rights to the spectrum licenses, they were attempting to renew their leases "for as little as possible and under restrictive lease terms that limited the educators' [*e.g.*, NACEPF's] access to the spectrum." FN27 According to the Complaint:

FN26. *Id.* at ¶ 17.

FN27. *Id.*

If Goldman Sachs could: (a) create a high enough price with more liberal access terms in their lease " offering" to these educators, (b) that neither Sprint nor WorldCom would want to match, (c) then in the traditional right of first refusal contained in these leases, (d) when Sprint and WorldCom would not match Clearwire's "offer", Goldman Sachs could position Clearwire to acquire the spectrum, (e) at a small fraction of the investment that WorldCom and Sprint had invested. FN28

FN28. *Id.*

As the Complaint explains, "[i]n the United States, there are a few networks of education licensees in the microwave ITFS band." FN29 Three of the largest of these networks (one of which was

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

NACEPF) joined to form ITFS Spectrum Development Alliance, Inc. (the "Alliance") in 2000.FN30

FN29. *Id.* at ¶ 18.

FN30. *Id.* The Complaint sets forth that the "funding [sic] members" of the Alliance were NACEPF, Hispanic Information and Telecommunications Network, Inc. ("HITN "), Instructional Telecommunications Foundation, Inc. ("ITF") and various affiliates of ITF. *Id.* at ¶ 19. These entities together held licenses for a " significant portfolio of the ITFS spectrum in the United States." *Id.*

In 2000, Goldman Sachs began negotiations with the Alliance and its members to obtain rights to the ITFS spectrum. Negotiations continued until March 2001, when Clearwire and the Alliance, including NACEPF and its other members, executed the Master Agreement.FN31 The Complaint alleges that the negotiations were "directed" by the Defendants and that Clearwire "was the vehicle Goldman Sachs used to contract with the Alliance and its members." FN32 The "business plan reflected in the terms of the Master Agreement" envisioned that Clearwire would exercise its power to obtain rights in the Alliance's ITFS licenses as the existing leases for Alliance spectrum expired and current lessees failed to exercise their rights of first refusal.FN33

FN31. The Master Agreement is both integral to NACEPF's claim and repeatedly referenced in the Complaint; therefore, the Court may consider its provisions, notwithstanding the fact that they may not have been cited in the Complaint. *See, e.g., Khanna v. McMinn,* 2006 WL 1388744, at *30 (Del. Ch. May 9, 2006).

FN32. Compl. at ¶ 20.

FN33. *Id.* at ¶ 21. "At the time the Master Agreement was signed, most of the Alliance member licenses were already licensed to third parties, such as Sprint." *Id.*
The Court notes that the terms "licensee" and "lessee" appear to be used interchangeably in certain portions of the Complaint when referring to lessees/sub-licensees of spectrum licensed to Alliance members by the FCC.
The Complaint also recites several provisions of the Preamble to the Master Agreement, one of which states that the agreement with "Clearwire will best facilitate the development of wireless access to (the Alliance's planned nationwide broadband educational network) and will maximize the financial and other resources available to the Alliance Members to provide an innovative and comprehensive package of services" and that "Clearwire desires to expand its business ... to a national platform utilizing the Commercial Spectrum Capacity of the [Alliance] Channels ... to their maximum extent provided for herein...." *Id.* at ¶ 38. Additionally, the Preamble recites that Clearwire "is prepared" to make the necessary payments under the agreement. *Id.*

*4 Important to NACEPF's claims is its allegation that the Defendants made several material statements regarding Goldman Sachs's intent with respect to Clearwire on which NACEPF relied in entering into the Master Agreement. FN34 NACEPF has alleged that "throughout" the negotiations from 2000 to March 2001, the Defendants "emphasized that Goldman Sachs was committed through Clearwire to providing adequate capital and management to develop the spectrum assets of Alliance members into an operating, national system of wireless connections to the internet." FN35 On June 7, 2000, Defendant Cardinale sent a memorandum to the Alliance "on Goldman Sachs' behalf" outlining Goldman Sachs's ostensible business strategy.FN36 Following the closing on the Master Agreement on March 13, 2001, NACEPF alleges, this understanding was " publicly confirmed" by Goldman Sachs through

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

announcements made by Clearwire and Goldman Sachs.[FN37]

FN34. *See id.* at ¶ 24 ("This commitment of Goldman Sachs to develop the wireless network using the licenses of the Alliance members was important to and relied upon by NACEPF when it signed the Master Agreement in March, 2001."). The Complaint explains that Goldman Sachs's business plan-as represented to Alliance members-if fulfilled, would have aided NACEPF in performing its non-profit function. *See id.* NACEPF sets forth that " [t]he proposal made by Clearwire provided the Alliance members with additional use of the wireless spectrum so that the Alliance members and NACEPF would have an increased ability to provide its services on a high speed internet platform to further expand their services." *Id.*

FN35. *Id.* at ¶ 22. The Complaint states that the Defendants "represented" to NACEPF between June 2000 and May 2002 that Goldman Sachs:

would do what was necessary to cause Clearwire to: (1) continue to expand its existing markets with its proprietary technology, (2) acquire the NACEPF's license rights in spectrum as the existing licenses for that spectrum expired and were not renewed, and (3) use the then-available technology of Clearwire or its equivalent to incorporate in its expanding unlicensed band build-outs, the Alliance spectrum as it became rationalized in an operating wireless network to access the internet while permitting the NACEPF to offer its services to its clients and to otherwise use that spectrum to maintain the NACEPF licenses.

*Id.* at ¶ 38.

FN36. The Complaint quotes the letter in pertinent part:

As part of our proposal, *we* wanted to reiterate again our philosophy in partnering with the alliance to meet the objectives of both sides, alleviate any material upfront concerns, and *provide as much assurance as possible* that the partnership going forward represents the best interests of the Alliance and its constituencies. As we tried to articulate in our last two meetings, we take a long-term view to wealth creation in these type of projects.

