Br.") at 16, 24.

***10** Below, the Court examines whether either insolvency or zone of insolvency has been adequately pleaded for these purposes; the Court then briefly describes the background for determining the critical question, in the general case, of what constitutes a direct or derivative claim. Next, the Court turns to the narrow question of whether a direct claim asserted by creditors of a corporation in the zone of insolvency is cognizable under Delaware law. Finally, the Court examines whether, assuming *arguendo* that a direct claim might be asserted in the context of insolvency, NACEPF has satisfied the demanding pleading burden required to set forth such a claim.

1. *Allegations of insolvency or zone of insolvency*

In support of its claim that Clearwire was either insolvent or in the zone of insolvency during the relevant periods, NACEPF alleges that Clearwire needed "substantially more financial support than it had obtained in March 2001." FN88 As described above, Goldman Sachs had invested $47 million in Clearwire, which "represent[ed] 84% of the total sums invested in Clearwire in March 2001, when Clearwire was otherwise virtually out of funds." FN89

FN88. Compl. ¶ 30.

FN89. *Id.* at ¶ 7(a). Simple arithmetic provides that the total amount invested in Clearwire in March 2001 was, therefore, approximately $56 million.

*After March 2001*, Clearwire had financial obligations related to its agreement with NACEPF and others that *potentially* exceeded $134 million, did not have the ability to raise sufficient cash from operations to pay its debts as they became due and was dependent on Goldman Sachs to make additional investments to fund Clearwire's operations for the foreseeable future. FN90

FN90. *Id.* at ¶ 7(b) (emphasis added). NACEPF also asserts that "Clearwire was unable to borrow money or obtain any other significant financing after March 2001, except from Goldman Sachs." *Id.* at ¶ 7(c).

The Complaint also alleges:
For example, upon the closing of the Master Agreement, Clearwire had approximately $29.2 million in cash and of that $24.3 million would be needed for future payments for spectrum to the Alliance members. Clearwire's "burn" rate was $2.1 million per month and it had then no significant revenues. The process of acquiring spectrum upon expiration of existing licenses was both time consuming and expensive, particularly if existing licenseholders contested the validity of any Clearwire offer that those license holders were required to match under their rights of first refusal. FN91

FN91. *Id.* at ¶ 30.

Elsewhere in the Complaint, NACEPF alleges that, "[b]y October 2003, Clearwire had been unable to obtain any further financing and effectively went out of business. Except for money advanced to it as a stopgap measure by Goldman Sachs in late 2001, Clearwire was never able to raise any significant money." FN92

FN92. *Id.* at ¶ 36.

Insolvency may be demonstrated by either showing (1) "a deficiency of assets below liabilities with no reasonable prospect that the business can be successfully continued in the face thereof," FN93 or (2) "an inability to meet maturing obligations as they fall due in the ordinary course of business." FN94 Applying the standards applicable to review under Court of Chancery Rule 12(b)(6), the Court accepts that NACEPF has satisfactorily pleaded facts permitting a reasonable inference that Clearwire operated in the zone of insolvency FN95 during at least a substantial portion of the relevant

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

periods for purposes of this motion to dismiss. [FN96] Similarly, insolvency has been adequately pleaded, for these purposes, for at least a portion of the relevant periods following execution of the Master Agreement.[FN97]

FN93. *Production Resources,* 863 A.2d at 782 (quoting *Siple v. S & K Plumbing & Heating, Inc.,* 1982 WL 8789, at *2 (Del. Ch. Apr. 13, 1982)); *see also Geyer,* 621 A.2d at 789 (explaining that corporation is insolvent if "it has liabilities in excess of a reasonable market value of assets held"); *McDonald v. Williams,* 174 U.S. 397, 403 (1899) (defining insolvent corporation as an entity with assets valued at less than its debts).

FN94. *Production Resources,* 863 A.2d at 782 (quoting *Siple,* 1982 WL 8789, at *2).

FN95. In light of the Court's ultimate ruling, here, the Court does not attempt to set forth a precise definition of what constitutes the "zone of insolvency." It is sufficient, for purposes of this litigation, merely to state that NACEPF has pleaded facts permitting a reasonable inference that, during at least some portions of the relevant period, Clearwire operated at the brink of insolvency. *Cf. Credit Lyonnais,* 1991 WL 277613, at *34; *see also Production Resources,* 863 A.2d at 789 n. 56 (describing the difficulties presented in identifying "zone of insolvency").

FN96. Although not considered for purposes of the insolvency inquiry under Court of Chancery Rule 12(b)(6), affidavits submitted by the Defendants for purposes of the Court's potentially broader examination of personal jurisdiction under Court of Chancery Rule 12(b)(2) indicate that Clearwire may not have become insolvent or, if it did, then only for limited periods.

FN97. NACEPF's allegation that *"[a]fter March 2001,* Clearwire had financial obligations related to its agreement with NACEPF and others that *potentially* exceeded $134 million," Compl. ¶ 7(b) (emphasis added), does not permit the reasonable inference that Clearwire was insolvent *at the time of contract,* especially given the context of the contract entered into and the substantial influx of capital provided to Clearwire in March 2001. *See also id* . at ¶¶ 30, 36 (indicating that Clearwire was insolvent, if ever, after the contract was executed). The conclusory allegations contained in Paragraph 7(b) do not aid in drawing this inference, either.

*2. Whether direct claims for breach of fiduciary duties may be asserted by creditors of corporations in the zone of insolvency*

*11 Analysis of NACEPF's putative direct claim first requires an understanding of the distinction between direct and derivative claims-a distinction drawn with the assistance of the test set forth in *Tooley v. Donaldson, Lufkin, & Jenrette, Inc.*[FN98] In *Tooley,* the Delaware Supreme Court held that the relevant inquiry in determining whether a claim is direct or derivative "must be based solely on the following questions: Who suffered the alleged harm-the corporation or the suing stockholder individually-and who would receive the benefit of the recovery or other remedy?" [FN99] In other words, "[a] direct claim ... is a claim on which the stockholder can prevail without showing an injury or breach of duty to the corporation, and one in which no relief flows to the corporation." [FN100] Thus, in order to assert a direct claim for relief, a plaintiff must satisfy the requirements of *Tooley;* but, more fundamentally, a plaintiff, in order to succeed in that effort, must also demonstrate that its claim is one that is cognizable under our jurisprudence.[FN101] This latter point, then, frames the question raised by the present litigation.

FN98. 845 A.2d 1031 (Del.2004). The fact of insolvency or entry into the zone of insolvency does not impinge upon the applicability of the test setting forth the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

derivative/direct distinction recognized by our jurisprudence. *See, e.g., Big Lots Stores, Inc. v. Bain Capital Fund VII, LLC,* 2006 WL 846121, at *6 (Del. Ch. Mar. 28, 2006); *Production Resources,* 863 A.2d at 792; *see also Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.,* 2006 WL 2333201, at *22 n. 75 (Del. Ch. Aug. 10, 2006) (explaining that, in the Court's " short answer" view, the "substantive effect the question of insolvency should have ... on the application of the derivative/direct claim distinction" is "none").

FN99. 845 A.2d at 1035.

FN100. *Big Lots Stores, Inc.,* 2006 WL 846121, at *6. Although the Plaintiff in this action claims status as a creditor, the direct/derivative distinction would not vary because the claim was asserted by a creditor instead of a stockholder.

FN101. *Cf. Tooley,* 845 A.2d at 1039 ("In this case it cannot be concluded that the complaint alleges a derivative claim.... But, it does not necessarily follow that the complaint states a direct, individual claim. While the complaint purports to set forth a direct claim, in reality, it states no claim at all. The trial court analyzed the complaint and correctly concluded that it does not claim that the plaintiffs have any rights that have been injured.").

