## QUESTIONS PRESENTED

I. Does a Delaware court have personal jurisdiction over the Defendants in the breach of fiduciary duty claims?

II. Does the complaint state a claim for relief?

III. Does a Delaware court have personal jurisdiction over the Defendants in the fraudulent inducement and interference with prospective business opportunity claims?

## SUMMARY OF ARGUMENT

The essence of Defendants' arguments is a simple factual assertion that they want this Court to accept solely on the word of Mr. Mansour's affidavit – they claim Clearwire was never on the verge of insolvency. That assertion is the basis for all their main arguments that follow: (1) Defendants owed no fiduciary duty to NACEPF, as at most it is a creditor, not a stockholder; (2) absent the fiduciary duty of Defendants to NACEPF as directors of Clearwire, there is no basis to serve Defendants under Section 3114; and (3) absent valid service under Section 3114, the pendent claims of fraudulent inducement and interference with contract cannot stand.

As we shall show, these arguments fail for their premise is false. Clearwire was insolvent, or at least in the vicinity of insolvency. It has repeatedly admitted that fact, even using the threat of insolvency to raise more money from its stockholders. Thus, Defendants did owe a duty to Clearwire's creditors, including NACEPF, and the breach of that duty provides a basis for service under Section 3114. Given that Defendants are before the courts of Delaware on that claim, under settled law they are also subject to the pendent claims of fraudulent inducement and interference with prospective business contracts of NACEPF.

## I. THE DIRECTORS OF A DELAWARE CORPORATION HAVE A FIDUCIARY DUTY TO ITS CREDITORS WHEN THE CORPORATION IS INSOLVENT OR IN THE VICINITY OF INSOLVENCY

### 1. Introduction

Defendants argue that NACEPF has no valid claim for breach of fiduciary duty.[5] Their argument has four parts: (a) there is no such direct fiduciary duty to creditors, even when the corporation is insolvent or in the vicinity of insolvency[6]; (b) NACEPF was not a "creditor" of Clearwire[7]; (c) Clearwire was not insolvent[8]; and (d) Clearwire was not even in the zone of insolvency.[9] Their first argument that no duty exists is just wrong as a matter of law. Their other three arguments ignore the well-pleaded factual allegations of the Complaint, ignore their own confessions of Clearwire's insolvency, and wrongly attempt to have this case dismissed at the pleading stage despite the evident dispute over the facts. Thus, their motion to dismiss the fiduciary duty claim must fail.

### 2. Upon Insolvency Directors Owe Creditors A Duty

The Defendants' first attack on the breach of fiduciary duty claim is based on their wrong interpretation of the recent *Production Resources* decision.[10] They claim that *Production Resources* effectively narrowed decades of Delaware law upholding directors' fiduciary duties to the creditors of insolvent corporations, to now only permit derivative claims on the corporation's

---

[5] D. Br. 14-20.

[6] *Id.* 16.

[7] *Id.* 17.

[8] *Id.*

[9] *Id.* 19-20.

[10] *Production Resources Group LLC v. NCT Group Inc.*, 863 A.2d 772 (Del. Ch. 2004).

behalf.[11] Thus, they argue that because NACEPF's claim is a direct claim for damages to it, its fiduciary duty claim is barred by *Production Resources*.[12]

Defendants misread *Production Resources*. First, *Production Resources'* analysis begins by recognizing "it is settled that under Delaware law, the firm's directors are said to owe fiduciary duties to the company's creditors."[13] *Production Resources* then points out that while it is the creditors who may enforce those duties, it is often the case that those duties are to properly manage the corporation itself. Those claims are derivative.[14] What the Court did not rule out, however, is that those fiduciary duties may also include the obligation to not unreasonably hurt the creditors – a direct claim.

This distinction is made clear by the Court's discussion of such direct claims.

> Another question the parties do not confront is what the direct/derivative claim distinction means when a firm is insolvent. PRG assumes that all fiduciary duty claims become direct when a firm is insolvent. The defendants' arguments are less clear but they come close to asserting the opposite; namely, that all fiduciary duty claims must be derivative.
>
> To my mind, the question has no stark answer. When a firm is solvent, there can be situations when a board's fiduciary misconduct is not injurious to the firm as a whole but is injurious to particular stockholders. Assume, for example, that the board controlled 80% of the stock and consistently shorted the remaining stockholders on dividend distributions, took the excess and gave it to themselves, and lied to the minority about the material facts. In those circumstances, it seems likely that the injured minority stockholders could assert direct duty of loyalty claims even though there was no injury to the firm.
>
> When a firm is insolvent, the directors are said to owe fiduciary duties to the creditors, much like the directors of solvent firms owe such duties to the stockholders. The important unanswered question is precisely what the contents of those duties are . . . .

---

[11] D. Br. 16.

[12] *Id.*

[13] *Production Resources Group LLC*, 863 A.2d at 790-791.

[14] *Id.*

> For reasons I will explain, I can resolve the motion without making any broad pronouncements that would have large policy implications. Rather, I will resolve the motion on the established principle that when a firm is insolvent, the directors take on a fiduciary relationship to the company's creditors, combining that principle with the conservative assumption that there might, possibly exist circumstances in which the directors display such a marked degree of animus towards a particular creditor with a proven entitlement to payment that they expose themselves to a direct fiduciary duty claim by that creditor.[15]

Here, NACEPF is asserting just such a direct claim on its own behalf.[16] For the reasons set forth below, that claim states a breach of fiduciary duty to NACEPF.

3. Complaint Sufficiently Alleges that Defendants Breached <u>Fiduciary Duties Owed To Plaintiff</u>

Defendants owed NACEPF fiduciary duties in its capacity as a substantial creditor. The Complaint specifically alleges that Defendants breached their fiduciary duties by engaging in self-dealing to further the plans of their employer, Goldman Sachs. This self-dealing occurred in the pursuit of a business that "had no reasonable likelihood of succeeding," but rather depleted Clearwire's assets to NACEPF's detriment.[17]

The Master Agreement was negotiated between the Alliance, NACEPF and Defendants, who acted on behalf of Goldman Sachs.[18] Clearwire's Board was controlled by Goldman Sachs through the Defendants by virtue of Goldman Sachs's quantum of investments.[19] It was made abundantly clear that if the Clearwire Board did not heed Goldman Sachs's instructions, the latter

---

[15] *Id.* at 796-798.

[16] While the Defendants do not mention it, the NACEPF claim also constitutes a "direct" claim under *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031 (Del. 2004) and its progeny.

[17] Compl. ¶ 46.

[18] *Id.* ¶¶ 6, 20, 21, 22, 23, 24, 25.

[19] *Id.* ¶¶ 6, 7(a).

would cease its support of Clearwire.[20] Under the control of Goldman Sachs, the Defendants engaged in negotiations with NACEPF and other Alliance members for the spectrum licenses between 2000 and 2001. They provided assurances that Goldman Sachs would infuse adequate capital and management assistance to develop the spectrum assets into a national system of wireless connections to the internet benefiting NACEPF.[21] Justifiably, NACEPF relied upon the Defendants' commitments on behalf of Goldman Sachs and entered into the Master Agreement with Clearwire on March 13, 2001.[22]

Contrary to the Defendants' commitments to develop Clearwire into a national wireless internet provider, they began secretly meeting with leading wireless providers to extract concessions based on Clearwire's claims to be able to interfere with their spectrum licenses.[23] The Defendants continued to assert, after they took positions on Clearwire's Board and after it was clear that Clearwire was insolvent, that Clearwire had the right to acquire the spectrum licenses from NACEPF.[24] These claims prevented NACEPF from offering the same licenses to other parties and were not undertaken to further Clearwire's legitimate business plan, but to hold NACEPF's spectrum hostage until the other wireless providers gave in to Defendants' scheme

The Complaint alleges that the directors did not take steps to "preserv[e] the assets of Clearwire for its benefit . . . when it became apparent that Clearwire would not be able to continue as a going concern and would need to be liquidated."[25] The Defendants' act of keeping the spectrum "in play" for Goldman Sachs's benefit without any prospect of Clearwire actually

---

[20] *Id.* ¶¶ 7(f), 8.

