# Exhibit C

## Part 1

# MASTER ROYALTY AND USE AGREEMENT

by and among

CLEARWIRE HOLDINGS INC.,

ITFS SPECTRUM DEVELOPMENT ALLIANCE, INC.,

NORTH AMERICAN CATHOLIC EDUCATIONAL PROGRAMMING FOUNDATION, INC.,

HISPANIC INFORMATION AND TELECOMMUNICATIONS NETWORK, INC.,

INSTRUCTIONAL TELECOMMUNICATIONS FOUNDATION, INC.,

PORTLAND REGIONAL EDUCATIONAL TELECOMMUNICATIONS CORPORATION,

DENVER AREA EDUCATIONAL TELECOMMUNICATIONS CONSORTIUM, INC.,

CHICAGO INSTRUCTIONAL TECHNOLOGY FOUNDATION, INC.,

AND

TWIN CITIES SCHOOLS' TELECOMMUNICATIONS GROUP, INC.

dated as of

March 13, 2001

TABLE OF CONTENTS


| | | Page |
|---|---|---|
| SECTION 1. | Issuance of the Series A Preferred Stock; Payments. | 4 |
| 1.1. | Initial Closing Payments | 4 |
| 1.2. | Subsequent Use Agreements for Alliance Member Commercial Spectrum Capacity | 5 |
| 1.3. | Royalties in Connection with Individual Use Agreements | 11 |
| 1.4. | Additional Rights With Respect To Individual Use Agreements | 17 |
| 1.5. | Effect of Alienation of Commercial Spectrum Capacity. | 24 |
| SECTION 2. | Representations and Warranties of the Corporation | 25 |
| 2.1. | Organization and Good Standing; Power and Authority; Qualifications | 26 |
| 2.2. | Authorization of the Documents | 26 |
| 2.3. | Capitalization | 27 |
| 2.4. | Subsidiaries | 28 |
| 2.5. | Authorization and Issuance of Capital Stock | 29 |
| 2.6. | Financial Statements | 30 |
| 2.7. | Absence of Undisclosed Liabilities | 30 |
| 2.8. | Absence of Changes | 30 |
| 2.9. | No Conflict | 31 |
| 2.10. | Agreements | 32 |
| 2.11. | Intellectual Property Matters | 32 |
| 2.12. | Corporate Minute Books | 35 |
| 2.13. | Personal Property; Real Property | 35 |
| 2.14. | Environmental Protections | 36 |
| 2.15. | Employee Benefit Plans | 36 |
| 2.16. | Labor Relations; Employees | 38 |
| 2.17. | Litigation | 39 |
| 2.18. | Compliance with Laws; Permits | 39 |
| 2.19. | Commissions, Etc. | 39 |
| 2.20. | Offering Exemption | 39 |
| 2.21. | Related Party Transactions | 40 |
| 2.22. | Taxes | 40 |
| 2.23. | Consents | 42 |
| 2.24. | Insurance | 42 |
| 2.25. | Brokers | 42 |
| 2.26. | Suppliers and Customers | 42 |
| 2.27. | Investment Banking Services | 43 |
| 2.28. | Suitability | 43 |
| 2.29. | Use of Proceeds | 43 |
| 2.30. | Disclosure | 43 |
| 2.31. | Contribution of Assets | 43 |
| 2.32. | Closing Actions | 43 |

SECTION 3. Representations and Warranties of Each Alliance Member. ... 43
3.1. Securities Law Matters ... 44
3.2. Organization and Good Standing; Power and Authority; Qualifications ... 44
3.3. Authorization of the Documents ... 44
3.4. No Conflict ... 45
3.5. Compliance with Laws ... 45
3.6. FCC Matters ... 45
3.7. Litigation ... 46
3.8. Permits ... 46
3.9. Schedules ... 47
3.10. Related Party Transactions ... 47

SECTION 4. Certain Covenants of Clearwire. ... 47
4.1. Access to Records ... 47
4.2. Financial Reports ... 48
4.3. System of Accounting ... 48
4.4. Maintenance of Corporate Existence, Etc ... 48
4.5. Compliance with Laws ... 49
4.6. Employee Nondisclosure Agreements ... 49
4.7. Clearwire ITFS Transactions ... 49
4.8. Technical Cooperation and Consultation ... 49

SECTION 5. Certain Covenants of Alliance Members. ... 49
5.1. Access to Records ... 49
5.2. Maintenance of Corporate Existence, Etc ... 50
5.3. Compliance with Laws ... 50
5.4. Maintenance of FCC Qualifications ... 50
5.5. Assignment of FCC Licenses ... 51
5.6. Spectrum Reallocation. ... 52
5.7. Employee Nondisclosure Agreements ... 53
5.8. Right of First Offer Upon Sale of FCC Licenses ... 54
5.9. Alliance Spectrum Transactions ... 55
5.10. Network Design and Build Out ... 56
5.11. Correspondence ... 56
5.12. Permitted Interference Consents ... 56
5.13. Analog Equipment Purchase on Termination from Individual Use Agreement. ... 57
5.14. Website ... 58

SECTION 6. FCC Fees ... 58

SECTION 7. Legends; Exchanges; Lost, Stolen or Mutilated Certificates. ... 59
7.1. Legends ... 59
7.2. Exchange of Certificates ... 60

SECTION 8. Survival of Representations, Warranties, Agreements and

| | | |
|---|---|---|
| | Covenants, Etc | 60 |
| SECTION 9. | The Closings | 60 |
| | 9.1. Initial Closing | 60 |
| | 9.2. Actions at the Closing | 60 |
| | 9.3. Actions at the Subsequent Closings | 61 |
| | 9.4. Actions at Each Subsequent Closing | 62 |
| | 9.5. Clearwire Subsequent Closing Representatives and Warranties | 62 |
| | 9.6. Alliance Member Subsequent Closing Representations and Warranties | 63 |
| SECTION 10. | Indemnification. | 65 |
| | 10.1. General Indemnification | 65 |
| | 10.2. Indemnification Principles | 66 |
| | 10.3. Claim Notice | 66 |
| SECTION 11. | Remedies | 66 |
| SECTION 12. | Further Assurances | 67 |
| SECTION 13. | Successors and Assigns | 67 |
| SECTION 14. | Entire Agreement | 67 |
| SECTION 15. | Notices | 67 |
| SECTION 16. | Amendments | 70 |
| SECTION 17. | Counterparts | 70 |
| SECTION 18. | Headings | 70 |
| SECTION 19. | Construction | 70 |
| SECTION 20. | Governing Law | 70 |
| SECTION 21. | Specific Performance | 71 |
| SECTION 22. | Severability. | 71 |
| SECTION 23. | Alternative Dispute Resolution. | 71 |
| SECTION 24. | Litigation and Special Costs | 74 |
| SECTION 25. | Confidentially | 75 |
| SECTION 26. | Publicity | 75 |
| SECTION 27. | Expiration | 75 |

Schedules and Exhibits

Schedule 1
Schedule 1.1
Schedule 1.2
Schedule 1.2(d)(H)
Schedule 1.3
Schedule 1.3(f)
Schedule 1.3(g)
Schedule 1.3(h)
Schedule 1.6(c)
Schedule 2.1
Schedule 2.3(a)
Schedule 2.3(b)
Schedule 2.4
Schedule 2.7
Schedule 2.8
Schedule 2.10
Schedule 2.11
Schedule 2.13(a)
Schedule 2.13(b)
Schedule 2.15
Schedule 2.16
Schedule 2.17
Schedule 2.18
Schedule 2.19
Schedule 2.21
Schedule 2.22(b)
Schedule 2.22(c)
Schedule 2.24
Schedule 2.27
Schedule 3.1(e)
Schedule 3.2
Schedule 3.4
Schedule 3.5
Schedule 3.6(a)
Schedule 3.6(c)
Schedule 3.7
Schedule 3.10
Schedule 9.2(e)

Exhibit A - Form of Individual Use Agreement
Exhibit B - Form of Certificate of Incorporation
Exhibit C - Form of Stockholders Agreement
Exhibit D - Form of Registration Rights Agreement
Exhibit E - Form of Officers Certificate
Exhibit F - Form of Alliance Member Certificate
Exhibit G - Form of Assignment Agreement
Exhibit H - Form of Employee Nondisclosure Agreement

Index of Defined Terms

Section

15th Anniversary Date .......... 1.3(h)
Acceptance Period .......... 1.4(c)
Advisory Committees .......... Recitals
Affected Alliance Member .......... 1.2(b)(i)
Affected Existing Agreement .......... 1.2(b)(i)
Affected FCC License .......... 1.2(b)(ii)
Aggregate Price Reset Number .......... 1.3(g)
Agreed Renewal Agreement .......... 1.4(a)(i)
Agreement .......... Preamble
Alliance .......... Preamble
Alliance Member .......... Preamble
Alliance Member Entity .......... 10.1
Alliance Members .......... Preamble
Appraiser .......... 1.3(i)
Assignment Agreement .......... 2.1
At Risk License .......... 1.2(b)(ii)
At Risk License Undertaking .......... 1.2(b)(ii)
At Risk Notice .......... 1.2(b)(ii)
Audited Financial Statement .......... 2.6
Audited Financial Statements .......... 2.6
Availability Event .......... 1.2(a)
Available .......... 1.1(a)
Benefit Plan .......... 2.15(a)
Board .......... Recitals
By-Laws .......... 2.3(b)
Calculation Software .......... 1.2(e)(iv)
Certificate of Incorporation .......... 1.3(c)
Channel POP .......... 1.2(e)
Channel Pop Calculation .......... 10
Channel Swap Transaction .......... 1.4(g)(i)
Channels .......... Recitals
CITF .......... Preamble
Claim Notice .......... 10.3
Clearwire .......... Preamble
Clearwire Entities .......... 2.1
Clearwire Equipment .......... 2.1
Clearwire ITFS Transaction .......... 4.7
Closing .......... 9.1
Closing Actions .......... 9.2
Closing Date .......... 9.1
Code .......... 2.15(a)
Commercial Spectrum Capacity .......... Recitals
Commitment Royalty .......... 1.1(b)

Common Stock........ 1.3(g)
Communications Act........ Recitals
Consideration........ 1.4(e)
Contract........ 2.10(a)
Corporation........ Preamble
Corporation Intellectual Property........ 2.11
CPR........ 23(c)
CTI........ 2.1
DAETC........ Preamble
Deductible........ 10.1
Designated Lump Sum Payment Channel POPs........ 1.1(a)(ii)
Disqualification Event........ 5.4
Documents........ 9.2(c)
EdNet........ Recitals
Employee........ 2.15(a)
Employee Agreement........ 2.15(a)
Employee Nondisclosure Agreements........ 2.16
Environmental Laws........ 2.14
Equity Royalty........ 1.3(c)
ERISA........ 2.15(a)
Exchange Act........ 2.21
Execution Royalty........ 1.3(e)
Exercise Period........ 1.4(c)
Existing Agreement........ 1.2(a)
Existing Agreement Payment Default........ 1.2(b)(i)
Existing Operator........ 1.2(a)
Existing Options........ 2.3(a)(ii)
Existing Stockholders........ 9.2(b)
Extended Initial Term........ 1.4(a)(i)
Extension Right........ 1.4(a)(ii)
Fair Dealing Standard........ 3.10
Fair Market Value........ 1.3(i)
FCC........ Recitals
FCC Licenses........ Recitals
FCC Qualification........ 5.4
FCC Qualifications........ 5.4
FCC Rules........ Recitals
FCC Transfer Decision........ 5.8
Final Court Ruling........ 1.4(h)
Financial Statements........ 2.6
Hazardous Substances........ 2.14
HITN........ Preamble
HMO........ 2.15(e)
Individual Use Agreements........ 1.1(a)
Initial Closing........ 9.1
Initial Term........ 1.4(a)(i)



ffny03\vonneda\388835.43

Intellectual Property Rights .......... 2.11
ITF .......... Preamble
ITFS .......... Recitals
Knowledge .......... 2.16
Law .......... 2.9
Leased Real Property .......... 2.13(b)
Litigation .......... 2.17
Litigation Cost Claim .......... 24(c)
Litigation Cost Notice .......... 24(c)
Litigation Costs .......... 24(b)
Losses .......... 10.2
Lump Sum Payment Royalty Amount .......... 1.3(f)(i)
Management Options .......... 2.3(a)(ii)
Market Area .......... Recitals
Material Adverse Effect .......... 2.8
Material Default .......... 1.4(h)
Material Default Situation .......... 1.4(h)
MDS .......... 1.2(a)
Monthly Base Royalty Payment .......... 1.3(f)
Multiplying Factor .......... 1.3(h)
NACEPF .......... Preamble
Negotiation Period .......... 1.3(i)
New Existing Operator Use Agreement .......... 1.2(a)
Non-Termination Notice .......... 1.2(b)(i)
Offer .......... 1.4(c)
Offer Notice .......... 1.4(c)
Operator Failure .......... 5.4
Orders .......... 2.9
Other Channel Capacity .......... 1.2(d)
Other Channel Notice .......... 1.2(d)
Other Channel POPs .......... 1.2(d)
Parties .......... Preamble
Party Appraiser .......... 1.3(i)(II)
Payment Default Notice .......... 1.2(b)(i)
Permitted Capacity Transaction .......... 1.4(g)(ii)
Permitted Encumbrances .......... 2.13(a)
Permitted Interference Agreement .......... 5.12
PRETC .......... Preamble
prevailing party .......... 24(a)
Quarterly Financials .......... 4.2(a)
Reallocated Channel .......... 5.6(b)
Reallocation Decision .......... 5.6(a)
Reclassification Event .......... 1.3(c)
Registration Rights Agreement .......... 9.2(c)
Renewal Notice .......... 1.2(c)
Replacement Spectrum .......... 5.6(b)

Replacement Spectrum Offer .......... 5.6(b)
Representative .......... 25
Required Negotiation Provision .......... 1.2(a)
Reset Monthly Base Royalty Payment .......... 1.3(g)
Reset Ratio .......... 1.3(g)
Revaluation Date .......... 1.3(g)
Right of First Refusal .......... 1.4(c)
Royalties .......... Preamble
Rule 144 .......... 3.1(c)
SEC .......... 4.2(d)
Second Period .......... 1.4(e)
Section 5.9 Acceptance Period .......... 5.9(b)
Section 5.9 Agreement Period .......... 5.9(b)
Section 5.9 Offer Notice .......... 5.9(b)
Section 5.9 Party .......... 5.9(b)
Securities Act .......... 2.20
Series A Conversion Shares .......... 1.3(g)
Series A Preferred Stock .......... 1.3(c)
Spectrum Fees .......... 6
Spin-off .......... 2.22(a)
Stage 1 Channel POPs .......... 1.3(e)(i)
Stage 2 Channel POPs .......... 1.3(e)(ii)
Stage 3 Channel POPs .......... 1.3(e)(iii)
Stockholders Agreement .......... 9.2(b)
Subsequent Closing .......... 9.3
Subsequent Closing Agreement .......... 9.5
Subsequent Closing Date .......... 9.3
Subsidiary .......... 2.4(b)
Substitute Payments .......... 1.2(b)(i)
Tax .......... 2.22(d)
Tax Return .......... 2.22(d)
Taxes .......... 2.22(d)
TCSTG .......... Preamble
Technical Consultation .......... 4.8
Third Appraiser .......... 1.3(i)(II)
Third Party Use Agreement .......... 1.4(c)
Transferring Alliance Member .......... 1.4(c)
Transition Compensation .......... 5.6(b)
Valuation Price .......... 1.3(g)



ffny03\ronneda\388835.43

# MASTER USE AND ROYALTY AGREEMENT

MASTER USE AND ROYALTY AGREEMENT (the "Agreement"), dated as of March 13, 2001, by and among CLEARWIRE HOLDINGS INC., a Delaware corporation ("Clearwire" or the "Corporation"), ITFS SPECTRUM DEVELOPMENT ALLIANCE, INC. (the "Alliance"), NORTH AMERICAN CATHOLIC EDUCATIONAL PROGRAMMING FOUNDATION, INC. ("NACEPF"), a Rhode Island non-profit corporation d/b/a ACN Academic Communications Network and CSN College and School Network, HISPANIC INFORMATION AND TELECOMMUNICATIONS NETWORK, INC. ("HITN"), a New York Not-For-Profit corporation, INSTRUCTIONAL TELECOMMUNICATIONS FOUNDATION, INC. ("ITF"), a Colorado nonprofit corporation, PORTLAND REGIONAL EDUCATIONAL TELECOMMUNICATIONS CORPORATION ("PRETC"), an Oregon nonprofit corporation, DENVER AREA EDUCATIONAL TELECOMMUNICATIONS CONSORTIUM, INC. ("DAETC"), a Colorado nonprofit corporation, CHICAGO INSTRUCTIONAL TECHNOLOGY FOUNDATION, INC. ("CITF"), an Illinois Not-For-Profit organization, TWIN CITIES SCHOOLS' TELECOMMUNICATIONS GROUP, INC. ("TCSTG"), a Minnesota nonprofit organization (collectively NACEPF, HITN, ITF, PRETC, DAETC, CITF, and TCSTG, the "Alliance Members", each individually an "Alliance Member" and collectively with Clearwire, the "Parties"). An index of defined terms appears in the table of contents hereto.