As we mentioned in our meeting, *we* believe in being fair and *are absolutely prepared to not only pay competitive market prices for the assets which you can deliver but also finance the acquisition cost for your entire portfolio of spectrum* (i.e., all 140 million channel POPs, as well as any additional affiliated channel POPs which you can deliver).

*This* results in upfront cash payment to the Alliance of $8 million (assuming 20 million channel POPs), which together with our funding of the engineering study and related legal/upfront development costs to be determined, *establishes our commitment to the Alliance of a long-term partnership* for the development of the ITFS spectrum via an ongoing, fully funded operating vehicle.

[A Goldman Sachs affiliate], with the assistance of Jimmy Mansour [Chairman of Clearwire's board and its Chief Executive Officer] and Goldman Sachs, will manage the engineering project and *ensure timely completion* under FCC guidelines.

Based on our current projections, the purchase and build-out costs associated with the delivery and operationalization of 140 million channel POPs will require approximately $350 million over the build-out period.

*Id.* at ¶ 23 (emphasis and alterations in Complaint). "Channel POPs" (Point of Presence) "in a Market Area ... are the number of total service area households times the number of Channels an Alliance Member is licensed to operate in a protected service area...." Master

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Agreement at 9.

FN37. *Id.* at ¶ 25. The Complaint provides that "[f]or example, Clearwire announced the recent funding should 'take us well into 2002' in expanding into new markets and Goldman Sachs stated, 'we identified Clearwire as the ideal platform for delivering data and voice services." ' *Id.*

In contrast to their private and public assurances, it is alleged, however, that the Defendants "never intended to do the build out" of the envisioned wireless network,[FN38] but instead had a "hidden agenda ... to use the rights granted Clearwire in the Master Agreement to extract concessions from Sprint, WorldCom and other wireless operators...." [FN39] Soon after entering into the Master Agreement, the Defendants "secretly" began meeting with commercial lessees of the Alliance's ITFS spectrum.[FN40] The Complaint provides that " Goldman Sachs/Clearwire" met with WorldCom on April 12, 2001; Sprint on April 3, 2001; and Bell South on April 14, 2001.[FN41] At those meetings, the "Goldman Sachs/Clearwire message" conveyed was that the Master Agreement granted them " topping leases" over a substantial portion of the spectrum subject to temporary leases and that, "by virtue of the consideration to be paid to the Alliance members," Clearwire was the probable successor to those leases on their expiration.[FN42] In light of Clearwire's "topping leases," "Goldman Sachs/Clearwire" encouraged wireless operators to " agree to cooperate" with Clearwire in rationalizing spectrum for their "material benefit," since they could otherwise "face the loss of valuable spectrum or interference with any spectrum they held next to ITFS channels acquired by Clearwire." [FN43] The Complaint alleges that, "rather than fulfill their representations to the Alliance and its members to build out [the wireless-internet] network," the Defendants and Goldman Sachs attempted to "flip" Clearwire's "rights" in Alliance spectrum.[FN44]

FN38. *Id.* at ¶ 31. The Complaint alleges that the Defendants knew the representations they were making were not true and that, to the extent any of those representations were "stated as their opinions of what Clearwire would do after the Master Agreement was signed," the Defendants "did not actually hold those opinions at that time." *Id.* at ¶ 41. In addition to their alleged knowledge of Clearwire's lack of funds and that Goldman Sachs "did not intend to provide the funding required," the Complaint also states that the Defendants "knew," both before and at the time of signing of the Master Agreement, that "Clearwire's equipment subsidiary (that was to supply the technology it needed) was for sale." *Id.*

FN39. *Id.* at ¶ 28.

FN40. *Id.* at ¶ 26. The Defendants " secretly began a series of meetings without the Alliance['s] prior knowledge with the Alliance commercial lessees." *Id.*

FN41. *Id.* The Complaint alleges that those meetings occurred "[i]n addition to [meetings with] other potential acquirers.... " *Id.*

FN42. *Id.* at ¶ 27. With respect to the consideration provided, the Complaint states: "For example, the Clearwire consideration included a substantial equity component in the form of preferred stock in Clearwire and greater access rights to Alliance members to the spectrum post-acquisition...." *Id.*

FN43. *Id.; see also id.* at ¶ 28.

FN44. *Id.* The Complaint further explains that "the undisclosed plan of Goldman Sachs was to leverage the Alliance's spectrum licenses when the market for spectrum improved as demand for internet access increased, while maintaining the pretense of an industry participant." *Id.* at ¶ 31. It perhaps bears noting, however, that the Master Agreement does, *inter alia,* explicitly permit Clearwire to enter into

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

certain "swap transactions with third parties," *see* Master Agreement, § 1.4(g)(ii), as well as, subject to certain conditions, to "sell, transfer, sublease and assign any Individual Use Agreement...." *See id.* at § 1.5(a).

The Defendants were unable to persuade the targeted wireless operators of the seriousness of their threat, however, and their attempts to "extract concessions" ultimately failed.[FN45] Indeed, any hope the Defendants may have had of succeeding in their plan was largely demolished by the collapse of the market for wireless spectrum in June 2002 after revelations regarding WorldCom's accounting problems and market participants began to anticipate a glut of available spectrum.[FN46]

FN45. *See* Compl. ¶ 29.

FN46. *See id.* at ¶ 34.

***5** "From the initial Alliance closing in March 2001 until May 2002," the Defendants "caused Clearwire to continue to assert to the Alliance members that Clearwire had the right to acquire from them any of their spectrum licenses that became available." [FN47] The Complaint explains that, as a consequence, Alliance members, including NACEPF, were "preclud[ed] ... from offering those licenses to third parties or extending the term of any expiring licenses." [FN48] Indeed, the Complaint alleges that Clearwire's claims "were not made in good faith," [FN49] but it "continued to claim entitlement to those licenses to pressure Sprint, WorldCom and others to agree to cooperate with Clearwire in dividing the wireless market." [FN50] Additionally, the Complaint states that the Defendants "directed" Clearwire to assert "its claims to the Alliance's ITFS spectrum, while knowing that Clearwire lacked the funding to acquire and use that spectrum and that Goldman Sachs would not provide that funding." [FN51]

FN47. *Id.* at ¶ 32.