"Typically, creditors may not allege fiduciary duty claims against corporate directors." FN102 When a corporation has become insolvent, however, directors have been "said to owe fiduciary duties to the company's creditors." FN103 The extent to which such statements may, in the context of *insolvency,* confer rights to assert claims for breach of fiduciary duties, as traditionally understood, perhaps remains the subject of legitimate debate. FN104

FN102. *Production Resources,* 863 A.2d at 787; *see also Geyer,* 621 A.2d at 787 ("[T]he general rule is that directors do not owe creditors duties beyond the relevant contractual terms.").

FN103. *See Production Resources,* 863 A.2d at 790-91 (citing *Geyer,* 621 A.2d at 787 ("[W]hen the insolvency exception [arises], it creates fiduciary duties for directors for the benefit of creditors.")). As the Court observed in *Production Resources:*
When a firm is *insolvent,* the directors are said to owe fiduciary duties to the creditors, much like the directors of solvent firms owe such duties to the stockholders. The important unanswered question is precisely what the contents of those duties are. As Justice Frankfurter famously stated: "But to say that a man is a fiduciary only begins analysis; it gives direction to further inquiry. To whom is he a fiduciary? What obligations does he owe as fiduciary? In what respects has he failed to discharge these obligations? And what are the consequences of his deviation from duty?"
863 A.2d at 797 (quoting *Sec. & Exch. Comm'n v. Chenery Corp.,* 318 U.S. 80, 85-86 (1943) (emphasis added)).

FN104. Regarding the effect of insolvency, if any, it is perhaps unclear whether, for example, such statements, in practice, only describe persons who may enforce duties or point to whom duties are owed. *See infra* note 108; Part III(B)(3).

Some have interpreted prior opinions of the Court FN105 to authorize fiduciary duty claims by creditors in what is referred to as the "zone of insolvency," as well. FN106 Indeed, in this instance, NACEPF contends that the Defendants, as directors of Clearwire, a corporation alleged to have been either insolvent or operating in the zone of insolvency, breached fiduciary duties allowing NACEPF, as its creditor, to seek to hold the Defendants individually liable for direct claims. FN107 In the following passages of this Subpart, the Court discusses the two principal grounds,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

appearing in case law and potentially implicated here, for imposing liability. First, the Court addresses the \"incentive-to-enforce rationale," described in greater detail below. This paradigm has been employed to support standing for creditors in their pursuit of derivative claims on the behalf of insolvent corporations. The principles underlying this doctrine are arguably compatible with its application in the zone of insolvency, as well; and, as a consequence, the doctrine may also, by analogy, lend support for the pursuit of derivative claims by creditors of corporations in the zone of insolvency. The incentive-to-enforce rationale, however, says little or nothing about whether direct claims should lie. Therefore, the Court next turns to so-called "trust fund theory," which is the only principled basis, appearing in case law, *potentially* supporting direct fiduciary duty claims by creditors (which is the subject of Part III(B)(3), below). Unlike the "incentive-to-enforce rationale," however, the principles of "trust fund theory," as described by our case law, do not support its extension, by analogy, to the zone of insolvency. Therefore, although "trust fund theory" *might* lend support to the notion that a limited direct claim could lie for creditors of an insolvent corporation, so-called "trust fund theory" fails to provide an adequate, principled basis for the recognition of direct claims in the zone of insolvency.

FN105. For example, the Court's analysis in *Credit Lyonnais, see* 1991 WL 277613, at *34 n. 55, has been interpreted by some commentators (and jurisdictions) as suggesting the existence of a cognizable claim for relief which may be asserted by creditors, *see Production Resources,* 863 A.2d at 789 ("Creative language in a famous footnote in *Credit Lyonnais* was read more expansively by some ... to expose directors to a new set of fiduciary duty claims, this time by creditors.... [S]ome read *Credit Lyonnais* as authorizing creditors to challenge directors' business judgments as breaches of fiduciary duty owed to them." (citations omitted)); however, the Court's language is, perhaps, better viewed merely as a shield for directors from stockholder claims, in this context. *See id.; see also Credit Lyonnais,* 1991 WL 277613, at *34 (explaining, in the text of the opinion, that the directors of a corporation operating in the vicinity of insolvency owe a duty to the corporate enterprise "to exercise judgment in an informed, good faith effort to maximize the corporation's long-term wealth creating capacity"); *Angelo, Gordon & Co., L.P. v. Allied Riser Commc'ns Corp.,* 805 A.2d 221, 229 (Del. Ch.2002); *cf. Production Resources,* 863 A.2d at 791 (explaining that, when a firm has become insolvent, "[t]he directors continue to have the task of attempting to maximize the economic value of the firm").
A recent decision of this Court suggested that cases following *Credit Lyonnais,* which have been the subject of considerable academic debate, are "more a judicial method of attempting to reinforce the idea that the business judgment rule protects the directors of *solvent, barely solvent, and insolvent* corporations, and that the creditors of an insolvent firm have no greater rights to challenge a disinterested, good faith business decision than the stockholders of a solvent firm." *Trenwick Am. Litig. Trust,* 2006 WL 2333201, at *22 n. 75 (emphasis added).

FN106. *See supra* note 95.

FN107. In this Subpart, the Court addresses *only* the narrow issue of whether direct claims may be asserted by creditors against directors of corporations operating in the zone of insolvency. To the extent that debate may remain over the existence of, scope of, or analysis applicable to derivative claims brought by creditors-whether arising in the context of insolvency or, presuming such claims may be asserted, in the zone of insolvency-the Court does not address these issues in this Memorandum Opinion.

*12 The notion that creditors of an *insolvent*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

corporation are permitted standing to maintain derivative claims for breach of existing fiduciary duties on behalf of the corporation is relatively uncontroversial.FN108 Indeed, the idea that an insolvent corporation's creditors (having been effectively placed "in the shoes normally occupied by the shareholders-that of residual risk-bearers" FN109) should be granted standing because they are the principal remaining constituency with a material incentive to pursue derivative claims on behalf of the corporation has significant intuitive and persuasive merit.FN110 This exception for creditors in these limited circumstances arguably maintains the delicate balance achieved by the standing requirements for pursuit of derivative actions outside of this context-*i.e.*, balancing the " Delaware prerogative that directors manage the affairs of a corporation with the realization that shareholder policing, via derivative actions, is a necessary check on the behavior of directors that serve in a fiduciary capacity to shareholders." FN111 It arguably follows, then, that this " incentive-to-enforce rationale" would, to a degree, be comparably applicable to derivative claims asserted on behalf of corporations operating in the zone of insolvency, as well.FN112 As emphasized above, however, this is not the question framed by the present litigation, and, therefore, the Court expresses no conclusions about such arguments' validity.FN113

FN108. That creditors of an insolvent corporation may assert derivative claims is generally accepted as a practical matter, even if the theoretical underpinnings for such a view may be fairly debated. *See Production Resources,* 863 A.2d at 776-77; *see also id.* at 792 (in explaining why creditors may be granted standing to pursue derivative claims in this context, reasoning that "[t]he firm's insolvency simply makes the creditors the principal constituency injured by any fiduciary breaches that *diminish the firm's value* and logically gives them standing to pursue these claims to rectify that injury" (emphasis added)); *id.* at 794 n. 67. *Compare infra* notes 134. This Court has recently suggested that the principal effect of insolvency is perhaps merely that "the creditors become the enforcement agents of fiduciary duties...." *Trenwick Am. Litig. Trust,* 2006 WL 2333201, at *22 n. 75 ("In other words, the fiduciary duty tool is transferred to the creditors when the firm is insolvent in aid of the creditor's contract rights."); *cf. id.* at *4.

FN109. *Production Resources,* 863 A.2d at 791.

FN110. *See id.* at 792 ("The firm's insolvency ... makes the creditors the principal constituency injured by any fiduciary breaches that diminish the firm's value and logically gives them standing to pursue these claims to rectify that injury.").