[21] *Id.* ¶¶ 22, 23.

[22] *Id.* ¶¶ 24, 25.

[23] *Id.* ¶¶ 26–29.

[24] *Id.* ¶ 32.

[25] *Id.* ¶ 45.

using those licenses, deprived NACEPF of the ability to sell the spectrum.[26] That self-dealing includes the Goldman Directors' knowledge that Clearwire was in danger of liquidation and that Goldman Sachs would not carry through the grand plans it trumpeted.[27] Finally, Defendants' further act of investing the spectrum licenses in a Florida business that had no reasonable likelihood of success jeopardized NACEPF's prospects of recovery on its debts owed by Clearwire.[28] Such acts were pernicious to NACEPF's economic rights.[29] Taken together, these acts instrumented by the Defendants during the Clearwire insolvency, violated the good faith required by their fiduciary duties to NACEPF.

This conduct is similar to the hypothetical conduct used by Chancellor Allen in *Credit Lyonnais* to illustrate when directors have violated their duty to creditors.[30] Indeed, it is the sort of self-dealing that is actionable under the decisions cited in *Production Resources.*[31] It is actionable here as well.

4. Complaint Sufficiently Alleges That Clearwire Was Either Insolvent Or In The Vicinity Of Insolvency

In its Complaint, NACEPF alleges that Clearwire was either insolvent or in its "vicinity,"[32] and supports these averments by factual predicates and extrinsic evidence.[33]

---

[26] *Id.* ¶ 33.

[27] *Id.*

[28] *Id.* ¶¶ 46, 47.

[29] *Id.*

[30] *Credit Lyonnais Bank Nederland N.V. v. Pathe Communications Corp.*, 1991 WL 277613, at *34 n. 55 (Del. Ch. Dec. 30, 1991) (gambling with the remaining assets while insolvent is a breach of duty to creditors.)

[31] *Production Resources*, 863 A.2d at 791-792, n. 62 (citing *Pennsylvania Co. Insurances on Lives and Granting Annuities v. South Broad St. Theatre Co.*, 174 A.112 (Del. Ch. 1934) and *Geyer v. Ingersoll Publications Co.*, 621 A.2d 784 (Del. Ch. 1992)).

[32] Compl. ¶¶ 7(a)-(c), 9, 30, 33, 35, 36, 39, 44, 45. Defendants use of the Mansour Affidavit to make their argument over jurisdiction that is acceptable. However, they are also arguing over

Nonetheless, Defendants argue that at this pleading stage and without discovery, the Court should simply accept their claim of Clearwire solvency.[34] Given the factual disputes outlined *supra* at 11-14, the insolvency of Clearwire must be taken as fact now.

The affidavit of John Primeau, NACEPF's president, challenges the distorted picture of Clearwire's financial health presented in Mansour's affidavit in support of its Motion to Dismiss. The Mansour Affidavit concedes that Clearwire's liabilities exceeded its debts at end-2000 by $6.4 million, rendering Clearwire insolvent in 2000, during the negotiations with NACEPF.[35] The Primeau Affidavit avers Clearwire's inability to meet over $100 million potential payments to NACEPF and others because "cash available" was a mere $27,718,000.[36] That affidavit exhibits Clearwire's inability to service its debts as they fell due because the monthly burn rate of $2.1 million per month far exceeded operational income.[37] The conclusion from the Primeau

the facts, using that affidavit, to attack the fiduciary duty claim on its merits. That is not acceptable in a motion to dismiss. Instead, the facts in the Complaint must be accepted.

[33] For example, paragraph 7(b) of the Complaint states, "[a]fter March 2001, Clearwire had financial obligations related to its agreement with [Plaintiff] and others that potentially exceeded $134 million," but lacked operational liquidity to honor them. Similarly, paragraph 30 draws attention to Clearwire's tryst with insolvency by stating its monthly "burn rate" of $2.1 million far exceeded cash resources, rendering its position financially untenable. Paragraph 35 alleges that Clearwire indicated imminent bankruptcy, to shrink its debt obligations to HITN and ITF. Clearwire's inability to raise "any significant money" to meet its obligations and its dependency on Goldman Sachs's insubstantial infusions is averred at paragraph 36. Finally, paragraph 44 reaffirms Clearwire's insolvency or entry into its "vicinity."

[34] D. Br. 17.

[35] Mansour Aff. Ex. B at 2 (the consolidated balance sheet for 2000 demonstrates liabilities to be $15,596,583 against assets of $9,151,217).

[36] Primeau Aff. ¶ 7; Ex. A.

[37] Primeau Aff. ¶ 7; Ex. C.

averments is clear: had Clearwire attempted to honor its over $100 million commitment to the Alliance and NACEPF, it would have courted bankruptcy.[38]

The terse Mansour Affidavit does not refute NACEPF's contention that Clearwire was insolvent. That Affidavit does not refute Clearwire was at least in the "vicinity" of insolvency in 2001, 2002, and 2003. Rather, it deflects attention from the relevant period by averring inconsequentially that in September 2005 Clearwire was "still in existence."[39] That same affidavit contains Clearwire's Independent Audit Report from KPMG. That report relates Defendants' contentions that Clearwire was not insolvent, or in its "vicinity," and ironically, helps NACEPF make its case. That report unequivocally states that after an examination of the balance sheets of Clearwire and its subsidiaries for 2001 and 2002, Clearwire was hemorrhaging financially and its future was rather grim:

> [T]he Company has suffered recurring losses from operations and has generated significant negative cash flows from operations during the years ended December 31, 2002 and 2001. Operating losses and negative cash flows from operations are expected to continue during 2003. *These factors, among others in note 2, raise substantial doubt concerning the Company's ability to continue as a going concern.*[40]

KPMG further qualified Clearwire's financial distress:

> The Company has incurred net losses since its inception and *there is no assurance that the company will be able to achieve future revenue levels sufficient to support existing operations or generate positive cash flow from operations to recover its* investment *in its property, plant and equipment*. The Company has limited additional financial resources available to support its operations and in the past has been supported by

---

[38] For example, paragraphs 8 and 9 of the Primeau Affidavit aver that on December 4, 2001, the Clearwire board accepted the Company was at least in the "vicinity of insolvency" by projecting a deficit of $1,926,000 by September 2002 and an imperative need to raise $20 million by October 2002 to avoid bankruptcy. Those funds were never raised, rendering Clearwire attempts to meet its obligations futile and its inability to service maturing debts unsuccessful.

[39] Mansour Aff. ¶ 8 (emphasis added).

[40] Mansour Aff. Ex. A at 1.

> certain major shareholders. There is no formal commitment for such shareholders to continue such support beyond the current investment. Also, as described in note 8, certain Alliance members have alleged that the company is in default under the Master Agreement due to the Company's failure to enter into the requisite agreements regarding additional spectrum rights. The ultimate outcome of this issue is uncertain. These factors raise substantial doubt concerning the ability of the Company as a going concern.[41]

Defendants' attempt to gloss over Clearwire's unmistakable entry into insolvency or its "vicinity" in 2001-2002 by pointing to a mere $600,000 infusion, is a weak, albeit unsuccessful attempt to reverse the laws of finance and demonstrate that pennies outweigh pounds.[42] That contention is truncated by the Primeau Affidavit that categorically avers the monthly burn rate for survival was $2.1 million.[43] It is undisputed, even by the Mansour Affidavit, that at the end of 2000, Clearwire was insolvent, with assets falling short of liabilities by over $6.4 million.[44] Clearwire's Board claimed that $27,718,000 was available in "cash."[45] However, that position is belied by its twin obligations to service: (1) over $100 million to NACEPF and Alliance members who held the wireless licenses;[46] and (2) $3,435,000 in unpaid closing costs,[47] the latter endorsed by the Clearwire Board.[48]

---

[41] Mansour Aff. Ex. A at 10 (emphasis added).