WITNESSETH:

WHEREAS, each Alliance Member holds the Instructional Television Fixed Service ("ITFS") license(s) granted by the Federal Communications Commission (the "FCC") listed under its name on Schedule 1 hereto ("FCC Licenses") authorizing the provision of service on the ITFS channels (collectively, excluding the I-Channels, also known as "Response Channels" of the Alliance Member, the "Channels") to the market areas (each such market area, along with any other market area subject to this Agreement, a "Market Area") listed on Schedule 1;

WHEREAS, subject to the Communications Act of 1934, as amended (the "Communications Act"), and FCC rules, regulations and policies (the "FCC Rules"), ITFS stations' excess capacity may be used for commercial purposes (the "Commercial Spectrum Capacity");

WHEREAS, the Alliance Members wish to develop a nationwide broadband educational network ("EdNet") utilizing the Channels and certain Other Channel Capacity (as defined in Section 1.2(d)), and state of the art two-way digital wireless technology provided for wireless access by Clearwire;

WHEREAS, the Parties believe that a long term relationship that is nationwide in scope and that provides the Alliance Members with an ownership interest in Clearwire will best facilitate the development of wireless access to EdNet and will maximize the financial and other resources available to the Alliance Members to provide

an innovative and comprehensive package of services to educational and non-profit institutions, consistent with FCC Rules supporting development of the Channels;

WHEREAS, Clearwire is in the business of providing digital wireless services to customers and desires to expand its business to a national platform utilizing the Commercial Spectrum Capacity of the Channels and the Other Channel Capacity and other spectrum rights and interests to the maximum extent provided for herein, subject to any existing rights of third parties and the FCC Rules;

WHEREAS, the Alliance Members have substantial experience in dealing with the unique characteristics of Channels and a detailed knowledge of the wireless industry and educational and non-profit communities and desire to advise Clearwire in addressing such matters through the membership of Alliance Members on the spectrum advisory committee and the educational advisory committee, both as provided for in the Stockholders Agreement and By-Laws (collectively, the "Advisory Committees"), in order to maximize the value of the Commercial Spectrum Capacity of the Channels and the Other Channel Capacity to Clearwire and to the Alliance Members;

WHEREAS, Clearwire is prepared to make, and the Alliance Members are prepared to accept, as royalties, the payments, transfers, rights and privileges provided for herein in consideration for access to the Commercial Spectrum Capacity of the Channels and the Other Channel Capacity when they become Available, which payments and transfers are intended to generate an aggregate value, as of the Initial Closing, of $0.90 for each Channel POP through a combination of a cash commitment royalty, equity in Clearwire, an earnout, use agreement execution and usage royalties, and which rights and privileges include participation on Clearwire's Board of Directors (the "Board") and on the Advisory Committees, each in accordance with the terms and conditions set forth in the Stockholders Agreement and By-Laws and certain other rights and privileges as specifically provided for in this Agreement; and

WHEREAS, in order to reflect the foregoing, each Alliance Member and Clearwire wish to enter into this Agreement and into related individual use and royalty agreements for Clearwire to access the Commercial Spectrum Capacity of the Channels and Other Channel Capacity on facilities (including two-way facilities) to be constructed by Clearwire when such capacity is Available consistent with any legal and contractual obligations of each Alliance Member, and subject to obtaining any required authorizations from the FCC, in order to achieve their mutual objectives;

NOW, THEREFORE, in consideration of the premises and the mutual representations, warranties, covenants and agreements set forth in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereto agree as follows:

PREAMBLE

This Agreement and the other documents entered into by the Parties in connection herewith describes the arrangement through which Clearwire may obtain access to the Commercial Spectrum Capacity of the Alliance Members in the Market Areas identified on the schedules to Section 1 and to the Other Channel Capacity in the Market Areas that become Available through the mechanism set forth in Section 1.2(d). In exchange, Clearwire will, in accordance with the terms and conditions of this Agreement, provide the royalty payments, rights and privileges detailed in this Section 1 and elsewhere in this Agreement (collectively, the "Royalties"), which include, among other things: (i) the royalty payments set forth in Section 1.3; (ii) subject to the terms and conditions set forth in the Stockholders Agreement and the By-Laws, the right to advise the Board through the Advisory Committees on matters related to Commercial Spectrum Capacity and educational and non-profit uses of the Channels; (iii) a mechanism for participation, on a continuing basis during that portion of the term of the Individual Use Agreement that corresponds to the period prior to a Qualified IPO (as defined in the Stockholders Agreement), through the ability to name and have elected a member of the Board on a continual basis throughout such period, all subject to the provisions set forth in the Stockholders Agreement; and (iv) access to a portion of the Commercial Spectrum Capacity of the Channels and Other Channel Capacity and technology, facilities, equipment and other functionality from Clearwire and its affiliates all as specifically set forth in this Agreement and in the Individual Use Agreements in order to help the Alliance Members' effort to advance the objectives and goals of EdNet to service educational and non-commercial communities utilizing both the reserved portion of the Channels and portions of the Commercial Spectrum Capacity of the Channels through a single source access vendor under the Individual Use Agreements and a potential provider of certain engineering consulting services. To this end, the Parties acknowledge the following:

(a) that it is the Parties' intention that the Commercial Spectrum Capacity and Other Channel Capacity be treated as a unity and that the Parties be obligated to enter into Individual Use Agreements when the Commercial Spectrum Capacity for a particular Market Area becomes Available, as set forth herein, and that Clearwire make the payments and provide the other rights and privileges in respect of all of the Commercial Spectrum Capacity of the Channels with such Commercial Spectrum Capacity becoming a formal part of this Agreement upon the execution of an Individual Use Agreement, as herein provided; and

(b) that in the absence of all of the various Royalties anticipated to be paid and the Commercial Spectrum Capacity of the Channels and Other Channel Capacity to both become Available over time, all as provided pursuant to the terms and conditions of this Agreement, and expressly conditioned on each Party's performance, neither Clearwire nor the Alliance Members would have entered into this Agreement.

SECTION 1. Issuance of the Series A Preferred Stock; Payments.

1.1. Initial Closing Payments. (a) Individual Use Agreements. At the Initial Closing the Alliance Members and Clearwire shall enter into the Individual Use Agreements, each in the form set forth as Exhibit A hereto (the "Individual Use Agreements"), for the Channels in Market Areas designated as Available at the Closing, as set forth on Schedule 1.1. "Available" means (x) that the Commercial Spectrum Capacity on a Channel in a Market Area is not encumbered by a prior use agreement or other contractual obligation of the Alliance Member holding the FCC License for such Channel (excluding interference consents and interference agreements granted or entered into by an Alliance Member prior to the date hereof and Permitted Interference Agreements (as defined in Section 5.12) entered into after the date hereof with respect to such Channels) and (y) with respect to the Other Channel Capacity, that an FCC license has been granted by the FCC authorizing operation on such Other Channel Capacity without conditions that are materially more adverse to Clearwire's anticipated business use than the FCC conditions, as of the date hereof, relating to the FCC licenses set forth in Schedule 1 and that the Other Channel Capacity on such channels is not encumbered by a prior use agreement or other contractual obligation of the Alliance Member holding the FCC license for such ITFS channels and are without interference consents and interference agreements granted or entered into by an Alliance Member, other than Permitted Interference Agreements. At the Initial Closing:

(i) Individual Use Agreement Equity Royalty. Clearwire shall issue, as the Equity Royalty, to each Alliance Member that executes an Individual Use Agreement at the Initial Closing 0.7712 shares of Series A Preferred Stock for each Channel POP that is subject to such Individual Use Agreement, as set forth on Schedule 1.1.

(ii) Accelerated Monthly Base Royalty Payments. Clearwire shall pay each Alliance Member that executes an Individual Use Agreement at the Initial Closing that relates to Designated Lump Sum Payment Channel POPs (as defined below) $0.30375, as the Lump Sum Payment Royalty Amount (as defined in Section 1.3(f)(i)), for each Designated Lump Sum Payment Channel POP that is subject to such Individual Use Agreement, which amount is in lieu of the Monthly Base Royalty Payments (as defined in Section 1.3(f)) with respect to such Channel POPs. "Designated Lump Sum Payment Channel POPs" shall mean Channel POPs, in an aggregate amount not to exceed twenty (20) million Channel POPs, relating to Commercial Spectrum Capacity of the Channels or Other Channel Capacity and which are designated in a writing duly executed and delivered by all Alliance Members in a notice to Clearwire as Designated Lump Sum Payment Channel POPs, which notice shall be delivered to Clearwire at least five (5) business days prior to the Subsequent Closing relating to such Channel POPs or Other Channel POPs.

(iii) Monthly Base Royalty Payments. With respect to the Channel POPs covered by an Individual Use Agreements entered into at the Initial Closing that are not Designated Lump Sum Payment Channel POPs, the applicable Alliance Member shall be entitled to the Monthly Base Royalty Payments provided for in

Section 1.3(f).

(iv) Individual Use Agreement Execution Royalty Payments. Clearwire shall pay each Alliance Member that executes an Individual Use Agreement at the Initial Closing $0.10125 per Channel POP as the execution royalty payment with respect to the Individual Use Agreements, as set forth on Schedule 1.1.

(b) Commitment Royalty Payment. At the Closing, Clearwire shall pay each Alliance Member the sum set forth on Schedule 1.1, which reflects a royalty of $0.09 per Channel POP listed on Schedule 1 hereto (the "Commitment Royalty").

1.2. Subsequent Use Agreements for Alliance Member Commercial Spectrum Capacity.

(a) Individual Use Agreements. In addition to the Individual Use Agreements entered into at the Initial Closing, Clearwire and each applicable Alliance Member agree to enter into, at Subsequent Closings in accordance with the provisions of Section 9.3 of this Agreement, Individual Use Agreements covering the Commercial Spectrum Capacity for the Market Areas set forth on Schedule 1 at such time as an Availability Event with respect to such Commercial Spectrum Capacity occurs. Clearwire acknowledges that the Commercial Spectrum Capacity for each Market Area set forth on Schedule 1.2 is subject to an existing agreement between an Alliance Member and a third party (including its successors and assigns, the "Existing Operator") in effect as of the date hereof (as such existing agreement may be renewed or extended in accordance with its terms and applicable law, each an "Existing Agreement") and such Commercial Spectrum Capacity shall not be available for delivery pursuant to an Individual Use Agreement until the expiration or termination of such Existing Agreement (and any new agreement required to be entered into by an Alliance Member pursuant to its terms, a "New Existing Operator Use Agreement") in accordance with its terms, including the expiration or termination of any provisions contained in an Existing Agreement or in a New Existing Operator Use Agreement requiring the Alliance Member to negotiate in good faith with the Existing Operator (each such provision, a "Required Negotiation Provision"); provided, further, that Clearwire and the Alliance Members acknowledge that the Alliance Members have an obligation to honor, to the extent enforceable, all such provisions of Existing Agreements or New Existing Operator Use Agreements, including any Required Negotiation Provisions, and Clearwire agrees that the Alliance Member shall have the right to enter into such agreements as a result of negotiations pursuant to the Required Negotiation Provisions as it deems appropriate. An "Availability Event" with respect to Commercial Spectrum Capacity for the Channels shall occur when (a) such Commercial Spectrum Capacity, including at least two Channels that are licensed to an Alliance Member or Alliance Members in the applicable Market Area are Available unless Clearwire, directly or through a wholly-owned affiliate, prior to such date, has entered into a use agreement with respect to, or directly or through a wholly-owned affiliate holds a license to, at least one (1) ITFS, MDS-1, MDS-2, MDS-2A or MMDS (collectively, "MDS") channel in such Market Area, that is in effect at the time such Commercial Spectrum Capacity becomes Available, in which case only one (1) Channel must be Available in such Market Area, and (b) such Commercial

Spectrum Capacity becomes Available after the date set forth on Schedule 1.2 with respect to the Market Area associated with such Commercial Spectrum Capacity. If Clearwire and the applicable Alliance Member disagree on whether an Availability Event has occurred, the Parties shall follow the procedures set forth in Section 23(a) of this Agreement.

(b) Existing Operator Default/At Risk Licenses.

(i) Existing Operator Payment Default. Upon the occurrence of an Existing Agreement Payment Default (as defined below), the Alliance Member (the "Affected Alliance Member") that is party to the Existing Agreement (the "Affected Existing Agreement") to which the Existing Agreement Payment Default relates may give notice (a "Payment Default Notice") of such Existing Agreement Payment Default to Clearwire. An "Existing Agreement Payment Default" with respect to an Existing Agreement shall mean the occurrence of the following events: (x) such Existing Agreement is, at that time, subject to termination by an Alliance Member prior to the scheduled termination or expiration date set forth on Schedule 1.2 as a result of a default by the Existing Operator under such Existing Agreement, and (y) such Existing Operator has failed to pay all the then-due monthly or other periodic payments under such Existing Agreement. Unless Clearwire shall give notice (a "Non-Termination Notice") to the Affected Alliance Member, within thirty (30) days of receipt of a Payment Default Notice that Clearwire does not wish such Affected Alliance Member to terminate the Affected Existing Agreement, or if Clearwire shall at any time withdraw a Non-Termination Notice that it has previously given with respect to such Affected Existing Agreement, the Affected Alliance Member may terminate such Affected Existing Agreement to the extent it is entitled to do so. If upon such termination (i) Commercial Spectrum Capacity is Available and (ii) the applicable Alliance Member is not in material default under the Affected Existing Agreement and (iii) the requirements of clause (a) of the definition of Availability Event are met with respect to the associated Commercial Spectrum Capacity, an Availability Event with respect thereto shall be deemed to have occurred. The Affected Alliance Member shall not take any action to terminate the Affected Existing Agreement for the thirty (30) day period beginning on the date of receipt of the Payment Default Notice by Clearwire. In addition, if Clearwire shall deliver a Non-Termination Notice within such thirty (30) day period, unless Clearwire shall withdraw such Non-Termination Notice, the Affected Alliance Member shall not take any action to terminate the Affected Existing Agreement prior to its scheduled termination or expiration date set forth on Schedule 1.2, and Clearwire shall have the obligation to pay to the Affected Alliance Member the lower of (x) amounts equal to the Monthly Base Royalty Payments that would be paid pursuant to this Agreement with respect to Commercial Spectrum Capacity covered by the Affected Existing Agreement as if such Commercial Spectrum Capacity was then subject to an Individual Use Agreement or (y) amounts equal to the monthly or other periodic payments required to be made under the Affected Existing Agreement (the "Substitute Payments"); provided, however, that any such payments shall not cause any of the royalty payment or any other provisions of this Agreement, other than as set forth in this Section 1.2(b) or related thereto, to become effective; and provided, further, that to the extent the Existing Operator with respect to the Affected Existing Agreement makes any payments, or cause payments to be made, to the Affected

Alliance Member that were past due, those payments shall be immediately applied by the Affected Alliance Member to offset past due amounts that are owed under such agreement and that have not been paid to the Alliance Member pursuant to the Substitute Payments. The Affected Alliance Member shall, at Clearwire's request, immediately assign to Clearwire all rights to payments from the Existing Operator, in excess of (x) any past due amounts owed to the Affected Alliance Member under the Affected Existing Agreement, less (y) all Substitute Payments received by the Affected Alliance Member. In addition, if at any time the Existing Operator that is party to the Affected Existing Agreement begins making payments with respect to such Affected Existing Agreement, the Affected Alliance Member will give notice to Clearwire within thirty (30) days of any such payments and Clearwire will no longer have any obligation to make any further Substitute Payments for so long as such payments thereunder continue.