FN48. *Id.* The Complaint alleges that, "[t]hroughout this period," ready, willing, and able acquirors existed, "but none of those potential acquisitions went forward because of Clearwire's claims." *Id.*

FN49. Compl. ¶ 33. The Complaint asserts that the Defendants "understood" that Clearwire "would need substantially more financial support than it had obtained in March 2001," *id.* at ¶ 30, and that it "lacked funding to acquire and operate the spectrum involved in expiring licenses." *Id.* at ¶ 33.

FN50. *Id.*

FN51. *Id.*

Following the collapse of the market for wireless spectrum, Clearwire began negotiations with the Alliance members to extricate itself from its obligations. Clearwire paid over $2 million to HITN and ITF to settle claims they may have had against the company and "was only able to limit its payments to that amount by otherwise threatening to file for bankruptcy protection." [FN52] NACEPF, however, refused to settle its claims.[FN53] The Complaint alleges that, by October 2003, Clearwire "had been unable to obtain any further financing and effectively went out of business." [FN54]

FN52. *Id.* at ¶ 35.

FN53. *See id.* ("These settlements left NACEPF as the sole remaining member of the Alliance.").

FN54. *Id.* at ¶ 36 ("Except for money advanced to it as a stopgap measure by Goldman Sachs in late 2001, Clearwire was never able to raise any significant money.").

## II. CONTENTIONS

NACEPF asserts three claims against the Defendants. First, NACEPF, in Count I of the Complaint, contends that the Defendants

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

fraudulently induced it to enter into the Master Agreement and, thereafter, to continue with the Master Agreement to "preserv[e] its spectrum licenses for acquisition by Clearwire." FN55 Second, in Count II, NACEPF argues that because, at all relevant times, Clearwire was either insolvent or in the "zone of insolvency," the Defendants owed fiduciary duties to NACEPF "as a substantial creditor of Clearwire," and that the Defendants breached those duties by:

FN55. *Id.* at ¶ 40.

(1) not preserving the assets of Clearwire for its benefit and that of its creditors when it became apparent that Clearwire would not be able to continue as a going concern and would need to be liquidated and (2) holding on to NACEPF's ITFS license rights when Clearwire would not use them, solely to keep Goldman Sachs's investment "in play." FN56

FN56. *Id.* at ¶ 45.

Finally, in Count III, NACEPF claims that the Defendants tortiously interfered with a prospective business opportunity belonging to NACEPF in that they caused Clearwire wrongfully "to assert the right to acquire NACEPF wireless spectrum," which resulted in NACEPF losing "the opportunity to convey its licenses for spectrum to other buyers." FN57

FN57. *Id.* at ¶ 50.

The Defendants have moved to dismiss this action on two grounds: first, for lack of personal jurisdiction under Court of Chancery Rule 12(b)(2); and, second, for the Plaintiff's failure to state a claim upon which relief can be granted under Court of Chancery Rule 12(b)(6). With respect to their first basis for dismissal, the Defendants observe that NACEPF's sole ground for asserting personal jurisdiction over them is 10 *Del.C.* § 3114. The Defendants argue, however, that personal jurisdiction under § 3114 requires, at least, sufficient allegations of a breach of fiduciary duty owed by director-defendants. With respect to their second basis for dismissal, the Defendants contend that, even assuming that personal jurisdiction does lie, NACEPF has failed to set forth allegations which adequately support its claims for relief.

## III. ANALYSIS

*6 The Defendants have moved to dismiss this action under Court of Chancery Rule 12(b)(2), for lack of personal jurisdiction, and under Court of Chancery Rule 12(b)(6), for failure to state a claim. Typically, motions on these grounds can be resolved independently. In this instance, however, they are not readily cabined.

### A. *Motion to Dismiss under Court of Chancery Rule 12(b)(2)*

First, the Court addresses the Defendants' motion under Court of Chancery Rule 12(b)(2).FN58 The Court may exercise personal jurisdiction over nonresident directors of Delaware corporations under 10 *Del.C.* § 3114. FN59

FN58. *See Branson v. Exide Elecs. Corp.,* 625 A.2d 267 (Del.1993).

FN59. Section 3114(a), the basis for personal jurisdiction relied upon by the Plaintiff, provides:
Every nonresident of this State who after September 1, 1977, accepts election or appointment as a director, trustee or member of the governing body of a corporation organized under the laws of this State or who after June 30, 1978, serves in such capacity, and every resident of this State who so accepts election or appointment or serves in such capacity and thereafter removes residence from this State shall, by such acceptance or by such service, be deemed thereby to have consented to the appointment of the registered agent of such corporation (or, if

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

> there is none, the Secretary of State) as an agent upon whom service of process may be made in all civil actions or proceedings brought in this State, by or on behalf of, or against such corporation, in which such director, trustee or member is a necessary or proper party, or in any action or proceeding against such director, trustee or member *for violation of a duty in such capacity,* whether or not the person continues to serve as such director, trustee or member at the time suit is commenced. Such acceptance or service as such director, trustee or member shall be a signification of the consent of such director, trustee or member that any process when so served shall be of the same legal force and validity as if served upon such director, trustee or member within this State and such appointment of the registered agent (or, if there is none, the Secretary of State) shall be irrevocable. (emphasis added).

"[T]he Delaware courts have consistently held that Section 3114 is applicable only in connection with suits brought against a nonresident for acts performed in his ... capacity as a director ... of a Delaware corporation." Further narrowing the scope of Section 3114, "Delaware cases have consistently interpreted [early cases construing the section] as establishing that [it] ... appl[ies] only in connection with suits involving the statutory and nonstatutory fiduciary duties of nonresident directors." [FN60]

> FN60. *Canadian Commercial Workers Indus. Pension Plan v. Alden,* 2006 WL 456786, at *11 (Del. Ch. Feb. 22, 2006) (alterations in original) (quoting Donald J. Wolfe, Jr. & Michael A. Pittenger, Corporate and Commercial Practice in the Delaware Court of Chancery § 3-5[a] (2005)).