FN111. *Agostino v. Hicks,* 845 A.2d 1110, 1117 (Del. Ch.2004); *see also Tooley,* 845 A.2d at 1036 ("The derivative suit has been generally described as 'one of the most interesting and ingenious of accountability mechanisms for large formal organizations." ' (quoting *Kramer v. W. Pac. Indus., Inc.,* 546 A .2d 348, 351 (Del.1988) (quoting R. Clark, Corporate Law 639-40 (1986)))); *Guttman v. Huang,* 823 A.2d 492, 500 (Del. Ch.2003) (noting the "deterrence effects of meritorious derivative suits on faithless conduct"); *cf. Khanna,* 2006 WL 1388744, at *11 n. 50 (describing the policy considerations underlying derivative-action standing requirements).

FN112. It may bear noting that, although the reasons for standing to assert derivative claims in the insolvency context would arguably apply to the zone of insolvency, as well (*i.e.*, the incentive-to-enforce rationale may remain, countering any attempt to draw a bright-line distinction), the Court merely presumes, in the text above, that standing would be available to creditors of corporations in the vicinity of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

insolvency to assert derivative claims on behalf of the corporation. Indeed, this issue is not without some debate. *See, e.g., Production Resources,* 863 A.2d at 789 n. 54, 790 n. 56 (describing potential arguments against such standing); Laura Lin, *Shift of Fiduciary Duty Upon Corporate Insolvency: Proper Scope of Directors' Duty to Creditors,* 46 Vand. L.Rev.. 1485, 1510 (1993). *Cf.* E. Norman Veasey & Christine T. Di Guglielmo, *What Happened in Delaware Corporate Law and Governance from 1992-2004? A Retrospective on Some Key Developments,* 153 U. Pa. L.Rev. 1399, 1432 (2005) (citing *Kohls v. Kenetech Corp.,* 794 A.2d 1160 (Table), 2002 WL 529908 (Order) (Del.2002) (affirming Court of Chancery decision "without reaching the general question of whether or to what extent directors of a corporation said to be in the so-called 'vicinity of insolvency' owe fiduciary duties to preferred stockholders" )). This question, however, need not be resolved within the narrow ambit of the present litigation-*i.e.,* the existence of direct claims for breach of fiduciary duties in this context.

FN113. *See* note 107, *supra.*

With respect to the narrow question presented here, the "incentive-to-enforce rationale" provides negligible, if any, analogous support for recognition of direct fiduciary duty claims brought by creditors of corporations in zone of insolvency. Put simply, in contrast to stockholder and (by analogy in this limited context) creditor derivative actions, *direct* claims by creditors would not help the corporate collective because the benefit would accrue to the creditor bringing the direct claim.[FN114] Any marginal benefit of such enforcement effort potentially accruing to the corporate collective would likely be outweighed by the disruption of the established corporate governance mechanism. NACEPF has neither offered any persuasive policy rationale favoring recognition of such claims which might mitigate or rebut these concerns nor has it identified any case law supporting its theory that claims are directly assertible by creditors in this context.[FN115]

FN114. The focus on the distinction between derivative and direct claims is not without its limitations. For example, it is dependent upon a relatively consistent boundary line between the two categories. Also, the incentive for a creditor to bring a derivative claim may not be as great as the incentive to bring a direct claim because the fruits of his efforts as a derivative plaintiff would benefit the corporate entity first and whether any of the benefit would pass down to the creditor may be problematic.

FN115. The principal case implicating the zone of insolvency, *Credit Lyonnais,* which NACEPF cites as authority, *see* Ans. Br. at 21 (contending that the Defendants' conduct is "similar to the hypothetical conduct" described in footnote fifty-five of *Credit Lyonnais* ), does not provide the definitive support NACEPF seeks. *See supra* note 105 and accompanying text. The decision which arguably comes closest to providing support for NACEPF's position-one on which NACEPF has not relied-is *Bren v. Capital Realty Group Senior Housing, Inc.,* 2004 WL 370214, at *7 (Del. Ch. Feb. 27, 2004) (denying motion to dismiss claim by noteholder for breach of fiduciary duty because "the existence of a duty to disclose is sufficiently plausible to survive" ).
NACEPF cites a number of decisions, some from other jurisdictions, in support of the proposition that "[i]t is settled Delaware law that when a firm enters insolvency or its vicinity, 'the firm's directors are said to owe fiduciary duties to the company's creditors." ' Ans. Br. at 26 n. 59 (quoting *Production Resources,* 863 A.2d at 790-91 (addressing "[w]hen a firm has reached the point of insolvency")). This bare proposition, however, does little

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

to resolve the questions at issue here. *See supra* note 103 and accompanying text. As this Court has recently suggested, " insolvency does not suddenly turn directors into mere collection agents" on the behalf of creditors, *see Trenwick Am. Litig. Trust,* 2006 WL 2333201, at *22 n. 75; taken as accurate, this observation would apply, *a fortiori,* in the zone of insolvency.

The source of some uncertainty in this regard may be the result of efforts to accommodate the so-called "trust fund doctrine" [FN116] within the zone of insolvency context.[FN117] Although "trust fund doctrine" to some extent arguably undergirds the Court's tentative recognition of a narrow direct claim by creditors in the context of insolvency, [FN118] these principles do not compel recognition of comparable direct claims in the zone of insolvency. [FN119]

FN116. *See Production Resources,* 863 A.2d at 792 ("A strand of authority (*by no means universally praised* ) therefore describes an insolvent corporation as becoming akin to a trust for the benefit of the creditors. This line of thinking has been termed the 'trust fund doctrine.' Under a trust fund approach, the directors become trustees tasked with preserving capital for the benefit of creditors who are deemed to have an equity-like interest in the firm's assets." (emphasis added) (citations omitted)).

FN117. As explained above, the two principal theories implicated here are the " incentive-to-enforce rationale" and the " trust fund theory."

FN118. *See, e.g., Production Resources,* 863 A.2d at 798 n. 77 (noting duties owed by trustees under trust law, which might, possibly bear on analysis "[t]o the extent that the directors are analogized as becoming trustees of a corporate pool of assets for creditors when the corporation is insolvent"). *Compare Price v. Wilmington Trust Co.,* 1996 WL 560177, at *2 (Del. Ch. Sep. 3, 1996) (opinion granting interlocutory appeal) ("For example, while trustees, directors, administrators, partners, guardians, etc are all called fiduciaries from time to time because all an important element of dependency, all of these special relationships are institutionally somewhat different in the types of circumstances in which each sort of legal relationship occurs. A trustee of an express trust *is different* from a corporate director for example, in the degree of trust, passivity or diligent self protection that the law should encourage, *see Kahn v. Seaboard Corp.,* 625 A.2d 269 (Del. Ch.1993), and different with respect to the length of the period in which the dependence is designed to continue.").

FN119. "Trust fund theory," to the extent that it might apply, is not implicated until insolvency, as indicated by, for example, the cases cited in *Geyer. See* 621 A.2d at 787 (citing *Bovay v. H.M. Byllesby & Co.,* 38 A.2d 808, 813 (Del.1944) (holding that "when [insolvency] is established," conduct may "thereafter" be analyzed differently) (citing *McDonald,* 174 U.S. at 404 (in applying so-called "trust fund doctrine," holding that "[a]lthough *no trust exists while the corporation is solvent,* the fact which creates the trust is the insolvency, and, when that fact is established, *at that instant* the trust arises" (emphasis added)))). *But cf. infra* note 148 (noting the narrow, *potential* issue of "acts committed in contemplation of insolvency" ).
*Credit Lyonnais* does not support the application of "trust fund theory" principles to conduct of directors in the zone of insolvency. Instead, the language employed in footnote fifty-five of *Credit Lyonnais* suggests that, in the zone of insolvency, directors may act to obtain what (in the narrow sense, *i.e.,* insofar as the interests of the corporate collective are

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

concerned) could be described as a "socially optimal" outcome. 1991 WL 277613, at *34 n. 55. This does not implicate "trust fund theory," however, which seeks to compel conduct, as presented in *McDonald,* directed toward the best interests of creditors as a particular constituency of residual risk-bearers.