[42] Mansour Aff. ¶ 7.

[43] Primeau Aff. ¶ 7.

[44] Mansour Aff. Ex. B at 2 (the consolidated balance sheet for 2000 demonstrates liabilities to be $15,596,583 against assets of $9,151,217, thus satisfying the test of insolvency).

[45] Primeau Aff. ¶ 7; Ex. A.

[46] Primeau Aff. Ex. B at 3-6 (the terms of payment in the master agreement).

[47] Primeau Aff. Ex. A. Interestingly, Clearwire's bold projections in 2001 show that average cash burn rate of $2.1 million "will increase due to recent management changes" and does not include closing costs, payable to the Alliance of $3.434 million. *See id.* at Ex. C; *see also* "Sources and Uses" statement at Ex. A.

[48] Primeau Aff. Ex. C.

The Primeau Affidavit states that Clearwire's Board acknowledged in December 2001 that a $20 million infusion was required by October 2002 to avoid bankruptcy.[49] The Board affirmed that conclusion on February 26, 2002, when it was advised that $19.5 million infusion by October 2002 was imperative to avoid insolvency; however, that funding was never received.[50] The Primeau Affidavit shows that on May 30, 2002, the Board was advised that Clearwire was on the brink of insolvency.[51] Projections showed a cash deficit of $1,955,000 in the fourth quarter of 2002. That forecast indicated a $50 million deficit by end of 2004, a figure that included provisions of $38,853,000 for the spectrum licenses to NACEPF and others.[52] To avoid bankruptcy, Clearwire repudiated its obligations under the Master Agreement.[53] Clearwire's projections again forecasted a negative cash flow by August 2003; tellingly, this depressing picture emerged without factoring in the $100 million spectrum payment obligations under the Master Agreement.[54] Presented with a grim picture and the quantum of maturing obligations, Clearwire raised a Lilliputian $600,000 in September 2003 to negate a Goliath $20 million shortfall.[55]

---

[49] Primeau Aff. ¶ 9.

[50] Primeau Aff. ¶ 11.

[51] Primeau Aff. ¶ 15.

[52] *Id.*

[53] Primeau Aff. ¶ 16.

[54] Primeau Aff. ¶ 17; *see also id.* at Ex. J (Clearwire's Board projections in its 2003 summary showed a cash shortfall in August 2003, even without factoring in substantial debts owed to Plaintiff).

[55] Primeau Aff. ¶ 19. In addition, the Affidavit avers $600,000 was raised by informing Clearwire's shareholders that the company would otherwise go bankrupt.

Cumulatively, all the above indicates that Clearwire was either "unable to meet its debts as they [fell] due in the usual course of business"[56] or, where liabilities exceed assets, had "no reasonable prospect that the business can be successfully continued."[57] This position is reinforced by Clearwire's KPMG Audit Report that unequivocally states, "[t]hese factors, among others, in note 2, raise substantial doubt concerning the Company's ability to continue as a going concern."[58]

Taken together, the Complaint, the Primeau and Mansour Affidavits, KPMG's Audit Report, and the Master Agreement's $100 million potential pay out to the Alliance members, lead to the conclusion that Clearwire was insolvent in 2000, and at least in the vicinity of insolvency in 2001-2003. Therefore, NACEPF has alleged sufficient facts to overcome Defendants' contentions that Clearwire was neither insolvent nor in the zone of insolvency.

5. Complaint Sufficiently Alleges That Plaintiff Was A Creditor Of Clearwire

It is settled Delaware law that when a firm enters insolvency or its vicinity, "the firm's directors are said to owe fiduciary duties to the company's creditors."[59] The Complaint

---

[56] *See Production Resources Group, L.L.C.*, 863 A.2d at 782 (citing *Siple v. S & K Plumbing and Heating, Inc.*, 1982 WL 8789, at *2 (Del. Ch. Apr. 13, 1982); *see also Francotyp-Postalia AG & Co. v. On Target Technology, Inc.*, 1998 WL 928382, at *5 (Del. Ch. Dec. 24, 1998).

[57] *Production Resources Group, L.L.C.*, 863 A.2d at 782 (citing *Siple*, 1982 WL 8789, at *2).

[58] Mansour Aff. Ex. A at 1, 10. *See also* Primeau Aff. ¶ 21 (countering the Mansour Affidavit's claims of Clearwire's pink health by stating that "[t]hese asset values depend on the value of a company called 'Flux' that is a subsidiary of another company not owned by Clearwire . . . is just a balance sheet value, not a real value. Of course, the 2003 and 2004 balance sheets ignore the amounts owed to [Plaintiff]."

[59] *Production Resources Group, L.L.C.*, 863 A.2d at 790-91 (citing *Geyer v. Ingersoll Publications Co.*, 621 A.2d 784, 787 (Del. Ch. 1992) ("[W]hen the insolvency exception [arises], it creates fiduciary duties for directors for the benefit of creditors.")); *see also id.* at 789 n.55 (citing and discussing *In re Buckhead Am. Corp.*, 178 B.R. 956, 968-69 (D. Del. 1994) (denying dismissal of fiduciary claim made by creditors when company was not insolvent when decision was made but court found the company was within the "zone of insolvency" and held that status

sufficiently alleges and discusses the relationship of NACEPF to Clearwire as one of its substantial creditors.[60] *The Fraudulent Transfers Act* defines "creditor" as a person possessing a claim.[61] A "claim" is defined as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured."[62] *Black's Law Dictionary* defines a creditor as "[o]ne to whom a debt is owed."[63] In the context of the preceding definitions, a scrutiny of the following language from the Master Agreement unequivocally indicates that NACEPF was a creditor of Clearwire and NACEPF possessed "claims" against debtor, Clearwire:

> WHEREAS, Clearwire is prepared to make, and the Alliance Members are prepared to accept, as royalties, the payments . . . for access to the Commercial Spectrum Capacity of the Channels . . . which payments and

---

could not be decided on a motion to dismiss)); *U.S. Bank National Ass'n v. U.S. Timberlands Klamath Falls*, 864 A.2d 930, 948 (Del. Ch. 2004) (citing *In re NCS Healthcare, Inc., S'holders Litig.*, 825 A.2d 240, 257 (Del. Ch. 2002)) and *In re Healthco Int'l, Inc.*, 208 B.R. 288, 300 (Bankr. D.Mass. 1997) (stating "[w]hen a transaction renders a corporation insolvent, or brings it to the brink of insolvency, the rights of creditors become paramount."); *see also Weaver v. Kellogg*, 216 B.R. 563, 582-84. (S.D. Tex. 1997) (fiduciary duties owed to creditors in vicinity of insolvency).

[60] Compl. ¶ 44. *See, e.g.*, ¶ 35 (Clearwire settled claims with HITN and ITF leaving Plaintiff as the sole creditor of the Alliance).

[61] 6 *Del. C.* § 1301(4).

[62] *Id.* § 1301(3).