(ii) At Risk Licenses. In addition to the provisions of Section 1.2(b)(i), if an Alliance Member shall notify Clearwire that an FCC License (the "Affected FCC License") under an Existing Agreement is an At Risk License (as defined below), then Clearwire shall either (A) if such Existing Agreement can be immediately terminated by such Alliance Member pursuant to the terms of such Existing Agreement and the Commercial Spectrum Capacity that is subject to the At Risk License would thereafter become Available, and the Channel Requirement would also otherwise be satisfied, at Clearwire's sole option, enter into an Individual Use Agreement with respect to such Commercial Spectrum Capacity or (B) notify such Alliance Member that Clearwire will undertake the At Risk License Undertaking (as defined below) with respect to the ITFS station operated pursuant to the Affected FCC License; provided that Clearwire shall have no obligation hereunder if either (a) the Alliance Member that is party to such Existing Agreement is in material default under such Existing Agreement or (b) such Alliance Member has not take all reasonable steps in its power to avoid the Affected FCC License from becoming an At Risk License. An FCC License is an "At Risk License" if the Affected ITFS Station has been non-operational for one hundred and eighty (180) consecutive days and the Existing Operator has failed to timely complete construction thereof or otherwise render the Affected ITFS Station operational in a timely manner, such that there is a material risk that the Affected FCC License will be revoked or forfeited; provided that a construction permit associated with a modification of an FCC License, where the facilities associated with such FCC License are otherwise operational, shall not be considered an "At Risk License". To the extent known in advance, the Alliance Member shall provide Clearwire with notice (the "At Risk Notice") at least thirty (30) days prior to an FCC License associated with any Commercial Spectrum Capacity becoming an At Risk License. Clearwire shall select from the options set forth in the first sentence of this Section 1.2(b)(ii) within forty-five (45) days after receipt of the At Risk Notice. The "At Risk License Undertaking" is an obligation by Clearwire to take such reasonable steps as may be necessary to timely render the Affected ITFS Station operational and continue to keep the Affected ITFS Station operational.

(iii) Alliance Reimbursement to Clearwire. If Clearwire shall have either made the At Risk License Undertaking or paid Substitute Payments or shall have entered into an Individual Use Agreement pursuant to Section 1.2(b)(i) or 1.2(b)(ii) above and it is subsequently determined that the related Commercial Spectrum Capacity was not

Available at the time of the At Risk Notice or Payment Default Notice, then in any such case the Alliance Member that is party to the Existing Agreement related to such Commercial Spectrum Capacity shall immediately repay to Clearwire all of Clearwire's costs and expenses associated with the construction of the Affected ITFS Station, the At Risk License Undertaking, and/or Substitute Payments related to such Commercial Spectrum Capacity, as the case may be. Such repayment shall be made by the Alliance Member by means of (x) the Alliance Member's transferring to Clearwire compensation from the Existing Operator with respect to the expenditures for the construction of the ITFS station or the At Risk License Undertaking made on behalf of the Alliance Member by Clearwire and (y) by means of set off against any Monthly Base Royalty Payments owed to such Alliance Member pursuant to Individual Use Agreements; provided, that in the case of an Existing Agreement Payment Default, the Affected Alliance Member shall have the right to first use any payments from the Existing Operator to offset the amounts owed to such Alliance Member under such Affected Existing Agreement.

(c) Limitation on New Agreements. Without regard to any Party's remedies for breach of this Agreement, no Alliance Member shall (i) enter into any agreement with respect to the Commercial Spectrum Capacity for the Market Areas listed on Schedule 1 with a party other than Clearwire following the expiration or termination of an Existing Agreement (except to the extent that the Alliance Member is required to enter into a New Existing Operator Use Agreement by the terms of such Existing Agreement, including as a result of any Required Negotiation Provision) or New Existing Operator Use Agreement, unless (x) the Alliance Member has given written notice to Clearwire that Clearwire has failed to enter into an Individual Use Agreement with respect to the Commercial Spectrum Capacity for such Market Area in accordance with the terms of this Agreement and Clearwire does not give written notice to such Alliance Member, within thirty (30) days thereafter, that it disputes that the Commercial Spectrum Capacity is Available, or (y) there has been a final determination in accordance with Section 23(a) that such Market Area was Available for delivery and an Individual Use Agreement with respect to the Commercial Spectrum Capacity for such Market Area is not entered into by Clearwire within thirty (30) days after such final determination; (ii) seek or agree to the renewal or extension of the Existing Agreement or New Existing Operator Use Agreement, other than as required by the terms thereof; or (iii) agree to amend any Existing Agreement or New Existing Operator Use Agreement. The Alliance Member party to any Existing Agreement that is renewed or extended pursuant to its terms will notify Clearwire within five (5) business days prior to such renewal or extension (the "Renewal Notice"). Such Renewal Notice will specify in detail the amount of consideration to be paid to the Alliance Member, as well as any other material information concerning such renewal, except to the extent such information is prohibited from being provided to Clearwire by the terms of a Confidentiality Obligation (as defined in Section 5.11).

(d) Other Channel Capacity. Prior to the tenth (10th) anniversary of the Initial Closing, if any Commercial Spectrum Capacity not identified on Schedule 1 is licensed to an Alliance Member (or any of its affiliates) and becomes Available, such Alliance Member shall immediately give notice (an "Other Channel Notice") to Clearwire describing such Commercial Spectrum Capacity and setting forth the associated number

of Channel POPs (determined in accordance with this Section 1.2(d)) (the "Other Channel POPs"), in the market area (the Commercial Spectrum Capacity described in the Other Channel Notice is referred to as "Other Channel Capacity"). With respect to all the Other Channel Capacity, other than Other Channel Capacity associated with a market area, determined as set forth below, with less than 50,000 total service area households, the Alliance Members to which the Other Channel Capacity is licensed and Clearwire shall enter into Individual Use Agreements on the terms hereof within sixty (60) days after the Other Channel Notice, or at Clearwire's option, such later date not later than one hundred eighty (180) days after the Other Channel Notice, as selected by Clearwire; provided, that such Alliance Member and Clearwire shall not be obligated to enter into Individual Use Agreements pursuant to this Section 1.2(d) at any time after Individual Use Agreements with respect to Other Channel Capacity have been entered into (or as a result of entering into an Individual Use Agreement; Individual Use Agreements will have been entered into) in respect of Market Areas with an aggregate of more than 100,000,000 Other Channel POPs; provided, further, that Clearwire shall not be obligated to enter into an Individual Use Agreement with respect to Other Channel Capacity in a Market Area (A) in which, following execution of an Individual Use Agreement with respect to such Other Channel Capacity, Clearwire would, in the aggregate, have the right to use Commercial Spectrum Capacity with respect to, or hold licenses for, more than eight (8) ITFS or MDS channels (including, for purposes of such calculation of eight (8) ITFS or MDS channels, any Commercial Spectrum Capacity that is listed on Schedule 1.2), or (B) in which Clearwire (or its wholly-owned affiliates) would not have the right to use Commercial Spectrum Capacity on at least two (2) ITFS or MDS channels following execution of an Individual Use Agreement with respect to such Other Channel Capacity. In addition to the foregoing, Clearwire shall have the option, in its sole discretion to be exercised within thirty (30) days after receipt of the Other Channel Notice relating to Other Channel Capacity in a Market Area with less than 50,000 total service area households, to require the Alliance Member with respect to which the Other Channel Capacity is licensed, to enter into an Individual Use Agreement with Clearwire on the terms hereof.

(e) Channel Pop Calculation. "Channel POPs" in a Market Area (including "Other Channel Pops" in a Market Area as described below) are the number of total service area households times the number of Channels an Alliance Member is licensed to operate in a protected service area (having the geographic area established as of the date hereof, ("PSA") or in the case of Other Channel POPs which are not covered by a license granted by the FCC, such PSA as may be associated with such license upon grant). The geographic area encompassed within a PSA shall define the limits of a Market Area for purposes of this Agreement. The Parties acknowledge and agree that all calculations utilizing "Channel POP" figures provided for in this Agreement, an Individual Use Agreement or Renewal Agreement with respect to (x) any Market Area set forth on Schedule 1 shall utilize the number of Channel POPs set forth on Schedule 1.3 for each Market Area and the associated Alliance Member, which have been determined by multiplying the number of Channels licensed to an Alliance Member by the FCC as of the date hereof, as set forth for each Market Area on Schedule 1.3, by the number of total households (such number referred to herein as the number of "Channel POPs" associated with such Market Area) set forth for such Market Area on Schedule 1.3

and (y) any Market Area associated with Other Channel Capacity shall be determined in accordance with this Section 1.2(e). With respect to Other Channel Capacity, the number of Other Channel POPs shall be determined as follows and for purposes of this Agreement shall be deemed "Channel POPs":

(i) If the Other Channel Capacity is located in a Market Area listed in Schedule 1.3, the number of Other Channel POPs shall be the number of Channel POPs listed in Schedule 1.3.

(ii) If the Other Channel Capacity is located in a Market Area listed in Schedule 1.2(d)(H), the number of Other Channel POPs shall be determined on the basis of the number of service area households listed in Schedule 1.2(d)(H).

(iii) In the event of a conflict between the Channel POP figures listed in Schedule 1.3 and Schedule 1.2(d)(H), the figures listed in Schedule 1.3 shall control.

(iv) If the number of total service area households is not listed in either Schedule 1.3 or Schedule 1.2(d)(H), the number of total service area households shall be determined as follows: total service area households shall be those located within a thirty five (35) mile radius of the main transmitter site of the ITFS System (as licensed by the FCC on the date of this Agreement in the applicable Market Area), as determined by MapInfo software with the Claritas database utilizing 1998 population data ("Calculation Software"), or, if such Calculation Software (or any necessary component thereof) is no longer available, the then-available commercial software that produces results closest to that intended to be produced by the Calculation Software as agreed by the Parties.

(v) In the event of a dispute over the number of Other Channel POPs set forth above, the number of Other Channel POPs shall be finally determined by an independent company of national reputation in this field selected by the Parties, or, if they are unable to agree on such company, by a company selected pursuant to the procedures set forth in Section 23(b-c) herein. Each Party shall be given ten (10) business days to review and comment in advance of the final calculation on the methodology of such chosen company, but the determination of such company shall be binding on the Parties for all purposes of this Agreement, any Individual Use Agreement and any Renewal Agreement.

(f) Increased Consideration Option. Consistent with its contractual obligations, each Alliance Member covenants and agrees that Clearwire shall have the right, in its sole discretion, at any time prior to the Alliance Member's entering into a New Existing Operator Use Agreement with respect to Commercial Spectrum Capacity in a Market Area, to increase the amount of consideration Clearwire will pay as a royalty with respect to the Commercial Spectrum Capacity that would be subject to such Individual Use Agreement in a Market Area covered by such Existing Agreement or a New Existing Operator Use Agreement.

1.3. Royalties in Connection with Individual Use Agreements.

(a) Static Calculation of Channel POPs. The number of Channel POPs associated with a Market Area set forth on Schedules 1.3 and 1.2(d)(H) or derived in accordance with Section 1.2(e)(iv) shall not be revised upward or downward for purposes of calculating any payments due under this Agreement, any Individual Use Agreement or any Renewal Agreement for any reason, including for changes in actual population over time, or increases in the actual population that may be served using Channels licensed to an Alliance Member as of the date hereof, due to changes in FCC Rules or improvements in technology.

(b) Other Channel Capacity Commitment Royalty. Upon execution of an Individual Use Agreement with respect to a Market Area associated with Other Channel Capacity, Clearwire shall pay the Alliance Member holding the FCC license covering such Other Channel Capacity, $0.09 per Channel POP associated with such Market Area, calculated in accordance with Section 1.2(e).

(c) Equity Royalty. Upon execution of an Individual Use Agreement including the Individual Use Agreements executed at the Initial Closing, and including upon execution of an Individual Use Agreement with respect to Other Channel Capacity in a particular Market Area but not any Renewal Agreement, Clearwire will issue to the Alliance Member executing such Individual Use Agreement 0.7712 shares per Channel POP (the "Equity Royalty") of Clearwire Series A Convertible Preferred Stock, par value $.01 per share (the "Series A Preferred Stock"), having the rights and preferences set forth in the Amended and Restated Certificate of Incorporation a copy of which is attached hereto as Exhibit B hereto (the "Certificate of Incorporation") or the number of Series A Conversion Shares (as defined in Section 1.3(g)) issued per 0.7712 shares per Channel POP of Series A Preferred Stock upon a Clearwire Qualified IPO or the amount of consideration received for 0.7712 shares of Series A Preferred Stock (or for the related amount of Series A Conversion Shares) in a stock split, reverse stock split, stock dividend, merger, reclassification, recapitalization, reorganization, stock sale or other similar event, involving Clearwire or the Series A Preferred Stock or Series A Conversion Shares (each a "Reclassification Event") or such consideration as is set forth in Section 1.5(d). If applicable, the issuance of the Equity Royalty shall be postponed until the expiration or termination of any waiting period (or extension thereof) for any necessary filing applicable to the issuance to any Alliance Member of the Series A Preferred Stock (or other consideration) under the Hart-Scott Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act," and together with any approvals required thereunder, the "HSR Clearance"). If HSR Clearance is denied, cash compensation shall be paid, at the election of the Alliance Member by notification to Clearwire within ten (10) business days of such denial, in lieu of the Equity Royalty, in an amount equal to the Fair Market Value thereof determined as of the date of payment in accordance with the provisions of Section 1.3(i). As used herein, a "Renewal Agreement" is any renewal or extension of an Individual Use Agreement, any new agreement entered into between Clearwire and an Alliance Member pursuant to Clearwire's Right of First Refusal as set forth in Section 1.4(c) (but not any agreement entered into pursuant to Section 1.4(c) for a period after the thirtieth (30th) year of the

date of execution of the first Individual Use Agreement for a Market Area) and any agreement entered into between Clearwire and an Alliance Member with respect to Channels in a Market Area associated with the Other Channel Capacity.

(d) Earnout Royalties. (i) Stage 1 Earnout. At such time as the Alliance Members and Clearwire have entered into Individual Use Agreements for forty (40) million Channel POPs in the aggregate from all Alliance Members, Clearwire shall make a cash payment to each Alliance Member equal to the amount derived by multiplying (x) the number of Channel POPs subject to Individual Use Agreements executed by such Alliance Member and included in such forty (40) million Channel POPs by (y) $0.09 and, as a result of the application of such formula, such payments under this Section 1.3(d)(i) shall be no more than $3,600,000 in the aggregate.

(ii) Stage 2 Earnout. In addition, at such time as the Alliance Members and Clearwire have entered into Individual Use Agreements for eighty (80) million Channel POPs in the aggregate from all Alliance Members, Clearwire shall make a cash payment to each Alliance Member equal to the amount derived by multiplying (x) the number of Channel POPs subject to Individual Use Agreements executed by such Alliance Member and included in such eighty (80) million Channel POPs by (y) $0.135 and, as a result of the application of such formula, such payments under this Section 1.3(d)(ii) shall be no more than $10,800,000 in the aggregate.

(e) Royalty Payments Upon Execution of an Individual Use Agreement. Upon execution of an Individual Use Agreement (but not any Renewal Agreement) with respect to a Market Area, Clearwire shall pay to the Alliance Member entering into such Individual Use Agreement a cash sum (each, a "Execution Royalty") determined in accordance with the following formulas:

(i) Stage 1 Execution Royalties. The Execution Royalty for each Individual Use Agreement, until forty (40) million Channel POPs in the aggregate from all Alliance Members become the subject of executed Individual Use Agreements (without regard to which Alliance Member has executed any such Individual Use Agreement) (the "Stage 1 Channel POPs"), shall be determined by multiplying (x) the number of Stage 1 Channel POPs associated with the Market Area, calculated in accordance with Section 1.3(a), which is the subject of the applicable Individual Use Agreement, by (y) $0.10125.