The appropriate analytical response to a defendant's challenge to personal jurisdiction under § 3114 has been explained:
"[O]nce a defendant has moved to dismiss the complaint for lack of personal jurisdiction the plaintiff bears the burden of showing that the court has personal jurisdiction over the defendant." Where, as here, "no evidentiary hearing [has been] held, the plaintiff typically meets this burden by making a prima facie showing that the exercise of personal jurisdiction is appropriate." "[I]n such a case, the record is construed in the light most favorable to the plaintiff." [FN61]

> FN61. *Canadian Commercial Workers Indus. Pension Plan,* 2006 WL 456786, at *11 (citations omitted); *see also Cornerstone Techs., LLC v. Conrad,* 2003 WL 1787959, at *3 (Del. Ch. Mar. 31, 2003).

Based on the particular arguments advanced by NACEPF,[FN62] and the Court's ruling below, the Court only analyzes whether personal jurisdiction exists over the Defendants with respect to Count II of the Complaint.

> FN62. *See infra* note 71 and accompanying text.

Count II alleges that the Defendants breached a fiduciary duty while they served as directors of Clearwire and while Clearwire was either insolvent or in the zone of insolvency. The facts alleged in the Complaint,[FN63] as bolstered and confirmed by the affidavit submitted by NACEPF, constitute a *prima facia* showing of a breach of fiduciary duty by the Defendants in their capacity as directors [FN64] of a Delaware corporation.[FN65] NACEPF has met its burden; [FN66] the Court, therefore, concludes that that a statutory basis for the exercise of personal jurisdiction exists for purposes of litigating Count II of the Complaint. In addition, the Court's exercise of jurisdiction over the Defendants is consistent with principles of due process [FN67] because the Defendants' acceptance of their positions as directors of Clearwire made it foreseeable that they would be haled into court in Delaware to respond to challenges based on their fiduciary obligations as directors of a Delaware corporation and because the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

exercise of jurisdiction otherwise comports with traditional notions of fairness and justice.[FN68]

FN63. *See Canadian Commercial Workers Indus. Pension Plan,* 2006 WL 456786, at *11 n. 93 (explaining that, notwithstanding suggestion that a plaintiff typically cannot rely simply on the allegations contained in its complaint once jurisdiction is challenged, "a plaintiff can, in fact, make the necessary prima facie showing using only the facts alleged in the complaint" (citing *Optimalcare, Inc. v. Hightower,* 1996 WL 417510 (Del. Ch. July 17, 1996) ); *see also Canadian Commercial Workers Indus. Pension Plan,* 2006 WL 456786, at *11-*12 (examining allegations contained in complaint for personal jurisdiction analysis).

FN64. *See infra* text accompanying note 80 (suggesting that NACEPF's theory of the case might have more likely met with success had it been used as the basis for a derivative claim for breach of fiduciary duty).

FN65. The parties have joined issue over personal jurisdiction with the submittal of affidavits directed at the debate about whether Clearwire was insolvent or in the zone of insolvency. Affidavits are routinely used to assist the Court in assessing the success of a plaintiff in making the *prima facia* showing of the factual basis enabling exercise of personal jurisdiction. The proper approach, in this circumstance, is complicated by the confluence of (1) § 3114 which has been construed to require a fiduciary duty as a predicate and (2) the substantive law that the existence of a fiduciary duty is related in some way to insolvency.

As an initial matter, assuming *arguendo* it is required, NACEPF has met its burden of making a *prima facie* showing, through its allegations as well as its supporting affidavits, that, at least at some time during the relevant periods, Clearwire was either insolvent or in the zone of insolvency. *See, e.g.,* Aff. of John Primeau (President of NACEPF), ¶ 13, Exs. D & G; Tr. 36:7-37:6 (comparing Aff. of Jimmy M. Mansour, Ex. B at 2 with *id.,* Ex. A at 10); *see also* Part III(B), *infra.* Certainly, the evidence offered by NACEPF (much of it consisting of financial projections of future events) does not stand uncontested. *See, e.g.,* Aff. of Jack Daly, ¶ 7 ("[P]ayment for Spectrum under the Master Agreement was not due in full immediately upon signing or even shortly thereafter, but rather payments were spread over *a thirty year period.* Further, these obligations and payment amounts were contingent upon Spectrum licensed by the Alliance becoming available at a future date and being presented to Clearwire for leasing-vents that would happen (if at all) over the span of decades.") (citations omitted) (emphasis in original); *see also id.,* ¶¶ 8, 9 (countering assertions in NACEPF affidavit in reliance on financial projections by purporting to identify actual financial outcomes). The Court is not, however, seeking to make a conclusive determination of fact for Court of Chancery Rule 12(b)(2) purposes. Also compare note 97, *infra,* explaining that the allegations do not support a reasonable inference, for purposes of Court of Chancery Rule 12(b)(6), that Clearwire was insolvent at the time of entering into the Master Agreement.

The Court notes, however, that *prima facie* evidence demonstrating that the suit involves acts by the Defendants in their " capacity as ... director[s]" and that the suit involves the "statutory [or] nonstatutory fiduciary duties]" of the Defendants likely satisfies NACEPF's burden for purposes of resolving the Defendants' motion to dismiss NACEPF's fiduciary duty cause of action under Court of Chancery Rule 12(b)(2). Conducting a more searching inquiry into the evidence proffered by NACEPF would arguably violate the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

understanding, expressed in our case law, that analysis of a motion to dismiss under Court of Chancery Rule 12(b)(2) is distinct from the analysis applicable to a motion to dismiss under Court of Chancery Rule 12(b)(6). *Cf. Hana Ranch, Inc. v. Lent,* 424 A.2d 28, 32 (Del. Ch.1980) ("In a 12(b)(2) motion, such as the one before the Court, it is necessary, in order to decide it, to examine the cause of action alleged in order to ascertain whether or not it is directed against the defendant in his capacity as a corporate director. Thus, the legal sufficiency of the complaint is not ... brought into question as in a [Rule] 12(b)(6) motion but merely that of the [personal] jurisdiction of the Court over a non-resident on the basis of a complaint which fails to state a cause of action against such a non-resident in his capacity of director."); Donald J. Wolfe, Jr. & Michael A. Pittenger, Corporate and Commercial Practice in the Delaware Court of Chancery § 3-5[a], 3-63 (2006); *but cf. Geyer v. Ingersoll Publ'ns Co.,* 621 A.2d 784, 787 n. 1 (Del. Ch.1992).