For perspective, also compare *Asmussen v. Quaker City Corp.,* 156 A. 180, 181 (Del. Ch.1931) ("The word 'trust' in [the] phrase ['trust fund doctrine'] has given rise to some confusion due to the fact that some courts have carried the logic of its connotations to a degree quite beyond the length to which its aptness as descriptive of the relations between the corporation and its creditors would warrant.").

The Court has traditionally been reluctant to expand existing fiduciary duties, including the range of persons by whom those duties may be enforced and, therefore, whom fiduciaries might feel compelled to consider.FN120 As a consequence, the rationale advanced in support of imposition of unique or additional duties should be relatively compelling in order for such recognition to be extended. In this instance, however, the arguments opposing recognition of direct claims by creditors in the zone of insolvency are both substantial and persuasive. In *Production Resources,* the Court remarked that recognition of fiduciary duties in the "zone of insolvency" context may involve:

FN120. *See, e.g., Wal-Mart Stores, Inc. v. AIG Life Ins. Co.,* 872 A.2d 611, 625 (Del. Ch.2005) ("The Delaware courts have been reluctant to extend too broadly the applicability of fiduciary duties.... Furthermore, while some cases in Delaware have found certain aspects of a commercial relationship to implicate fiduciary duties, these cases should not be read so broadly as to engulf in fiduciary duties ordinary commercial relationships." ), *aff'd in part and rev'd in part on other grounds,* 901 A.2d 106 (Del.2006); *Bird's Constr. v. Milton Equestrian Ctr.,* 2001 WL 1528956, at *4 (Del. Ch. Nov. 16, 2001) ("Our courts have been cautious when evaluating entreaties to expand the number and kinds of relationships that are denominated as 'fiduciary." '); *see also Heller v. Kiernan,* 2002 WL 385545, at *3 (Del. Ch. Feb. 27, 2002). *See also infra* note 156.

Among the reasons underlying the Court's reluctance is the recognition that any additional duty may subject fiduciaries to greater risk (or liability), which may, in turn, have an undue chilling effect on conduct-a result that may be especially troubling in the context of corporate directors who must make business decisions on the behalf of a financially troubled, but solvent, corporation.

*13 using the law of fiduciary duty to fill gaps that do not exist. Creditors are often protected by strong covenants, liens on assets, and other negotiated contractual protections. The implied covenant of good faith and fair dealing also protects creditors. So does the law of fraudulent conveyance. With these protections, when creditors are unable to prove that a corporation or its directors breached any of the specific legal duties owed to them, one would think that the conceptual room for concluding that the creditors were somehow, nevertheless, injured by inequitable conduct would be extremely small, *if extant.*FN121

FN121. 863 A.2d at 790 (emphasis added). The Court also posited: "Having complied with all legal obligations owed to the firm's creditors, the board would, in that scenario, ordinarily be free to take economic risk for the benefit of the firm's equity owners, so long as the directors comply with their fiduciary duties to the firm by selecting and pursuing with fidelity and prudence a plausible strategy to maximize the firm's value." *Id.; see also id.* at 790 n. 57. Of course, this Subpart addresses only direct claims in the vicinity of insolvency.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Indeed, it would appear that creditors' existing protections-among which are the protections afforded by their negotiated agreements, their security instruments, the implied covenant of good faith and fair dealing, fraudulent conveyance law, and bankruptcy law-render the imposition of an additional, unique layer of protection through direct claims for breach of fiduciary duty unnecessary. FN122 Moreover, any benefit to be derived by the recognition of such additional direct claims appears minimal, at best, and significantly outweighed by the costs to economic efficiency. One might argue that an otherwise solvent corporation operating in the "zone of insolvency" is one in most need of effective and proactive leadership-as well as the ability to negotiate in good faith with its creditors-goals which would likely be significantly undermined by the prospect of individual liability arising from the pursuit of direct claims by creditors. FN123 NACEPF has not persuasively argued otherwise.

FN122. *See, e.g., Big Lots Stores, Inc.*, 2006 WL 846121, at *8 (remarking, in the context of an insolvent corporation: "As numerous commentators have observed, creditors are usually better able to protect themselves than dispersed shareholders." (citing Stephen M. Bainbridge, *Much Ado About Little? Directors' Fiduciary Duties in the Vicinity of Insolvency*, J. Bus. & Tech. L. (forthcoming) http://ssrn.com/abstract=832504 at 30)); *cf. id.* at *8 n. 50 (noting contrary commentary providing that "the greater protection generally due to debt-holders over shareholders is not an inherent characteristic of either instrument, because such distinctions may not apply to closely held corporations, or public corporations held substantially by institutional shareholders who can act collectively or through intermediaries" (citing Larry E. Ribstein & Kelli Alces, *Directors' Duties in Failing Firms*, J. Bus. & Tech. L. (forthcoming) http://ssrn.com/abstract=880074 at 8)).

FN123. Certainly this is true of corporations that were once solvent but have entered the zone of insolvency; however, the same may also be said of, for example, start-up firms that may often operate in the zone of insolvency until their business plan succeeds. The negative consequences to innovation potentially resulting from an expansion of possible individual liability through direct claims for breach of fiduciary duties, in that context, should give considerable pause to any court contemplating an expansion of direct claims.

These considerations compel the conclusion that no direct claim for breach of fiduciary duties may be asserted by creditors of a solvent corporation operating in the zone of insolvency. Therefore, the Court concludes that Count II of the Complaint fails as a matter of law to the extent that it attempts to state a direct claim for breach of fiduciary duty while Clearwire was in the zone of insolvency.

3. *NACEPF's failure to allege facts necessary to plead a direct claim during insolvency*

As described above, NACEPF has predicated its argument in favor of personal jurisdiction over the Defendants on the Court's first concluding that NACEPF has sufficiently alleged a direct claim for breach of fiduciary duty by the Defendants in their capacity as directors of Clearwire. FN124 Therefore, the Court must now turn to the question of whether NACEPF has adequately alleged a direct claim for breach of a fiduciary duty occurring during insolvency, to the extent that NACEPF has alleged insolvency, as well.

FN124. *See supra* note 76 and accompanying text.

In its Complaint, NACEPF states that, because Clearwire was either insolvent or in the zone of insolvency "from March 2001 until it went out of business," "[a]t all times after March 2001, the ... Defendants owed a fiduciary duty to NACEPF, as a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

substantial creditor of Clearwire." FN125 As recited above, NACEPF alleges that a breach of fiduciary duty by the Defendants occurred either by:

FN125. Compl. ¶ 44. Of course, to the extent that Clearwire was merely in the zone of insolvency, no direct claim may be asserted. *See* Part III(B)(2). Additionally, as explained above, the allegations do not support the inference that Clearwire was insolvent at the time the Master Agreement was executed. *See supra* note 97. Thus, to the extent that a direct claim properly might be asserted during insolvency-an issue discussed in detail, below-the underlying breach of fiduciary duty would have had to have occurred during a period of insolvency.

***14** (1) not preserving the assets of Clearwire for its benefit and that of its creditors when it became apparent that Clearwire would not be able to continue as a going concern and would need to be liquidated and (2) holding on to NACEPF's ITFS license rights when Clearwire would not use them, solely to keep Goldman Sachs's investment "in play." FN126

FN126. Compl. ¶ 45.