[63] *Black's Law Dictionary* 375 (7th ed. 1999); *see also Richards v. Jones*, 142 A. 832, 833-34 (Del. Ch. 1928) (interpreting Delaware's then Fraudulent Conveyances law (30 Del. Laws, 207) to define "creditor" as a "person having any claim, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent."); *see also Cooper's Home Furnishings v. Rittenhouse Investment Associates, Inc.*, 1977 WL 9542 (Del. Ch. Nov. 1, 1977) (exploring the definition of "creditor" in 6 *Del. C.* § 1301(3). That definition stated that "Creditor is defined in part as 'a person having any claim, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent.'"). Another useful definition of "claim," essentially the same as 6 *Del. C.* § 1301(4), is provided in the Federal Bankruptcy Code: "[C]laim means right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C.A. § 101(5)(A). Section 101(5)(B) includes "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment." 11 U.S.C.A. § 101(5)(B).

> transfers are intended to generate an aggregate value, as of the Initial Closing, of $0.90 for each Channel POP [CPOP] through a combination of cash commitment royalty, equity in Clearwire, an earn-out, use agreement execution and usage royalties.[64]

This shows that Clearwire had financial obligations towards NACEPF and Alliance members, rendering NACEPF a creditor of Clearwire with a right to demand its monetary dues for license usage. Clearwire's Board also endorsed NACEPF's creditor-status in its financial projections. For example, in December 2001, the Board projected the quantum of financial obligations in 2002 owed to Alliance members, including NACEPF.[65] The Board accordingly factored $38,853,000 in its May 2002 projections as due and payable to NACEPF and Alliance members for the period 2002-2004.[66]

The Primeau Affidavit avers that, consistent with the Master Agreement, Clearwire was obligated to pay over $100 million to NACEPF and other holders of the wireless spectrum.[67] In the 2002 projections, Clearwire made an $11,579,567 provision for 2002 projected payments to NACEPF and others for spectrum licenses.[68] Mr. Primeau avers that Defendant Gheewalla told NACEPF and Alliance members that Clearwire could not pay its "debts" without concessions.[69] Additionally, the Clearwire Board's May 30, 2002, projections provisioned $38,853,000 debt-payments to NACEPF and other Alliance members.[70] Taken together, these factual predicates cloak NACEPF with creditor status.

---

64 Primeau Aff. Ex. M at 2.

65 Primeau Aff. Ex. F.

66 Primeau Aff. Ex. H.

67 Primeau Aff. ¶ 7; Ex. B at 3-6.

68 Primeau Aff. ¶ 10; Ex. F.

69 Primeau Aff. ¶ 13.

70 Primeau Aff. ¶ 15; Ex. H.

The Mansour Affidavit confirms that NACEPF was a creditor.[71] Clearwire's Consolidated Balance Sheet for 2002 and 2001, appended with that Affidavit, vividly captures long-term spectrum-related liabilities to be at $6,684,664 million and $4,943,725 million respectively.[72] Clearwire also acknowledged that "[u]pon entering into an [Individual Use Agreement ("IUA")], the Company [Clearwire] is required to make certain upfront and ongoing payments to the Alliance Member, pursuant to the terms of [the] IUA."[73] Finally, Clearwire asserted that "Spectrum obligations as of December 31, 2002, totaling $6,684,664, represent the present value of such future payments required to be made pursuant to existing IUAs."[74] Thus, NACEPF is a Clearwire creditor.

6. Conclusion

The Complaint states the type of direct creditor claim for beach of fiduciary duty that prior case law and *Production Resources* support. Defendants acted out of loyalty to Goldman Sachs and improperly hurt NACEPF in the process. Because Clearwire was at least in the vicinity of insolvency (if not insolvent) and NACEPF was a creditor, the Complaint states a claim for Defendants' breach of fiduciary duty.

---

71 Mansour Aff. Ex. A at 2.

72 *Id.*

73 Mansour Aff. Ex. A at 13, ¶ (5)(b).

74 *Id.*

## II. PLAINTIFF HAS PLED SUFFICIENT FACTS TO WITHSTAND DEFENDANTS' MOTION TO DISMISS THE FRAUDULENT INDUCEMENT CLAIM

### 1. Introduction

Defendants argue that NACEPF has failed to state a claim for fraudulent inducement.[75] However, in considering a motion to dismiss under Rule 12(b)(6):

> [T]he Court is required to accept as true all of the nonmoving party's well-pleaded factual allegations and to draw all reasonable inferences in the light most favorable to the nonmoving party. The motion may not be granted unless it appears with reasonable certainty that the nonmoving party would not be entitled to relief under any set of facts that it could prove at trial.[76]

### 2. The Merger Clause Does Not Bar The Fraud Claim

Defendants argue that NACEPF has failed to plead the necessary elements for a claim of fraudulent inducement. In support of their argument, Defendants point to the merger clause in the Master Agreement. Defendants incorrectly argue that because of the merger clause, NACEPF cannot claim that it justifiably relied on any alleged misrepresentation.[77] However, for a contract to bar a fraudulent inducement claim, the contract must contain language adding up to

---

[75] *See* D. Br. 21-23.

[76] *BAE Systems North America Inc. v. Lockheed Martin Corp.*, 2004 Del. Ch. LEXIS 119, at *10-11 (Del. Ch. Aug. 3, 2004).

[77] D. Br. 22. In their brief, Defendants rely on the following language from *Progressive International Corporation v. E.I. DuPont de Nemours & Co*: "*Absent fraud* or other unconscionable circumstances not present here, the existence of an integration clause between sophisticated parties is conclusive evidence that the parties intended the written contract to be their complete agreement." 2002 Del. Ch. LEXIS 91, at *25 (Del. Ch. July 9, 2002) (emphasis added). What Defendants fail to perceive is that the above-quoted language begins with the qualifier "absent fraud." Because NACEPF is alleging fraudulent inducement, the integration clause does not prevent Plaintiff from introducing evidence of fraud. When a party alleges fraud, the proof of oral promises or representations made prior to the written agreement is always admissible as an exception to the parol evidence rule. *See Scott-Douglas Corp. v. Greyhound Corp.*, 304 A.2d 309, 317 (Del. 1973). In this respect, the case quoted by Defendants strengthens Plaintiff's argument.

a "clear anti-reliance clause by which the plaintiff has contractually promised that it did not rely upon statements outside the contract's four corners in deciding to sign the contract."[78] The "Entire Agreement" provision in the Master Agreement provides:

> This Agreement, the Documents and the other writings referred to herein or delivered pursuant hereto which form a part hereof contain the entire agreement among the Parties with respect to the subject matter hereof and supersede all prior and contemporaneous arrangements or understandings with respect thereto.[79]

This integration clause is of the type that can be found in any agreement. Typical integration clauses, like the one in the Master Agreement, "do not operate to bar fraud claims based on factual statements not made in the written agreement."[80] "The presence of a standard integration clause alone, which does not contain explicit anti-reliance representations and which is not accompanied by other contractual provisions demonstrating with clarity that the plaintiff had agreed that it was not relying on facts outside the contract, will not suffice to bar fraud claims."[81] In reconciling previous decisions, the Court in *Kronenberg v. Katz* explained:

> In all of the decisions in which this court has found that fraud claims were barred by contractual provisions, the court has concluded that the contract's terms, when read together, constituted a clear statement by the plaintiff that it was not relying on the very factual statements that the plaintiff was contending to be fraudulent. Because Delaware's public policy is intolerant of fraud, the intent to preclude reliance on extra-contractual statements must emerge clearly and unambiguously from the contract.[82]

What is strikingly absent in this case, as it was in *Kronenberg*, is the presence of a clear and unambiguous contractual provision in which the Plaintiffs forthrightly affirm that they are not

---

[78] *Kronenberg v. Katz*, 872 A.2d 568, 593 (Del. Ch. 2004).

[79] Master Agreement § 14.

[80] *Kronenberg*, 872 A.2d at 592.

[81] *Id.* at 593.

[82] *Id.*

relying upon any representation or statement of fact not contained within the Master Agreement. Because the integration clause here lacks any specific language constituting a clear anti-reliance statement, this clause cannot bar Plaintiff's claim of fraudulent inducement.