(ii) Stage 2 Execution Royalties. The Execution Royalty for each Individual Use Agreement that relates to Channel POPs that are between the forty (40) millionth Channel POP and the eighty (80) millionth Channel POP in the aggregate from all Alliance Members that become subject to executed Individual Use Agreements (without regard to which Alliance Member has executed any such Individual Use Agreement) ("Stage 2 Channel POPs"), shall be determined by multiplying (x) the number of Stage 2 Channel POPs associated with the Market Area, calculated in accordance with Section 1.3(a), which is the subject of the applicable Individual Use Agreement, by (y) $0.12375.

(iii) Stage 3 Execution Royalties. The Execution Royalty for each Individual Use Agreement that relates to Channel POPs in excess of the first eighty (80) million Channel POPs in the aggregate from all Alliance Members that become subject to executed Individual Use Agreements (without regard to which Alliance Member has executed any such Individual Use Agreement) ("Stage 3 Channel POPs"), shall be determined by multiplying (x) the number of Stage 3 Channel POPs associated with the Market Area, calculated in accordance with Section 1.3(a), which is the subject of the applicable Individual Use Agreement, by (y) $0.1575.

(iv) Proration within an Individual Lease. In the event that the Channel POPs that are the subject of a single Individual Use Agreement fall under different formulas set forth above (for example, an Individual Use Agreement includes Stage 1 Channel POPs and Stage 2 Channel POPs), the payments under such Individual Use Agreement shall be calculated by applying the appropriate payment formula to the number of Channel POPs subject to each formula.

(f) Monthly Base Royalty Payments. Other than with respect to any Individual Use Agreement executed by an Alliance Member with respect to Commercial Spectrum Capacity or Other Channel Capacity in a Market Area for which a Designated Lump Sum Payment Royalty Amount has been paid, each Individual Use Agreement executed by an Alliance Member and Clearwire with respect to Commercial Spectrum Capacity or Other Channel Capacity in a Market Area and each Agreed Renewal Agreement entered into upon the expiration of such Individual Use Agreement, shall require the payment by Clearwire of monthly payments (each, a "Monthly Base Royalty Payment"), which, with respect to Commercial Spectrum Capacity in a Market Area set forth on Schedule 1.2, shall be determined based upon the number of Channel POPs associated with such Market Area as set forth on Schedule 1.3, and with respect to Other Channel Capacity, based upon the number of Channel POPs determined in accordance with the methodology set forth in this Section 1.3, accreting at a rate of three percent (3%) per annum from the date of this Agreement. Examples of such accreting Monthly Base Royalty Payments are set forth in Schedule 1.3(f).

(i) Lump Sum Royalty for Designated Lump Sum Payment Channel POPs. There shall be no Monthly Base Royalty Payments for the Designated Lump Sum Payment Channel POPs. In lieu of such payment, a payment equal to the Lump Sum Payment Royalty Amount, calculated as set forth below, per Designated Lump Sum Payment Channel POP shall be paid to the appropriate Alliance Member, upon execution of the applicable Individual Use Agreement, with respect to each Designated Lump Sum Payment Channel POP covered by such Individual Use Agreement. The "Lump Sum Payment Royalty Amount" shall mean (a) $0.30375 per Channel POP, if a Designated Lump Sum Payment Channel POP is a Stage 1 Channel POP, (b) $0.37125 per Channel POP, if a Designated Lump Sum Payment Channel POP is a Stage 2 Channel POP and (c) $0.4725 per Channel POP, if a Designated Lump Sum Payment Channel POP is a Stage 3 Channel POP.

(ii) Stage 1 Channel POPs. The Monthly Base Royalty Payments for each Individual Use Agreement that covers Stage 1 Channel POPs (other

than Designated Lump Sum Payment Channel POPs) shall be determined as set forth on Schedule 1.3(e). Such payments are intended to deliver $0.30375 per Channel POP on a present value basis, calculated as a thirty (30) year annuity discounted at ten percent (10%) and growing at a three percent (3%) annual growth rate split into twelve (12) monthly payments per year.

(iii) Stage 2 Channel POPs. The Monthly Base Royalty Payments for each Individual Use Agreement that covers Stage 2 Channel POPs (other than Designated Lump Sum Channel POPs) shall be determined as set forth on Schedule 1.3(f). Such payments are intended to deliver $0.37125 per Channel POP on a present value basis, calculated as a thirty (30) year annuity discounted at ten percent (10%) and growing at a three percent (3%) annual growth rate split into twelve (12) monthly payments per year.

(iv) Stage 3 Channel POPs. The Monthly Base Royalty Payments for each Individual Use Agreement that covers Stage 3 Channel POPs (other than Designated Lump Sum Channel POPs) shall be determined as set forth on Schedule 1.3(f). Such payments are intended to deliver $0.4725 per Channel POP on a present value basis, calculated as a thirty (30) year annuity discounted at ten percent (10%) and growing at a three percent (3%) annual growth rate split into twelve (12) monthly payments per year:

(v) Proration within an Individual Use Agreement. In the event that the Channel POPs that are the subject of a single Individual Use Agreement fall under different formulas set forth above (for example, an Individual Use Agreement includes Stage 1 Channel POPs and Stage 2 Channel POPs), the payments under such Individual Use Agreement shall be calculated by applying the appropriate payment formula to the number of Channel POPs subject to each formula.

(g) Valuation Adjustment. If, upon the date (the "Revaluation Date") of the earlier to occur of (i) the date that is the fifth anniversary date of the Closing Date, (ii) the date of consummation of a sale or exchange of all or more than seventy-five percent (75%) of the outstanding stock of Clearwire or all or substantially all of Clearwire's assets to a third party, in each case in a transaction in which more than fifty percent (50%) of the consideration received by Clearwire's shareholders is cash or (iii) the date of the first sale of Clearwire common stock, par value $.01 per share (the "Common Stock"), in a Qualified IPO, the Fair Market Value (determined as set forth below) of each share of Series A Preferred Stock (or the shares of Common Stock into which each share of Series A Preferred Stock is then convertible (the "Series A Conversion Shares")) is not at least three hundred percent (300%) of the Valuation Price adjusted appropriately for any Reclassification Event or any event described in Section 1.5(d)), then the Monthly Base Royalty Payments following the Revaluation Date under any Individual Use Agreement in effect as of the Revaluation Date (other than with respect to any Individual Use Agreement to which the Designated Lump Sum Payment Channel POPs were subject), and under any Individual Use Agreement or any Renewal Agreement entered into after the Revaluation Date, shall be equal to the Reset Monthly Base Royalty Payment with respect to such Individual Use Agreement. The "Reset

Monthly Base Royalty Payment" with respect to an Individual Use Agreement shall equal the product of (x) the Reset Ratio (as defined below), times (y) the Monthly Base Royalty Payment under such Individual Use Agreement immediately prior to the Revaluation Date; provided that in all cases such change from the Monthly Base Royalty Payment calculation to the Reset Monthly Base Royalty Payment calculation shall be made only if the Reset Monthly Base Royalty Payment under the Individual Use Agreements is greater than the Monthly Base Royalty Payment under the Individual Use Agreements prior to the Revaluation Date. Until the Reset Monthly Base Royalty Payment is calculated, the Monthly Base Royalty Payment, determined in accordance with the terms of the Individual Use Agreement immediately prior to the Revaluation Date, shall remain in effect and upon the determination of the Reset Monthly Base Royalty Payment with respect to each Individual Use Agreement then in effect, Clearwire shall pay the Alliance Member that is party to such Individual Use Agreement the difference between the Reset Monthly Base Royalty Payment (if applicable) and the Monthly Base Royalty Payment in effect prior to the Revaluation Date for the time period between the Revaluation Date and the date that the Reset Monthly Base Royalty Payment is calculated. An example of the Reset Monthly Base Royalty Payment calculation with respect to Stage 3 Channel POPs, assuming that the Revaluation Date occurs on the fifth anniversary of the Closing Date is set forth on Schedule 1.3(g).

The "Aggregate Price Reset Number" shall equal: eighty-five percent (85%) of (x) the Fair Market Value of all Channel POPs subject to Individual Use Agreements in effect on the Revaluation Date divided (y) by the number of all Channel POPs subject to Individual Use Agreements in effect on the Revaluation Date.

The "Valuation Price" equals the deemed valuation of $0.2334 per share of Series A Preferred Stock.

The "Reset Ratio" shall equal the quotient of (x) the Aggregate Price Reset Number, divided by (y) $0.90.

The Fair Market Value of each share of Series A Preferred Stock (or the Series A Conversion Shares) held by an Alliance Member as of the Revaluation Date means (x) if the Revaluation Date is the event described in Section 1.3(g)(iii), the offering price to the public of Common Stock issued as part of the Qualified IPO; (y) if the Revaluation Date is the event described in Section 1.3(g)(ii), the sum of (I) the value of the total consideration that would be received by a holder of one share of Series A Preferred Stock (or the Series A Conversion Shares) in such transaction, plus (II) the Fair Market Value, determined in the same manner as is set forth in clause (z) below, of a share of Series A Preferred Stock (or the Series A Conversion Shares) that is outstanding following such transaction and which is not otherwise taken into account in the value of the total consideration described in clause (I) above; provided that if the consideration to be received by holders of Series A Preferred Stock (or Series A Conversion Shares) is other than cash, the value of such consideration shall be equal to the value determined by the independent members of the Board in good faith, who may, at the sole option of the independent members of the Board, investment bankers and other experts as they may determine; and (z) if the Revaluation Date is the event described in Section 1.3(g)(i), the

value of the total consideration that would be received by a holder of one share of Series A Preferred Stock for Series A Conversion Shares upon the sale of all of the Clearwire's issued and outstanding securities of any class in a single transaction or series of related transactions to a buyer willing to pay the highest purchase price that would be received in an auction conducted by a nationally recognized investment banking firm that has experience in the telecommunications businesses, which buyer is under no compulsion to buy and the holders of such securities are under no compulsion to sell, all parties having reasonable knowledge of all relevant facts, as determined in accordance with the appraisal procedures set forth in Section 1.3(i); provided that the value of the consideration to be received pursuant to clause II of (y) or pursuant to (z) above, is subject to a party's right to invoke the appraisal right procedure of Subsection 1.3(i) below.

The Fair Market Value of a Channel POP for purposes of this Section 1.3(g) shall mean the total consideration that would be received by the applicable Alliance Member for Commercial Spectrum Capacity or Other Channel Capacity in a Market Area having the same number of Channel POPs or Other Channel POPs, as the case may be, in a transaction comparable in duration, scope, and terms and conditions to the transactions provided for in this Agreement taken in its entirety from an operator willing to pay the highest total consideration, which operator and Alliance Member are under no compulsion to agree, all parties having reasonable knowledge of all relevant facts, as determined in accordance with the appraisal procedures set forth in Section 1.3(i).

(h) Performance Adjustment. Effective on the first day after the fifteenth (15th) anniversary of the Closing Date (the "15th Anniversary Date"), Monthly Base Royalty Payments made after such date pursuant to Individual Use Agreements (and Agreed Renewal Agreements) then in effect or entered into thereafter shall be adjusted to equal the then Monthly Base Royalty Payment times the Multiplying Factor. The "Multiplying Factor" shall be the number that is determined, in accordance with Schedule 1.3(h), as the Multiplying Factor based upon the Fair Market Value of one share of Series A Preferred Stock (or the related amount of shares of Series A Conversion Shares, adjusted appropriately for any Reclassification Event or any event described in Section 1.5(d), on the 15th Anniversary Date.

(i) Appraisal Procedures. (I) If any event requiring the determination of fair market value ("Fair Market Value") occurs, the Parties shall, for a period of thirty (30) days after such event (the "Negotiation Period"), attempt in good faith to agree on Fair Market Value. If the Parties fail to agree on the Fair Market Value before the conclusion of the Negotiation Period, then the Parties shall jointly appoint an appraiser (the "Appraiser") to determine Fair Market Value. The Appraiser shall make such determination, as promptly as reasonably possible following the date of such person's engagement, and such determination shall for all purposes hereof constitute Fair Market Value with respect to the matter giving rise to the determination.

(II) If the Parties fail to reach agreement as to Fair Market Value during the Negotiation Period and for any reason fail to jointly appoint the Appraiser

within ten (10) days of the conclusion of the Negotiation Period, then each Party shall promptly appoint an investment banking firm that has experience in the telecommunications industry and in the valuation of assets, properties and rights used in such industry (the "Party Appraiser"). If either Party shall fail to appoint such a Party Appraiser within fifteen (15) days of the conclusion of the Negotiation Period, then the Party Appraiser appointed by the Party that does so appoint a Party Appraiser shall make the determination of Fair Market Value for all purposes hereof. If two Party Appraisers are appointed pursuant to the first sentence of this clause (II) and the two Party Appraisers agree upon the Fair Market Value, their joint determination shall for all purposes hereof constitute Fair Market Value. If the two Party Appraisers cannot reach an agreement within sixty (60) days after the conclusion of the Negotiation Period, the two Party Appraisers selected shall promptly select a third appraiser (the "Third Appraiser"). The Third Appraiser shall review the determinations made by the two Party Appraisers and shall choose the determination that the Third Appraiser deems to be the most accurate determination of Fair Market Value and which determination shall constitute the Fair Market Value with respect to the matter giving rise to the determination.

(III) All decisions of any appraiser appointed hereunder shall be rendered in writing and shall be signed by such appraiser or appraisers. The Fair Market Value determined as herein provided shall be enforceable in any court having jurisdiction over a proceeding brought to seek such enforcement. Each Party shall bear the costs associated with any appraisal done by the Party Appraiser appointed by such Party, and Clearwire on the one hand, and the applicable Alliance Member or Alliance Members, on the other hand shall each bear one half of the costs associated with any appraisal done by (a) the Appraiser jointly designated by the Parties or (b) the Third Appraiser.

1.4. Additional Rights With Respect To Individual Use Agreements.

(a) FCC Permitted Extensions. (i) Direct Maximum Term Extensions. All Individual Use Agreements for Commercial Spectrum Capacity or Other Channel Capacity not previously subject to an Individual Use Agreement will be for fifteen (15) year terms (the "Initial Term"), as permitted under the FCC Rules as of the date hereof; provided that, if the FCC Rules should at any time permit lease terms in excess of fifteen (15) years, the Initial Term of each Individual Use Agreement then in effect and any Individual Use Agreements entered into thereafter shall be automatically extended to the maximum term then permitted, not to exceed a maximum term of thirty (30) years with respect to each Individual Use Agreement for Commercial Spectrum Capacity or Other Channel Capacity in a Market Area (such extended term hereinafter an "Extended Initial Term"). Any Party that shall determine that there has been a change in FCC Rules permitting such extension shall promptly notify the other Party in writing of such change and the notifying Party's basis for determining the existence of such change. Upon the expiration of an Individual Use Agreement; provided that (x) such Individual Use Agreement has not been terminated, (y) a Decoupling Event has not occurred with respect to such Individual Use Agreement, and (z) that the Alliance Member shall not have entered into an agreement pursuant to and in accordance with the terms of the Right of First Refusal set forth below in clause (c), Clearwire and the Alliance Member that is

the party to such Individual Use Agreement shall enter into a new Renewal Agreement or Renewal Agreements (each an "Agreed Renewal Agreement") for an additional term of the number of years equal to the remainder of thirty (30) years minus the Initial Term or Extended Initial Term, as applicable, upon the same terms as the Individual Use Agreement to which it relates; provided, however, that the only payments that shall be made to the Alliance Member under such Agreed Renewal Agreement shall be the Monthly Base Royalty Payment calculated in accordance with Section 1.3, as adjusted in accordance with the terms thereof, and that no other payments, including any Equity Royalty, earnout royalty, or Execution Royalty shall be due thereunder. In addition, all registration rights and rights related to having a seat on the Board, and membership on the Advisory Committees shall continue subject to the terms and conditions set forth in the Registration Rights Agreement, the Stockholders Agreement and By-Laws.