It should be noted that an alternate view of personal jurisdiction, in this context, might require that the Court determine whether a fiduciary duty of the type for which NACEPF argues exists for purposes of resolving the motion to dismiss for lack of personal jurisdiction. *See id.; see also Oryx Capital Corp. v. Phoenix Laser Sys., Inc.,* 1990 WL 58180, at *3 (Del.Super.1990) (decision of Superior Court holding that, in order to obtain jurisdiction under Section 3114, plaintiff must be owed a fiduciary duty). The Court is reluctant to adopt such a restrictive interpretation, however, given prior case law, described above, requiring that a distinction between motions to dismiss under Court of Chancery Rules 12(b)(2) and 12(b)(6) be maintained. Indeed, to hold otherwise, might produce the potentially awkward result of a finding of personal jurisdiction if litigation had been pursued on a derivative basis, but not as a direct action.

An argument, not without significant merit, can be made, however, that the determination of whether the argued-for cause of action exists is a proper subject for resolution under Court of Chancery Rule 12(b)(2). The Court declines, in this instance, to adopt such an approach on the ground that it views these questions, regarding the fiduciary obligations of directors of a Delaware corporation, as warranting a final resolution on the merits, especially given the purposes underlying adoption of Section 3114.

FN66. *See, e.g.,* Aff. of John Primeau, ¶¶ 13-14 ("On May 1, 2002, all the members of the Alliance met with Messrs. Cardinale, Gheewalla in New York City to discuss Clearwire's finances. At that meeting, Mr. Gheewalla told us that Clearwire could not pay its debts without concessions as to the amounts to be paid for spectrum. I understood this to be a threat that unless we Alliance members made substantial concessions that Clearwire would be allowed to go bankrupt and through such a long process the remaining Clearwire cash (about $20 million) would be kept until exhausted and bankruptcy followed."); *see also* Aff. of Jack Daly, ¶ 1 (stating that Defendant Daly has served as a director of Clearwire " from March 2001 to the present"). It should perhaps be noted, however, that the Affidavit of Jack Daly also informs that the Defendants did not become directors of Clearwire until after the Clearwire board approved the Master Agreement. *See id.* at ¶ 7, *see also id.,* Ex. A (containing written consents of then-current Clearwire directors "to be effective as of March 6, 2001"); Aff. of Jimmy M. Mansour, Ex. E at 5.

FN67. The Defendants did not raise this issue; instead, they focused on Section 3114 as a statutory basis for obtaining personal jurisdiction over them.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN68. *See, e.g., Canadian Commercial Workers Indus. Pension Plan,* 2006 WL 456786, at *12; *see also Carlton Invs. v. TLC Beatrice Int'l Holdings, Inc.,* 1996 WL 608492, at *5 (Del. Ch. Oct. 16, 1996) ; Wolfe & Pittenger, *supra* note 65, § 3-3; *cf. Cornerstone Techs. LLC,* 2003 WL 1787959, at *13.

*7 NACEPF argues that this Court also has personal jurisdiction over the Defendants with regard to the other claims asserted in the Complaint because they are "sufficiently related" to NACEPF's fiduciary duty claim. Indeed, "once jurisdiction is obtained pursuant to Section 3114, nonresident directors are properly before the court with respect to any claims that are sufficiently related to the cause of action asserted against such directors in their capacity as directors." FN69 As alluded to above, however, NACEPF has expressly premised its arguments for personal jurisdiction over the Defendants for Counts I and III (*i.e.,* the non-fiduciary duty claims) on the Court's first determining that Count II (*i.e.,* the fiduciary duty claim) survives the Defendants' motion to dismiss. FN70 In setting forth why the Court has personal jurisdiction over the Defendants with respect to Counts I and III, NACEPF contends:

FN69. *Canadian Commercial Workers Indus. Pension Plan,* 2006 WL 456786, at *11 (quoting Wolfe & Pittenger, *supra* note 60, § 3-5[a] ).

FN70. The standard applicable to dismissal under Court of Chancery Rule 12(b)(6) is the subject of the introduction to Part III(B), below.

[Section 3114] contemplates jurisdiction over directors of a Delaware Corporation "where the cause of action is grounded on such individuals' breach of the fiduciary duties owed to the corporation and its owners." When a breach of fiduciary duty is *well pled,* this Court may join " sufficiently related" causes of action.FN71

FN71. Ans. Br. at 46 (quoting *Armstrong v. Pomerance,* 423 A.2d 174, 176 n. 5 (Del.1980)) (emphasis added). At oral argument, NACEPF did not address further the consequences of dismissing the fiduciary duty claim under Court of Chancery Rule 12(b)(6) on NACEPF's " related," non-fiduciary duty claims; instead, NACEPF, in substance, reiterated its contention that jurisdiction over Counts I and III depends, in the general case, " upon whether those claims are sufficiently related to the fiduciary claim." *See* Tr. 49:20-50:3; *see also id.* at 50:3-8.

Although perhaps likely correct,FN72 the Court notes that this statement could arguably also be viewed as overly-restrictive.FN73 NACEPF has not argued otherwise, however, and, therefore, at least for purposes of this litigation, the Court employs the rule for which NACEPF has argued.

FN72. NACEPF has not offered case law standing squarely for the proposition that only a well-pleaded fiduciary duty claim will be sufficient to sustain personal jurisdiction with respect to other " sufficiently related" causes of action.