Additionally, NACEPF alleges that the Defendants: engaged in self-dealing by: (1) keeping Clearwire in business to preserve the ability of Goldman Sachs to carry its investment without admitting Clearwire was a failure and (2) investing Clearwire assets in a wireless business in Jacksonville, Florida that had no reasonable likelihood of succeeding but whose existence was utilized as a justification for the strategy of the ... Defendants to not honor the Alliance members' rights.FN127

FN127. *Id.* at ¶ 46. The only additional information provided in the Complaint regarding the Jacksonville investment is set forth in Paragraph 47, which states:

The Jacksonville business: (1) never had sufficient assets to build out the suppositional technology with its complex network of towers and sectors that were required to adequately service potential wireless customers, (2) never had the technology necessary to provide mobile wireless access to the internet, and (3) involved extraordinary expenses not justified by a customer base.

Based on NACEPF's answering brief, it appears that the allegations concerning Clearwire's investment in the "Jacksonville business" are intended as support for NACEPF's first argument for breach of fiduciary duty (*i.e.*, failure to "preserve" the assets of Clearwire). *See* Ans. Br. at 19, 21; text accompanying note 126, *supra*.

To the extent that this is intended as a stand-alone claim, it is a derivative claim under the test of *Tooley*. The alleged harm is one to the corporation (a diminution of the pool of available assets), and any recovery would flow to the corporation. *Cf. Trenwick Am. Litig. Trust*, 2006 WL 2333201, at *22 n. 75 (in discussing related academic arguments, suggesting that, "if the directors of an insolvent firm commit a breach of fiduciary duty reducing the value of the firm, any claim belongs to the entity and ... creditors would benefit from the recovery derivatively, based on their claim on the firm's assets"). Indeed, it would appear to be a classically derivative claim for waste. Because NACEPF has chosen not to pursue a derivative claim in this litigation, *see supra* note 76 and accompanying text, the Court does not address it further.

However, to the extent that these allegations are offered to demonstrate, in support of its claim that the Defendants breached a duty in "holding on to" NACEPF's license rights, *see* text accompanying note 126, *supra*, that the alleged "self-dealing occurred in the pursuit of a business that had 'no reasonable likelihood of succeeding," ' *see* Ans. Br. at 19, the allegations might

implicate conduct material to analysis of a direct claim in this context. *Cf. Production Resources,* 863 A.2d at 800 (denying motion to dismiss where facts pleaded involved allegations that board was, *inter alia,* "engaging in preferential treatment of the company's primary creditor and de facto controlling stockholder (and perhaps of its top officers, who are also directors) without any legitimate basis for the favoritism"). The Court need not reach this question, however, given the analysis, below.

In formulating its argument, NACEPF has placed heavy reliance on this Court's analysis in *Production Resources.*[FN128] In that case, the Court denied, in part, the defendants' motion to dismiss the plaintiff-creditor's fiduciary duty claims on the *"conservative assumption* that there *might, possibly* exist circumstances in which directors display such a marked degree of animus towards a particular creditor with a proven entitlement to payment that they expose themselves to a direct fiduciary duty claim by that creditor." [FN129] The Court emphasized its reluctance to offer a definitive statement of law, especially given the limited briefing of the issues by the parties,[FN130] remarking instead that it would "resolve the [defendants'] motion without making any broad pronouncements that would have large policy implications." [FN131] In addition, the Court explained merely that it was "not prepared to rule out" the possibility that the plaintiff had alleged conduct that "might support" a limited direct claim. [FN132] Importantly, the Court noted that the plaintiff's complaint sufficiently alleged a derivative claim, as well-rendering it unnecessary to resolve the question of the existence of direct claims in the insolvency context.[FN133]

FN128. 863 A.2d 772 (Del. Ch.2004).

FN129. *Id.* at 798 (emphasis added).

FN130. The Court noted that it had addressed a number of issues without the benefit of input from counsel. *See id.* at 797-98 ("Another question the parties do not confront is what the direct/derivative claim distinction means when a firm is insolvent."); *see also id.* at 798-99 ("To at least my mind, there are a myriad of policy considerations that would arise by the indulgence or non-indulgence of a fiduciary duty claim of this type and I am reluctant to ponder their viability without better help from briefing by adversarial parties.").

FN131. *Id.* at 798.

FN132. *Id.* at 800. The Court reserved "the opportunity ... to revisit some of these questions with better input from the parties. " *Id.* at 801. The Court explained:

In particular, it will be important to better understand the precise justification for equity's role in cases like this, an understanding that needs to be informed by the scope of the legal rights that PRG possesses as a creditor against NCT and its directors and officers. Evaluating a creditor's claim that directors have breached fiduciary duties owed to the firm involves no novel inquiry, as the court can draw deeply on the principles that apply in typical derivative cases. The extent of the fiduciary obligations directors and officers owe in their dealings with specific creditors of insolvent firms is a far less settled matter. In general, equity is reluctant to create remedies when adequate legal remedies already exist. It may well be, for example, that upon close examination, existing principles of tort or contract law are sufficient when applied with the understanding that directors bear a fiduciary relation to creditors when a firm is insolvent.

*Id.* (citations omitted).

FN133. In *Production Resources,* the Court held that the plaintiff's allegations with respect to the surviving fiduciary duty claim (*i.e.,* its claim regarding conscious, faithless conduct) set forth sufficient

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

particularized facts to allege a derivative claim for breach of fiduciary duty. *See id.* at 800 (explaining that the plaintiff had set forth an "unusual set of particularized facts " and that it *"might* prevail on either a derivative *or* individual claim" (emphasis added)).

It should also be noted that, with respect to the Court's earlier decision in *Geyer,* although not addressed, *see* 621 A .2d at 790-91 (analyzing claim for breach of fiduciary duty under general standards of Court of Chancery Rule 12(b)(6)), the plaintiff's claim in that case would likely be characterized as derivative under the test prescribed in *Tooley.*

In light of the Court's analysis in *Production Resources,* its decision to permit the plaintiff's direct claim to continue is perhaps best described as tentative. The Court, however, largely focused on the notion that-in most, if not all, instances-claims for breach of fiduciary duty in the insolvency context would be asserted derivatively by creditors. FN134 In response to the plaintiff's contention that all its claims for breach transformed into direct claims upon insolvency, the Court emphasized:

FN134. The Court stated:

The reason for this bears repeating-the fact of insolvency does not change the primary object of the director's duties, which is the firm itself.... Put simply, when a director of an insolvent corporation, through a breach of fiduciary duty, injures the firm itself, the claim against the director is still one belonging to the corporation.

*Production Resources,* 863 A.2d at 792; *see also id.* (explaining that "the transformation of a creditor into a residual owner does not change the nature of the harm in a typical claim for breach of fiduciary duty by corporate directors"). As a consequence, the Court in essence reasoned that recognition of standing for creditors, at least in order to assert derivative claims in the context of insolvency, "does not completely turn on its head the equitable obligations of the directors to the firm itself." *Id.* at 791. *See generally id.* at 792-93 (describing how most potential claims foreseeable by the Court would be derivative in nature). *Cf. Trenwick Am. Litig. Trust,* 2006 WL 2333201, at *22 n. 75.

The fact that the corporation has become insolvent does not turn [derivative] claims into direct creditor claims, it simply provides creditors with standing to assert those claims. At all times, claims of this kind belong to the corporation itself because even if the improper acts occur when the firm is insolvent, they operate to injure the firm in the first instance by reducing its value, injuring creditors only indirectly by diminishing the value of the firm and therefore the assets from which the creditors may satisfy their claims.FN135

FN135. *Production Resources,* 863 A.2d at 776; *see also Trenwick Am. Litig. Trust,* 2006 WL 2333201, at *22 n. 75.