3. Complaint Pleads Sufficient Facts For The Claim Of Fraudulent Inducement

Because NACEPF alleges it was fraudulently induced to sign the Master Agreement and thereafter preserve its spectrum licenses for acquisition by Clearwire, Plaintiff is assumed able to present evidence to satisfy the elements of common law fraud.[83] The elements of a common law fraud claim are: (1) a false representation, concealment of a material fact, or silence in the face of a duty to speak; (2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; (3) an intent to induce the plaintiff to act or to refrain from acting; (4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result of such reliance.[84]

Element one: The false representations alleged in the Complaint are that the Goldman Defendants did not disclose either their true intentions for Clearwire or the reasons for Goldman Sachs's interest in Clearwire.

Element Two: "[F]raud does not consist merely of overt misrepresentations, but may also occur through deliberate concealment of material facts, or by silence in the face of a duty to speak."[85] The Complaint alleges that at and before the signing of the Master Agreement, the Goldman Defendants knew, or had reason to know, that (a) Clearwire would not acquire

---

[83] *See E.I. Du Pont de Nemours & Co. v. Fl. Evergreen Foliage*, 744 A.2d 457, 461-462 (Del. 1999).

[84] *First State Staffing Plus v. Montgomery Mut. Ins. Co.*, 2005 Del. Ch. LEXIS 132, at *44 (Del. Ch. Sept. 7, 2005).

[85] *Gaffin v. Teledyne, Inc.*, 1990 Del. Ch. LEXIS 198, at *16 (Del. Ch. Dec. 4, 1990) (internal citations omitted).

NACEPF's spectrum licenses as they became available or build out an operating wireless network, because it lacked the resources to do so and because Goldman Sachs did not intend to provide the funding; and (b) Clearwire's equipment subsidiary, which was to supply the technology it needed, was for sale.[86]

Element three: The Complaint alleges the Defendants' intent was to induce NACEPF to enter into the Master Agreement and to use its spectrum licenses for the purpose of leveraging Sprint and the other wireless operators and not for the plan represented to NACEPF.

Element four: The Complaint pleads that NACEPF justifiably relied on representations made by the Defendants in signing the Master Agreement thereby preserving its spectrum licenses for acquisition by Clearwire. There is recent case law addressing the justifiable reliance of sophisticated parties in a commercial contract; however, that case law does not apply to this case. When sophisticated parties contractually disclaim reliance upon representations not included within the four corners of the written agreement, fraud claims based on those representations are barred because any purported reliance upon them is unreasonable as a matter of law. That is, "Delaware courts have held that sophisticated parties may not reasonably rely upon representations that are inconsistent with a negotiated contract, when that contract contains a provision explicitly disclaiming reliance upon such outside representations."[87] Although it is accurate to say that there may be factual settings in which suitably tailored disclaimers may bar

---

[86] Compl. ¶ 41.

[87] *St. James Rec., LLC v. Rieger Opportunity Ptnrs.*, LLC, 2003 Del. Ch. LEXIS 126 (Del. Ch. Nov. 5, 2003); *see also Progressive International Corp.*, 2002 Del. Ch. LEXIS 91, at *23.

certain fraud actions, it is inaccurate to say that merely because sophisticated parties negotiated terms of an agreement, there is an automatic bar to any fraud claim that might be asserted.[88]

In holding that the parties' contractually negotiated disclaimers extinguished the fraud claims, the Court in *Great Lakes Chemical Corp. v. Pharmacia Corp.* explained: "To allow [Plaintiff] to assert, under the rubric of fraud, *claims that are explicitly precluded by contract*, would defeat the reasonable commercial expectations of the contracting parties and eviscerate the utility of written contractual agreements."[89] Similarly, the integration clause in the *Progressive International Corporation v. E.I. DuPont de Nemours & Co.* License Agreement provided "that all parties expressly agreed and stipulated that no party had made any representation to induce the other to execute the License Agreement, nor had any party executed the Agreement in reliance 'upon any such . . . representation . . . not contained herein.'"[90] Here, however, there is no such disclaimer language in the Master Agreement; therefore, the above case law does not apply. As a matter of fact, the only disclaimer-like language is in Section 8 of the Master Agreement, which stipulates the survival of representations, warranties, agreements, and covenants, etc.[91] This forward looking clause has no language disclaiming the reliance on statements, oral or written, made prior to the signing of the Master Agreement. Therefore, the case law disallowing justifiable reliance if disclaimers are tailored precisely to address the fraud alleged does not apply here, and NACEPF was justified in relying on Defendants' representations.

---

[88] *See CP Kelco U.S., Inc. V. Pharmacia Corp.*, 2002 WL 31230816 (D. Del. Oct. 2, 2002) (explaining the Chancery Court's opinion in *Great Lakes Chemical Corp. v. Pharmacia Corp.*, 788 A.2d 544 (Del. Ch. 2001)).

[89] *Great Lakes Chemical Corp.*, 788 A.2d at 556 (emphasis added).

[90] *Progressive International Corp.*, 2002 Del. Ch. LEXIS 91, at *25.

[91] Master Agreement § 8.

<u>Element five</u>: The damages generally pled in the Complaint are that NACEPF lost the opportunity to entertain other offers for the spectrum licenses or to renew the leases of the already existing licensees.

The Complaint alleges sufficient facts for each of the above elements to sustain a claim of fraudulent inducement. At trial, Plaintiff will present evidence proving each of the requisite elements.

4. Plaintiff's Complaint Is Pled With Particularity <u>Pursuant To Rule 9(b)</u>

Court of Chancery Rule 9(b) provides that in all averments of fraud, "the circumstances constituting fraud . . . shall be stated with particularity. Malice, intent, knowledge and other condition of mind of a person may be averred generally." Essentially, to satisfy the requirements of Rule 9(b), "the plaintiff must allege circumstances sufficient to fairly apprise the defendant of the basis for the claim."[92] As the Supreme Court of Delaware held in *Browne v. Robb*, "[t]he entire purpose of Rule 9(b) is to put the defendant on notice so that he can adequately prepare a defense."[93]

---

[92] *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 145 (Del. Ch. 2003).

[93] *Browne v. Robb*, 583 A.2d 949, 955 (Del. 1990), *cert. denied* 499 U.S. 952 (1991). *See also Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1208 (Del. 1993) (to require that fraud be pleaded with particularity serves to discourage the initiation of suits brought solely for their nuisance value, and safeguards potential defendants from frivolous accusations of moral turpitude) (internal citation omitted); *Fox v. Fox*, 729 A.2d 825, 827 n. 2 (Del. 1999) (the purpose of Rule 9(b) is fairness and notice so that the Defendant can fairly prepare a defense) (citing *Chesapeake and Potomac Telephone Co. of Md. v. Chesapeake Utilities Corp.*, 436 A.2d 314, 338 (Del. 1981)); *American Home Products Corporation v. Norden Laboratories, Inc.*, 1991 Del. Ch. LEXIS 130, at *12-*13 (Del. Ch. 1991) (putting the defendant on notice of the transaction at issue and the alleged misconduct in the transaction is all that is required by Chancery Rule 9(b)).

Although a purpose of Rule 9(b) is to provide notice of the circumstances constituting fraud, not every alleged misrepresentation has to appear in the pleadings.[94] The plaintiff is required to set forth only the major misrepresentations or omissions upon which the fraud claims are based, and is not required to explain the legal theory of the fraud claim.[95]

The Rule 9(b) reference to "circumstances constituting fraud" requires the plaintiff to allege: (1) the time, place and contents of the false representation; (2) the identity of the person(s) making the representation; and (3) what those persons intended to obtain thereby.[96] Nevertheless, plaintiffs are not absolutely required to plead the specific date, place, or time of the fraudulent acts, provided they use some alternative means of injecting precision and some measure of substantiation into their allegations of fraud.[97]

In their brief, Defendants argue that a "*cursory* review of plaintiff's allegations reveals none of the facts required by Rule 9(b)."[98] As laid out below, Plaintiffs have averred all circumstances that must be stated with particularity.