(ii) Indirect Maximum Term Extensions. If the FCC changes its policy at any time to permit additional renewal, first refusal or other substantially similar rights (herein referred to as the "Extension Right"), each Individual Use Agreement (or any Renewal Agreement) then in effect and any Individual Use Agreements (or any Renewal Agreements) entered into thereafter shall be amended to include the Extension Right to the extent, and only to the extent necessary, to permit the extension of an Initial Term of an Individual Use Agreement or the term of an Agreed Renewal Agreement to a total maximum term not to exceed thirty (30) years, and no additional compensation (other than compensation provided for herein with respect to Individual Use Agreement or any Renewal Agreement) shall be payable to the Alliance Members in connection with such amendment; provided that in any case, the Right of First Refusal shall remain in effect, as described in clause (c) below, upon the expiration of such thirty (30) year maximum term.

(b) No Shop Periods. Each Alliance Member agrees that it (x) shall not, and shall cause its representatives and any other person acting on its behalf not to, directly or indirectly, solicit, entertain, negotiate with respect to, or facilitate any offers or proposals from third parties for any agreements with respect to the Commercial Spectrum Capacity or Other Channel Capacity of a Market Area that is the subject of an Individual Use Agreement or Renewal Agreement at any time prior to the date that is (i) one hundred and eighty (180) days prior to the expiration of the Initial Term of such Individual Use Agreement, or (ii) if an Individual Use Agreement has any Extended Initial Term where such Extended Initial Term has extended the Initial Term to less than twenty eight (28) years after the original execution of such Individual Use Agreement, or (iii) two (2) years prior to the end of the Second Period, and (y) shall promptly give Clearwire written notice of any inquiry or proposal relating thereto that may be received at any time; provided that, such limitations shall not apply with respect to any Individual Use Agreement that has been subject to a Decoupling Event or that is subject to being terminated by the Alliance Member party for outstanding defaults (one of which must be a payment default). Each Alliance Member agrees that it shall not enter into any agreement with respect to the Commercial Spectrum Capacity or Other Channel Capacity of a Market Area that is the subject of an Individual Use Agreement without first following the Right of First Refusal provisions set forth in clause (c) below; provided that, such limitations shall not apply with respect to any Individual Use Agreement that

has been subject to a Decoupling Event or that is subject to being terminated for outstanding defaults (one of which must be a payment default).

(c) Right of First Refusal. With respect to each Individual Use Agreement and Renewal Agreement, Clearwire shall have a right of first refusal (the "Right of First Refusal") following the expiration of such Individual Use Agreement or Renewal Agreement as follows:

The Alliance Member party to such Individual Use Agreement or Agreed Renewal Agreement may, at any time during the period commencing with the date that is one-hundred eighty (180) days prior to the expiration date of an Individual Use Agreement or that is seven hundred and twenty (720) days prior to the expiration date of an Agreed Renewal Agreement, deliver a written notice (the "Offer Notice") to Clearwire, which shall (i) state such Alliance Member's (the "Transferring Alliance Member") intention to enter into an agreement with a third party (a "Third Party Use Agreement") in a bona fide arm's length transaction, the Market Area covered by such Third Party Use Agreement, the name and address of the person(s) with whom the Alliance Member proposes to enter into such Third Party Use Agreement, the payment structure therefor and a summary of other material terms of such Third Party Use Agreement and (ii) offer to Clearwire the option to enter into a new agreement upon the terms and subject to the conditions of the proposed Third Party Use Agreement as set forth in the Offer Notice, or other terms and conditions which, taken as a whole, are no more favorable to the Alliance Member than the terms and conditions of the proposed Third Party Use Agreement (the "Offer"). The Offer shall remain open and irrevocable for a period of thirty (30) days after delivery of the Offer Notice (the "Acceptance Period") and to the extent the Offer is accepted during the Acceptance Period, until the consummation of the agreement contemplated by the Offer. Clearwire shall have the right and option, during the Acceptance Period, to accept the Offer on the terms set forth therein. Such acceptance shall be made by delivering a written notice to the Transferring Alliance Member within the Acceptance Period. If effective acceptance shall not be delivered to the Transferring Alliance Member within the Acceptance Period, then the Transferring Alliance Member may enter into such Third Party Use Agreement with the persons identified in the Offer Notice on the terms and conditions set forth in the Offer Notice at any time within one hundred and twenty (120) days after the expiration of the Acceptance Period (the "Exercise Period"). In the event that such Third Party Use Agreement is not entered into by the Transferring Alliance Member during the Exercise Period, (i) where the Right of First Refusal involves an Individual Use Agreement other than an Agreed Renewal Agreement the term of which, when taken together with the term of the Individual Use Agreement to which it relates, is thirty (30) years through and including the date of execution of an agreement in accordance with the provisions of this Section 1.4(c) (a "Final Agreed Renewal Agreement"), the right of the Transferring Alliance Member to enter into a Third Party Use Agreement shall expire and the Transferring Alliance Member will enter into an Agreed Renewal Agreement with Clearwire, and (ii) where the Right of First Refusal involves a Final Agreed Renewal Agreement, the right of the Transferring Alliance Member to enter into such Third Party Use Agreement shall expire and the rights and obligations of the Parties in this Section 1.4(c) shall be reinstated. If, at the time of expiration of an Individual Use Agreement or

Agreed Renewal Agreement, the Right of First Refusal procedures set forth in this Section 1.4(c) have not been concluded, the Alliance Member that is party to such Individual Use Agreement or Agreed Renewal Agreement shall provide capacity to Clearwire, on a transitional basis, in the same manner as provided in any such Individual Use Agreement or Agreed Renewal Agreement, and in accordance with the Monthly Base Royalty Payment terms, during the period following expiration of such Individual Use Agreement or a Final Agreed Renewal Agreement; provided, however, that the applicable Alliance Member will not have to provide such transitional capacity to Clearwire with respect to an Individual Use Agreement or a Final Agreed Renewal Agreement that has been subject to a Decoupling Event or if such Individual Use Agreement or Agreed Renewal Agreement has been terminated for outstanding default.

(d) Except as contractually obligated pursuant to an Existing Agreement or a New Existing Operator Use Agreement, to the extent that an Alliance Member enters into an agreement with a third party with respect to Commercial Spectrum Capacity or Other Channel Capacity in a Market Area that has been subject to an Individual Use Agreement, any such agreement shall be limited to one fifteen (15) year term and no such agreement shall contain a right of first refusal; provided that, this provision shall not be applicable to any agreement with a third party if such agreement relates to Commercial Spectrum Capacity or Other Channel Capacity that was previously the subject of an Individual Use Agreement that was (x) subject to a Decoupling Event, or (y) was terminated by the Alliance Member for Clearwire defaults (including payment defaults) or any use agreement with a third party entered into, in accordance with the terms of this Agreement at the time that a Material Default Situation was in existence.

(e) Excess Proceeds. Upon the expiration of the Initial Term or Extended Initial Term of any Individual Use Agreement, or the term of any Renewal Agreement, which when taken together with the terms of the Individual Use Agreement to which it relates and any earlier Renewal Agreement related thereto, is less than thirty (30) years if Clearwire exercises its Right of First Refusal under Section 1.4(c) and enters into a Renewal Agreement for Commercial Spectrum Capacity or Other Channel Capacity in a Market Area or, if Clearwire does not exercise its Right of First Refusal and an Alliance Member enters into a Third Party Use Agreement for Commercial Spectrum Capacity or Other Channel Capacity in a Market Area, the Alliance Member party to such agreement will, for the period consisting of the remainder of thirty (30) years minus the Initial Term or Extended Initial Term, as applicable (for each such Third Party Use Agreement term or Renewal Agreement term, the "Second Period"), pay, assign or otherwise transfer to Clearwire all consideration consisting of cash, cash equivalents, including any securities, or other consideration, with a readily ascertainable value (collectively, the "Consideration") in excess of the aggregate Monthly Base Royalty Payments established pursuant to Section 1.3 (e-h) through the Second Period with respect to such Market Area, in order to fully align the economic incentives of the Alliance Members and Clearwire or which has been terminated for breach by Clearwire in accordance with its terms; and provided that no such payments will be made by either Party with respect to an Individual Use Agreement or Renewal Agreement that has been the subject of a Decoupling Event; and provided that the Monthly Base Royalty Payments payable by Clearwire shall be reduced by a percentage, equal to the increased

percentage of channel capacity retained by such Alliance Member, with respect to any Third Party Use Agreement or Agreed Renewal Agreement entered into pursuant to the Right of First Refusal provided in Section 1.4(c), which provides an Alliance Member with greater retained channel capacity than that provided for under the form of Individual Use Agreement.

(f) Termination of Excess Proceeds/Right of First Refusal Reinstated. Following the end of the Second Period with respect to each Agreed Renewal Agreement or Third Party Use Agreement, in each case only if the term of such Renewal Agreement or Third Party Use Agreement, when taken together with the terms of the Individual Use Agreement to which it relates and any earlier Renewal Agreement is thirty (30) years or at the end of an Extended Initial Term which is thirty (30) years after the date of the applicable Individual Use Agreement with respect to each Individual Use Agreement, Clearwire will be offered a Right of First Refusal in accordance with Section 1.4(c), on any subsequent agreement with respect to the Commercial Spectrum Capacity or any part thereof with respect to such Individual Use Agreement, Third Party Use Agreement or Agreed Renewal Agreement. Each Alliance Member shall be entitled to retain all consideration derived from royalty and use agreements for periods after the expiration of the Second Period with respect to their respective Individual Use Agreements or Third Party Use Agreements.

(g) Certain Permitted Transactions.

(i) Channel Swap Transactions. Clearwire and each of the Alliance Members agree to cooperate in connection with swaps of Channels in which the Alliance Member swaps some or all of its current channels within a market area for ITFS channels within the same Market Area (each, a "Channel Swap Transaction"), including Channel Swap Transactions that de-interleave the Alliance Member's Channels within a Market Area. Any such Channel Swap Transaction shall be consistent with the need of the Alliance Member to satisfy FCC educational requirements and the Alliance Member's goals in its Market Areas and to maintain existing service to educational and non-profit institutions in the affected Market Area. No Alliance Member shall be required to participate in any Channel Swap Transaction unless (x) the Alliance Member's ITFS Channel or ITFS Channels subject thereto are exchanged for an equal number of, and equal bandwidth of, MDS (other than those within the 2150-2162 MHz band) or ITFS channels licensed to operate in the same Market Area; (y) the Alliance Member's ITFS Channel or Channels are subject to an Individual Use Agreement that is not in default and has not been the subject of a Decoupling Event; (z) the MDS or ITFS channels that would be received by the Alliance Member in exchange are reasonably equivalent in other technical characteristics, coverage, utility, FCC conditions and associated obligations and encumbrances (including interference consents and operating agreements) to the Alliance Member's ITFS Channels that would be exchanged therefor; (xx) there is no condition or circumstance that might reasonably be expected to cause the FCC to refuse to renew, to revoke or to materially adversely restrict the operations or allowable operations or characteristics of such MDS or ITFS channels that would be received by the Alliance Member in exchange; (yy) the Alliance Member is provided with a reasonable opportunity, not to exceed twenty-one (21) days, subject to the swapping licensee's

cooperation, in advance of agreement to any such swap to conduct a thorough due diligence review of MDS or ITFS channels that would be received by the Alliance Member in exchange, and any associated agreements or encumbrances with respect thereto, including lease obligations with respect thereto, if any, and the Alliance Member shall be reasonably satisfied with the result of such review and that the conditions set forth in this Section 1.4(g)(i) have been satisfied. As a condition to such Channel Swap Transaction, (1) the number of households in the FCC-protected service area associated with the ITFS or MDS channels that would be received by the Alliance Member in exchange will be no fewer than those of the Alliance Member's ITFS Channel or Channels that will be given for them; and (2) the Alliance Member receives from the licensee of the channels in the exchange such written representations, warranties, covenants and indemnities as the Alliance Member shall request that are customary in channel swap transactions.

(ii) Other Permitted Transactions. In addition to Channel Swap Transactions, Clearwire shall have the right to enter into swap transactions with third parties (other than by an assignment or novation in which Clearwire ceases to be obligated) pursuant to which the Commercial Spectrum Capacity in any Market Area is made available for use by a third party, whether by sublease, wholesale capacity arrangement or other substantially similar means in exchange for Commercial Spectrum Capacity in other areas (any such transaction referred to as "Permitted Capacity Transaction"), provided that any such Permitted Capacity Transaction is accomplished through a sublease, wholesale capacity arrangement or other substantially similar arrangement and under which (a) Clearwire remains obligated under the Individual Use Agreement to deliver the material benefits provided for thereunder, including all Royalties, and (b) the sublease is made explicitly subordinate to the applicable Individual Use Agreement

(iii) Swap/Permitted Capacity Consideration. To the extent that any Consideration in addition to the consideration provided for in this Agreement and the applicable Individual Use Agreement or Renewal Agreement is payable to an Alliance Member as a result of any such Permitted Capacity Transaction or Channel Swap Transaction, all such Consideration shall be paid or otherwise transferred to Clearwire.

(h) Limitations Following a Material Default. Notwithstanding anything in this Agreement to the contrary, to the extent but only for so long as a Material Default Situation exists, an Alliance Member will not be obligated to enter into an Individual Use Agreement or Agreed Renewal Agreement with respect to Commercial Spectrum Capacity or Other Channel Capacity in any Market Area that becomes Available while a Material Default Situation exists and such Commercial Spectrum Capacity or Other Channel Capacity at the option of the Alliance Member, shall be deemed excluded from the terms of this Agreement, except with respect to the Commitment Royalty, which shall not be refundable to Clearwire, and such Commercial Spectrum Capacity or Other Channel Capacity shall no longer be subject to the terms of this Agreement. Any Alliance Member exercising the option set forth in the previous sentence shall provide written notice to Clearwire within fifteen (15) days prior to any Subsequent Closing Date that would otherwise apply with respect to the Commercial

Spectrum Capacity with respect to which such Alliance Member has such option, and if no such notice is provided, such Commercial Spectrum Capacity shall be deemed to be subject to this Agreement in all respects. If a Material Default Situation is no longer in existence, Alliance Members and Clearwire will be obligated to enter into an Individual Use Agreement or Agreed Renewal Agreement with respect to Commercial Spectrum Capacity or Other Channel Capacity in a Market Area that becomes Available at a point in time after a Material Default Situation no longer exists (or, if 270 days have passed with respect to an Individual Use Agreement or Agreed Renewal Agreement after the notice referred to in the previous sentence, with respect to Commercial Spectrum Capacity or Other Channel Capacity subject to such Individual Use Agreement or Agreed Renewal Agreement if it is Available at such time, then the Alliance Member and Clearwire will be obligated to enter into an Individual Use Agreement or Agreed Renewal Agreement with respect to such Commercial Spectrum Capacity or Other Channel Capacity) and such Commercial Spectrum Capacity or Other Channel Capacity shall be subject to the terms of this Agreement.

A "Material Default Situation" is defined as a situation in which Clearwire has committed, and there is continuing and ongoing as of any date, a Material Default with respect to, (x) Individual Use Agreements or Renewal Agreements covering twenty (20%) percent or more of the aggregate number of Channel POPs and Other Channel POPs that are covered by all Individual Use Agreements or Renewal Agreements executed prior to and during the time of such Material Default Situation and (y) twenty (20%) percent or more of the existing Individual Use Agreements or Renewal Agreements executed prior to and during the time of such Material Default Situation; provided, however, that under all circumstances an Individual Use Agreement or Renewal Agreement that expires or terminates at the end of its normal term, including any extensions shall not count toward any of the foregoing percentages. A "Material Default" is defined as (x) any one of the following having occurred: (a) Clearwire has not made a Monthly Base Royalty Payment or Execution Royalty when due hereunder, (b) Clearwire has failed to comply with the Individual Use Agreement or Agreed Renewal Agreement in a manner that, if not corrected, could reasonably be expected to result in the loss of a material FCC license with respect to the Commercial Spectrum Capacity or Other Channel Capacity in a Market Area, or (c) Clearwire is unable to deliver at a Subsequent Closing the Equity Royalty when due in connection with the execution of an Individual Use Agreement, which determination will be made on the applicable Subsequent Closing Date, and (y) either (i) the expiration of a period of ninety (90) days following notice from the applicable Alliance Member that the relevant event described in clause (a), (b) or (c) has occurred with respect to such claimed relevant event and the default set forth therein has not been cured, or (ii) if a Final Court Ruling, determined in accordance with Section 23(b-c), that the relevant event described in clause (a), (b) or (c) has occurred, and the default set forth therein not having been cured within ninety (90) days after such Final Court Ruling. For purposes of this Agreement, a "Final Court Ruling" shall mean any non-appealable judgment, on the merits, of any court; provided that, had such Final Court Ruling been rendered at the time the original court ruling to which the Final Court Ruling relates was decided there would, as a result, have been a Material Default Situation at some date thereafter, the Alliance Members shall have the right to revoke and rescind any Individual Use Agreements entered into on or after that



ffny03\ronneda\388835.43

date, by tender of the Royalty payments (other than any Monthly Base Royalty Payments).