FN73. The notion that a plaintiff might be permitted to continue to pursue litigation in which personal jurisdiction is premised upon the consent-to-service statute for claims that are merely "sufficiently related" to a fiduciary duty claim which has been dismissed under Court of Chancery Rule 12(b)(6) would seem, at least upon initial examination, to violate the understanding implicit in our jurisprudence's narrow interpretation of Section 3114. *Cf. Norman v. Paco Pharm. Servs., Inc.,* 1989 WL 110648 (Del. Ch. Sept. 22, 1989) (appearing to dismiss claims against particular directors for lack of personal jurisdiction under Section 3114 after dismissing the fiduciary duty claim against all defendants for lack of standing); *Van de Walle v. L.F. Rothschild Holdings, Inc.,*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1994 WL 469150, at *3 (Del. Ch. Aug. 2, 1994) (dismissing suit against defendant directors because they "ha[d] been sued based solely upon their status as directors of a Delaware corporation" when no cause of action for breach of fiduciary duty was alleged); *compare Hana Ranch, Inc.,* 424 A.2d at 31 ("[A] valid cause of action against a non-resident defendant for acts within the scope of a directorship [is] a sine qua non to the successful assertion of a claim against such a non-resident in his capacity as a stockholder."). On the other hand, that the averments fail to state a claim upon which relief can be granted does not determine whether the Court has personal jurisdiction with respect to any claim, as an initial matter. *Cf. Carlton Invs. v. TLC Beatrice Int'l Holdings, Inc.,* 1995 WL 694397, at *13 (Del. Ch. Nov. 21, 1995) ("The ability of a shareholder to invoke Section 3114 cannot turn upon whether the facts allege[d] constitute a valid claim. If they do not, the director may have the case dismissed on its merits under Rule 12(b)(6), not under 12(b)(2) or (4)."); *see also id.* (quoting *Bell v. Hood,* 327 U.S. 678, 682 (1946)). It is important, however, to recognize that the immediately preceding proposition perhaps more properly relates to the fiduciary duty claim, in the context of Section 3114, and is at least arguably distinct from the multiple complications raised by non-fiduciary duty claims for which plaintiffs seek to obtain statutory personal jurisdiction over non-resident directors solely because those claims are "sufficiently related" to the putative breach of fiduciary duty. *See, e.g., Manchester v. Narragansett Capital, Inc.,* 1989 WL 125190, at *7 (Del. Ch. Oct. 19, 1989) ("The issue is whether plaintiff's contract claims are sufficiently related to the claims alleging breach of fiduciary duty by the nonresident director defendants so as to require them to appear and defend the contract claims in Delaware."); *see also id.* (finding contract claims " sufficiently related" to plaintiff's "breach of fiduciary duty and corporate waste claims" such that defendants "should expect to answer in a Delaware court for the contract actions related to plaintiff's breach of fiduciary duty claims"); *cf. Armstrong,* 423 A.2d at 176 n. 5 (explaining that [Section] 3114 authorizes service "where the cause of action is grounded on such individuals' breach of the fiduciary duties owed to the corporation and its owners"); *id.* ("Thus, [ Section] 3114 authorizes jurisdiction only in actions which are inextricably bound up in Delaware law and where Delaware has a strong interest in providing a forum for redress of injuries inflicted upon or by a Delaware domiciliary, i.e ., the Delaware corporation."). Additionally, it should perhaps be noted that the legislative synopsis accompanying § 3114 might arguably inform, and lend support to, the restrictive view of personal jurisdiction over "related" claims assumed by NACEPF in this context. *See* 61 Del. Laws, c. 119 (July 7, 1977) (explaining, in pertinent part: "Delaware has a substantial interest in defining, regulating and enforcing the fiduciary obligations which directors of Delaware corporations owe to such corporations and the shareholders who elected them. In promoting that interest, it is essential that Delaware afford a convenient and available forum for supervising the affairs of Delaware corporations and the conduct of directors of Delaware corporations. This legislation is designed to accomplish that objective."). Moreover, consideration of these issues " might lead to an interesting procedural conundrum." Wolfe & Pittenger, note 65, *supra,* § 3-5[a], at 3-63. One might argue that once personal jurisdiction is obtained, it is at least unusual to say that it could be lost. Such difficulties arguably arise, however, because personal jurisdiction under Section 3114, unlike 10 *Del.C.* § 3104, has been interpreted, for special reasons, *see* Wolfe & Pittenger, note 65, *supra,* § 3-5[a], to require not only a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

demonstration of facts in existence regardless of the cause of action pursued, but also the existence of a relationship that is itself the premise of a cause of action. *Compare* 4A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure:*Civil* § 1069.7 (in discussing the doctrine of "pendent personal jurisdiction," stating: "Of course, if the only jurisdictionally sufficient claim is dropped or dismissed, particularly if that occurs early in the litigation, the pendent claim should be dismissed as well." (citing *Olin Corp. v. Fisons PLC,* 47 F.Supp.2d 151, 155 (D.Mass.1991))).
Notwithstanding this, it should also be noted that "Delaware courts have tended to construe the scope of a director's fiduciary duties broadly in assessing whether jurisdiction is properly premised under Section 3114." *Id.* at § 3-5[a], at 3-59 (citing *Hoover Indus., Inc. v. Chase,* 1988 WL 73758 (Del. Ch. July 13, 1988)); *see also id.* at § 3-5[a], at 3-60 (stating that " Delaware courts ... have similarly construed broadly the classes of persons to whom fiduciary duties are owed by the directors of a Delaware corporation" in applying Section 3114 (citing, *inter alia, Geyer,* 621 A.2d at 787-90)). Thus, the potential difficulty here is not so much whether the Defendants are properly before the Court on NACEPF's claim for breach of fiduciary duty, but, instead, the consequences to NACEPF's putatively " sufficiently related" claims of a finding that NACEPF has failed to state a claim for breach of fiduciary duty upon which relief can be granted. Given the lack of briefing by the parties on the implications of this question and, more importantly, that NACEPF has expressly adopted the more restrictive view, as described in the text above, this question need not be resolved for purposes of the present litigation.