*15 NACEPF argues that "[w]hat the Court *did not rule out,* however, is that those fiduciary duties may also include the obligation to not unreasonably hurt the creditors-a direct claim." FN136

FN136. Ans. Br. at 18 (emphasis added).

NACEPF has left ambiguous-perhaps intentionally-the issue of whether it predicates its present argument on allegations of "animus" of the type described in *Production Resources,* or whether it alleges breach of some additional or unique duty owed by the Defendants that is remediable through a direct claim.FN137 To the extent that NACEPF argues that it may assert a potential direct claim for breach of fiduciary duty beyond the realm mapped in *Production Resources,* however, this Court's recent ruling in *Big Lots Stores, Inc. v. Bain Capital Fund VII, LLC* FN138 precludes such a claim. In dismissing the plaintiff's direct claim for breach of fiduciary duty, the Court, in substance, held that the scope of *potentially* cognizable direct claims assertible by creditors in the insolvency context is

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

restricted to instances in which invidious conduct toward a particular "creditor" with a clear " entitlement to payment" has been alleged.[FN139] As a consequence, assuming, *arguendo,* that a direct claim may be asserted, NACEPF's allegations need only be analyzed, in this instance, to determine whether this restricted type of claim has been adequately alleged.

FN137. Although our understanding of the duties of corporate fiduciaries does (and should) evolve, stability and predictability are, nonetheless, important objectives. *See, e.g., Harff v. Kerkorian,* 324 A.2d 215, 220 (Del. Ch.1974), *aff'd in part and rev'd in part on other grounds,* 347 A.2d 133 (Del.1975). To embrace NACEPF's approach would increase the uncertainty of directors (already challenged by the financial difficulties of the corporations they serve) as to: the scope of their duties; to whom they owe those duties; how to accommodate potentially competing interests; and how to discharge their duties without an unwarranted risk of becoming ensnarled in litigation regardless of the choices they may make.

FN138. 2006 WL 846121 (Del. Ch. Mar. 28, 2006).

FN139. *See, e.g., id.* at *6 (granting that there "might nonetheless" exist a direct claim in "some circumstances" and reciting only the narrow language mentioning "animus" set forth in *Production Resources* (quoting 863 A.2d at 798)).

In *Big Lots Stores, Inc.,* the Court emphasized the unusual nature of the direct claim described in *Production Resources*-"a decision which relied heavily on its unique facts." [FN140] The Court explained that the "unusual allegations of the plaintiff in *Production Resources* vividly illustrate" how a direct claim might be pleaded:

FN140. 2006 WL 846121, at *7; *see also id.* at *7 n. 47 ("As the court noted, it was the 'odd' circumstances of *Production Resources* in concert that were 'suggestive of ... bad faith on the part of the NCT board members." '). It perhaps bears repeating that the Court's decision in *Production Resources* describes circumstances in which *"such a marked degree* of animus" is alleged. 863 A.2d at 798 (emphasis added).

As the court's opinion [in *Production Resources* ] sets out, the plaintiff had obtained a judgment against the defendant for $2 million in 1999, and had attempted to compel payment since that time. The facts alleged in the complaint established that the defendant had been insolvent for several years and, yet, had gone to extreme lengths both to avoid paying its judgment creditor and to misuse corporate power for the purpose of improperly benefiting itself and others in control. In the face of such extraordinary machinations, the court was unwilling to dismiss the creditor's claims of specific injury as derivative because it seemed possible that the creditor in question was the only one that had been injured, and was thus the only one to which recovery was due. [FN141]

FN141. 2006 WL 846121, at *7.

Among other things, the Court, in *Big Lots Stores, Inc.,* pointed out that the plaintiff-creditor in *Production Resources* was, in fact, a judgment creditor. The Court reasoned that "[t]he immediacy of the *Production Resources* defendant's debt was a necessary underpinning of the court's finding that the debtor's recalcitrance might have been motivated by targeted animus towards the plaintiff." [FN142] The Court distinguished the plaintiff's claim in *Big Lots Stores, Inc.* from the *Production Resources* defendant's debt on the ground that the credit agreement benefiting the plaintiff in *Big Lots Stores, Inc.* consisted of an unsecured note "due eight years after the 2002 transaction was set to close." [FN143] Moreover, the Court emphasized that, while, in *Production Resources,* "all the challenged transactions occurred in the context of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

an already insolvent company," FN144 in *Big Lots Stores, Inc.*, the complained-of breaches of fiduciary duty were alleged to have caused the insolvency, which the Court found to be "classically derivative." FN145 The Court concluded that such claims "do not become direct simply because they are raised by a creditor, who alleges that the breaches of fiduciary duty caused it specific harm by preventing it from recovering a debt outside of bankruptcy." FN146 Assuming, *arguendo*, that a direct claim may potentially be asserted in these circumstances, the Court follows this approach in analyzing NACEPF's claim.

FN142. *Id.*

FN143. *Id.*

FN144. *Id.*

FN145. *Id.*

FN146. *Id.*

*16 The analysis employed by the Court in *Big Lots Stores, Inc.* effectively limits direct claims, assuming *arguendo* that they are cognizable, by creditors of insolvent firms for breach of fiduciary duty to allegations of fact substantially similar to those pleaded by the plaintiff in *Production Resources*. Indeed, *Big Lots Stores, Inc.* suggests a two-step approach for determining whether a creditor has properly asserted a direct claim for breach of fiduciary duty in the insolvency context. First, the Court must determine whether the plaintiff-creditor has pleaded facts demonstrating, with a high degree of certainty, that the creditor is entitled to payment and that the entitlement is either currently or imminently due.FN147 If the Court concludes that the pleadings satisfy the demanding burden set forth by this initial requirement, the Court must then consider whether the claimant's allegations satisfy the second step of the analysis, which asks whether a direct claim implicating invidious conduct or, in the words of *Production Resources*, "such a marked degree of animus" has been properly pleaded.

FN147. *See also Production Resources*, 863 A.2d at 798 (positing that a direct claim might exist when directors display " marked degree of animus towards a particular creditor with a *proven entitlement* to payment" (emphasis added)).

In this instance, NACEPF has failed to allege facts satisfying the first step of the above analysis. Put simply, the pleadings neither identify an entitlement to payment that is *clearly and immediately* due nor do they permit a reasonable inference to that effect. As a consequence, the Court need not consider whether the Complaint properly sets forth allegations satisfying the second element of the analysis.FN148

FN148. Because of its conclusion below, the Court does not attempt to define " animus" in this context. "Animus," of course, is only a convenient (and, one hopes, helpful) label for a concept that likely will require iterative development. More specifically, the Court need not resolve the question, posed in *Production Resources*, of whether "pure self-dealing is the only fiduciarily-invidious reason that might justify a direct claim by a disadvantaged creditor." 863 A.2d at 798. The Court notes that this question is likely to be answered affirmatively-*i.e.*, that in determining whether the second-step of the analysis in this context has been satisfied, the Court should examine whether, during the period of insolvency and for self-dealing purposes, collection of the entitlement at issue has been wrongfully made more difficult or other creditors have been wrongfully preferred. *Cf. Production Resources*, 863 A.2d at 800 (noting the unique and "suspicious pattern of dealing" alleged permitting an inference of preferential treatment benefiting insiders and the "de facto controlling stockholder" over plaintiff-creditor).
It should also be noted that, although the Court uses the term "self-dealing" for convenience, this claim would conceivably

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

also extend to wrongful preferences by directors for the benefit of persons controlling the directors. Additionally, there is the possibility that a direct claim might lie for "acts committed in contemplation of insolvency." *McDonald,* 174 U.S. at 404-05 (applying principles of so-called "trust fund doctrine"). Of course, this notion is very distinct from (and substantially more limited than) the broader "zone of insolvency." The Court only notes the possibility that this narrow exception *might* apply in very limited circumstances, given our case law's previous, intermittent citation to *McDonald.*

First, NACEPF has failed to allege the existence of an entitlement that is "clearly" due. Instead, NACEPF's theory of the case assumes *a priori* the existence of a fiduciary duty, upon Clearwire's entry into insolvency, requiring that the Defendant Directors variously preserve certain assets or relinquish Clearwire's claimed rights in those assets. This assumption is made without first carefully delineating the nature of Clearwire's obligations which make NACEPF a creditor holding a clear and immediate claim.[FN149] For their part, the Defendants have vigorously denied that NACEPF should be considered a "creditor" at all for purposes of this litigation. In *Production Resources,* the plaintiff-creditor was a judgment creditor. In this instance, in support of its status as a "creditor" of Clearwire, NACEPF merely identifies a clause of the Master Agreement providing:

FN149. It may be that NACEPF considers itself a creditor simply because of the obligations that flow in both directions between NACEPF and Clearwire under the Master Agreement.