---

[94] 2 *James Wm. Moore et al.*, Moore's Federal Practice § 9.03[1][a] (Matthew Bender 3d ed.) (The exact quote from Moore's has a typographical error in that it includes an extra "not." The quote reads: "Although a purpose of Rule 9(b) is to provide detailed notice of the circumstances constituting fraud, *not* every alleged misrepresentation need *not* appear in the pleadings. A claimant is required to set forth only the major misrepresentations or omissions upon which the fraud claims are based." (emphasis added).)

[95] *Id.*

[96] *See Lazard Debt Recovery GP, LLC. v. Weinstock*, 864 A.2d 955, 964 (Del. Ch. 2004); *see also Metro Communication Corp. BVI v. Advanced Mobilecomm Technologies Inc.*, 854 A.2d 121, 144 (Del. Ch. 2004); *H-M Wexford LLC*, 832 A.2d at 145; *Crescent/Mach I Partners, L.P. v. Turner*, 846 A.2d 963, 988 (Del. Ch. 2000).

[97] *Moore et al., supra* note 94, at § 9.03[1][b]; *see also Rolo v. City Investing Co. Liquidating Trust*, 155 F.3d 644, 653-55 (3d Cir. 1998) (plaintiffs need not, however, plead the "date, place or time" of the fraud, so long as they use an "alternative means of injecting precision and some measure of substantiation into their allegations of fraud." (quoting *Seville Indus. Machinery v. Southmost Machinery*, 742 F.2d 786, 791 (3d Cir. 1984)).

[98] D. Br. 23 (emphasis added).

Element one: (a) The Complaint alleges that the timing of the false representations was during the Defendants' negotiations with the Alliance for ITFS spectrum – from June 2000 to March 2001, and March 2001 to May 2002;[99] (b) places pled are in June 7, 2000 letter and at negotiation meetings;[100] (c) contents of the false representations pled are the Goldman reassurances that it would cause Clearwire to utilize the Alliance spectrum in its plan to access the internet while permitting NACEPF to offer its services to its clients and to otherwise use that spectrum to maintain NACEPF licenses.[101]

Element two: The Complaint alleges that the identities of those persons making the false representations are Goldman Sachs, its employees, and the Defendants as directors of Clearwire, Gheewalla, Cardinale, and Daly.

Element three: The Complaint pleads that Defendants' intent was for NACEPF to sign the Master Agreement to transfer to Clearwire the rights to NACEPF's ITFS licenses, but not to make the investment necessary to carry our their promises to NACEPF.[102] In addition, the Complaint pleads that Defendants' intent was to use the Master Agreement as leverage to obtain concessions from Sprint and other large operators,[103] and to use Clearwire to speculate on the value of spectrum licenses by holding them captive.[104]

As a last hope, Defendants argue that the Complaint fails to allege "specific facts about how and why NACEPF relied upon certain alleged statements by defendants."[105] Reliance is not

---

[99] Compl. ¶¶ 20, 22-24, 32, 38.

[100] *Id.*

[101] *Id.* ¶¶ 21, 23-25, 32, 38.

[102] *Id.* ¶¶ 20-21, 23, 32, 42.

[103] *Id.* ¶¶ 26-29, 31.

[104] *Id.* ¶ 52.

[105] Dr. Br. 24.

one of the circumstances required to be stated with particularity.[106] An allegation of reliance, however, is required for the claim of fraudulent inducement. This element, in addition to the other elements required for fraudulent inducement, is discussed at length in the previous section.

5. Conclusion

The Complaint states a claim for fraudulent inducement and pleads the Defendants' fraud with all the detail Rule 9 requires. Therefore, their motion to dismiss Count I should be denied.

[106] *H-M Wexford LLC*, 832 A.2d at 145.

## III. THE COMPLAINT PLEADS SUFFICIENT FACTS FOR THE CLAIM OF INTERFERENCE WITH PROSPECTIVE BUSINESS OPPORTUNITY

### 1. Introduction

Defendants attack the claim for interference with prospective business opportunity on two bases: (a) they claim the complaint does not adequately plead facts sufficient to state that claim[107]; and (b) they claim immunity as corporate directors for causing Clearwire's actions.[108] Neither argument is valid. The first argument ignores the actual facts pled in the complaint. Their second argument mistakes Delaware law.

### 2. Count III States A Claim

At the outset, it is well to recall the liberal standards that govern pleadings subject to a motion to dismiss. The facts alleged are to be taken as true, with all fair inferences drawn in favor of the Plaintiff.[109] Moreover, notice pleading is all that is required, not detailed factual recitations that might later be needed to actually prove the claim at trial.[110]

The Complaint pleads sufficient facts to establish the claim that Plaintiff is entitled to relief for interference with a prospective business opportunity. Prevailing on this tort requires: (1) the reasonable probability of a business opportunity; (2) the intentional interference by defendant with that opportunity; (3) proximate causation; and (4) damages, all of which must be considered in light of a defendant's privilege to compete or protect his business interests in a fair and lawful manner.[111] Each of these requirements is met by the Complaint.

---

107 D. Br. 26-28.

108 *Id.* 28-30.

109 *See* discussion *supra* at 30.

110 *Id.*

111 *See De Bonaventura v. Nationwide Mut. Ins. Co.*, 419 A.2d 942, 947 (Del. Ch. 1980), *aff'd* 428 A.2d 1151 (Del. 1981).

First, the Complaint squarely alleges that the NACEPF had a reasonable probability of the business opportunity "to convey its licenses to use wireless spectrum to a number of companies that sought to acquire that spectrum" in 2001-2002.[112] Defendants' sole attack on the sufficiency of this allegation is that it is "insufficient to establish the existence of a valid business" opportunity.[113] That misses the mark because this case is at the pleading stage, not at trial.[114]

Second, the Complaint fairly alleges that the Defendants intentionally interfered with NACEPF's opportunity to sell its spectrum licenses. For example, the Complaint states that Defendants made Clearwire assert "claims [to the licenses] not made in good faith," with knowledge they "lacked the funding to acquire and use that spectrum."[115] It is a fair reading of the Complaint that the Defendants sought to tie up NACEPF's licenses because they knew that otherwise the licenses would be conveyed to other bidders.[116] Defendants just ignore these parts of the Complaint and argue the Complaint "is . . . devoid of any factual assertion, conclusory or otherwise, that could suggest [Defendant[s] knew of any relationship expectancy."[117] That is just wrong.

Third, the Complaint clearly alleges that Defendants' wrong claims to NACEPF's licenses proximately caused it damages. After detailing the Defendants' conduct, the Complaint

---

112 Compl. ¶ 49.

113 D.Br. 27.

114 The decisions Defendants cite all involve dismissals of claims <u>after</u> discovery. (D. Br. 27).

115 Compl. ¶ 33.

116 Compl. 32-33.

117 D.Br. 27.

asserts: "As a result, NACEPF lost the opportunity to convey its licenses for spectrum to other buyers."[118]

Finally, Defendants claim the Master Agreement gave them a privilege to stop NACEPF from licensing its spectrum.[119]. In determining whether an actor's conduct is intentionally interfering with a prospective contractual relation of another is improper or not, the Restatement (Second) of Torts provides that consideration is given to the following factors: (a) the nature of the actor's conduct; (b) the actor's motive; (c) the interests of the other with which the actor's conduct interferes; (d) the interests sought to be advanced by the actor; (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other; (f) the proximity or remoteness of the actor's conduct to the interference; and (g) the relations between the parties.[120] These are factual issues that need to be resolved only after discovery and a trial.