1.5. Effect of Alienation of Commercial Spectrum Capacity.

(a) Right to Assign Individual Use Agreement or Renewal Agreement. In addition to the provisions of Section 1.4(g) and the other terms of this Agreement, Clearwire shall have the right, directly or through a transfer of its equity interests in a Clearwire affiliate or otherwise, to sell, transfer, sublease and assign any Individual Use Agreement; provided that, from the date of a Decoupling Event forward, (i) the separate provisions of this Agreement shall terminate as to the Commercial Spectrum Capacity under that Individual Use Agreement and the royalty payments under the Individual Use Agreement shall be determined thereunder without reference to this Agreement and (ii) the provisions of Section 1.4 of this Agreement shall terminate and be of no further effect with respect to such Individual Use Agreement. A "Decoupling Event" shall mean an assignment or other transfer of an Individual Use Agreement or Renewal Agreement in which Clearwire does not continue to be obligated to perform all of its obligations hereunder, including its obligations to provide all of the Royalties hereunder as due with respect to such Individual Use Agreement or Renewal Agreement and the Commercial Spectrum Capacity or Other Channel Capacity thereunder.

(b) Early Transfer Limitations. Notwithstanding Section 1.5(a), for a period beginning on the Closing Date and ending on the earlier of (x) three (3) years from the Closing Date or (y) a Qualified IPO (each an "Early Benchmark Date"), Clearwire shall not be permitted to assign or sublease, except pursuant to transactions described in Section 1.4(g) or pursuant to assignments or subleases to wholly owned affiliates of Clearwire, Individual Use Agreements with respect to Commercial Spectrum Capacity or Other Channel Capacity covering more than forty (40) million Channel POPs and Other Channel POPs to any Person. The term "Person" means any individual, corporation, partnership, limited partnership, limited liability company, association, joint-stock company, trust, unincorporated organization, government or political subdivision or any other entity.

(c) Clearwire Sale of ITFS Business. Notwithstanding any other provision of this Agreement but subject to Section 1.5(d), from and after an Early Benchmark Date, if a Material Default Situation shall not have occurred and be continuing, Clearwire may, without remaining obligated under any of the terms of this Agreement or any Individual Use Agreement or Renewal Agreement, assign all but not less than all of its rights and obligations hereunder, including the obligation to provide all of the Royalties, together with its rights and obligations under all Individual Use Agreements and Renewal Agreements to a single Person (a "Permitted Clearwire Sales Transaction"). Upon the occurrence of a Permitted Clearwire Sales Transaction, the assignee may deliver other consideration in lieu of the Equity Royalty with respect to any Commercial Spectrum Capacity or Other Channel Capacity not then Available; provided that, the obligation of an Alliance Member to enter into an Individual Use Agreement with respect to any such Commercial Spectrum Capacity not yet Available or with respect to Other Channel Capacity shall be subject to the satisfaction of the Alliance

Member and its advisors that the consideration to be delivered as or in lieu of, the Equity Royalty (other than any such consideration which is exchanged for Series A Preferred Stock upon a Reclassification Event) shall be reasonably acceptable to the Alliance Members to be delivered pursuant to or in lieu of, the Equity Royalty. A Permitted Clearwire Sales Transaction shall not be deemed a Decoupling Event as to any Individual Use Agreement or Renewal Agreement.

(d) Sale or Liquidation of Clearwire. In connection with a sale of all and not less than all of the capital stock of Clearwire, whether by means of a direct sale of such securities or by merger or otherwise (a "Sale or Merger Transaction"), or upon a liquidation of Clearwire in connection with a transaction in which all of the Individual Use Agreements and all of Clearwire's obligations under the Master Agreement (including the obligation to provide the Equity Royalty) have been assumed, and continued as a whole, by another Person (a "Qualifying Liquidation Transaction"; any Sale or Merger Transaction or Qualifying Liquidation Transaction is referred to individually as a "Transaction"), if each share of Series A Preferred Stock (or the related amount of Series A Conversion Shares) is converted into any other consideration (the "Transaction Consideration"), the Parties agree that, as long as the acquiring entity (including for this purpose the issuer of any securities included in the Transaction Consideration) in the case of a Sale or Merger Transaction, and such Person in the case of a Qualifying Liquidation Transaction, covenants and agrees to the Equity Royalty Commitment (as defined below) in connection with such Transaction as a condition to the closing thereof, then the Equivalent Consideration (as defined below) shall become the Equity Royalty provided for in Section 1.3(c). The "Equity Royalty Commitment" shall mean a covenant and agreement to provide and make available to the applicable Alliance Member as the Equity Royalty to be paid (as provided in Section 1.3(c) hereof) for each Channel POP included under, and upon the execution of, any Individual Use Agreement executed after such Transaction, the identical Transaction Consideration that would have been received by a Series A Preferred Stockholder holding 0.7712 shares of Series A Preferred Stock (or for the related amount of Series A Conversion Shares or other equivalent consideration received pursuant to a Reclassification Event) at the effective time of the Transaction (without regard to any rounding for fractional shares) (the "Equivalent Consideration"). A Sale or Merger Transaction or Qualifying Liquidation Transaction shall not be deemed to be an assignment of this Agreement or of any Individual Use Agreement or Renewal Agreement where the Equity Royalty Commitment has been made and shall not be deemed to be a Decoupling Event with respect thereto.

(e) Individual Use Agreement. In the event of the proper termination of an Individual Use Agreement, the provisions of this Agreement shall lapse in respect of the Commercial Spectrum Capacity under such Individual Use Agreement for all purposes of this Agreement.

SECTION 2. Representations and Warranties of the Corporation. The Corporation hereby represents and warrants to the Alliance Members as of the date hereof as follows.

2.1. Organization and Good Standing; Power and Authority; Qualifications. Clearwire Equipment, L.L.C. ("Clearwire Equipment" and collectively with the Corporation, Clearwire Spectrum Corp. and Clearwire Technologies, Inc. ("CTI"), the "Clearwire Entities", and each individually, a "Clearwire Entity") is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware. Each Clearwire Entity (other than Clearwire Equipment) is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware. Each Clearwire Entity has all requisite power and authority to own, lease and operate its properties, to carry on its business as presently conducted and as proposed to be conducted. Each Clearwire Entity has all requisite corporate, or in the case of Clearwire Equipment, limited liability company, power and authority to enter into and carry out the transactions contemplated by the Documents (as defined in Section 9.2(c)) to which they are a party. The Corporation has the requisite corporate power and authority to enter into and carry out the transactions contemplated by the Certificate of Incorporation. Clearwire has the requisite corporate power and authority to enter into the Master Assignment and Assumption Agreement, dated March 1, 2000 (the "Assignment Agreement") and to carry out the transactions contemplated by the Assignment Agreement. Each Clearwire Entity is duly qualified to transact business as a foreign corporation (or other foreign entity) in, and is in good standing under the laws of, those jurisdictions listed on Schedule 2.1 under its name, which jurisdictions constitute all of the jurisdictions wherein the character of the property owned or leased or the nature of the activities conducted by it makes such qualification necessary. Each Clearwire Entity has made available to the Alliance Members correct and complete copies of their respective organization and governance documents.

2.2. Authorization of the Documents. The execution, delivery and performance of each of the Documents to which they are a party and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action, or, in the case of Clearwire Equipment, all requisite limited liability company action on the part of each of the Clearwire Entities, and each of the Documents to which they are a party constitutes a legal, valid and binding obligation of such Clearwire Entity enforceable against such Clearwire Entity, in accordance with its terms, except to the extent that enforceability may be limited by bankruptcy, insolvency or other similar laws affecting creditors' rights generally. The execution, delivery and performance of each of the Documents to which the Existing Stockholders (as defined in Section 9.2(b)) are party constitutes a legal, valid and binding obligation of each of the Existing Stockholders, enforceable against each of the Existing Stockholders in accordance with its terms, except to the extent that enforceability may be limited by bankruptcy, insolvency or other similar laws affecting creditors' rights generally. The Assignment Agreement, a true and complete copy of which has been provided to each of the Alliance Members and which is attached as Exhibit G, has been duly and validly executed and delivered by CTI and Clearwire Equipment. The execution, delivery and performance of the Assignment Agreement, and the consummation of the transactions contemplated thereby have been duly authorized by all requisite corporate action on the part of CTI and by all necessary limited liability company action on the part of Clearwire Equipment, and the Assignment Agreement constitutes a legal, valid and binding obligation of both CTI and Clearwire Equipment enforceable against both CTI and

Clearwire Equipment, respectively, in accordance with its terms, except to the extent that enforceability may be limited by bankruptcy, insolvency or other similar laws affecting creditors' rights generally.

2.3. Capitalization.

(a) The capitalization of the Corporation consists of, and immediately prior to the Closing and immediately prior to the transactions contemplated by the Purchase Agreement, but after giving effect to the conversion of the convertible notes and after giving effect to the SpectrumLink Merger (as defined in the Purchase Agreement), will consist of:

(i) Preferred Stock. 1,000,000,000 shares of Preferred Stock are authorized (of which 500,000,000 shares will be designated Series A Preferred Stock prior to the Closing and 500,000,000 shares will be designated Series B Preferred Stock prior to the Closing) none of which shares of Series A Preferred Stock are outstanding.

(ii) Common Stock. 1,500,000,000 shares of Common Stock are authorized, of which (A) 129,780,255 shares of Common Stock are outstanding, of which all but 42,276,580 have the right to be converted into Series A Preferred Stock at the Closing and all such shares have been validly issued and are fully paid and nonassessable, with no personal liability attaching to the ownership thereof and free and clear of all Encumbrances (except for the shares pledged pursuant to the SpectrumLink Merger Agreement) (B) 126,410,000 shares are authorized for issuance pursuant to the Clearwire Holdings Inc. Long Term Incentive Plan, 5,287,490 shares of Common Stock have been duly reserved for issuance upon the exercise of certain options granted to persons which options have the exercise price as set forth in Schedule 2.3(a) ("Existing Options") and (C) 48,089,454 shares of Common Stock have been duly reserved for issuance upon the exercise of certain options to be granted to James Mansour and Leo Cyr contemporaneously with the Closing ("Management Options").

(b) Immediately following the Closing, after giving effect to the Series A Purchase (as defined in the Preferred Stock Purchase Agreement (the "Purchase Agreement"), dated as of March 13, 2001, by and among the Corporation, CTI, and the parties thereto), the STI Conversion, the conversion of the JMM Debt, the conversion of the Shareholder Debt and the transactions contemplated in the Purchase Agreement, the capitalization of the Corporation will be as set forth in Section 2.3(a), except that (i) 335,132,204 shares of Series A Preferred Stock will be issued and outstanding; (ii) 42,276,580 shares of Common Stock will be issued and outstanding; (iii) 53,376,944 shares of Common Stock will be reserved for issuance upon exercise of Existing Options and Management Options as set forth in Section 2.3(a)(ii); and (iv) 335,132,204 shares of Common Stock will be reserved for issuance of the Series A Conversion Shares.

Except as set forth above, there will be no equity securities of the Corporation outstanding immediately following the Closing. Schedule 2.3(a) contains a list of (i) all holders of record of capital stock of the Corporation, including the number of shares of capital stock held by each such holder, as well as the number of shares of Series

A Preferred Stock to be issued to the Alliance Members and (ii) all outstanding warrants, options, agreements, convertible securities or other commitments pursuant to which the Corporation is or may become obligated to issue any shares of the capital stock or other securities of the Corporation, which names all persons entitled of record to receive such shares or other securities, the shares of capital stock or other securities required to be issued thereunder as of the date hereof and the price per share, if any, payable with respect to the issuance of any share of capital stock issuable thereunder. Except as set forth on Schedule 2.3(b) and except with respect to the Alliance Members, the Existing Stockholders constitute all of the holders of record of capital stock of the Corporation as of the date hereof. Except as set forth on Schedule 2.3(b), and except with respect to the Alliance Members, as of the Closing Date there are no other beneficial owners of shares of capital stock who are not otherwise holders of record. Except as set forth on Schedule 2.3(b) or as contemplated by the Documents or this Agreement, there are, and immediately after the Closing, there will be, no rights, including preemptive or similar rights, to purchase or otherwise acquire shares or sell or otherwise transfer shares of the capital stock of the Corporation pursuant to any provision of law, the Certificate of Incorporation, the amended and restated by-laws of the Corporation (the "By-Laws") or any agreement to which the Corporation is a party; and, except as set forth on Schedule 2.3(b) or as contemplated by the Documents, the Corporation is not a party to, and to the best knowledge of the Corporation, there are, and immediately after the Closing, there will be, no agreement, restriction or encumbrance (such as a right of first refusal, right of first offer, proxy, voting agreement, voting trust, registration rights agreement, stockholders' agreement, etc., whether or not the Corporation is a party thereto) with respect to the purchase, sale or voting of any shares of capital stock of the Corporation (whether outstanding or issuable upon conversion or exercise of outstanding securities). Except as set forth on Schedule 2.3(b) or as contemplated by the Documents and the Certificate of Incorporation, or except for a stockholder's right under Delaware law to vote its shares of Common Stock for the election of directors, no person has the right to nominate or elect one or more directors of the Corporation.

2.4. Subsidiaries. (a) Except with respect to the Class B, Class C, Class D, Class E, and Class F Membership Interests in Clearwire Equipment held by certain of the Existing Stockholders and certain other parties, all as set forth in Schedule 2.4, which were distributed prior to the closing of the agreement by and between CT Acquisition Corp. and the Corporation, in which CT Acquisition Corp. merged with, and into, the Corporation (the "HoldCo Merger"), the Corporation holds of record and owns all of the equity interests of Clearwire Equipment, all of which such equity interests have been validly issued and are all outstanding, fully paid and nonassessable with no personal liability attaching to the ownership thereof, free of any Encumbrances. Except as set forth on Schedule 2.4, as of the Closing there will be no outstanding warrants, options, agreements, convertible securities, or other commitments pursuant to which Clearwire Equipment is or may become obligated to issue any interests or other securities of Clearwire Equipment. In addition, there are no rights, including preemptive or similar rights, to purchase or otherwise acquire equity interests or other securities or sell or otherwise transfer the equity interests or other securities of Clearwire Equipment pursuant to any provision of law, the certificates of incorporation or by-laws or similar organizational document of any of the Clearwire Entities or any agreement to which any

of the Clearwire Entities is a party; and, except as contemplated by the Documents, none of the Clearwire Entities is a party to, and to the best knowledge of the Corporation and CTI, there are not, and immediately after the Closing, there will not be, any agreements, restrictions or Encumbrances (such as a right of first refusal, right of first offer, proxy, voting agreement, voting trust, registration rights agreement, stockholders' agreement, etc., whether or not any of the Clearwire Entities is a party thereto) with respect to the purchase, sale or voting of any equity interests of Clearwire Equipment.