Thus, should the Court find that Count II must be dismissed under Court of Chancery Rule 12(b)(6), then the Court will conclude that it is without personal jurisdiction over the Defendants for purposes of moving forward with the merits of Counts I and III. Therefore, in order to resolve the lingering questions of personal jurisdiction, the Court must first examine whether Count II properly states a claim upon which relief can be granted.

B. *Motion to Dismiss under Court of Chancery Rule 12(b)(6)*

The standards governing motions to dismiss under Court of Chancery Rule 12(b)(6) are well-settled:
(i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded " if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate unless the "plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof." FN74

FN74. *In re General Motors (Hughes) S'holder Litig.,* 897 A.2d 162, 168 (Del.2006) (quoting *Savor, Inc. v. FMR Corp.,* 812 A.2d 894, 896-97 (Del.2002)).

A number of considerations flow from these general criteria:
Although the Court must "accept as true all of the well-pleaded allegations of fact and draw reasonable inferences in the plaintiff's favor," it is " not ... required to accept as true conclusory allegations 'without specific supporting factual allegations." ' Instead, the Court must "accept only those 'reasonable inferences that logically flow from the face of the complaint' and 'is not required to accept every strained interpretation of the allegations proposed by the plaintiff." ' FN75

FN75. *Khanna,* 2006 WL 1388744, at *29 (quoting *Hughes,* 897 A .2d at 168).

*8 These principles guide the Court's analysis,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

below, with respect to the Defendants' motion to dismiss under Court of Chancery Rule 12(b)(6).

In this action, the Court is confronted with the question of whether a corporation's creditors may assert direct claims against directors for breach of fiduciary duties when the corporation is insolvent or in the zone of insolvency. The Court need only answer this question on two narrow lines of approach. First, the Court examines whether a *direct* claim may be asserted by creditors for breach of fiduciary duty if the corporation is in the zone of insolvency. Second, assuming *arguendo* that a direct claim may be asserted against directors by creditors of an insolvent corporation in this context, the Court turns to the narrow question of whether NACEPF has satisfied its burden of alleging the requisite unusual facts necessary to maintain such a claim.

NACEPF has waived any basis it may have had for pursuit of its claim derivatively; instead, it has made it clear that it seeks to assert only a direct claim for breach of fiduciary duties.[FN76] It contends that direct claims by creditors have been recognized, in the context of both insolvency and the zone of insolvency by prior decisions of this Court.[FN77] Furthermore, NACEPF argues that the challenged conduct, here, is "similar to the hypothetical conduct used ... to illustrate when directors have violated their duty to creditors" in the now-famous footnote fifty-five of *Credit Lyonnais Bank Nederland, N.V. v. Pathe Communications Corp.* [FN78] Similarly, NACEPF contends that the Defendants' conduct constitutes the "sort of self-dealing that is actionable under the decisions cited in *Production Resources.*" [FN79]

FN76. *See* Pl. N. American Catholic Educ. Programming Found., Inc .'s Ans. Br. in Resp. to the Defs.' Mot. to Dismiss Pl.'s Compl. ("Ans.Br.") at 19 ("Here, NACEPF is asserting just such a direct claim on its own behalf."); *see also id.* at 19 n. 16 ("While the Defendants do not mention it, the NACEPF claim also constitutes a 'direct' claim under *Tooley v. Donaldson, Lufkin & Jenrette, Inc .,* 845 A.2d 1031 (Del.2004), and its progeny.").
Although derivative claims and direct claims may arise out of the same conduct, *cf. Gentile v. Rossette,* 2006 WL 2388934, at *6 n. 19 (Del. Aug. 17, 2006); *Grimes v. Donald,* 673 A.2d 1207, 1212 (Del.1996) ( "Courts have long recognized that the same set of facts can give rise both to a direct claim and a derivative claim."), a claim that is fairly characterized as derivative is just that: one that must, if at all, be brought on behalf of the corporation. The waiver of any derivative claim deprives NACEPF of the broad opportunity to recover for the Clearwire entity-perhaps the principal victim of the Defendants' alleged faithless conduct in favoring Goldman Sachs over Clearwire-and leaves it with a narrower claim which it may or may not be able to assert on its own behalf.
Also, because NACEPF disavows assertion of any derivative claim, the procedural questions linked to the requirements of Court of Chancery Rule 23.1 need not be contemplated. *See, e.g., Production Resources Group, L.L.C. v. NCT Group, Inc.,* 863 A.2d 772, 795-96 (Del. Ch.2004).

FN77. *See* Ans. Br. at 17-19 (quoting *Production Resources,* 863 A.2d at 790-91, 796-98 (assuming, without deciding, that a direct claim may be asserted by creditors of an insolvent corporation)); *see also* Ans. Br. at 21 n. 31 (identifying *Penn. Co. for Ins. on Lives & Granting Annuities v. S. Broad St. Theatre Co.,* 174 A. 112 (Del. Ch.1934); *Geyer,* 621 A.2d 784).

FN78. Ans. Br. at 21 (citing *Credit Lyonnais Bank Nederland, N.V. v. Pathe Commc'ns Corp.,* 1991 WL 277613, at *34 n. 55 (Del. Ch. Dec. 30, 1991) (discussing conduct of directors in the zone of insolvency)).

FN79. Ans. Br. at 21 (identifying *Penn.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Co. for Ins. on Lives & Granting Annuities,* 174 A. 112; *Geyer,* 621 A.2d 784).