WHEREAS, Clearwire is prepared, and the Alliance Members are prepared to accept, as royalties, the payments ... for access to the Commercial Spectrum Capacity of the Channels ... which payments and transfers are intended to generate an aggregate value, as of Initial Closing, of $0.90 for each Channel POP through a combination of cash commitment royalty, equity in Clearwire, an earn-out, use agreement execution and usage royalties.[FN150]

FN150. Master Agreement at 2.

NACEPF argues that "[t]his shows that Clearwire had financial obligations towards NACEPF and Alliance members, rendering NACEPF a creditor of Clearwire with a right to demand its monetary dues for license usage." [FN151] NACEPF also seeks to rely on financial projections prepared for the Clearwire board of directors that projected certain outlays payable to NACEPF and Alliance members.[FN152]

FN151. Ans. Br. at 28.

FN152. *Id.*

*17 As an initial matter, the financial projections referenced by NACEPF are not contained within the allegations of the Complaint and therefore lie outside the scope of matters that may be considered by the Court. Moreover, even if the Court could consider them, the budgets of anticipated future expenditures fail here to demonstrate a clear entitlement to payment, much less one that is currently due. Significantly, the Defendants argue that NACEPF recites the "WHEREAS" clause of the Master Agreement, in its answering brief, " [p]resumably [in order to] draw[ ] the conclusion that [P]laintiff 'had a right to payment' under the terms of the Master Agreement." [FN153] The Defendants rightly point out that NACEPF has failed to demonstrate, through the facts pleaded in the Complaint or even in its brief, that "it was not paid what it was owed under the Master Agreement, or that [NACEPF] performed under the terms of the Master Agreement in some way that triggered an unfulfilled obligation of Clearwire to pay [P]laintiff. " [FN154] As a consequence, the Court cannot, based on the arguments advanced by NACEPF, conclude that NACEPF has met its burden of alleging a clear entitlement to payment.[FN155]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN153. Reply Br. at 12.

FN154. *Id.* at 12-13. On February 12, 2004, NACEPF voluntarily dismissed a separate action, filed on November 20, 2003, against Clearwire for breach of contract. *See N. Am. Catholic Educ. Programming Found., Inc. v. Clearwire Holdings, Inc.*, C.A. No. 03C-11-172 (RRC) (Del.Super.).

FN155. The Court notes that, at oral argument, NACEPF's counsel only briefly stated: "At the time when we get to 2002, .. . the agreements with Sprint and WorldCom, some of them had expired or come to their end. At that point, there was an immediate cash obligation on the part of Clearwire." Tr. 41:1-5; *see also* Tr. 40:1-7 (citing Master Agreement, Preamble Clause (a)); Tr. 40:7-14. As an initial matter, it does not appear that the Complaint sets forth facts supporting this particular proposition-nor was it referenced in NACEPF's answering brief. The Complaint's principal allegations related (perhaps only tangentially, at best) to this proposition state, *inter alia,* that the market for wireless spectrum "collapsed" in June 2002 and that Clearwire "thereafter " entered into negotiations with Alliance members to "end Clearwire's obligations to the members." Compl. ¶¶ 34-35. The Complaint also provides that Clearwire ultimately settled with HITN and ITF and that, "by October 2003," Clearwire " effectively went out of business;" but the Complaint never alleges that a monetary obligation of Clearwire to NACEPF, coming due under the terms of the Master Agreement, actually arose and was left unpaid. Certainly, it is difficult to view these suppositions as satisfying the requirement that allege a clear entitlement to payment.

By scouring the terms of the Master Agreement, the Court, of its own accord, is able to pick up a basis from which an obligation to pay *potentially* could have arisen. *See, e.g.,* Master Agreement, §§ 1.2(a) (describing a process by which " Individual Use Agreements" would be subsequently entered into upon the occurrence of an "Availability Event," as those terms are defined in the Master Agreement); § 9.3. NACEPF, however, has failed to place this argument before the Court, instead making only general references to obligations for payment, as described above. Indeed, it is unclear precisely when these obligations may have arisen, if ever. For example, NACEPF has identified no information which the Court may consider for purposes of this motion to dismiss regarding whether an " Availability Event" occurred during the relevant periods, whether obligations arising pursuant to such an occurrence were left unmet by Clearwire, and, most importantly, the extent to which Clearwire may have had discretion in entering into additional agreements. Even assuming that an obligation to enter into additional " Individual Use Agreements" (or any other unidentified obligation) arose, the bare pleadings of NACEPF (and its references, in briefing and at oral argument, to the introductory provisions of the Master Agreement) leave the Court unable to infer that any of those obligations was not fulfilled. At best, NACEPF's arguments in this regard could be described as only conclusory allegations (if they are allegations, at all), which do not aid in making the necessary inferences in NACEPF's favor.

Additionally, even assuming that a clear entitlement were shown, NACEPF's claim in this respect would ultimately be derivative. The Court is required to make all *reasonable* inferences in favor of the plaintiff on a motion to dismiss under Court of Chancery Rule 12(b)(6); however, the only reasonable inference that may be drawn, based on the allegations, regarding non-payment of this obligation, assuming it existed and was adequately pleaded, was that no funds (or

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

only inadequate funds) were available. NACEPF premises its claims on the theory that the Defendants failed to pursue adequately the ostensible business plan of Clearwire, which resulted in its coffers being empty. Thus, the harm was to the corporation, and the benefit of any remedy would flow to the corporation.

Indeed, it appears that the best argument in NACEPF's favor, given the allegations contained in the Complaint, would be that Clearwire breached its implied duty of good faith and fair dealing in failing to pursue aggressively build-out of the envisioned wireless internet network. Such a claim would not, on these facts, give rise to a clear entitlement to payment satisfying the first prerequisite for a cognizable direct claim in this context. NACEPF is one party to a contract, and its frustration is perhaps-indeed, likely-better characterized as a claim under contract or tort law.[FN156] Perhaps NACEPF has a colorable claim that Clearwire failed to abide, in good faith, by the terms of the Master Agreement; [FN157] however, this is the subject of legitimate debate and therefore fails to constitute a "clear" debt obligation of the firm. [FN158]

FN156. *Cf. Production Resources,* 863 A.2d at 801 (citing *RGC Int'l Investors, LDC v. Greka Energy Corp.,* 2001 WL 312454, at *10 n. 45 (Del. Ch. Mar. 7, 2001) ("Equity historically 'follows the law' and does not create remedies where the parties' behavior is already closely regulated by the law.")); *Production Resources,* 863 A.2d at 801 n. 88 ("In general, ... there seems to be utility in applying fiduciary duty law quite cautiously, to avoid unduly benefiting creditors by enabling them to recover in equity when they could not prevail on legal tort or contract claims.").

FN157. *But see supra* note 154.