Here, for example, the claim is that the Defendants knew that Clearwire was not able to perform its obligations to develop the NACEPF spectrum, but still continued to assert a claim to that spectrum to lock it up until they could convince others to pay them off. This did not advance Clearwire's business, but instead was designed to favor Defendants' employer, Goldman Sachs by sacrificing NACEPF's interests in the hope of recovering something for Goldman Sachs. Their conduct was not justified as a benefit to Clearwire or as a rational way to raise funds to pay off its debts. Ultimately, the propriety of their conduct will be tested by a close examination of the facts, but that cannot be done now.

---

[118] Compl. ¶ 50.

[119] D.Br. 28.

[120] *See Gillenardo v. Connor Broadcasting State Co.*, 1999 Del. Super. LEXIS 530, at *23-4 (Del. Super. Oct. 27, 1999) (citing Restatement (Second) of Torts § 767).

3. Defendants Incorrectly Argue That They Are <u>Immune From Tort Liability</u>

When a director commits or participates in the commission of a tort, whether or not it is also by or for the corporation, he is liable to third persons injured thereby, and it does not matter what liability attaches to the corporation for the tort. A contrary rule would enable a director or officer of a corporation to perpetrate flagrant injuries and escape liability behind the shield of his representative character, even though the corporation might be insolvent or irresponsible.[121]

In Defendants' Brief, they argue that Defendants cannot be held personally liable for tortious interference with a contract.[122] However, the cases relied upon for this proposition do not support immunity from torts committed to third parties; they only support immunity from torts committed to shareholders. Defendants quote the following language from *Goldman v. Pogo.com Inc.*: "officers or directors may be held personally liable for tortious interference with a contract of the corporation if and only if they exceed the scope of their agency in so doing."[123] The context of this language does not support Defendants' argument.[124] In fact, "[t]he default

[121] 18B Am. Jur. 2d *Corporations* § 1877 (2004).

[122] D.Br. 29.

[123] *Id.* (quoting *Goldman v. Pogo.com Inc.*, 2002 Del. Ch. LEXIS 71, at *28-9 (Del. Ch. June 14, 2002)).

[124] The court in *Goldman* is quoting from *International Association of Heat and Frost Insulators and Asbestos Workers Local Union 42 v. Absolute Environmental Service, Inc.*, 814 F. Supp. 392 (D. Del. 1993) ("*Local Union 42*"). In that case, the court is explaining comment b of Restatement (Second) of Torts § 770. Section 770 provides: "One who, charged with responsibility for the welfare of a third person, intentionally causes that person not to perform a contract or enter into a prospective contractual relationship with another, does not interfere improperly with the other's relation if the actor: (a) does not employ wrongful means and (b) acts to protect the welfare of the third person." The court then quotes comment b, which states this section "is frequently applicable to those who stand in a fiduciary relation toward another, as in the case of agents acting for the protection of their principals, trustees for their beneficiaries or corporate officers acting for the benefit of the corporation." Thereafter appears the language relied on by Defendants. It is apparent from these cases that this language has no bearing on director tort liability to third parties and only applies in the shareholder-director context. In

common-law rule is that corporate officials may be held individually liable for their tortious conduct, even if undertaken while acting in their official capacity."[125] The claims here are not subject to immunity because these claims belong to a third party creditor and not to the corporation or its stockholders.[126]

Lastly, Defendants argue that Plaintiff has not alleged any action exceeding the scope of the Defendants' authority.[127] Defendants cite *Wallace v. Wood*, in which the court granted a motion to dismiss the claim of interference with contractual relations because plaintiff failed to allege that defendant officers "exceeded the scope of their authority to direct the [company's] business decision making."[128] Once again, Defendants have taken a case out of context by failing to acknowledge that directors could only be liable for tortuous interference with their *own* company's contract.[129] Here, in contrast, the Complaint alleges the Defendants tortiously interfered with the contracts offered to NACEPF by third parties who wanted NACEPF's spectrum. *Wallace v. Wood* has nothing to do with that circumstance.

---

addition, to further support their arguments, Defendants quote on the following language from *Local Union 42*: "The rule . . . is consistent with Delaware's venerable business judgment rule which creates a presumption that officers and directors are immune from personal liability when making business decisions in their fiduciary capacity." (D. Br. 29) (alteration in Defs.' Br.). What the ellipsis is replacing is "§ 770;" therefore, the quote should read, "[t]he rule in § 770 . . . ." *Local Union 42*, 814 F. Supp. at 400 (emphasis added). The court is merely reconciling the rule set forth in § 770 with the long-standing business judgment rule, and for the reasons previously stated, the language of § 770 does not support Defendants' argument. *See id.*

125 *St. James Recreation, LLC*, 2003 Del. Ch. LEXIS 126, at *21; *see also Donsco, Inc. v. Casper Corp.*, 587 F.2d 602, 606 (3d Cir. 1978) (holding a corporate officer is individually liable for the torts he personally commits and cannot shield himself behind a corporation when he is an actual participant in the tort).

126 *See, e.g., Production Resources Group, L.L.C.*, 863 A.2d at 794.

127 D.Br. 29.

128 *Id.*; *see also Wallace v. Wood*, 752 A.2d 1175, 1183 (Del. Ch. 1999).

129 *Wallace*, 752 A. 2d at 1183.

4. Conclusion

The Complaint has detailed factual allegations that state a claim for interference with the contracts available to NACEPF. There was no privilege for the Defendants to commit that tort. Therefore, their motion to dismiss should be denied.

## IV. JURISDICTION UNDER SECTION 3114 INCLUDES CLAIMS SUFFICIENTLY RELATED TO BREACH OF FIDUCIARY DUTY CLAIMS

### 1. Introduction

When personal jurisdiction is challenged under Section 3114, Plaintiff must demonstrate the Court's jurisdiction over nonresident director defendants.[130] That burden is discharged by a *prima facie* showing of jurisdiction,[131] with factual inferences drawn in a light most favorable to the Plaintiff.[132] Factual allegations of personal jurisdiction are considered true "unless contradicted by affidavit."[133] The Court may consider extrinsic evidence at that stage.[134] Plaintiff's averments must enable the Court to conclude that facts exist to justify personal jurisdiction and if decided upon affidavits, Plaintiff need only make a *prima facie* showing.[135] When both parties provide divergent views, "[t]he court will not decide conflicted facts on such a

---

130 *Plummer & Co. Realtors v. Crisafi*, 533 A.2d 1242, 1244 (Del. Super. 1987); *Crescent/Mach I Partners, L.P.*, 846 A.2d at 974.

131 *Marketing Products Management, LLC. v. HealthAndBeautyDirect.Com, Inc.*, 2004 WL 249581 at *1 (Del. Super. Jan. 28, 2004); *Cornerstone Technologies, LLC v. Conrad*, 2003 WL 1787959, at *3 (Del. Ch. 2003) (relying on 1 Donald J. Wolfe, Jr. & Michael A. Pittenger, Corporate and Commercial Practice in the Delaware Court of Chancery § 303 (2003) (stating that when no evidentiary hearing has been held the Plaintiff's burden is light, requiring only a prima facie showing of proper personal jurisdiction); *Hart Holding Co. v. Drexel Burnham Lambert Inc.*, 593 A.2d 535, 539 (Del. Ch. 1991); *Mid-Atlantic Machine & Fabric, Inc. v. Chesapeake Shipbuilding, Inc.*, 492 A.2d 250, 253 (Del. Super. 1985) (only *prima facie* showing required and "record construed most strongly against moving party.")

132 *Outokumpu Eng'g Enter., Inc. v. Kvaerner EnviroPower, Inc.*, 685 A.2d 724, 727 (Del. Super. 1996) (citing *Greenly v. Davis*, 486 A.2d 669, 679 (Del. 1984)).