(b) Except as set forth in Schedule 2.4, (i) the Corporation owns all of the outstanding shares of capital stock (or other ownership interests having by their terms ordinary voting power to elect directors or others performing similar functions with respect to such Subsidiary) of each of the Corporation's Subsidiaries, and (ii) each of the outstanding shares of capital stock of each of the Corporation's Subsidiaries (and, in the case of outstanding ownership interests) is duly authorized, validly issued, fully paid and nonassessable, and is owned, directly or indirectly, by the Corporation free and clear of all liens, pledges, security interests, claims or other encumbrances ("Encumbrances"). Schedule 2.4 sets forth for each Subsidiary of the Corporation: (i) its name and jurisdiction of incorporation, organization or formation; (ii) its authorized capital stock or share capital, or, in the case of Clearwire Equipment, the authorized limited liability company interests; (iii) the number of issued and outstanding shares of capital stock and share capital, or, in the case of Clearwire Equipment, the issued and outstanding limited liability company interests; and (iv) the holder or holders of such shares, or, in the case of Clearwire Equipment, limited liability company interests. Except for interests in the Corporation's Subsidiaries, neither the Corporation nor any of its Subsidiaries owns directly or indirectly any interest or investment (whether equity or debt) in any corporation, business, trust or other entity.

"Subsidiary" means, with respect to any person, any company, corporation, partnership, limited liability company or other entity (A) of which shares of capital stock or other ownership interests having ordinary voting power to elect a majority of the board of directors or other similar managing body of such company, corporation, partnership, limited liability company or other entity are at the time owned or controlled, directly or indirectly, by such person or (B) the management of which is otherwise controlled, directly or indirectly, through one or more intermediaries by such person.

2.5. Authorization and Issuance of Capital Stock. The authorization, offer, issuance, sale and delivery of the Series A Preferred Stock pursuant to this Agreement and the authorization, reservation, issuance, sale and delivery of the Series A Conversion Shares, in each case, have been duly authorized by all requisite corporate action on the part of the Corporation, and when issued, sold and delivered in accordance with this Agreement, the Series A Preferred Stock will be, and when issued and delivered in accordance with the Certificate of Incorporation, the Series A Conversion Shares will be, validly issued and outstanding, fully paid and nonassessable with no personal liability attaching to the ownership thereof, free of any Encumbrances and not subject to preemptive or similar rights of the stockholders of the Corporation or others. The terms, designations, powers, preferences and relative, participating, optional and other special

rights, and the qualifications, limitations and restrictions, of the Series A Preferred Stock are as stated in the Certificate of Incorporation.

2.6. Financial Statements. The Corporation has provided to the Alliance Members (a) the balance sheets of CTI at December 31, 1998 and December 31, 1999, and the related statements of income, retained earnings and cash flows for the fiscal years ended December 31, 1998 and December 31, 1999 (each an "Audited Financial Statement", and collectively the "Audited Financial Statements"), (b) the unaudited balance sheet of CTI as of December 31, 2000 and the related unaudited statements of income, changes in stockholder equity, retained earnings and cash flows for the fiscal year ended December 31, 2000 (together with the Audited Financial Statements, the "Financial Statements") and (c) the Deloitte Opinion. The Financial Statements (i) are in accord with the books and records of CTI, (ii) have been prepared in accordance with GAAP consistently applied (except that the Financial Statements as of December 31, 2000 and for the period then ended do not contain all of the footnotes required under GAAP), (iii) are complete and correct in all material respects (iv) fairly present, in all material respects, the financial condition, results of operations changes in stockholder equity, and cash flows of CTI as of the respective dates and for the respective periods indicated therein. Each Clearwire Entity maintains and will continue to maintain accounting methods, practices and procedures and accounting systems and controls that permit financial statements to be prepared in accordance with GAAP. The books and records of each of the Clearwire Entities are in all material respects correct and complete, are maintained in accordance with good business practice and all applicable Laws, and accurately present and reflect in all material respects all of the transactions that are or should be therein described.

2.7. Absence of Undisclosed Liabilities. Except as disclosed on Schedule 2.7, no Clearwire Entity has any liabilities or obligations (whether accrued, absolute, contingent, unliquidated or otherwise, whether due or to become due) other than (a) liabilities or obligations reserved against or otherwise disclosed in the Financial Statements, (b) liabilities or obligations arising since December 31, 2000 which were incurred in the ordinary course of business consistent (in amount and kind) with past practice (none of which is a liability resulting from breach of Contract, breach of warranty, tort, infringement claim or lawsuit or violation of Law or Order) and which do not, individually or in the aggregate, exceed $50,000, and (c) liabilities and obligations that individually or in the aggregate would not have a Material Adverse Effect.

2.8. Absence of Changes. Except as set forth on Schedule 2.8 and except for the execution and delivery of the Documents and the transactions contemplated hereby and thereby, or referred to herein or therein, since December 31, 2000, the Clearwire Entities have conducted their businesses in the ordinary course, consistent with past practice, and there has not been (a) any material adverse change having, or any event or condition which has had, or could reasonably be expected to have, a material adverse effect on the business, operations, properties, assets, condition (financial or other), prospects or results of operations of the Clearwire Entities taken as a whole (a "Material Adverse Effect"), (b) any waiver of any valuable right of any Clearwire Entity, the cancellation of any valuable right of any Clearwire Entity, or the cancellation of any

material debt or claim held by any Clearwire Entity, (c) any payment or declaration of dividends on, or other distribution with respect to, or any direct or indirect redemption or acquisition of, any securities of any Clearwire Entity, (d) any issuance of any stock, bonds or other securities of any Clearwire Entity other than pursuant to the exercise of the previously outstanding options set forth on Schedule 2.8, (e) any sale, assignment or transfer of any tangible or intangible assets of any Clearwire Entity, except (i) in the ordinary course of business, and (ii) assets for which the book value does not exceed $10,000 and which are not, individually or in the aggregate, material, (f) any loan by any Clearwire Entity to any officer, director, employee, consultant or shareholder of any Clearwire Entity (other than advances to such persons in the ordinary course of business in connection with travel and travel related expenses), (g) any damage, destruction or loss (whether or not covered by insurance) materially and adversely affecting the assets, property, financial condition or results of operations of any Clearwire Entity, (h) any increase, direct or indirect, in the compensation paid or payable to any officer or director of any Clearwire Entity, or, other than in the ordinary course of business, to any other employee, consultant or agent of any Clearwire Entity, (i) any change in the accounting or Tax methods, practices or policies or in any Tax election of any Clearwire Entity (j) any indebtedness incurred for borrowed money other than in the ordinary course of business or other than pursuant to an agreement set forth on Schedule 2.10 to this Agreement, (k) any amendment to or termination of any material agreement to which any Clearwire Entity is a party (other than amendments to or terminations of agreements pursuant to or contemplated by this Agreement), (l) any material adverse change with respect to the regulation of any Clearwire Entity or its products by any administrative agency or governmental body, (m) any material change in the manner of business or operations of any Clearwire Entity, (n) any transaction except in the ordinary course of business or as otherwise contemplated hereby, (o) any distribution by Clearwire pursuant to Section 9.01 of the Amended and Restated Limited Liability Company Agreement of Clearwire Equipment, dated as of March 1, 2001, or (p) any agreement or commitment (contingent or otherwise) to do any of the foregoing.

2.9. No Conflict. The (x) execution, delivery and performance by the Corporation and the Existing Stockholders of the Documents and the consummation by the Corporation and the Existing Stockholders of the transactions contemplated hereby and thereby, including the issuance, sale and delivery by the Corporation of the Series A Preferred Stock, and the issuance and delivery of the Series A Conversion Shares in accordance with the Certificate of Incorporation by the Corporation (y) the execution, delivery and performance by the Corporation, SpectrumLink Networks, Inc. and SN Acquisition Corp (the "HoldCo Constituent Companies") and the consummation by the HoldCo Constituent Companies of the transactions contemplated by the Agreement and Plan of Merger dated as of March 12, 2001 by and among the HoldCo Constituent Companies, and (z) the execution, delivery and performance by SpectrumLink Networks, Inc. and SN Acquisition Corp. and the consummation by SpectrumLink Networks, Inc. and SN Acquisition Corp. of the transactions contemplated by the Plan of Merger dated as of March 1, 2001 by and among Clearwire, SpectrumLink Networks, Inc. and SN Acquisition Corp. (the "SpectrumLink Merger Agreement") did not (a) violate any provision of law, statute, rule or regulation, or any ruling, writ, injunction, order, judgment or decree of any court, administrative agency or other governmental body

("Law"), or any ruling, writ, injunction, order, judgment or decree of any court, administrative agency or other governmental body ("Orders") applicable to any of the Clearwire Entities, or any of their properties or assets, (b) conflict with or result in any breach of any of the terms, conditions or provisions of, or constitute (with due notice or lapse of time, or both) a default (or give rise to any right of termination, cancellation or acceleration) under, or result in the creation of any Encumbrance upon any of the properties or assets of the Corporation under, any Contract required to be set forth on Schedule 2.10 hereto or (c) violate the Certificate of Incorporation, the By-Laws or similar organizational document of any of the Clearwire Entities.

2.10. Agreements. (a) Except as set forth on Schedule 2.10 hereto, no Clearwire Entity is a party to any indenture, mortgage, guaranty, lease, license or other contract, agreement or understanding, written or oral (a "Contract") other than any Contract which (i) pursuant to its terms, has expired, been terminated or fully performed by the parties, and in each case, under which no Clearwire Entity has any liability, contingent or otherwise or (ii) involves annual aggregate payments to or from such Clearwire Entity of $200,000 or less (as opposed to an indemnity agreement or similar contract under which a Clearwire Entity has any contingent liability), and in each case, is not material to the business or financial condition of such Clearwire Entity.

(b) Complete copies (or, if oral, full written descriptions) of all Contracts required to be listed on Schedule 2.10 hereto, including all amendments thereto, have been delivered to the Alliance Members. Each of the Contracts is, as of the date hereof, and will continue to be after the Closing, a legal, valid and binding obligation of, enforceable against, and in full force and effect against, the Clearwire Entity thereto and, to the best knowledge of the Corporation, the other parties thereto. Except as set forth on Schedule 2.10 hereto, (i) there is no breach, violation or default by any Clearwire Entity and no event which, with notice or lapse of time or both, would (A) constitute a material breach, violation or default by such Clearwire Entity under any Contract required to be listed on Schedule 2.10 or (B) give rise to any lien or right of termination, modification, cancellation, prepayment, suspension, limitation, revocation or acceleration against such Clearwire Entity under any such Contract, and (ii) to the best knowledge of the Corporation and CTI, no other party to any of such Contracts is in arrears in any material matter in respect of the performance or satisfaction of the terms and conditions on its part to be performed or satisfied under any of such Contracts, no waiver or indulgence has been granted by any of the parties thereto and no party to any of such Contracts has repudiated any provision thereof.

2.11. Intellectual Property Matters. The term "Intellectual Property Rights" shall mean (a) all inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereon, and all patents, patent applications and patent disclosures, together with all reissues, continuations, continuations-in-part, revisions, divisions, extensions and reexaminations thereof, (b) all trademarks, service marks, trade dress, logos, trade names, domain names and corporate names, together with all translations, adaptations, derivations, and combinations thereof, and including all goodwill associated therewith, and all applications, registrations and renewals in connection therewith, (c) all copyrightable works, all copyrights, and all applications,

registrations and renewals in connection therewith, (d) all mask works and all applications, registrations and renewals in connection therewith, (e) all trade secrets and confidential business information (including but not limited to research and development, know-how, formulas, compositions, manufacturing and production processes and techniques, methods, schematics, technology, flowcharts, block diagrams, technical data, designs, drawings, specifications, customer and supplier lists, pricing and cost information and business and marketing plans and proposals), (f) all computer software in whatever form (including data and related documentation), (g) all copies and tangible embodiments of any of the foregoing (in whatever form or medium) and (h) all licenses, sublicenses, permissions or Contracts in connection with any of the foregoing. The term "Corporation Intellectual Property" shall mean all Intellectual Property Rights which are used in connection with the conduct of the business of the Clearwire Entities as currently conducted or currently contemplated to be conducted.

Each item of Corporation Intellectual Property which is: (a) a registered patent or pending application therefor; (b) a registered trademark, service mark or domain name or pending application therefor, or constitutes a trade dress, logo, trade name or corporate name; (c) a registered copyright or maskwork or pending application therefor; (d) licensed or sublicensed or is subject to an agreement or permission to use from a third party; or (e) licensed or sublicensed or is subject to an agreement or permission to use to a third party; is set forth on Schedule 2.11, parts (a) through (e), and the Corporation has delivered to the Investors correct and complete copies of all written documentation evidencing ownership and prosecution of, or rights arising from, each item identified in Schedule 2.11. Except as noted and set forth on Schedule 2.11, to Clearwire's knowledge:

(a) the Clearwire Entities either (i) are the sole and exclusive owners of, with all right, title and interest in and to (free and clear of any Encumbrances) all Corporation Intellectual Property (including but not limited to the Intellectual Property Rights set forth on Schedule 2.11), or (ii) have rights to the use of all Corporation Intellectual Property pursuant to license, sublicense or other Contract (and is not contractually obligated to pay any compensation or grant any rights to any third party in respect thereof);

(b) the Clearwire Entities have the right to require the applicant, inventor, or author of any Corporation Intellectual Property which constitutes an application for registration, including, but not limited to, all patent applications, trademark applications, service mark applications, copyright applications and mask work applications, to transfer ownership, including all right, title and interest in and to (including any moral rights) to the Corporation of the application and of the registration once it issues;

(c) all Corporation Intellectual Property which are registrations, including, but not limited to, all issued patents, trademarks, service marks, copyrights and mask works, are valid and subsisting and in full force and effect;

(d) no claims have been asserted or threatened by any person, nor is the Corporation or CTI aware of any basis for any claims challenging the ownership, legality, use, validity, enforceability or effectiveness of any of the Corporation Intellectual Property;

(e) neither the Corporation nor CTI has any knowledge of any third party interfering with, infringing upon, misappropriating, or using without authorization any Corporation Intellectual Property, and no employee or former employee of any Clearwire Entity, has interfered with, infringed upon, misappropriated, used without authorization, or otherwise come into conflict with any Corporation Intellectual Property;

(f) the Clearwire Entities have not infringed on, interfered with, misappropriated or otherwise come in conflict with, and the continued operation of the business of the Clearwire Entities as currently conducted and as currently contemplated to be conducted, will not infringe on, interfere with, misappropriate or otherwise come into conflict with, any Intellectual Property Right of any other person, and no such claim, complaint, charge, demand or notice has been asserted or has been threatened by any person (including any claim that the Clearwire Entities must license or refrain from using any Intellectual Property Rights of any third party) nor is the Corporation or CTI aware of any basis for any claims therefor;

(g) the Clearwire Entities have not granted any licenses to or other rights in Corporation Intellectual Property to any person;

(h) the Corporation Intellectual Property are all the Intellectual Property Rights that are necessary for the ownership and unencumbered maintenance and operation of the properties, assets, and business of the Clearwire Entities as currently conducted or currently contemplated to be conducted;

(i) the execution, delivery and performance by the Clearwire Entities of the Documents to which they are a party and the consummation of the transactions contemplated hereby and thereby will not alter, impair, diminish or result in the loss of any rights or interests of the Clearwire Entities in any Corporation Intellectual Property and all such Corporation Intellectual Property will be owned or available for use by the Clearwire Entities on identical terms and conditions immediately subsequent to the Closing;

(j) none of the Corporation Intellectual Property is subject to any outstanding Order or Contract restricting in any manner the use or licensing thereof by the Clearwire Entities;

(k) the Clearwire Entities have taken all necessary action to maintain and protect each item of Corporation Intellectual Property;

(l) the Clearwire Entities have the right to use all of the Corporation Intellectual Property in all jurisdictions in which the Clearwire Entities have conducted, conducts, and currently contemplates conducting their business;

(m) the Clearwire Entities have not entered into any Contract to indemnify any other person for or against any charge of infringement or misappropriation of, or interference or conflict with respect to, any of the Corporation Intellectual Property; and

(n) there are no Contracts in effect with third parties for the conversion, modifications or enhancements of computer software.

2.12. Corporate Minute Books. The corporate records of the Clearwire Entities (and in the case of Clearwire Equipment, the limited liability company records) are true and complete and accurately reflect all meetings of and resolutions of, or written consents by, the stockholders or board of directors (or committee thereof) since the day of corporate organization (and with respect to Clearwire Equipment all meetings of and resolutions of, or written consents by, the members or managers since the day of formation). The Clearwire Entities have previously furnished to the Alliance Members true and correct copies of all minutes of meetings or other actions by the directors, stockholders, members, managers or incorporators of the Clearwire Entities since their respective inception.