NACEPF argues that the Defendants "breached their fiduciary duties by engaging in self-dealing to further the plans of their employer, Goldman Sachs. This self-dealing occurred in the pursuit of a business that 'had no reasonable likelihood of succeeding,' but rather depleted Clearwire's assets to NACEPF's detriment." [FN80] NACEPF contends that Goldman Sachs controlled the Clearwire board through its financing and that the Defendants negotiated the Master Agreement while under the control of Goldman Sachs. "[The Defendants] provided assurances that Goldman Sachs would infuse adequate capital and management assistance to develop the spectrum assets into a national system of wireless connections to the internet benefiting NACEPF." [FN81] NACEPF argues that it justifiably relied on the Defendants' "commitments on behalf of Goldman Sachs" in entering into the Master Agreement.[FN82] Counsel for NACEPF, at oral argument, cogently summarized the basis for his client's claim:

FN80. Ans. Br. at 19 (quoting Compl. ¶ 46). These allegations might have provided NACEPF with a solid foundation for a derivative action, but it did not pursue that strategy.

FN81. Ans. Br. at 20.

FN82. *Id.* It should be noted that, although not considered for purposes of resolving the Defendants' Motion to Dismiss, given the somewhat ambiguous allegations of timing contained in the Complaint, the issue of whether these statements were made before the Defendants became directors of Clearwire has been the subject of vigorous debate.

The idea that was sold to us, as an owner of some of this educational spectrum, was that when the licenses that had previously been given to the Sprints and WorldComs of this world expired, then Clearwire would come in, acquire those licenses, pay us the additional consideration that the [M]aster [A]greement required, and develop a system of wireless internet services that-Clearwire already had some technology, would permit them to do this. And then we would be better off and running with a much better deal than we had with Sprint and WorldCom at that point in time.

*9 The key thing is that Clearwire, through the financial strength of Goldman Sachs, would actually develop this network.... We say that on days after the [M]aster [A]greement was signed in March of 2001, rather than pursue the development of this wireless network, the defendants had a secret plan, which is that instead of paying us for these licenses when they became off-licensed from Sprint and WorldCom, they instead went to Sprint and WorldCom ... and said to them, "Look, we won't buy your license. We won't outbid you under our deal with the Alliance. Instead, we will stand by. You just pay us off to do that. Then, because we won't be competing with you to get the Alliance's licenses under our [M]aster [A]greement, you can do whatever you want, leaving us without the payments that we were supposed to get, but leaving Clearwire enriched by the deals they were going to make with the Sprints and the WorldComs of this world."

We didn't say that stayed the same thereafter, forever, as part of their scheme. We say that failed. Thereafter, when they became increasingly insolvent, they simply held on to the rights that they had under the [M]aster [A]greement, with knowledge that they could not fulfill those rights and knowledge that we could have renewed our licenses with Sprint and WorldCom if they had gotten out of the way, and thereby made some real money with Sprint and WorldCom.

That continued not in March of 2001, but after March of 2001, into 2002, when Clearwire was clearly insolvent, or certainly in the vicinity of insolvency. And at that point in time, rather than acknowledge to us that they were not going to be able to fulfill their contractual obligations, they, instead, insisted on asserting those rights and precluded us from going out in the market when they were not able to do so. With some details, that is the outline of the theory here behind what was going on.[FN83]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 19 of 38



FN83. Tr. 33:14-35:20. NACEPF's briefing also elaborates on its theory of the case:

Contrary to the Defendants' commitments to develop Clearwire into a national wireless internet provider, [the Defendants] began secretly meeting with leading wireless providers to extract concessions based on Clearwire's claims to be able to interfere with their spectrum licenses. The Defendants continued to assert, after they took positions on Clearwire's Board and after it was clear that Clearwire was insolvent, that Clearwire had the right to acquire the spectrum licenses from NACEPF. These claims prevented NACEPF from offering the same licenses to other parties and were not undertaken to further Clearwire's legitimate business plan, but to hold NACEPF's spectrum hostage until the other wireless providers gave in to Defendants' scheme.

The Complaint alleges that the directors did not take steps to "preserv[e] the assets of Clearwire for its benefit ... when it became apparent that Clearwire would not be able to continue as a going concern and would need to be liquidated." The Defendants' act of keeping the spectrum ' in play' for Goldman Sachs's benefit without any prospect of Clearwire actually using those licenses, deprived NACEPF of the ability to sell the spectrum. That self-dealing includes the [Defendants'] knowledge that Clearwire was in danger of liquidation and that Goldman Sachs would not carry through the grand plans it trumpeted.... Such acts were pernicious to NACEPF's economic rights.

Ans. Br. at 20-21. NACEPF also mentions that the "Defendants' further act of investing the spectrum licenses in a Florida business that had no reasonable likelihood of success jeopardized NACEPF's prospects of recovery on its debts owed by Clearwire." *Id.* at 21 (citing Compl. ¶¶ 46, 47). This matter is discussed in greater detail, below. *See infra* note 127 and accompanying text.

NACEPF argues that, "[t]aken together, these acts instrumented by the Defendants during the Clearwire insolvency, violated the good faith required by their fiduciary duties to NACEPF." FN84

FN84. Ans. Br. at 21.

The Defendants counter that NACEPF improperly seeks to assert "a direct creditor claim more akin to one for breach of contract by Clearwire than for breach of directorial duty by individual directors...." FN85 The Defendants contend that they owed no fiduciary duty to Clearwire's creditors and, therefore, no claim for breach of fiduciary duty may be asserted against them directly. FN86 Instead, the Defendants argue that Delaware jurisprudence recognizes only that a corporation's creditors are, in the context of insolvency or the "vicinity of insolvency," permitted standing to assert fiduciary duty claims derivatively on behalf of the corporation.

FN85. Defs.' Reply Br. in Supp. of Their Mot. to Dismiss Pl.'s Compl. ("Reply Br.") at 2.

FN86. *Id.* at 3-5.

Specifically, the Defendants maintain that the Court's opinion in *Production Resources*-on which NACEPF has placed particular reliance-acknowledged merely the *possibility* that a direct claim could be asserted by creditors of an insolvent corporation, but that the Court by no means definitively resolved this question. FN87 The Defendants argue that, notwithstanding the Court's prior reluctance to preclude the possibility of a direct claim by creditors in this context, NACEPF's direct claim for breach should not now be permitted to continue.

FN87. *See* Defs.' Br. in Supp. of Their Mot. to Dismiss Pl.'s Compl. ("Opening

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.