FN158. Similarly, NACEPF has not argued that Count I of the Complaint, for fraudulent inducement, is a proper basis for creditor status in this context. The bulk of its arguments with respect to that claim are directed toward allegedly fraudulent conduct of the Defendants, not Clearwire. Therefore, to the extent NACEPF might have a claim (regardless of its viability), it is against the Defendants. The Court notes, however, that NACEPF has briefly mentioned conduct that might be charged to Clearwire-principally, if not entirely, in reference to statements of intention contained in the Preamble of the Master Agreement. *See* Compl. ¶ 38. This argument, although not advanced by NACEPF in support of its creditor status, would, *inter alia,* obviously fail to set forth a clearly held entitlement to payment and therefore could not serve as the basis of a direct fiduciary duty claim in this context-assuming such a claim exists.
Additionally, to the extent that Count III arguably, might theoretically serve as the basis for claiming creditor status in this context-an argument NACEPF has not advanced-such an argument fails, *inter alia,* for similar reasons in this context. Moreover, the "nexus" between the claimed breach of fiduciary duty and such an entitlement, even if it were adequately alleged, is not readily apparent.

Second, given the Court's analysis above that NACEPF has failed to demonstrate a clear entitlement to payment, NACEPF has also necessarily failed to demonstrate that the alleged entitlement on which it seeks to premise its claim has the immediacy necessary to maintain a direct claim in this context. As in *Big Lots Stores, Inc.,* no claim of NACEPF has been reduced to judgment, even assuming that a breach of contract has occurred. Judgment creditor status might not be necessary in the face of an entitlement that is otherwise clearly and currently due.[FN159] In this instance, however, the pleadings fail to allege facts from which the existence of such a debt can be reasonably inferred.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN159. This is an issue that the Court need not resolve, however, given the other inadequacies of NACEPF's allegations described above. *But cf. Johnston v. Wolf,* 487 A.2d 1132, 1135-37 (Del.1985) (holding that plaintiff was not a "creditor" (of pre-merger corporation) granted standing under 8 *Del.C.* § 174 to pursue claims against pre-merger directors for unlawful redemption of stock where plaintiff's claim had not been reduced to judgment prior to merger).

The two-step approach followed here with respect to direct claims comports with the principal policy considerations that underlie analysis in this context. Foremost among these is the notion that directors of insolvent corporations must retain the freedom to engage in vigorous, good-faith negotiations with their creditors for the benefit of the firm.FN160 To hold otherwise would, in the context of insolvency, not only cast a cloud of uncertainty over directors' ordinary discretion to exercise freely their rational business judgment, but arguably also would diminish the potential that an insolvent corporation might emerge from insolvency on its own. Moreover, to some extent, albeit neither easily defined nor universally praised, the so-called "trust fund doctrine" may, however, inform analysis in this context. FN161 Assuming the so-called "trust fund doctrine" does, to some degree, apply,FN162 the initial requirement that a debt be both clearly and immediately due arguably achieves a workable balance between the complex realities of serving as a director of an insolvent firm and the concerns implicit in "trust fund doctrine." FN163

FN160. *Cf. Production Resources,* 863 A.2d at 797 ("[D]irectors of an insolvent corporation must retain the right to negotiate in good faith with creditors and to strike fair bargains for the firm."); *id.* at 800 ("I do not rest my decision in any manner on the proposition that it is a breach of fiduciary duty for the board of an insolvent company to engage in vigorous, good-faith negotiations with a judgment creditor. That, in fact, might be the *duty* of a board, which necessarily has to balance the interests of all those with a claim to the firm's inadequate assets.").

FN161. In conceding that a direct claim for "animus" might exist, *Production Resources* suggests that, to some extent, semi-analogous trust principles *might* require that creditors not, in certain circumstances (*e.g.,* for self-dealing purposes), be wrongfully disadvantaged vis-a-vis other creditors. *See* 863 A .2d at 798 n. 77. *Cf. supra* note 118.

FN162. *But cf. Asmussen,* 156 A. at 181. The Court, in *Production Resources,* acknowledged that venerable case law holds that directors of an insolvent corporation may generally prefer one creditor over another. *See* 863 A.2d at 792, 798 (citing *Asmussen,* 156 A. 180). This line of case law, however, imposes the limitation that directors may not exercise this discretion for self-dealing purposes. *See Penn. Co. for Ins. on Lives & Granting Annuities,* 174 A. 112. This limitation would also most likely extend to preferences for the benefit of persons or entities by which the directors are controlled.
It may bear repeating that the analysis contained in the text above only assumes the existence of a direct claim which may be asserted by creditors for "animus." The venerable line of case law discussed above, however, arguably addresses only *distributions* of corporate assets-*i.e.,* dissipating the corporation's pool of available assets, which would presumably constitute a derivative claim under the modern test enunciated in *Tooley. See, e.g., Penn. Co. for Ins. on Lives & Granting Annuities,* 174 A. at 116 (suggesting, through its "lifeboat" example, that recognition of claims for preference implicating directorial self-dealing may be limited to instances in which injury to the corporation occurs and that this doctrine is perhaps better viewed

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

as flowing from "applied common honesty" than "so-called 'trust fund theory" ').

FN163. It should be noted that this Memorandum Opinion does not reach the applicability of the presumptions of the business judgment rule, because the Court concludes that NACEPF has failed, as an initial matter, to set forth allegations satisfying the elements of the underlying claim-assuming, *arguendo,* such a claim exists.

*18 Additionally, although NACEPF argues that Clearwire was insolvent or in the vicinity of insolvency from the moment the Master Agreement was entered into, when the Complaint is "shorn of excess verbiage," it becomes clear that the alleged conduct of the Defendants challenged by NACEPF is better viewed as the cause of Clearwire's approach to the brink of insolvency and, perhaps, slide into actual insolvency. The allegations in the Complaint suggest that, as of the time of contract, Clearwire had been provided with fonds that, although not sufficient for the long-term, appear to have been sufficient for the purpose of developing the "intended" business opportunity in the short-term. [FN164] As in *Big Lots Stores, Inc.,* " claims of this type are classically derivative." [FN165]

FN164. *See supra* note 97 and accompanying text.

FN165. 2006 WL 846121, at *7 (quoting *Production Resources,* 863 A.2d at 776). It is not as easy to fault Clearwire's directors as NACEPF suggests it should be for failing to relinquish Clearwire's claim to license rights under the Master Agreement-conduct which forms the principal basis for NACEPF's alleged breach of fiduciary duty claim-when that was the one significant asset Clearwire appears to have had.

Unlike in *Production Resources,* Clearwire's alleged debt obligation, as alleged in the Complaint, to NACEPF was neither clear nor immediate.[FN166] Therefore, even assuming that a limited direct claim might be asserted by a creditor of an insolvent corporation in this context, the Court concludes that NACEPF has failed to allege facts which set forth such a claim. NACEPF may not now recover for its own benefit what it perhaps could not have recovered through contract or tort by transforming its claims into one claim for breach of a fiduciary duty that it can directly pursue.

FN166. As noted above, because NACEPF's claim fails to satisfy the foundational requirements for a direct claim for breach of fiduciary duty in this context, the Court does not consider whether the pleadings properly allege facts supporting the second step of the analysis. Therefore, the Court also does not reach the issue of whether "animus," *see supra* note 148, can supply the final ingredient for a direct claim for breach of fiduciary duty in this context.

## IV. CONCLUSION

Accordingly, Count II of the Complaint fails to state a claim upon which relief can be granted and must be dismissed. Therefore, for reasons also set forth above, the Court is without personal jurisdiction over the Defendants with regard to Counts I and III, which must be dismissed. Accordingly, the Defendants' Motion to Dismiss is granted. An implementing order will be entered.

Del.Ch.,2006.
North American Catholic Educational Programming Foundation, Inc. v. Rob Gheewalla
Not Reported in A.2d, 2006 WL 2588971 (Del.Ch.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.