133 *Crescent/Mach I Partners, L.P.*, 846 A.2d at 974.

134 *See, e.g.*, *Hart Holding Co.*, 593 A.2d at 539; *Chandler v. Ciccoricco*, 2003 WL 21040185, at *8 (Del. Ch. May 5, 2003) (quoting *Newspan, Inc., v. Heathstone Funding Corp.*, 1994 WL 198721, at *3 (Del. Ch. May 10, 1994) ("In deciding a motion to dismiss for lack of personal jurisdiction, the court may go beyond the pleadings and look to affidavits and other discovery of record.")

135 *See Hart Holding Co.*, 593 A.2d at 539-40; *see also Cornerstone Technologies, LLC*, 2003 WL 1787959, at *3.

motion but will evaluate for sufficiency of evidence Plaintiff adduces supporting its allegation, as on a defendant's motion for directed verdict at the close of Plaintiff's evidence."[136] For the reasons provided in the next few sections, NACEPF has met this burden and Defendants' motion to dismiss must accordingly be denied.

2. Delaware Courts Have Personal Jurisdiction Over Defendants Under Section 3114 for Breach Of Fiduciary Duty and Associated "Sufficiency Related" Claims

Delaware's long-arm "director-consent statute" – Section 3114 – enables this Court with personal jurisdiction over the director Defendants. That statute contemplates jurisdiction over directors of a Delaware Corporation "where the cause of action is grounded on such individuals' breach of the fiduciary duties owed to the corporation and its owners."[137] When a breach of fiduciary duty is well pled, this Court may join "sufficiently related" causes of action.[138] Here, NACEPF has established a viable claim for breach of Defendants' fiduciary duties while they were Clearwire directors.[139] Hence, as to that claim, the jurisdiction of this Court over these Defendants should be undisputed.[140]

[136] *Newspan, Inc.*, 1994 WL 198721, at *1 (citing *Cable/Home Comm. Corp. v. Network Prods., Inc.*, 902 F.2d 829, 855 (11th Cir. 1990)).

[137] *Armstrong v. Pomerance*, 423 A.2d 174, 177 fn 5 (Del. 1980).

[138] *See infra* IV. 3.

[139] *See* discussion *supra* at I-3.

[140] *See Carlton Investments v. TLC Beatrice International Holdings, Inc.*, 1996 WL 608492, at *3 (Del. Ch. Oct. 16, 1996) (observing that "[a]lthough many of these allegations concern activities which occurred prior to April 1991, when [that defendant] became a director . . . this does not preclude a finding of jurisdiction for claims involving the ongoing impact of such continuing activities . . . nor breaches that originated after such time.")

3. <u>Plaintiff Sufficiently Alleges That Section 3114 Contemplates Joining of "Sufficiently Related" Claims When That Section Otherwise Attaches</u>

Defendants concede that this Court has personal jurisdiction over Delaware directors for a breach of fiduciary duty.[141] However, they contend this Court has no jurisdiction over the "fraudulent inducement" and "interference with prospective business opportunity" counts. Defendants' contention must fail for the following reasons.

When a Delaware Court obtains personal jurisdiction over directors pursuant to Section 3114, it opens the door to join "sufficiently related" claims to the breach of fiduciary claim.[142] This Court held in *Infinity Investors Ltd. v. Takefman*:[143]

> [O]nce jurisdiction is properly obtained over a non-resident director defendant pursuant to § 3114, such non-resident director is properly before the Court for any claims that are *sufficiently related to the cause of action* asserted against such directors in their capacity as directors. Here, Infinity's tort claim for interference with contract is predicated on the same set of facts as one of its breach of fiduciary duty allegations.[144]

In *Manchester v. Narragansett Capital, Inc.*,[145] this Court decided similarly that Section 3114 is triggered when claims "sufficiently related" to the underlying fiduciary duty are presented, but would deny them for "sufficiently unrelated" ones.[146] The *Cambridge* Court similarly noted that the claims and facts were unrelated because the breach of fiduciary count was predicated on diversion of a corporate opportunity, while the second claim was based on a

---

141 *See* D. Br. 15.

142 *See Gans v. MDR Liq. Corp.*, 1990 Del. Ch. LEXIS 3, at *26-27 (Del. Ch. 1990); *see also Manchester v. Narragansett Capital, Inc.*, 1989 Del. Ch. LEXIS 141, at *1 (Del. Ch. 1989).

143 *See Infinity Investors Ltd. v. Takefman*, 2000 WL 130622, at *6 (Del. Ch. Jan. 28, 2000).

144 *Id.* (citing *In re Cambridge Financial Group, Ltd.*, 1987 WL 19677, at *1 (Del. Ch. Nov. 9, 1987)).

145 *Manchester*, 1989 Del. Ch. LEXIS 141, at *21-*24.

146 *Id.* (citing *In re Cambridge Financial Group, Ltd.*, 1987 WL 19677, at *1).

pre-incorporation contract.[147] Similarly, the tortuous interference and fiduciary claims were unrelated to the dissolution proceedings in that case.[148]

In the present case, all three claims are predicated on the same underlying facts. The breach of fiduciary duty claim follows from NACEPF being induced into the Master Agreement by promises of financial support that Defendants knew would not be fulfilled.[149] Subsequently, Defendants breached their fiduciary duty to NACEPF by claiming rights to NACEPF licenses, rather than acknowledging Clearwire's insolvency and acting in conformance with their fiduciary duties. Those acts of self-dealing thus triggered the breach of fiduciary claim establishing jurisdiction under Section 3114.

The same factual predicate upon which the fiduciary duty is based serves to support the other two counts. In the case of fraudulent inducement, Defendants enticed Plaintiff into the Master Agreement, knowing that their representations of financial support were false. Those same claims led to their later interfering with the NACEPF prospective business opportunities to carry out their scheme.[150] Moreover, unlike *Cambridge*, the tortious interference and fraudulent inducement claims spring from Defendants' role in Clearwire and the Master Agreement in particular, rather than from an unrelated set of facts.[151] The instant facts also mimic *Gans*[152] because it is the underlying Master Agreement that shares a common factual basis with the fiduciary duty count. The two above associated counts are "sufficiently related" under the

---

[147] *In re Cambridge Financial Group, Ltd.*, 1987 WL 19677, at *1.

[148] *Id.* at *3.

[149] *See e.g.*, Compl. ¶¶ 32, 33.

[150] Compl. ¶¶ 6, 7, 22, 24, 25, 26, 28, 30, 32, 33, 36, 37-41.

[151] *Id.* ¶¶ 37-42, 48-52.

[152] *Gans*, 1990 Del. Ch. LEXIS 3, at *26-27.

*Cambridge*, *Manchester*, *Gans* and *Infinity Investors* analysis to the fiduciary duty claim, to permit jurisdiction of a Delaware Court under Section 3114 to resolve those claims.

4. Conclusion

This Court has jurisdiction over the Defendants for the fiduciary duty claim, as authorized by Section 3114. The fraudulent inducement and interference with prospective business relationship claims are sufficiently related to that fiduciary duty claim to also support this Court's jurisdiction to resolve them. Hence, the Defendants' motion to dismiss those claims should be denied.

**CONCLUSION**

For the foregoing reasons, the Court should deny the Defendants' motion to dismiss. This Court has personal jurisdiction over the Defendants with respect to all of NACEPF's claims. The Complaint states a claim in all three of its Counts.

MORRIS, JAMES, HITCHENS & WILLIAMS LLP

Edward M. McNally (#614)
222 Delaware Avenue, 10th Floor
Wilmington, Delaware 19899
(302) 888-6800
Attorneys for Plaintiff, North American Catholic Educational Programming Foundation, Inc.

Dated: October 28, 2005

1297864/1