2.13. Personal Property; Real Property. (a) Except as set forth on Schedule 2.13(a), each Clearwire Entity has good and marketable title to all of its assets and properties, free and clear of any Encumbrances except (i) Encumbrances for taxes not yet due and payable; (ii) Encumbrances for taxes and charges and other claims, the validity of which such Clearwire Entity is contesting in good faith in appropriate proceedings, all of which, in the case of such Encumbrances on the assets and properties of the Clearwire Entity, are disclosed in Schedule 2.13(a); or (iii) Encumbrances that arise in the ordinary course of business and do not materially impair such Clearwire Entity's ownership, use of any such asset or property or such Clearwire Entity's ability to obtain financing by using such assets or property as collateral (Encumbrances referenced in clauses (i), (ii) and (iii), collectively referred to as "Permitted Encumbrances") and (iv) Encumbrances listed on Schedule 2.13(a). The assets and properties owned by, or leased to, each Clearwire Entity are sufficient for the conduct of the business and operation of such Clearwire Entity as presently conducted.

(b) None of the Clearwire Entities nor any predecessors of any Clearwire Entity, directly or indirectly, owns or has ever owned any real property. Schedule 2.13(b) hereto sets forth all of the real property presently leased by the Clearwire Entities (the "Leased Real Property"). The Clearwire Entities have good, clean record and marketable title to enforceable leasehold interests in the Leased Real Property, free and clear of all Encumbrances except for Permitted Encumbrances. The Corporation has furnished to the Alliance Members true and complete copies of all of the leases of the Leased Real Property. Each of said leases has been duly authorized and executed by the Clearwire Entity which is a party to it, and is in full force and effect. None of the Clearwire Entities is in default under any of said leases, nor has any event occurred which, with notice or the passage of time, or both, could be reasonably expected to give rise to an event of default. With respect to each lease of Leased Real Property to which any Clearwire Entity is a party, so long as the applicable Clearwire Entity performs all of

its obligations under such lease for Leased Real Property within applicable notice and grace periods, (i) the rights of such Clearwire Entity under such lease shall not be terminated and (ii) such Clearwire Entity's possession of such Leased Real Property and the use and enjoyment thereof shall not be disturbed by any landlord, overlandlord, mortgagee or other superior party. Except as set forth on the Schedule 2.13(b), no Clearwire Entity is obligated to purchase any Leased Real Property and no Leased Real Property is required to be accounted for under GAAP as a capitalized lease.

2.14. Environmental Protections. To Clearwire's knowledge, each Clearwire Entity is in material compliance with all applicable Environmental Laws. To Clearwire's knowledge, the Clearwire Entities have not caused, arranged or allowed, or contracted with any party for, the transportation, treatment, storage or disposal of any Hazardous Substance in connection with the operation of their business or otherwise. To Clearwire's knowledge, no Hazardous Substance has been released into the environment on or from the Leased Real Property which is required under applicable Environmental Laws, to be abated or remediated by any Clearwire Entity. To Clearwire's knowledge, there are no past or present conditions, events, circumstances, facts, activities, practices, incidents, actions, omissions, or plans that can reasonably be expected to form the basis of any claim, action, suit, proceeding, hearing, investigation, or inquiry against or involving any Clearwire Entity allegedly or actually based on or related to any violation of any Environmental Law or that is reasonably likely to require any Clearwire Entity to incur any Losses in connection therewith. For purposes of this Agreement, the term "Environmental Laws" shall mean any federal, state or local law, ordinance, rule or regulation, in effect and as amended as of the date of this Agreement, relating to human health, employee safety or the protection of the environment, including the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. § 9601 et seq., the Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. § 11001, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq., and the Occupational Health and Safety Act 29 U.S.C. § 641 et seq. For purposes of this Agreement, the term "Hazardous Substances" shall include all substances, products or materials (including asbestos-containing materials, petroleum or any by-products thereof) classified as hazardous or toxic under any Environmental Laws.

2.15. Employee Benefit Plans. (a) Schedule 2.15 hereto contains a true and complete list of (i) each plan, program, policy, payroll practice, or other Contract providing for compensation, severance, termination pay, performance awards, stock or stock-related awards, fringe benefits or other material employee benefits of any kind, whether formal or informal, funded or unfunded, written or oral and whether or not legally binding, which is now or previously has been sponsored, maintained, contributed to or required to be contributed to by any Clearwire Entity or pursuant to which any Clearwire Entity has any liability, contingent or otherwise, including, but not limited to, any "employee benefit plan" within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") (each a "Benefit Plan"); (ii) each management, bonus, option, equity (or equity related), severance, non-compete, confidentiality or similar agreement or contract between the Corporation and any current, former or retired employee, officer, consultant, independent contractor, agent or director of any Clearwire Entity (an "Employee"); and (iii) each employment or consulting

Contract between any Clearwire Entity and an Employee; provided, however, that for scheduling purposes only, the only Employee Agreements required to be listed pursuant to clause (iii) shall be those Employee Agreements between any Clearwire Entity and an Employee who earns annual compensation in excess of $50,000 (each agreement in clauses (ii) and (iii), an "Employee Agreement"). None of the Clearwire Entities currently sponsors, maintains, contributes to, nor is required to contribute to, nor has any Clearwire Entity ever sponsored, maintained, contributed to or been required to contribute to, or incurred or could incur any liability to, (i) any "defined benefit plan" (as defined in ERISA Section 3(35)); (ii) any "multiemployer plan" (as defined in ERISA Section 3(37)) or (iii) any Benefit Plan which provides, or has any liability to provide, life insurance, medical, severance or other employee welfare benefits to any Employee upon his or her retirement or termination of employment, except as required by Section 4980B of the Internal Revenue Code of 1986, as amended (the "Code"). Except as set forth on Schedule 2.15, none of the Clearwire Entities has any plan or commitment, whether legally binding or not, (i) to establish any new Benefit Plan, or to modify or terminate any Benefit Plan or (ii) to enter into, modify or terminate any Employee Agreement with any Employee who earns more than $50,000 annually.

(b) Except as otherwise provided on Schedule 2.15 hereto, none of the Clearwire Entities is or ever has been (i) a member of a "controlled group of corporations," under "common control" or a member of an "affiliated service group" within the meaning of Sections 414(b), (c) or (m) of the Code, (ii) required to be aggregated under Section 414(o) of the Code, or (iii) under "common control," within the meaning of Section 4001(a)(14) of ERISA, or any regulations promulgated or proposed under any of the foregoing Sections, in each case with any entity other than a Clearwire Entity.

(c) The Corporation has made available to the Alliance Members current, accurate and complete copies of all documents embodying or relating to each Benefit Plan and each Employee Agreement, including all amendments thereto, interpretations thereof, trust or funding agreements relating thereto (if any), the two most recent annual reports (Series 5500 and related schedules) required under ERISA (if any), the most recent determination letter received from the IRS (if any), the most recent summary plan description (with all material modifications) (if any), and all material communications to any Employee or Employees relating to any Benefit Plan or Employee Agreement required to be listed on Schedule 2.15.

(d) Each Benefit Plan has been established and maintained in accordance with its terms and in compliance in all material respects with all applicable, laws, statutes, orders, rules and regulations, including but not limited to ERISA and the Code, and each Benefit Plan intended to qualify under Section 401 of the Code is, and since its inception has been, so qualified.

(e) No "prohibited transaction," within the meaning of Section 4975 of the Code or Section 406 of ERISA, has occurred with respect to any Benefit Plan. There are no actions, proceedings, arbitrations, suits or claims pending, or to the best knowledge of the Corporation and CTI, threatened or anticipated (other than routine

claims for benefits) with respect to any Benefit Plan or Employee Agreement. No Employee has been hired by any of the Clearwire Entities in violation of any restrictive covenant or any non-compete agreement with any other person. Each Benefit Plan can be amended, terminated or otherwise discontinued without liability to any Clearwire Entity. No liability under any Benefit Plan has been funded nor has any such obligation been satisfied with the purchase of a contract from an insurance company as to which the Corporation or CTI has received notice that such insurance company is insolvent or is in rehabilitation or any similar proceeding. No Benefit Plan is under audit or investigation by the Internal Revenue Service, the Department of Labor or the Pension Benefit Guarantee Corporation, and, to the knowledge of the Corporation and CTI, no such audit or investigation is pending or has been threatened. With respect to each Benefit Plan which is an employee welfare benefit plan (within the meaning of Section 3(1) of ERISA), all claims incurred by any Clearwire Entity are (i) insured pursuant to a contract of insurance whereby the insurance company bears any risk of loss with respect to such claims; (ii) covered under a contract with a health maintenance organization (an "<u>HMO</u>") pursuant to which the HMO bears the liability for claims, or (iii) reflected as a liability or accrued for on the Financial Statements.

(f) The execution and performance by the Clearwire Entities of the transactions contemplated by the Documents to which they are a party will not (either alone or upon the occurrence of any additional or subsequent events) (i) constitute an event under any Benefit Plan or Employee Agreement that will or may result in any payment (whether of severance pay or otherwise), acceleration, forgiveness of indebtedness, vesting, distribution, increase in benefits or obligations to fund benefits with respect to any Employee or (ii) result in the triggering or imposition of any restrictions or limitations on the right of any Clearwire Entity to amend or terminate any Benefit Plan and receive the full amount of any excess assets remaining or resulting from such amendment or termination. No payment or benefit which will or may be made by any Clearwire Entity or any of their respective affiliates with respect to any Employee may be characterized as an "excess parachute payment," within the meaning of Section 280G(b)(1) of the Code.

2.16. <u>Labor Relations; Employees</u>. Schedule 2.16 lists all employees of the Clearwire Entities with annual compensation in excess of $100,000. Except as set forth on Schedule 2.16, (a) the Clearwire Entities are not delinquent in payments to any of their employees, for any wages, salaries, commissions, bonuses or other direct compensation for any services performed by the date hereof or amounts required to be reimbursed by them to the date hereof, (b) the Clearwire Entities are in compliance in all material respects with all applicable federal, state and local laws, rules and regulations respecting employment, employment practices, labor, terms and conditions of employment and wages and hours, (c) the Clearwire Entities are not bound by or subject to (and none of their assets or properties are bound by or subject to) any written or oral, express or implied, commitment or arrangement with any labor union, or any collective bargaining agreement and no labor union has requested or, to the best knowledge of the Corporation, has sought to represent any of the employees, representatives or agents of any of the Clearwire Entities, (d) there is no labor strike, dispute, slowdown or stoppage actually pending, or, to the best knowledge of the Corporation and CTI, threatened against or

involving the Clearwire Entities, and (e) to the best Knowledge of the Corporation and CTI, no salaried key employee, including those employees whose names are set forth on Annex I hereto, has any present plans to terminate his or her employment with any of the Clearwire Entities. Each of the Existing Stockholders, who is an employee of any of Clearwire Entities, has executed a confidentiality agreement substantially in the form of Exhibit H (collectively, the "Employee Nondisclosure Agreements"), and such agreements are in full force and effect. Each officer, key employee, and each other employee or consultant of the Clearwire Entities has executed standard confidentiality agreements, which agreements are now in full force and effect. For purposes of this Section 2.16, "Knowledge" means the actual knowledge of those persons whose names are set forth on Annex I hereto.

2.17. Litigation. Except as set forth on Schedule 2.17, there is no civil, criminal or administrative action, suit, claim, notice, hearing, examination, inquiry, proceeding or investigation at law or in equity or by or before any court, arbitrator or similar panel, governmental instrumentality or other agency ("Litigation") now in progress or pending or, to the best knowledge of the Corporation and CTI, threatened against any Clearwire Entity or the assets (including the Intellectual Property Rights) or the business of any Clearwire Entity. No Clearwire Entity is subject to any order, writ, injunction or decree of any court of any federal, state, municipal or other domestic or foreign governmental department, commission, board, bureau, agency or instrumentality.

2.18. Compliance with Laws; Permits. Except as provided on Schedule 2.18, each Clearwire Entity (a) has complied in all respects with all federal, state, local and foreign laws, rules, ordinances, codes, consents, authorizations, registrations, regulations, decrees, directives, judgments and orders applicable to it and its business other than where noncompliance would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect and (b) has all federal, state, local and foreign governmental licenses, permits and qualifications necessary in the conduct of its business as currently conducted and to own and use its assets in the manner in which such assets are currently owned and used other than where the failure to possess such licenses, permits or qualifications would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, such licenses, permits and qualifications are in full force and effect, and no violations have been recorded in respect of any such licenses, permits and qualifications, and no proceeding is pending or, to the best knowledge of the Corporation and CTI, threatened to revoke or limit any such license, permit or qualification. Schedule 2.18 sets forth a list of all material licenses, permits and qualifications and the expiration dates thereof.

2.19. Commissions, Etc. Except as set forth on Schedule 2.19, no Clearwire Entity is a party to any Contract obligating such Clearwire Entity to pay commissions or fees to any party in connection with the issuance or sale of any shares of capital stock or other securities of such Clearwire Entity.

2.20. Offering Exemption. Assuming the accuracy of the representations and warranties made by the Alliance Members in Section 3, the offer and sale of the Series A Preferred Stock as contemplated hereby (including the STI Conversion and the

percentage conversion and exchange of the Convertible Notes, the JMM Debt and the Shareholder Debt, each as defined in the Preferred Stock Purchase Agreement, by and among Clearwire, CTI, and the parties thereto), the issuance and delivery of the Series A Conversion Shares to the Alliance Members upon the conversion of the Series A Preferred Stock in accordance with the terms of the Certificate of Incorporation, are each exempt from registration under the Securities Act of 1933, as amended (the "Securities Act") and under applicable state securities and "blue sky" laws, as currently in effect. All shares of capital stock and other securities issued by the Corporation prior to the Closing, including pursuant to the SpectrumLink Merger Agreement, have been issued in transactions exempt from registration under the Securities Act, and all applicable state securities or "blue sky" laws and the Corporation has not violated the Securities Act or any applicable state securities or "blue sky" laws in connection with the issuance of any shares of capital stock or other securities prior to the Closing. The Corporation has not offered any of its capital stock, or any other securities, for sale to, or solicited any offers to buy any of the foregoing from the Corporation, or otherwise approached or negotiated with any other person in respect thereof, in such a manner as to require registration under the Securities Act or any "blue sky" laws.

2.21. Related Party Transactions. (a) Schedule 2.21 sets forth all obligations and transactions (i) between any of the Clearwire Entities and any of the Clearwire Entities' affiliates, and (ii) between any of the Clearwire Entities and any of the officers, directors, equity holders or employees, or any of their affiliates or associates (each term as defined in the Securities Exchange Act of 1934, as amended (the "Exchange Act")) of any Clearwire Entity. Except as set forth on Schedule 2.21, no officer or director of the Corporation or person who owns at least ten (10%) percent of the outstanding equity of the Corporation (nor any parent, child or spouse of any of such persons, or any trust, partnership or corporation in which any of such persons has or has had an interest), has or has had, directly or indirectly, (i) any interest or involvement in any entity which furnished or sold, or furnishes or sells, services or products which any of the Clearwire Entities furnishes or sells, or proposes to furnish or sell or (ii) any interest or involvement in any entity which purchases from or sells or furnishes to, any of the Clearwire Entities, any goods or services; provided, that ownership of no more than one (1%) percent of the outstanding voting stock of a publicly traded corporation in and of itself shall not be deemed an interest in any entity for purposes of this Section 2.21.

(b) Each transaction set forth on Schedule 2.21 is on terms that are (i) consistent with past practice of the Corporation thereto and (ii) at least as favorable to the Corporation as would be available with independent third parties dealing at arm's length.

2.22. Taxes. (a) All of the Clearwire Entities have timely filed in accordance with all applicable Laws (taking into account valid extensions) all Tax Returns (as hereinafter defined) required to be filed by them, and all such Tax Returns are true, correct and complete in all material respects. All Taxes (as hereinafter defined) which are due and payable by any of the Corporation and CTI, including any Taxes levied upon any of their properties, assets, income or franchises, have been timely paid. All amounts required to be collected or withheld by any of the Clearwire Entities have been collected