# Exhibit C

## Part 2

or withheld and any such amounts that are required to be remitted to any taxing authority have been duly and timely remitted by the appropriate Clearwire Entity. No examination, claim, assessment, deficiency or other Litigation is pending or, to the best knowledge of any of the Clearwire Entities, threatened, with regard to any Taxes or Tax Returns of any of the Clearwire Entities. None of the Clearwire Entities is (nor have any of them ever been) a party to or bound by any Tax sharing, Tax indemnity or Tax allocation or similar Contract, including with respect to the May 29, 1998 spin-off of the stock of CTI by Sierra Technologies, Inc. (the "Spin-off") or otherwise. The Spin-off was tax free under Section 355 of the Code, and none of the Clearwire Entities has any liability with respect thereto. True and complete copies of all Tax Returns that have been filed by all of the Clearwire Entities have been delivered or made available to the Alliance Members.

(b) Except as set forth on Schedule 2.22(b) and prior to the closing of the HoldCo Merger, for federal income tax purposes, CTI had made a timely and valid election to be treated as an "S Corporation" under Section 1361(a) of the Code and the Treasury Regulations promulgated thereunder effective on May 29, 1998, and was so classified for state and local income tax purposes pursuant to analogous state or local provisions in the jurisdictions and effective on the dates set forth on Schedule 2.22(b). Except as set forth on Schedule 2.22(b), CTI has maintained its status as a "small business corporation" within the meaning of Section 1361(b) of the Code, and any analogous provision of state or local law in any jurisdiction listed in Schedule 2.22(b). Except as set forth on Schedule 2.22(b), and prior to the closing of the HoldCo Merger, at no time since electing to be treated as an "S Corporation" has such election been terminated or revoked pursuant to Section 1362 of the Code, or any analogous provision of state or local law in any jurisdiction listed in Schedule 2.22(b). Except as set forth on Schedule 2.22(b) and prior to the closing of the HoldCo Merger, CTI has never been taxed other than as an "S Corporation" for federal income tax purposes and for state and local income tax purposes in those jurisdictions set forth above. For federal tax income tax purposes, Clearwire Equipment is classified as a partnership.

(c) No taxing authority in a jurisdiction where any of the Clearwire Entities do not file Tax Returns has made a claim or asserted that such Clearwire Entity (or the stockholders or interest holders thereof) is or may be subject to taxation by such jurisdiction. Schedule 2.22(c) contains a list of states, territories and jurisdictions (whether foreign or domestic) in which any of the Clearwire Entities has filed a Tax Return for taxable periods ending on or after May 29, 1998.

(d) For purposes of this Agreement, "Tax" or "Taxes" means any taxes, assessment, duties, fees, levies, imposts, deductions, or withholdings, including income, gross receipts, ad valorem, value added, excise, real or personal property, asset, sales, use, license, payroll, transaction, capital, net worth and franchise taxes, estimated taxes, withholding, employment, social security, workers compensation, utility, severance, production, unemployment compensation, occupation, premium, windfall profits, transfer and gains taxes, or other governmental charges of any nature whatsoever, imposed by any taxing authority of any government or country or political subdivision of any country, and any liabilities with respect thereto, including any penalties, additions to tax, fines or interest thereon and includes any liability for Taxes of another person by

contract, as a transferee or successor, under Treasury Regulation 1.1502-6 or analogous state, local or foreign law provision or otherwise, and "Tax Return" means any report, return, statement, estimate, declaration, notice, form or other information required to be supplied to a taxing authority in connection with Taxes.

2.23. Consents. No permit, authorization, consent or approval of or by, or any notification of or filing (including any filing under the HSR Act) with any person (governmental or private) is required in connection with the execution, delivery and performance by the Clearwire Entities of the Documents to which they are a party or any documentation relating thereto, the consummation by the Corporation of the transactions contemplated hereby or thereby, or the issuance, sale or delivery of the Series A Preferred Stock and the Series A Conversion Shares.

2.24. Insurance. All of the assets of the Clearwire Entities that are of insurable character are covered by insurance with financially sound and reputable insurers against risks of liability, casualty and fire and other losses and liabilities customarily obtained to cover comparable businesses and assets in amounts, scope and coverage which are consistent with prudent industry practice. Schedule 2.24 sets forth any contract or arrangement, other than a policy of insurance, for the transfer or sharing of any risk by a Clearwire Entity. Schedule 2.24 sets forth a list of all insurance coverage carried by the Clearwire Entities, the carrier and the terms and amount of coverage. The Clearwire Entities are not in default in any material respect under any insurance policy maintained by them. All such policies and other instruments are in full force and effect and all premiums with respect thereto have been paid. The Clearwire Entities have not failed to give any notice or present any claim under any such insurance policy in due and timely fashion or as required by any of such insurance policies and, to the best knowledge of the Corporation and CTI, have not otherwise, through any act, omission or non-disclosure, jeopardized or impaired full recovery of any claim under such policies, and the Clearwire Entities have not made any claim against any insurance policy to which the insurer is denying coverage or defending the claim under a reservation of rights or similar clause. The Clearwire Entities have not received notice of any pending or threatened termination of any of insurance policies or any premium increases with respect to any of the Clearwire Entities insurance policies, and the consummation of the transactions contemplated by the Documents will not result in any such termination or premium increase.

2.25. Brokers. No Clearwire Entity or any of its respective officers, directors, employees or stockholders has employed any broker or finder in connection with the transactions with the Alliance Members contemplated by this Agreement.

2.26. Suppliers and Customers. Neither the Corporation nor Clearwire has any knowledge of any termination, cancellation or threatened termination or cancellation or limitation of, or any material modification or change in, or expressed material dissatisfaction with the business relationship between any Clearwire Entity and any supplier, vendor, customer or client of any Clearwire Entity of materials or services in an amount in excess of $25,000 per year.

2.27. Investment Banking Services. Except as set forth on Schedule 2.27, no Clearwire Entity is a party to any Contract which grants rights to any third party with respect to the performance of investment banking services for any Clearwire Entity, including, with respect to the sale of the corporation or a public offering, including an initial public offering, of securities of any Clearwire Entity.

2.28. Suitability. None of the following events has occurred during the last five years with respect to any director or officer of a Clearwire Entity: (a) a petition under federal bankruptcy or insolvency Laws was filed by or against, or a receiver, fiscal agent or similar officer was appointed for the business or property of such person; (b) such person was indicted for any crime, or was convicted in a criminal proceeding or is a named subject of a pending criminal proceeding; (c) such person is subject to an Order enjoining him from engaging in any kind of business practice, or any other activity in connection with the purchase or sale of securities, or to be associated with persons engaging in such activities; (d) such person has ever been denied any permit affecting the Clearwire Entity's or such person's ability to conduct any activity conducted by the Clearwire Entity; or (e) such person was found by a court of competent jurisdiction in a civil action or by a government agency to have violated any securities laws.

2.29. Use of Proceeds. Except as contemplated by this Agreement, no Clearwire Entity is required pursuant to any Contract or otherwise to apply the proceeds received from the Alliance Members pursuant to the transactions contemplated hereby in any specified manner including the repayment of any obligations of any Clearwire Entity or any "affiliate" or "associate" (as such terms are defined in Rule 12b-2 under the Exchange Act).

2.30. Disclosure. Neither this Agreement (including all exhibits, annexes, schedules or attachments hereto) nor any certificate, instrument or written statement furnished or made to any of the Alliance Members by or on behalf of any Clearwire Entity or an Existing Stockholder pursuant to or in connection with this Agreement (including all exhibits, annexes, schedules or attachments hereto) contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained herein and therein not misleading.

2.31. Contribution of Assets. All of the assets reflected on the balance sheet of Clearwire Equipment, dated as of December 31, 2000, delivered by the Corporation to the Alliance Members, are owned by Clearwire Equipment.

2.32. Closing Actions. Subject to the execution and delivery of the Documents, the Closing Actions have been completed.

SECTION 3. Representations and Warranties of Each Alliance Member.

Each of the Alliance Members, severally and not jointly, represents and warrants as to itself and not as to any other Alliance Member to Clearwire as of the date hereof as follows:

3.1. Securities Law Matters. (a) Such Alliance Member is acquiring the Series A Preferred Stock to be issued to it under this Agreement for its own account, for investment and not with a view to the distribution thereof within the meaning of the Securities Act.

(b) Such Alliance Member understands that (i) the Series A Preferred Stock has not been, and the Series A Conversion Shares will not be, registered under the Securities Act or any state securities laws, by reason of their issuance by Clearwire in a transaction exempt from the registration requirements thereof and (ii) the Series A Preferred Stock and the Series A Conversion Shares may not be sold unless such disposition is registered under the Securities Act and applicable state securities laws or is exempt from regulation thereunder.

(c) Such Alliance Member further understands that the exemption from registration afforded by Rule 144 promulgated under the Securities Act ("Rule 144") (the provisions of which are known to the Alliance Member) depends on the satisfaction of various conditions, and that, if applicable, Rule 144 may afford the basis for sales only in limited amounts.

(d) With the exception of ING Barings, such Alliance Member has not employed any broker or finder in connection with the transactions contemplated by this Agreement.

(e) Except as set forth on Schedule 3.1(e), such Alliance Member is an "Accredited Investor" (as defined in Rule 501(a) under the Securities Act).

3.2. Organization and Good Standing; Power and Authority; Qualifications. Such Alliance Member is a corporation duly organized, validly existing and in good standing under the Laws of the jurisdictions listed on Schedule 3.2. Such Alliance Member has all requisite power and authority to own, lease and operate its properties, to carry on its business as presently conducted and as proposed to be conducted. Such Alliance Member has all requisite corporate power and authority to enter into and carry out the transactions contemplated by the Documents. Such Alliance Member is duly qualified to transact business as a foreign corporation (or other foreign entity) in, and is in good standing under the laws of, those jurisdictions listed on Schedule 3.2 under its name, which jurisdictions constitute all of the jurisdictions wherein the character of the property owned or leased or the nature of the activities conducted by it makes such qualification necessary. Each Alliance Member has made available to Clearwire correct and complete copies of their respective organization and governance documents.

3.3. Authorization of the Documents. The execution, delivery and performance of each of the Documents and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of such Alliance Member, and each of the Documents constitutes a legal, valid and binding obligation of such Alliance Member enforceable against such Alliance Member, in accordance with its terms, except to the extent that enforceability may be limited by bankruptcy, insolvency or other similar laws affecting creditors' rights

generally and subject to the authority of the FCC to review the terms of the Individual Use Agreement under the FCC Rules and require revisions to these terms.

3.4. No Conflict. The execution, delivery and performance by such Alliance Member of the Documents and the consummation by such Alliance Member of the transactions contemplated hereby and thereby, will not (a) violate any Law, or any Order applicable to such Alliance Member, or any of their properties or assets, (b) if entered into in accordance with the terms hereof, conflict with or result in any breach of any of the terms, conditions or provisions of, or constitute (with due notice or lapse of time, or both) a default (or give rise to any right of termination, cancellation or acceleration) under, violate or result in the creation of any Encumbrance upon any of the properties or assets of such Alliance Member under, any of the Existing Agreements or any other agreement, or (c) violate the certificate of incorporation or the By-Laws or similar organizational document of any of the Alliance Members. Each Existing Agreement to which such Alliance Member is a party is set forth on Schedule 1.2. To the best knowledge of each Alliance Member, after reasonable investigation, interference consents granted by such Alliance Member with respect to Market Areas set forth on Schedule 1 and any amendment, modification or supplement thereto, whether written or oral, that would have a material impact on the use of the channels (and excluding routine consents customary in the industry) are set forth on Schedule 3.4.

3.5. Compliance with Laws. Except as provided on Schedule 3.5 and except with respect to the FCC Licenses, each Alliance Member (a) has complied in all respects with all federal, state, local and foreign laws, rules, ordinances, codes, consents, authorizations, registrations, regulations, decrees, directives, judgments and orders applicable to it and its business other than where noncompliance would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the business, operations, assets, condition (financial or other), prospects, or results of operations of Clearwire in any Market Area and (b) has all federal, state, local and foreign governmental licenses, permits and qualifications necessary in the conduct of its business as currently conducted other than where the failure to possess such licenses, permits or qualifications would not, individually or in the aggregate, reasonably be expected to have a material adverse effect, such licenses, permits and qualifications are in full force and effect, and no violations have been recorded in respect of any such licenses, permits and qualifications, and no proceeding is pending or, to the best knowledge of such Alliance Member threatened to revoke or limit any such license, permit or qualification. Schedule 3.5 sets forth a list of all licenses, permits and qualifications other than the FCC licenses, and items covered by Section 3.6, the loss of which would have a material adverse effect on the applicable Alliance Member.

3.6. FCC Matters. (a) Such Alliance Member holds, and is fully qualified in all respects to hold, the FCC Licenses set forth and described on Schedule 1. The FCC Licenses constitute all of the licenses, permits and authorizations from the FCC that are necessary or required for and/or used in the operations of the Alliance Members in the Market Areas. Except as otherwise disclosed on Schedule 3.6(a), the FCC Licenses are valid and in full force and effect through the dates set forth on Schedule 1. There is no condition imposed by the FCC as part of any FCC Licenses that is neither set forth on the

face thereof as issued by the FCC nor contained in the rules and regulations of the FCC applicable generally to stations of the type, nature, class or location of the stations. No application, action or proceeding is pending for the renewal or modification (excluding requests for extension of construction permits) of any of the FCC Licenses except as set forth in Schedule 3.6(a), and, except for actions or proceedings affecting ITFS facilities generally, no application, complaint served on such Alliance Member, action or proceeding known to the Alliance Member is pending or, to such Alliance Member's knowledge, threatened that could reasonably be expected to result in the (a) denial of an application for renewal, (b) the revocation, modification, non-renewal or suspension of any of the FCC Licenses, (c) the issuance of a cease-and-desist order, or (d) the imposition of any fines, forfeitures or other administrative or judicial sanctions.

(b) To such Alliance Member's knowledge, there is not now issued, outstanding or threatened any investigation, proceeding (other than proceedings of general applicability), notice of violation or material complaint against such Alliance Member at the FCC. Such Alliance Member does not have any knowledge of any person who has manifested an intent to contest the renewal of any FCC License.

(c) Except as set forth on Schedule 3.6(c), to such Alliance Member's knowledge such Alliance Member's licensed ITFS facilities are being operated, and such Alliance Member's operations and activities pursuant to any FCC License are being conducted, in compliance with the Communications Act, and in all material respects in compliance with the terms and conditions of the FCC Licenses applicable to them and with the rules and regulations of the FCC.

(d) Such Alliance Member has complied in all material respects with all requirements to file returns, reports and statements relating to each of such Alliance Member's licensed ITFS facilities currently required to be filed by such Alliance Member with the FCC and all such reports are complete and correct in all material respects.

3.7. Litigation. Except as set forth on Schedule 3.7 and except for any proceedings before the FCC, there is no civil, criminal or administrative action, suit, claim, notice, hearing, examination, inquiry, proceeding or investigation at law or in equity or by or before any court, arbitrator or similar panel, governmental instrumentality or other agency now in such progress or pending or, to the best knowledge of each Alliance Member, threatened against such Alliance Member or the assets or the business of such Alliance Member. Such Alliance Member is not subject to any order, writ, injunction or decree of any court of any federal, state, municipal or other domestic or foreign governmental department, commission, board, bureau, agency or instrumentality.

3.8. Permits. Other than such filings and approvals of the FCC with respect to Individual Use Agreements, no permit, authorization, consent or approval of or by, or any notification of or filing (including any filing under the HSR Act) with, any person (governmental or private) is required in connection with the execution, delivery and performance by any of the Alliance Members of the Documents to which it is a party or any documents relating thereto, the consummation by such Investor of the transactions

contemplated hereby or thereby, or the issuance, sale or delivery of the Series A Preferred Stock and the Series A Conversion Shares.

3.9. Schedules. The Alliance Members are parties to the Existing Agreements set forth next to such Alliance Member's name on Schedule 1.2. The Alliance Members are not party to any Existing Agreement or amendment to an Existing Agreement other than those listed on Schedules 1.1 and 1.2. The expiration dates and the Existing Operator's names set forth next to such Existing Agreements are accurate. The leases in Market Areas set forth next to such Alliance Member's name on Schedule 1.1 are no longer in effect and all Channels in the Market Areas are currently Available.

3.10. Related Party Transactions. Except as set forth on Schedule 3.10, all obligations and transactions (i) between any of the Alliance Members and any of the Alliance Members' affiliates, and (ii) between any of the Alliance Members or any of the Alliance Members' officers, directors, members or employees, or any of their affiliates or associates each transaction or obligations described in clause (i) and (ii), a "Related Party Transaction") are on terms (i) consistent with past practice of the applicable Alliance Members thereto and (ii) at least as favorable to the Alliance Member as would be available with independent third parties dealing at arms' length (collectively, the "Fair Dealing Standard"). Except as set forth on Schedule 3.10, no officer or director of any Alliance Member (nor any parent, child or spouse of any of such persons, or any trust, partnership or corporation in which any of such persons has or has had an interest), has or has had, directly or indirectly, (i) any interest or involvement in any entity that furnished or sold, or furnishes or sells, services or products that any of the Alliance Members furnishes or sells, or proposes to furnish or sell that did not meet the Fair Dealing Standard or (ii) any interest or involvement in any entity that purchases from or sells or furnishes to, any of the Alliance Members Entities, any goods or services that did not satisfy the Fair Dealing Standard; provided that ownership of no more than one (1%) percent of the outstanding voting stock of a publicly traded corporation in and of itself shall not be deemed an interest in any entity for purposes of this Section 3.10.

SECTION 4. Certain Covenants of Clearwire.

4.1. Access to Records. From and after the Closing, each Clearwire Entity shall afford to the Alliance and its employees, counsel, accountants and other authorized representatives access, during normal business hours, upon reasonable advance notice at a time to be mutually agreed, but no later than twenty (20) days following such notice, with due regard to such Clearwire Entity's ongoing operations, to all of the books, records, accounts and properties of or relating to (including all work papers of such Clearwire Entity's accountants) such Clearwire Entity's business relationship with the Alliance Members and to all officers and employees of such Clearwire Entity who are directly involved in the business relationship with the Alliance Members for any reasonable purpose whatsoever; provided that no Clearwire Entity shall be obligated to provide such access more than once in each fiscal year to the Alliance. The Alliance shall bear any and all out of pocket costs associated with the exercise of its rights under this Section 4.1.

4.2. Financial Reports. From and after the Closing, Clearwire agrees to furnish to each Alliance Member the following:

(a) Except during such periods when Clearwire is a reporting company under the Exchange Act, within forty-five (45) days after the end of each quarterly fiscal period, commencing with the first quarterly fiscal period ending after the Closing, (i) unaudited balance sheets and an income statement as of the end of such period, together with statements of retained earnings and cash flow for such period ("Quarterly Financials"), plus (ii) a statement certified by the chief financial officer of Clearwire, certifying that the financial position and results of operations of Clearwire for such period as presented in the Quarterly Financials are presented fairly and have been prepared in accordance with GAAP (subject to normal year-end adjustments and the absence of footnotes) consistently applied.

(b) Except during such periods when Clearwire is a reporting company under the Exchange Act, within ninety (90) days after the end of each fiscal year, commencing with the first fiscal year ending after the Closing, (i) audited balance sheets and an income statement as of the end of such fiscal year, together with statements of retained earnings and cash flow for such fiscal year, all in reasonable detail and certified by a recognized national firm of independent accountants selected by the Board as presenting fairly the financial position and results of operations of Clearwire and as having been prepared in accordance with GAAP consistently applied, including their opinion thereon, and (ii) the accounting firm's management letter.

(c) Except during such periods when Clearwire is a reporting company under the Exchange Act, upon request, promptly upon becoming available, copies of all financial statements, reports, press releases, notices, proxy statements, documents summarizing Clearwire's current capital structure and documents describing Clearwire's corporate structure of subsidiaries, in each case limited to those items otherwise sent by Clearwire to its stockholders or released to the public and other documents provided to any lending institution.

(d) Copies of all regular and periodic reports, if any, filed by Clearwire with the Securities and Exchange Commission ("SEC") or any securities exchange.

4.3. System of Accounting. The books of account and other financial and corporate records of Clearwire and its subsidiaries shall be maintained in accordance with good business and accounting practices and the financial condition of Clearwire shall be accurately reflected in the financial statements referred to in Section 4.2.

4.4. Maintenance of Corporate Existence, Etc. At all times Clearwire shall, and shall cause any subsidiaries to, maintain in full force and effect its corporate or other organizational existence, rights, governmental approvals and franchises and all licenses and other rights to use patents, processes, licenses, trademarks, trade names or copyrights owned or possessed by it and deemed by Clearwire to be material to the conduct of its business.

4.5. Compliance with Laws. At all times Clearwire and its subsidiaries shall comply with all applicable Laws and Orders, noncompliance with which could materially adversely affect its business or condition, financial or otherwise.

4.6. Employee Nondisclosure Agreements. Clearwire shall use its best efforts to obtain, and shall cause its subsidiaries to use their best efforts to cause all future officers, key employees and other employees who will have access to confidential information of Clearwire or any of its subsidiaries, if any, upon their employment by Clearwire or any of such subsidiaries, to sign an Employee Nondisclosure Agreement substantially in the form set forth on Exhibit H.

4.7. Clearwire ITFS Transactions. Clearwire shall, where legally required to effectuate an attempted bid or purchase of an ITFS license in conjunction with a non-profit entity or other such entity that cannot be an affiliate of Clearwire or formed or acquired by Clearwire ("Clearwire ITFS Transaction"), use the Alliance, to the extent it is an entity that meets such legal requirement. The Alliance has the right, subject to Clearwire's consent, to assign its rights with respect to such Clearwire ITFS Transaction to any Alliance Member; provided, however, that Clearwire shall in its sole discretion have the right to reject the Alliance Member selected by the Alliance; provided, further, that to the extent Clearwire objects to the originally selected Alliance Member, the Alliance shall choose a second Alliance Member, which such Alliance Member must be used by Clearwire, unless Clearwire reasonably objects to such selection. To the extent that an Alliance Member or the Alliance participates with Clearwire in a Clearwire ITFS Transaction, Clearwire will pay all costs associated with such transaction and the participating Alliance Member or the Alliance will not charge any consideration, except for the nominal amount that may be required by applicable law or regulation.

4.8. Technical Cooperation and Consultation. Without limiting the obligations specified in Section 5.10, Clearwire may, at Clearwire's expense, provide such reasonable technical consultation ("Technical Consultation") to each Alliance Member, as Clearwire, in its sole discretion, shall determine appropriate in the circumstances, with respect to the Channels and all other ITFS licenses of the Alliance Member. Such Technical Consultation may include: providing engineering studies and technical advice concerning applications which could have an interference impact on the Channels and/or other ITFS licenses held by the Alliance Members; preparation of engineering statements to be used to petition to deny applications that would create impermissible interference to the Channels and/or other ITFS licenses; and providing such other advice as may be reasonably requested by any Alliance Member seeking to protect the utility and value of the Channels and/or other ITFS licenses.

SECTION 5. Certain Covenants of Alliance Members.

5.1. Access to Records. From and after the Closing, each Alliance Member shall afford to Clearwire and its employees, counsel, accountants and other authorized representatives access, during normal business hours, upon reasonable advance notice at a time to be mutually agreed, but no later than twenty (20) days following such notice, with due regard to such Alliance Member's ongoing operations, to all of the books,

records, accounts and properties, that are reasonably requested, of or relating to (including all work papers of such Alliance Member's accountants) such Alliance Member's business relationship with Clearwire and access to all officers and employees of such Alliance Member who are directly involved in the business relationship with Clearwire, for any reasonable purpose, provided that no Alliance Member shall not be obligated to provide such access to Clearwire more than once in each fiscal year. Clearwire shall bear any and all out of pocket costs associated with the exercise of its rights under this Section 5.1.

5.2. Maintenance of Corporate Existence, Etc. At all times each Alliance Member shall, and shall cause any subsidiaries to, maintain in full force and effect its corporate or other organizational existence, rights, governmental approvals and franchises and all licenses and other rights to use patents, processes, licenses, trademarks, trade names or copyrights owned or possessed by it and deemed by each Alliance Member to be material to the conduct of its business.

5.3. Compliance with Laws. At all times each Alliance Member and its subsidiaries shall comply with all applicable Laws and Orders, including FCC Rules, noncompliance with which could reasonably be expected to have a material adverse effect on the business, operations, assets, condition (financial or other), prospects, or results of operations of Clearwire in any Market Area or such Alliance Member's ability to perform its obligations under this Agreement or any Individual Use Agreement. In addition, with respect to any Related Party Transactions, each Alliance Member shall at all times comply with all Laws applying to Related Party Transactions, including those Laws applying to maintaining such Alliance Member's non-profit corporate status or not-for-profit corporate status, as applicable.

5.4. Maintenance of FCC Qualifications. Except as such qualifications may be affected by this Agreement or one or more Individual Use Agreements and/or Renewal Agreements or by the act or omission of an Existing Operator under an Existing Agreement or a New Existing Operator Agreement or the act or omission of an operator under a Third Party Use Agreement (any such act or omission, an "Operator Failure"), each Alliance Member hereby covenants and agrees that it shall maintain all necessary qualifications to hold and to obtain renewal in the ordinary course of any License, as such qualifications may be amended or modified from time to time (individually an "FCC Qualification" and collectively referred to as the "FCC Qualifications"), and further covenants that it shall not knowingly or negligently take any action, or fail to take any action (excluding any act or omission attributable to an Operator Failure), which action or failure to act creates a material risk that such Alliance Member shall lose any FCC Qualification; provided, that in the event that the FCC or any other legal authority shall at any time specify new or different qualifications or conditions for the maintenance of any FCC Qualification or shall issue a pronouncement offering a new interpretation of an FCC Qualification, each affected Alliance Member shall only be obligated to maintain such FCC Qualification in accordance with this sentence so long as to do so would not have a material adverse effect on its business or operations, taken as a whole, and provided, further, that it shall not be deemed a breach of this sentence if an Alliance Member loses an FCC Qualification as a result, in whole or in part, of an action or

omission of Clearwire, or of any failure by Clearwire to perform its obligations under this Agreement any Individual Use Agreement or any Renewal Agreement or as a result of an Operator Failure. If, at any time, an Alliance Member fails, or it appears to such Alliance Member more likely than not that it will fail, to maintain any FCC Qualification with respect to any FCC License or its operations pursuant thereto, such Alliance Member shall give written notice to Clearwire within five (5) days after such Alliance Member becomes actually aware that (i) it no longer maintains any FCC Qualification or (ii) with the passage of time or upon the occurrence of a future event it will no longer maintain any FCC Qualification (referred to as a "Disqualification Event"). Each Alliance Member shall cooperate with reasonable requests of Clearwire made from time to time for the purpose of verifying that such Alliance Member maintains its FCC Qualifications, at Clearwire's Expense. Upon the occurrence of a Disqualification Event with respect to an Alliance Member, such Alliance Member shall, to the extent permitted by applicable law, promptly undertake all reasonable actions to obtain a waiver from the FCC regarding the circumstances giving rise to such Disqualification Event, or to cure the circumstances giving rise to, such Disqualification Event, at Clearwire's sole cost and expense. If such Alliance Member does not obtain a waiver from the FCC regarding, or to cure the circumstances giving rise to, such Disqualification Event, such Alliance Member agrees to assist Clearwire, as reasonably requested by Clearwire and at Clearwire's expense, in identifying one or more entities possessing the FCC Qualifications, and to take such actions, at Clearwire's expense, as are reasonable and appropriate in order to effectuate the transfer or assignment of any FCC License affected by such Disqualification Event (each, an "Affected FCC License") to one or more entities possessing all necessary FCC Qualifications. Clearwire agrees that any Alliance Member that is then fully qualified in all respects to hold an Affected FCC License shall be the transferee of any such Affected FCC License, and that if more than one Alliance Member is then fully qualified in all respects to hold an Affected FCC License, the Alliance Member selected by Clearwire, in its sole discretion, shall be the transferee of such Affected FCC License.

5.5. Assignment of FCC Licenses. Except in respect of assignments in accordance with Section 1.4(g)(i), in the event that any Alliance Member sells, exchanges, delivers ownership of, assigns encumbers, transfers or permits to be transferred, transfers control of or permits the transfer of control of any FCC License listed on Schedule 1.1, such Alliance Member shall cause (i) the transferee of such FCC License to unconditionally agree in writing to assume such Alliance Member's obligations under this Agreement with respect to any such FCC License and (ii) the written instrument described in the foregoing subsection (i) to provide that Clearwire shall be a third-party beneficiary of such instrument.

5.6. Spectrum Reallocation.

(a) The Parties acknowledge that the FCC may, in the future, act to reallocate ITFS spectrum for new uses. The Parties agree that if any such event occurs, or seems likely to occur, the Parties will work together to jointly consider and propose a plan to maximize the benefit of any such action to the Alliance Members and Clearwire. In addition, Clearwire will have the right to participate in any discussions or communications between any of the Alliance Members or the Alliance with the FCC and other involved governmental organizations and the party or parties who shall be the recipient of any reallocated spectrum. The parties agree that upon the adoption of any such decision by the FCC (a "Reallocation Decision"), the Parties shall amend this Agreement in order to preserve, to the maximum extent possible consistent with such Reallocation Decision, the balance of benefits, rights, and obligations provided for in this Agreement and any other agreements or transactions provided for or contemplated herein, including the Individual Use Agreements, to reflect the principles set forth in Section 5.6(b) below.

(b) In accordance with the foregoing, each Alliance Member agrees that Clearwire shall have the option hereinafter described in this Section 5.6 to lease any spectrum ("Replacement Spectrum") awarded to any Alliance Member in order to replace any Channel that is reallocated in whole or in part for use by third parties (each, a "Reallocated Channel") as described below. If a Decoupling Event has not occurred with respect to an Individual Use Agreement or Renewal Agreement and Replacement Spectrum is awarded to an Alliance Member with respect to such Individual Use Agreement or Renewal Agreement, the Alliance Member awarded such Replacement Spectrum with respect to such Individual Use Agreement or Renewal Agreement shall submit to Clearwire a written offer (the "Replacement Spectrum Offer") to enter into a reformed Individual Use Agreement in respect of such Replacement Spectrum on the terms then applicable under this Agreement and any Individual Use Agreement or Renewal Agreement applicable to a Reallocated Channel replaced by such Replacement Spectrum, as such terms may be amended in accordance with Section 5.6(a). For a period of sixty (60) days following the receipt of the Replacement Spectrum Offer (the "Replacement Spectrum Offer Period"), Clearwire shall have the right and option to accept the Replacement Spectrum Offer in its sole discretion. Such acceptance shall be made by delivering a written notice to the Alliance Member which made the Replacement Spectrum Offer within the Replacement Spectrum Offer Period. If Clearwire does not transmit effective acceptance to the Alliance Member which made the Replacement Spectrum Offer within the Replacement Spectrum Offer Period, (i) the Alliance Member that made the Replacement Spectrum Offer shall, subject to the terms of this Agreement, be free to enter into a use agreement with a third party or otherwise dispose of such Replacement Spectrum, (ii) the Alliance Member shall be entitled to retain all money or other compensation made available by the Reallocation Decision for the construction of facilities operating on the Replacement Spectrum or other costs associated with the transition to operation on the Replacement Spectrum (such compensation referred to as "Transition Compensation") and (iii) Clearwire shall have no further obligation to make payments under this Agreement or any Individual Use Agreement or Renewal Agreement with respect to the Reallocated Channel and the

Individual Use Agreement or Renewal Agreement with respect to such Reallocated Channel shall be terminated. In the event that Clearwire disputes in good faith whether the Replacement Spectrum Offer complies with the requirements of this Section 5.6, Clearwire shall provide written notice of such dispute within the Replacement Spectrum Offer Period, any issues in dispute shall thereafter be subject to the procedures set forth in Section 23 of this Agreement and the expiration of the Replacement Spectrum Offer Period shall be tolled pending the resolution of any such dispute.

(c) If Clearwire shall accept a Replacement Spectrum Offer, Clearwire shall be timely obligated to construct facilities operating on the Replacement Spectrum that as closely as possible replace the facilities that were lost or contemplated by Cleawire's business plan for the surrendered channels and that are in accordance with any requirements imposed in the Reallocation Decision, and shall be entitled to all Transition Compensation that exceeds the out-of-pocket expenses incurred by the Alliance Member in connection with the implementation of the Reallocation Decision with respect to a Reallocated Channel. Clearwire shall apply all of the compensation received to such construction or otherwise to working capital and shall not make distribution thereof to any securities holder.

(d) In the event that, in connection with a Reallocation Decision, money or other compensation other than Transition Compensation is provided (for example, for the value of a Reallocated Channel, or as compensation for lost business opportunities or revenues, the foregone royalty stream, and the residual value of the spectrum at the end of the term of the use agreement, the expenditures made by either party to date and the portion of the term remaining under the use agreement), the Parties shall negotiate in good faith as to the proper allocation of such money or compensation among the Parties based on their respective interests in any Reallocated Channel, including but not limited to the Parties' respective rights and obligations under this Agreement. If the parties are unable to reach agreement upon a proper allocation within thirty (30) days of the initiation of negotiations, the matter will be submitted for final resolution to in accordance with Section 23(d) of this Agreement.

(e) To the extent applicable, upon the adoption of any Reallocation Decision with respect to any Commercial Spectrum Capacity or Other Channel Capacity not subject to an Individual Use Agreement or Renewal Agreement at the time of the Reallocation Decision, the Parties agree to enter into arrangements similar in nature as provided for above so that each Party will receive the rights and benefits it would have received with respect to the Reallocated Channel had such channel not been reallocated.

5.7. <u>Employee Nondisclosure Agreements</u>. Each Alliance Member shall use its reasonable best efforts to obtain, and shall cause its subsidiaries to use their reasonable best efforts to cause all present and future officers, key employees and other employees who will have access to confidential information of Clearwire or any of its subsidiaries, if any, upon their employment by each Alliance Member or any of such subsidiaries, to sign an Employee Nondisclosure Agreement in the form set forth as Exhibit H.

5.8. Right of First Offer Upon Sale of FCC Licenses. (a) If at any time the FCC modifies its rules to permit the sale, assignment or transfer of any FCC license to for-profit entities (an "FCC Transfer Decision"), and the Alliance Member (the "Selling Alliance Member") choose(s), in its sole discretion, to sell, assign or transfer an FCC License to a for profit entity (collectively any such sale, assignment or transfer, a "Section 5.8 Sale"), then the following provisions shall apply with respect to each FCC license subject to an FCC Transfer Decision other than those FCC licenses that were subject to an Individual Use Agreement or Renewal Agreement that had been the subject of a Decoupling Event or that had been properly terminated by the Alliance Member in accordance with its terms or had expired without renewal, in either case, prior to the date of the Section 5.8 Notice:

(b) The Selling Alliance Member shall first deliver to Clearwire a written notice (a "Section 5.8 Offer Notice"), which shall (i) state the Selling Alliance Member's intention to make a Section 5.8 Sale of an FCC license to one or more Persons, a description of the FCC license involved, the purchase price therefor and a summary of the other material terms of the proposed Section 5.8 Sale and (ii) offer, in accordance with this Section 5.8, to Clearwire the option to acquire the applicable FCC license upon the terms and subject to the conditions of the proposed Section 5.8 Sale as set forth in the Section 5.8 Offer Notice (the "Section 5.8 Offer"). The Section 5.8 Offer shall remain open and irrevocable for the periods set forth below (and, to the extent the Section 5.8 Offer is accepted during such periods, until the consummation of the Section 5.8 Sale contemplated by the Section 5.8 Offer). Clearwire shall have the right and option, for a period of forty five (45) days after receipt of the Section 5.8 Offer Notice (the "Section 5.8 Acceptance Period"), to accept the Section 5.8 Offer on the terms stated in the Section 5.8 Offer Notice. Such acceptance shall be made by delivering a written notice of such acceptance to the Selling Alliance Member within the Section 5.8 Acceptance Period.

(c) If effective acceptance shall not be received pursuant to Section 5.8(b) above with respect to the Section 5.8 Offer pursuant to the Section 5.8 Offer Notice within the Section 5.8 Acceptance Period, then the Selling Alliance Member may sell, assign or transfer the applicable FCC license so offered for sale and not so accepted, at a price not less than the price, and on terms, taken as a whole no more favorable to the purchaser thereof than the terms stated in the Section 5.8 Offer Notice at any time within one hundred and twenty (120) days after the expiration of the Section 5.8 Acceptance Period (the "Section 5.8 Transfer Period"). In the event that the applicable FCC license is not sold, assigned or transferred by the Selling Alliance Member during the Section 5.8 Transfer Period, the right of the Selling Alliance Member to sell, assign or transfer such FCC license shall expire and the obligations of this Section 5.8 shall be reinstated; provided, however, that, in the event that the Selling Alliance Member determines, at any time during the Section 5.8 Transfer Period, that the sale, assignment or transfer of the FCC license on the terms set forth in the Section 5.8 Offer Notice is impractical, the Selling Alliance Member may terminate the offer and reinstate the procedure provided in this Section 5.8 without waiting for the expiration of the Section 5.8 Transfer Period.

(d) All transfers of FCC licenses to Clearwire that are subject to a Section 5.8 Offer Notice shall be consummated contemporaneously at the offices of Clearwire on a mutually satisfactory business day within thirty (30) days after the expiration of the Section 5.8 Acceptance Period or, if later, the fifth business day following the receipt of any regulatory approvals.

5.9. Alliance Spectrum Transactions.

(a) New ITFS Spectrum. Except with respect to Commercial Spectrum Capacity subject to Section 1.2(d), each Alliance Member agrees that, to the extent it acquires or gains access to any ITFS licenses, in addition to the FCC Licenses, such Alliance Member will provide Clearwire with a ninety (90) day exclusive negotiation period, and during such time the Alliance Member will not negotiate, discuss or otherwise communicate the terms of a new agreement covering the Commercial Spectrum Capacity for the market area associated with such ITFS license, except that the Alliance Member may discuss such terms with any other Alliance Member, and will be obligated to exclusively negotiate with Clearwire the terms of a new royalty and use agreement covering Commercial Spectrum Capacity for such market area. In addition, to the extent that Clearwire has notified the Alliance Members in accordance with Section 4.7, in writing, that Clearwire is making a bid or negotiating to enter into a Clearwire ITFS transaction that may require the participation of a non-profit entity, the Alliance Members agree to not separately pursue the acquisition of such ITFS license, whether independently, jointly or with a third party.

(b) New Non-ITFS Spectrum. If the Alliance or any Alliance Member seeks to enter into an agreement with a third party for-profit entity, not controlled by the Alliance or the Alliance Members, with respect to gaining access to or acquiring non-ITFS spectrum, the applicable Alliance Member or the Alliance shall first deliver a written notice (the "Section 5.9 Offer Notice") to Clearwire, which shall (i) state such Alliance Member's or the Alliance's (in either case, the "Section 5.9 Party") desire to enter into an agreement with a third party, for such purposes, in a bona fide arm's length transaction, the market area and frequencies comprising such non-ITFS spectrum, and a summary of other material proposed terms and (ii) offer to Clearwire the option to enter into an agreement upon the terms and subject to the conditions of the proposed Section 5.9 Offer Notice. The Section 5.9 Offer shall remain open and irrevocable for a period of forty five (45) days after delivery of the Section 5.9 Offer Notice (the "Section 5.9 Acceptance Period") and to the extent the Section 5.9 Offer is accepted during the Section 5.9 Acceptance Period, until the consummation of the agreement contemplated by the Section 5.9 Offer. Clearwire shall have the right and option, during the Section 5.9 Acceptance Period, to accept the Section 5.9 Offer on the terms set forth therein. Such acceptance shall be made by delivering a written notice to the Section 5.9 Party within the Section 5.9 Acceptance Period. If effective acceptance shall not be delivered to the Section 5.9 Party within the Section 5.9 Acceptance Period, then the Section 5.9 Party may enter into an agreement with any third party on terms and conditions no more favorable to a third party than set forth in the Section 5.9 Offer Notice at any time within forty five (45) days after the expiration of the Section 5.9 Acceptance Period (the "Section 5.9 Agreement Period"). In the event that such third party agreement is not

entered into by the Section 5.9 Party during the Section 5.9 Agreement Period the right of the Section 5.9 Party to enter into such third party Agreement shall expire and the obligations of this Section 5.9 shall be reinstated.

5.10. Network Design and Build Out. Apart from any services that may be provided pursuant to Section 4.8, Clearwire will, in accordance with executed Individual Use Agreements and in consultation with the Alliance Members, use reasonable efforts to prepare FCC applications for two-way facilities for Market Areas that are subject to an executed Individual Use Agreement as soon as possible, subject to Clearwire's overall business development plans approved by the Board and consistent, to the extent reasonably achievable, with the educational broadband objectives of the Alliance Members including EdNet. In addition, the Alliance Members will not unreasonably refuse to file FCC applications for two-way facilities for Market Areas that are not yet subject to executed Individual Use Agreements, as recommended by Clearwire after good faith consultation with the Alliance Members, except to the extent prohibited by Existing Agreements or New Existing Operator Agreements or otherwise inconsistent therewith. For purposes of the foregoing sentence, provisions of the Individual Use Agreement attached hereto as Exhibit A that apply to FCC filings are incorporated herein by reference. Clearwire will consult with the Alliance Members in developing plans to build out high-capacity two-way facilities in each Market Area delivered under an Individual Use Agreement, subject to the foregoing. The timing of such build out of Market Areas will be at Clearwire's discretion; provided that the build out will always be consistent with FCC Rules, including the build out of Market Areas to satisfy minimum requirements required to keep FCC authorizations in good standing with the FCC and in accordance with the applicable filings with respect to such spectrum and the applicable Individual Use Agreement. Clearwire and the Alliance Members shall use reasonable best efforts to maximize protection of the Alliance Members' Channels from interference and the foreclosure of service to Market Areas, whether or not such Channels are subject to an Individual Use Agreement, including, without limitation, by making FCC filings in opposition to third party applications, consistent with FCC rules and the Parties' contractual and legal obligations. Taking account of Alliance's commitment to developing a broadband network for educational and non-profit organizations, each of the Alliance Members and Clearwire recognizes their common interest in maximizing the commercial value of the joint enterprise contemplated by this Agreement and each intends to work together in good faith to maximize that value.

5.11. Correspondence. Each Alliance Member covenants to copy Clearwire on all correspondence with any Existing Operator, but each Alliance Member may redact (or otherwise keep confidential) confidential or proprietary information from any such correspondence that it is required to keep confidential under the terms of an Existing Agreement or a confidentiality agreement with an Existing Operator (a "Confidentiality Obligation").

5.12. Permitted Interference Consents. Each Alliance Member agrees not to enter into an interference consent or similar agreement (each, an "Interference Agreement") with respect to (i) the Channels listed in Schedule 1 and (ii) with respect to ITFS systems that are a source of Other Channel Capacity licensed to an Alliance

Member now or in the future, in either case without the consent of Clearwire, which consent may be withheld for any reason by Clearwire except as set forth below. Consent for an Interference Agreement may not be withheld if such consent both (x) is needed to enhance the value and/or utility of the Channels for the Alliance Member and the Existing Operator and (y) would not materially adversely affect the value or utility of the ITFS system's channels to Clearwire. An Interference Agreement entered into in accordance with the provisions of this Section 5.12 is referred to as a "Permitted Interference Agreement".

5.13. Analog Equipment Purchase on Termination from Individual Use Agreement. Clearwire shall have the right to retain any Legacy Equipment for use in any Market Area subject to the Master Agreement following the discontinuance of use of any such Legacy Equipment under the applicable Individual Use Agreement, subject to the following terms and conditions. Upon request by an Alliance Member, Operator shall provide an Alliance Member with a written listing of any Licensee Legacy Equipment provided to Clearwire by such Alliance Member for use under an Individual Use Agreement, or any Prior User Legacy Equipment acquired by an Alliance Member or Clearwire pursuant to such Individual Use Agreement (for each Alliance Member, all such equipment retained by Clearwire shall be referred to as such Alliance Member's "Legacy Equipment Inventory"). In the case of Prior User Legacy Equipment, such listing shall detail the acquisition cost of such equipment (the "Cost"). In the event that Clearwire wishes to dispose of any equipment in an Alliance Member's Legacy Equipment Inventory, Operator shall provide written notice to such Alliance Member. Within thirty (30) days of such Alliance Member's receipt of such written notice, Licensee may inform Operator in writing (i) in the case of Licensee Legacy Equipment, whether Licensee (x) wishes to have Clearwire return such equipment to such Alliance Member, or (y) sell such equipment to a third party or (ii) in the case of Prior User Legacy Equipment, whether Licensee (x) desires to reimburse Clearwire for the Cost, and take delivery of such Prior User Legacy Equipment, or (y) permit Clearwire to sell such equipment to a third party. In the case of a request specified in clause (i)(x) Operator shall promptly thereafter deliver such equipment to such domestic location as selected by Licensee, the applicable delivery costs, insurance costs and any taxes to be at Operator's expense. In the case of a request specified in clause (i)(y) or (ii)(y), Clearwire shall use reasonable efforts to market and sell the applicable equipment for cash to any unaffiliated third parties within a reasonable period of time. Following any such sale, in the case of a request under clause (i)(y), Clearwire shall promptly tender to Licensee the excess (if any) of the sales proceeds (minus reasonable transactional costs) over the costs incurred by Clearwire in providing any Transition Services to the requesting Alliance member under the Individual Use Agreement pursuant to which the requesting Alliance Member contributed the applicable Licensee Legacy Equipment, and in the case of a request pursuant to clause (ii)(y), Clearwire shall be entitled to retain the proceeds of any such sale. In the case of a request under clause (ii)(x), Licensee shall tender payment of the Cost to Operator, and Operator shall promptly thereafter deliver such equipment to such domestic location as selected by Licensee, the applicable delivery costs, insurance costs and any taxes to be at Licensee's expense. As used herein, the terms "Licensee Legacy Equipment", "Prior User Legacy Equipment" and "Legacy Equipment" shall bear the meanings assigned to them in the form of Individual Use Agreement attached hereto as

Exhibit A. The provisions of this Section 5.13 shall not apply to any Prior Use Legacy Equipment acquired pursuant to an Individual Use Agreement after a Decoupling Event with respect to such Individual Use Agreement.

5.14. Website. Clearwire shall, in addition to any technical cooperation and consultation services delivered pursuant to Section 4.8, provide the following one-time payments to the Alliance for website design and hosting services for use by the Alliance: (a) reimbursement for up to $25,000 for website design, as such costs are incurred; (b) reimbursement for up to $40,000 for website facilities and installation as such costs are incurred; (c) reimbursement for up to $10,000 to convert existing Alliance video programming as such costs are incurred. In addition to the foregoing one-time payments, Clearwire shall make the following payments: (x) $25,000 per year for two years, the first annual $25,000 payment being paid within thirty (30) days after the Closing Date and the second $25,000 payment being made on the first anniversary of the Closing Date; and (y) on each of the third, fourth and fifth anniversary of the Closing Date, $10,000. The total payments set forth in this Section 5.14 shall not exceed $155,000 in the aggregate.

SECTION 6. FCC Fees. (a) If the U.S. Congress shall authorize the FCC to impose and collect regulatory, spectrum license, use or other fees or taxes in respect of the FCC licenses held by an Alliance Member ("Spectrum Fees"), payment of the Spectrum Fees shall be allocated to and be borne by the Parties as follows:

(b) If the Spectrum Fees are periodic or recurring in nature, Clearwire shall pay such Spectrum Fees as are imposed for the period commencing at the time they are first assessed and ending upon expiration or termination of the Individual Use Agreement or Renewal Agreement pertaining to each FCC License upon which a Spectrum Fee was charged but shall not be liable for Spectrum Fees incurred before the date an Individual Use Agreement is first entered into with respect to the Channel related to the Spectrum Fee.

(c) If the Spectrum Fee is a one-time lump sum charge, Clearwire shall pay the entirety of such fee when due; provided that the Spectrum Fee shall be equitably shared between the applicable Alliance Member and Clearwire to the extent attributable to periods before the date an Individual Use Agreement is first entered into with respect to the related Channel. Promptly, but no later than thirty (30) days after, the expiration or termination of an Individual Use Agreement or Renewal Agreement, the applicable Alliance Member shall reimburse Clearwire for the portion of the Spectrum Fee paid by Clearwire attributable to the FCC license(s) covered by such agreement, with the amount of the reimbursement determined by a perpetuity calculation measured from the date the Spectrum Fee was paid, using as the discount rate the prime rate as published in the *Wall Street Journal* on the date the Spectrum Fee was paid.

(d) In the event that a lump-sum Spectrum Fee is imposed, and one or more lump-sum Spectrum Fee(s) is subsequently imposed, without regard to the circumstances, legislative history or rationale therefore all prior lump-sum Spectrum Fees in respect of the FCC licenses shall be deemed to be periodic or recurring and will be subject to clause (a) above and only the most recent Spectrum Fee in respect of FCC

licenses shall be deemed a lump-sum Spectrum Fee and will be subject to the provisions of Clause (b) above.

SECTION 7. Legends; Exchanges; Lost, Stolen or Mutilated Certificates.

7.1. Legends. Each certificate representing shares of Series A Preferred Stock or Common Stock issued to the Alliance Members hereunder shall bear a legend containing the following words:

> "THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED. THE SECURITIES HAVE BEEN ACQUIRED FOR INVESTMENT AND MAY NOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF EXCEPT IN COMPLIANCE WITH SUCH ACT.
>
> IN ADDITION, THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO THE RESTRICTIONS ON TRANSFER AND CERTAIN VOTING REQUIREMENTS SET FORTH IN THE STOCKHOLDERS AGREEMENT DATED AS OF MARCH 13, 2001, BY AND AMONG CLEARWIRE AND THE PARTIES THERETO, A COPY OF WHICH IS ON FILE IN THE OFFICE OF CLEARWIRE.
>
> THE POWERS, DESIGNATIONS, PREFERENCES, AND RELATIVE PARTICIPATING, OPTIONAL OR OTHER SPECIAL RIGHTS, AND THE QUALIFICATIONS, LIMITATIONS, OR RESTRICTIONS ON SUCH PREFERENCES AND/OR RIGHTS OF EACH CLASS OR SERIES OF CAPITAL STOCK OF THE COMPANY ARE SET FORTH IN THE CERTIFICATE OF INCORPORATION WHICH IS AVAILABLE TO THE HOLDER OF THIS CERTIFICATE WITHOUT CHARGE UPON REQUEST."

The requirement that the first paragraph of the foregoing legend be placed upon certificates evidencing any such securities shall cease and terminate upon the earliest of the following events: (i) when such shares are transferred in a public offering under the Securities Act, (ii) when such shares are transferred pursuant to Rule 144 under the Securities Act or (iii) when such shares are transferred in any other transaction if the seller delivers to Clearwire an opinion of its counsel, which counsel and opinion shall be reasonably satisfactory to Clearwire, or a "no-action" letter from the staff of the SEC, in either case to the effect that such legend is no longer necessary in order to protect Clearwire against a violation by it of the Securities Act upon any sale or other disposition of such shares without registration thereunder. The requirement that the second paragraph of the foregoing legend be placed upon certificates evidencing such securities shall cease and terminate upon the earlier of (A) the transfer of such securities pursuant to an effective registration statement filed under the Securities Act or (B) the termination of

the Stockholders Agreement. Upon the occurrence of any event requiring the removal of a legend hereunder, Clearwire, upon the surrender of certificates containing such legend, shall, at its own expense, deliver to the holder of any such shares as to which the requirement for such legend shall have terminated, one or more new certificates evidencing such shares not bearing such legend.

7.2. Exchange of Certificates. Upon surrender by any Alliance Member to Clearwire of any certificate representing Series A Preferred Stock or Common Stock issued or acquired hereunder, Clearwire, at its expense, will, within five business days, issue in exchange therefor, and deliver to the Alliance Member, a new certificate or certificates representing such shares, in such denominations as may be requested by such Alliance Member. Upon receipt of evidence satisfactory to Clearwire of the loss, theft, destruction or mutilation of any certificate representing any share of Series A Preferred Stock or Common Stock issued or acquired by any Alliance Member hereunder, and in case of any such loss, theft or destruction, upon delivery of any indemnity agreement satisfactory to Clearwire, or in any case of any such mutilation, upon surrender and cancellation of such certificate, Clearwire at its expense will, within five business days, issue and deliver to the Alliance Member a new certificate for such Series A Preferred Stock or Common Stock of like tenor, in lieu of such lost, stolen or mutilated certificate.

SECTION 8. Survival of Representations, Warranties, Agreements and Covenants, Etc. All representations and warranties in the Documents shall survive the Closing indefinitely and shall in no way be affected by any investigation of the subject matter thereof made by or on behalf of any Alliance Member or Clearwire. All statements contained in any certificate or other instrument delivered by any Party pursuant to this Agreement shall constitute representations and warranties by such Party under this Agreement. All agreements and covenants contained herein shall survive indefinitely until, by their respective terms, they are no longer operative.

SECTION 9. The Closings.

9.1. Initial Closing. Subject to the terms and conditions set forth in this Agreement, the closing of the transactions provided in this Agreement including with respect to those Individual Use Agreements that are executed on the date hereof (the "Closing" or the "Initial Closing") shall take place simultaneously with the execution and delivery of this Agreement at the offices of Fried, Frank, Harris, Shriver & Jacobson, One New York Plaza, New York, New York 10004 on March 13, 2001 or on such other date as may be agreed to in writing by each of the Parties hereto (the "Closing Date"). All payments to be made pursuant to Section 1.1(b) or with respect to those Individual Use Agreements executed at the Closing and as otherwise set forth herein shall be paid to each Alliance Member, by wire transfer of immediately available funds to the account of each Alliance Member as set forth on Schedule 9.1 attached hereto.

9.2. Actions at the Closing. Simultaneously with, or prior to, the execution and delivery of this Agreement, the following actions shall occur (the "Closing Actions").

(a) The actions set forth in Section 1.1(b) and actions set forth in Section 1.1 with respect to the Individual Use Agreements executed at Closing shall have occurred.

(b) A stockholders agreement, substantially in the form of Exhibit C (the "Stockholders Agreement"), among Clearwire, the Alliance Members and the other Stockholders listed as parties thereto (the "Existing Stockholders"), shall be duly executed and delivered by the parties thereto.

(c) A registration rights agreement substantially in the form of Exhibit D (the "Registration Rights Agreement", together with this Agreement, the Individual Use Agreements and the Stockholders Agreement, the "Documents") among Clearwire, the Alliance Members, the investors listed as parties thereto and the existing stockholders listed as parties thereto, shall be properly completed and duly executed and delivered by the parties thereto.

(d) The Individual Use Agreements with respect to the Market Areas set forth on Schedule 1.1 shall be properly completed and duly executed and delivered by the parties thereto.

(e) Clearwire shall cause the people listed on Schedule 9.2(e) to be elected to, and to comprise, the Board, the Spectrum Advisory Committee of the Board, and the Educational Advisory Committee of the Board, in each case effective as of the Closing.

(f) All certificates representing shares of Series A Preferred Stock shall bear the legends required pursuant to Section 7 hereof and all shares of Series A Preferred Stock that are to be delivered at Closing shall be delivered to the applicable Alliance Member and the payments required to be made at the Initial Closing under Sections 1.1 and 1.3 shall be made.

(g) Clearwire shall have delivered to the Alliance Members a certificate, executed on behalf of Clearwire by Clearwire's Chairman of the Executive Committee and general counsel, in the form attached hereto as Exhibit E certifying that all of the representations and warranties of Clearwire set forth in Section 2 are true and correct to which shall be attached a certified copy of the Certificate of Incorporation and By-Laws of Clearwire.

(h) Each Alliance Member shall have delivered to Clearwire a certificate, executed on behalf of such Alliance Member by such Alliance Member's president or chief executive officer, in the form attached hereto as Exhibit F certifying that all of the representations and warranties of such Alliance Member set forth in Section 3 are true and correct.

9.3. Actions at the Subsequent Closings. Subject to the terms and conditions set forth in this Agreement, the closing of the transactions provided for in Section 1.2 of this Agreement (each a "Subsequent Closing") shall take place twenty (20) business days following notice of an Availability Event, with respect to a particular Market Area unless

Clearwire disputes that such Availability Event has occurred, in which case, twenty (20) business days following resolution of such dispute pursuant to the dispute procedures set forth in Section 23(a), which Subsequent Closing shall be completed by such means of electronic transfers and mail/courier delivery as Clearwire and the applicable Alliance Member shall agree or failing agreement at the offices of Fried, Frank, Harris, Shriver & Jacobson, One New York Plaza, New York, New York 10004 (the "Subsequent Closing Date"). All cash payments to be made pursuant to Section 1.2 and 1.3 hereof shall be paid to each Alliance Member by wire transfer of immediately available funds to the account of each Alliance Member as set forth on Schedule 9.1 attached hereto.

9.4. Actions at Each Subsequent Closing. Simultaneously with, or prior to, the execution and delivery of the each Individual Use Agreement at a Subsequent Closing, the following actions shall take place, it being agreed that the failure of a Party to make a required action set forth herein at a Subsequent Closing, if required to do so in accordance with this Agreement, shall be a breach of this Agreement unless waived by the other Party hereto:

(a) The By-Laws provisions (or similar provision in the By-Laws of any successor to Clearwire) with respect to the Advisory Committees shall not have been terminated by Clearwire without the consent of the Alliance Members.

(b) The Individual Use Agreement scheduled to be executed at such Subsequent Closing shall be properly completed and duly executed and delivered by the parties thereto.

(c) All certificates representing the shares of Series A Preferred Stock to be received by Alliance Member shall bear the legends required pursuant to Section 7 hereof and shall be delivered to the applicable Alliance Member and the payments required to be made at the Subsequent Closing under Section 1.3 shall be made.

(d) Clearwire shall have delivered to the Alliance Members a certificate, executed on behalf of Clearwire by Clearwire's chief executive officer and general counsel, in the form attached hereto as Exhibit E representing and certifying that all of the representations and warranties of Clearwire set forth in Section 9.5 are true and correct.

(e) The Alliance Member executing an Individual Use Agreement shall have delivered to Clearwire a certificate, executed on behalf of such Alliance Member by such Alliance Member's president or chief executive officer, in the form attached hereto as Exhibit F representing and certifying that all of the representations and warranties of such Alliance Member set forth in Section 9.6.

9.5. Clearwire Subsequent Closing Representatives and Warranties. At each Subsequent Closing, Clearwire shall represent and warrant to the Alliance Member party to the Individual Use Agreement executed in connection therewith (the "Subsequent Closing Agreement") as of the date thereof, as follows. For purposes of this Section 9.5, "Clearwire" shall mean Clearwire or any successors to Clearwire.

(a) Power and Authority. Clearwire has all requisite corporate power and authority to enter into and carry out the transactions contemplated by the Subsequent Closing Agreement and each constitutes a legal, valid and binding obligation of Clearwire enforceable against Clearwire, in accordance with its terms, except to the extent that enforceability may be limited by bankruptcy, insolvency or other similar laws affecting creditors' rights generally.

(b) Authorization and Issuance of Capital Stock. To the extent Series A Preferred Stock is being delivered as the Equity Royalty, the authorization, offer, issuance, sale and delivery of the Series A Preferred Stock pursuant to this Agreement has not been revoked, the terms, designations, powers, preferences and relative, participating, optional and other special rights, and the qualifications, limitations and restrictions of the Series A Preferred Stock are as stated in the Certificate of Incorporation and, upon delivery, the shares of Series A Preferred Stock representing the Equity Royalty are validly issued and outstanding, fully paid and non-assessable, with no personal liability attaching to the ownership thereof, free of any Encumbrances and not subject to pre-emptive or similar rights of the stockholders of Clearwire or otherwise.

(c) No Conflict. The execution, delivery and performance by Clearwire of the Subsequent Closing Agreement and the consummation by Clearwire of the transactions contemplated by the Subsequent Closing Agreement do not violate any FCC injunction, order or decree binding on Clearwire.

9.6. Alliance Member Subsequent Closing Representations and Warranties. At each Subsequent Closing, the Alliance Member party to the Subsequent Closing Agreement shall represent and warrant to Clearwire, as of the date thereof, as follows.

(a) Power and Authority; Qualifications. Such Alliance Member has all requisite corporate power and authority to enter into and carry out the transactions contemplated by the Subsequent Closing Agreement and it constitutes a legal, valid and binding obligation of such Alliance Member enforceable against such Alliance Member in accordance with its terms, except to the extent that enforceability may be limited by bankruptcy, insolvency or other similar laws affecting creditors' rights generally.

(b) No Conflict. The execution, delivery and performance by such Alliance Member of the Subsequent Closing Agreement and the consummation by such Alliance Member of the transactions contemplated thereby, will not (a) violate any Law, or any Order applicable to such Alliance Member, or any of their properties or assets related to the Channels in the Market Area covered by the Subsequent Closing Agreement, (b) if entered into in accordance with the terms hereof, conflict with or result in any breach of any of the terms, conditions or provisions of, or constitute (with due notice or lapse of time, or both) a default (or give rise to any right of termination, cancellation or acceleration) under, or violate any of the Existing Agreements or any other agreement related to the Channels in the Market Area covered by the Subsequent Closing Agreement, or (c) violate the certificate of incorporation or the by-laws or similar organizational document of any of the Alliance Members.

(c) FCC Matters. (i) Such Alliance Member holds, and is fully qualified in all respects to hold, the FCC licenses related to the Channels in the Market Area covered by the Subsequent Closing Agreement. Such FCC licenses constitute all of the licenses, permits and authorizations from the FCC that are necessary or required for and/or used in the operations of the Alliance Members in the Market Areas related to the Channels in the Market Area covered by the Subsequent Closing Agreement. These FCC licenses are valid and in full force and effect through the dates set forth on a schedule accompanying the applicable Individual Use Agreement. There is no condition imposed by the FCC as part of any such FCC licenses that is neither set forth on the face thereof as issued by the FCC nor contained in the FCC rules applicable generally to stations of the type, nature, class or location of the stations. No application, action or proceeding is pending for the renewal or modification of any of such FCC licenses except as set forth on a schedule accompanying the applicable Individual Use Agreement, and, except for actions or proceedings affecting ITFS facilities generally, no application, complaint served on such Alliance Member, or action or proceeding known to the Alliance Member is pending or, to such Alliance Member's knowledge, threatened that could reasonably be expected with respect to these FCC licenses, to result in the (a) denial of an application for renewal, (b) the revocation, modification, non-renewal or suspension of any of these FCC licenses, (c) the issuance of a cease-and-desist order, or (d) the imposition of any fines, forfeitures or other administrative or judicial sanctions.

(ii) To such Alliance Member's knowledge, there is not now issued, outstanding or threatened any investigation, proceeding (other than proceedings of general applicability), notice of violation or material complaint against such Alliance Member at the FCC. Such Alliance Member does not have any knowledge of any person who has manifested an intent to contest the renewal of any of these FCC licenses.

(iii) Such Alliance Member's operations and activities pursuant to any such FCC license are being conducted, in all material respects, in compliance with the Communications Act, as amended, and in all material respects in compliance with the terms and conditions of such FCC license and with the FCC rules as applied thereto. To such Allliance Member's knowledge such Alliance Member's licensed ITFS facilities in connection with the FCC license the Commercial Spectrum Capacity of which is the subject of the Subsequent Closing Agreement, are being operated.

(iv) Such Alliance Member has complied in all material respects with all requirements to file returns, reports and statements relating to each of such Alliance Member's licensed ITFS facilities currently required to be filed by such Alliance Member with the FCC in connection with the FCC license the Commercial Spectrum Capacity which is the subject of the Subsequent Closing Agreement, and all such reports are complete and correct in all material respects.

(d) Litigation. Except as set forth on a schedule accompanying the applicable Individual Use Agreement and except for any of the same proceedings before the FCC, there is no civil, criminal or provided administrative action, suit, claim, notice, hearing, examination, inquiry, proceeding or investigation at law or in equity or by or before any court, arbitrator or similar panel, governmental instrumentality or other

agency now in such progress or pending or, to the best knowledge of each Alliance Member, threatened against such Alliance Member or the assets or the business of such Alliance Member in respect of the Channels in the Market Area covered by the Subsequent Closing Agreement.

(e) Securities Matters. Such Alliance Member is acquiring the Series A Preferred Stock to be issued to it under the applicable Individual Use Agreement for its own account, for investment and not with a view to the distribution thereof within the meaning of the Securities Act.

SECTION 10. Indemnification.

10.1. General Indemnification. Clearwire shall indemnify, defend and hold each Alliance Member, its affiliates, and each of their respective officers, directors, partners, managing directors, employees, agents, consultants, representatives, successors and assigns (each an "Alliance Member Entity") harmless from and against all Losses incurred or suffered by an Alliance Member Entity arising out of, relating to, or resulting from any breach of any of Clearwire's representations, warranties, covenants or agreements made by Clearwire in this Agreement or in any certificate or other instrument delivered pursuant hereto including the Documents (other than the Individual Use Agreements and Renewal Agreements). Each Alliance Member, severally and not jointly, shall indemnify, defend and hold Clearwire, its affiliates, and each of their respective officers, directors, employees, agents, consultants, representatives, successors and assigns harmless against all Losses arising out of, relating to, or resulting from the breach of any of its representations, warranties, covenants or agreements in this Agreement or in any certificate or other instrument delivered pursuant hereto, including the Documents (other than the Individual Use Agreements and Renewal Agreements). Notwithstanding anything to the contrary in this Agreement, no indemnification payment pursuant to this Section 10 with respect to any Losses otherwise payable hereunder as a result of a breach of representations and warranties in the case of Clearwire and the Alliance Members in Sections 2 and 3, respectively, shall be payable until the time as such Losses shall aggregate for all other parties to more than $50,000 (the "Deductible"), and then only to the extent that such Losses, in the aggregate for all other parties, exceed the Deductible. In addition, any agreement, settlement or waiver with respect to indemnification payments being made pursuant to Section 10 of the Purchase Agreement between Clearwire and the parties thereto, dated the date hereof, shall be binding on the Alliance Members so long as every holder of shares of Series A Preferred Stock (and Series A Conversion Shares) is treated the same on a per share basis. Furthermore, each Alliance Member and the Alliance agree that it shall not make a claim for indemnification subject to the Deductible, unless a claim is made by a holder of Series A Preferred Stock pursuant to the Purchase Agreement with respect to such matter; provided, however, that this limitation on an Alliance Member's right to make a claim for indemnification shall be terminated if and when any share of Series A Preferred Stock (or the shares of stock received upon conversion thereof) are no longer held by the original purchaser under the Purchase Agreement. With respect to representations and warranties of Clearwire and the Alliance Members at a Subsequent Closing under Sections 9.5 and 9.6, respectively, no indemnification payment with respect to any Losses otherwise payable thereunder as a

result of a breach of representations and warranties shall be payable until the time as such Losses shall aggregate for all other parties to more than $5,000 per Party per Subsequent Closing (the "Subsequent Closing Deductible") and the provisions of this Section 10.1 shall apply substituting the term Subsequent Closing Deductible; provided, that, there shall be no requirement that any claim be made by another holder Series A Preferred Stock with respect to Losses in respect of representations and warranties in a Subsequent Closing.

10.2. Indemnification Principles. For purposes of this Section 10, "Losses" shall mean, subject to the following proviso, each and all of the following items: claims, losses (including losses of earnings), liabilities, obligations, payments, damages (actual, punitive or consequential), charges, judgments, fines, penalties, amounts paid in settlement, costs and expenses (including interest which may be imposed in connection therewith), costs and expenses of investigation, actions, suits, proceedings, demands, assessments and fees, expenses and disbursements of counsel, consultants and other experts; provided, however, that "Losses" shall not include consequential damages, loss of earnings or punitive damages with respect to any breach of the representations and warranties set forth in Section 2, except to the extent that any such consequential damages, loss of earnings or punitive damages are payable to a third party.

10.3. Claim Notice. A Party seeking indemnification under this Section 10 shall, promptly upon becoming aware of the facts indicating that a claim for indemnification may be warranted, give to the Party from whom indemnification is being sought a claim notice relating to such Loss (a "Claim Notice"). Each Claim Notice shall specify the nature of the claim, the applicable provision(s) of this Agreement or other instrument under which the claim for indemnity arises, and, if possible, the amount or the estimated amount thereof. No failure or delay in giving a Claim Notice (so long as the same is given prior to expiration of the representation or warranty upon which the claim is based) and no failure to include any specific information relating to the claim (such as the amount or estimated amount thereof) or any reference to any provision of this Agreement or other instrument under which the claim arises shall affect the obligation of the Party from whom indemnity is sought except to the extent such Party is materially prejudiced by such failure or delay.

SECTION 11. Remedies. Except as provided in Section 1.4(h) the Parties agree that the remedies for breach of this Agreement shall be limited to damages and/or specific performance. The Parties further agree that all other remedies, including termination or rescission of this Agreement, are specifically prohibited. In addition, the Parties agree that the only remedy for a breach of a representation or warranty shall be the indemnification set forth, as further provided in Section 10.1 above.

SECTION 12. Further Assurances. At any time or from time to time after the Closing, Clearwire, on the one hand, and the Alliance Members, on the other hand, agree to cooperate with each other, and at the request of the other Party, to execute and deliver any further instruments or documents and to take all such further action as the other Party may reasonably request in order to evidence or effectuate the consummation of the transactions contemplated hereby and to otherwise carry out the intent of the Parties hereunder.

SECTION 13. Successors and Assigns. This Agreement shall bind and inure to the benefit of Clearwire and each of the Alliance Members and their respective permitted successors, assigns, heirs and personal representatives of Clearwire and each of the Alliance Members. Except as set forth in Section 1.5, no Party may assign either this Agreement or any of its rights, interests or obligations hereunder without the prior written approval of the other Party; provided that Clearwire may assign its rights and obligations hereunder: (x) to a wholly owned affiliate of Clearwire, in which case Clearwire shall guarantee all of the obligations of the affiliate; and (y) in connection with the sale or exchange of all or more than seventy-five (75%) percent of the outstanding stock of Clearwire or all or substantially all of Clearwire's assets to a third party; provided, further, that the Alliance Members may assign their rights and duties under this Agreement with respect to individual FCC Licenses in accordance with Section 5.5 herein; and provided, further, that each Alliance Member may assign its rights and obligations under this Agreement to any other Alliance Member party to this Agreement.

SECTION 14. Entire Agreement. This Agreement, the Documents and the other writings referred to herein or delivered pursuant hereto which form a part hereof contain the entire agreement among the Parties with respect to the subject matter hereof and supersede all prior and contemporaneous arrangements or understandings with respect thereto.

SECTION 15. Notices. All notices, requests, consents and other communications hereunder to any party shall be deemed to be sufficient if contained in a written instrument delivered in person or sent by facsimile (with a confirmatory copy sent by a different means within three (3) business days of such notice), nationally recognized overnight courier or first class registered or certified mail, return receipt requested, postage prepaid, addressed to such party at the address set forth below or such other address as may hereafter be designated in writing by such party to the other Parties:

(i) if to Clearwire, to:

Clearwire Holdings Inc.
2000 E. Lamar Blvd.
Suite 730
Arlington, Texas 76006
Telecopy: (817) 226-5900
Attention: Leo Cyr

with copies to:

Locke Liddell & Sapp LLP
2200 Ross Avenue
Suite 2200
Dallas, Texas 75201
Telecopy: (214) 740-8800
Attention: Don M. Glendenning, Esq.

GS Capital Partners III, L.P.
85 Broad Street
New York, New York 10004
Telecopy: (212) 902-3000
Attention: Gerry Cardinale

Fried, Frank, Harris, Shriver & Jacobson
One New York Plaza
New York, New York 10004
Telecopy: (212) 859-8156
Attention: Paul M. Reinstein, Esq.

and

GS Capital Partners III, L.P.
85 Broad Street
New York, New York 10004
Telecopy: (212) 357-5505
Attention: Ben Adler, Esq.

(ii) if to NACEPF:

2419 Hartford Avenue
Johnston, RI 02919-1719
Tel: (401) 934-1100
Fax (401) 934-2240
Attention: John Primeau

with copies to:

Day, Berry & Howard
One Canterbury Green
Stamford, CT 06901-2047
Fax: (203) 977-7301
Attention: Sabino Rodriguez III, Esq.

(iii) if to ITF, CITF, PRETC, DAETC, or TCSTG:

P.O. Box 6060
Boulder, CO 80306
Tel: (303) 442-2707
Fax: (303) 442-6472
Attention: John Schwartz

with copies to:

Day, Berry & Howard
One Canterbury Green
Stamford, CT 06901-2047
Fax: (203) 977-7301
Attention: Sabino Rodriguez III, Esq.

(v) if to HITN:

449 Broadway
New York, NY 10013
Tel: (787) 725-7200
Fax: (787) 725-7232
Attention: Jose Luis Rodriguez

with copies to:

Day, Berry & Howard
One Canterbury Green
Stamford, CT 06901-2047
Fax: (203) 977-7301
Attention: Sabino Rodriguez III, Esq.

(vi) if to the Alliance:

P.O. Box 6060
Boulder, CO 80306
Tel: (303) 442-2707
Fax: (303) 442-6472
Attention: John Schwartz

with copies to:

Day, Berry & Howard
One Canterbury Green
Stamford, CT 06901-2047
Fax: (203) 977-7301
Attention: Sabino Rodriguez III, Esq.

All such notices, requests, consents and other communications shall be deemed to have been given when received.

SECTION 16. Amendments. The terms and provisions of this Agreement may be modified or amended but only by written agreement between Clearwire and the Alliance, or, if an amendment will affect only an Alliance Member in a manner that does not affect other Alliance Members, the affected Alliance Member.

SECTION 17. Counterparts. This Agreement may be executed in any number of counterparts, including by facsimile, and each such counterpart hereof shall be deemed to be an original instrument, but all such counterparts together shall constitute but one agreement.

SECTION 18. Headings. The headings of the sections of this Agreement have been inserted for convenience of reference only and shall not be deemed to be a part of this Agreement.

SECTION 19. Construction. Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of names and pronouns shall include the plural and vice versa. The term "including" means "including without limitation." References to Exhibits, Sections and Schedules refer to Exhibits, Sections and Schedules of this Agreement, unless expressly stated otherwise.

SECTION 20. Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware without giving effect to the principles of conflicts of law which might result in the application of the laws of any other jurisdiction. Each of the Parties hereto hereby irrevocably and unconditionally consents to submit to the exclusive jurisdiction of the courts of the State of Delaware and of the United States of America, in each case located in the County of New Castle, for any Litigation arising out of or relating to this Agreement and the transactions contemplated hereby (and agrees not to commence any Litigation relating thereto except in such courts), and further agrees that service of any process, summons, notice or document by U.S. registered mail to its respective address set forth in this Agreement, or such other address as may be given by one or more Parties to the other Parties in accordance with the notice provisions of Section 15, shall be effective service of process for any Litigation brought against it in any such court. Each of the Parties hereto hereby irrevocably and unconditionally waives any objection to the laying of venue of any Litigation arising out of this Agreement or the transactions contemplated hereby in the courts of the State of Delaware or the United States of America, in each case located in the County of New Castle, and hereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such Litigation brought in any such court has been brought in an inconvenient forum. The foregoing provisions shall not apply with respect to an alternative dispute resolution proceeding instituted pursuant to Section 23.

SECTION 21. Specific Performance. The Parties hereto agree that irreparable harm would occur in the event that any of the agreements and provisions of this Agreement were not performed fully by the Parties hereto in accordance with their specific terms or conditions or were otherwise breached, and that money damages are an inadequate remedy for breach of the Agreement because of the difficulty of ascertaining and quantifying the amount of damage that will be suffered by the Parties hereto in the event that this Agreement is not performed in accordance with its terms or conditions or is otherwise breached. It is accordingly hereby agreed that the Parties hereto shall be entitled to an injunction or injunctions to restrain, enjoin and prevent breaches of this Agreement by the other Parties and to enforce specifically such terms and provisions of such Articles in any court of the United States or any state having jurisdiction, such remedy being in addition to and not in lieu of, any other rights and remedies to which the other Parties are entitled to at law or in equity.

SECTION 22. Severability. Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid, but if any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any law or public policy or any listing requirement applicable to the Common Stock, all other terms and provisions of this Agreement shall nevertheless remain in full force and effect. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties hereto affected by such determination in any material respect shall negotiate in good faith to modify this Agreement (and to the extent necessary any Individual Use Agreement and any Renewal Agreement) so as to effect the original intent of the Parties as closely as possible in order that the provisions hereof are given effect as originally contemplated to the greatest extent possible. Nothing in this Section 22 shall be interpreted to require (x) Clearwire to return any of the Excess Proceeds or (y) an Alliance Member to return any portion of the Royalties set forth in Sections 1.1 and 1.3 hereof previously paid or payable in respect of this Agreement, or any then existing Individual Use Agreement or Renewal Agreement prior to termination as herein set forth, or to require an Alliance Member to deliver Commercial Spectrum Capacity pursuant to an Individual Use Agreement when it becomes Available for less than the Royalties; provided, that, if the effect of a determination by the FCC is to substantially eliminate the benefits of Section 1.4 to Clearwire, Clearwire may, in its sole discretion, elect to terminate this Agreement (a) in its entirety (including all Individual Use Agreements and Renewal Agreements) or (b) as to all Commercial Spectrum Capacity not yet subject to an Individual Use Agreement. The Parties may invoke the meeting and mediation process set forth in Section 23(b)-(c) below to facilitate applying the principles of this Section 22, and the obligation to enter new Individual Use Agreements shall be tolled until the end of the mediation process.

SECTION 23. Alternative Dispute Resolution.

(a) Availability Disputes. If Clearwire and the Alliance disagree on whether the Commercial Spectrum Capacity for a Market Area is "Available" for any reason, the parties shall resort to the Alternate Dispute Resolution mechanism set forth in this Section 23 of this Agreement. To the extent that no resolution is reached through such mechanism, then the Alliance Members may commence a declaratory judgment

proceeding against the Existing Operator to seek a judicial determination as to whether such Commercial Spectrum Capacity is Available. The Alliance Members can require Clearwire to participate as part of any such declaratory judgment proceeding. However, to the extent a declaratory judgment proceeding is not available or, in consultation with Clearwire, it is not the preferred action, the Alliance Members may file a lawsuit against Clearwire, in attempt to judicially determine whether such Market Area is available. As part of such lawsuit the Existing Operator shall be impleaded or otherwise made a party to the lawsuit in such a way that the court decision as to Availability will be binding on the Existing Operator. Notwithstanding the provisions of Section 20, any action brought pursuant to this Section 23 may be brought in any court where jurisdiction and venue is proper with respect to the Existing Operator, and each of the Parties hereto irrevocably and unconditionally consents to submit to such jurisdiction and hereby irrevocably and unconditionally waives any objection to the laying of venue or service of any process in such jurisdiction.

(b) Other Disputes. Clearwire, on the one hand, and each of the Alliance Members, on the other hand, recognize that a bona fide dispute as to certain matters may from time to time arise during the term of this Agreement, or any of the Documents (other than disputes under an Individual Use Agreement or a Renewal Agreement, except to the extent that such dispute requires interpretation of a matter in dispute under the Master Agreement) that relate to a Party's rights and/or obligations hereunder or thereunder. In the event of the occurrence of such any dispute, controversy or claim arising out of or relating to the validity, construction, enforceability or performance of this Agreement, or any of the Documents relating thereto, each Party, before commencing any action to enforce its rights hereunder or thereunder (except for actions seeking equitable relief that in the reasonable judgment of the Party require intervention prior to the expiration of the time periods provided for herein) and before starting the mediation process described below, shall, by written notice to the other parties, have such dispute referred to their respective Designated Officer identified below or his or her successor, for attempted resolution (the "Meeting Process") by good faith negotiations at a meeting to be held within thirty (30) days after such notice is received. Said Designated Officers shall be for the Alliance Members, the then President of the Alliance and for Clearwire, an officer or member of the Board, as chosen by Clearwire in its sole discretion; provided, that, if the dispute involves the spectrum of the Alliance President and not that of any other Alliance member, the Alliance Designated Officer shall be the president of an Alliance Member selected by the Alliance Member involved in the dispute.

(c) Mediation. Any dispute, controversy or claim arising out of or related to this Agreement, or the interpretation, application, breach, termination or validity thereof, including any claim of inducement by fraud or otherwise and that was not resolved pursuant to the Meeting Process shall be mediated through non-binding mediation in accordance with the Model Procedures for the Mediation or Business Disputes promulgated by the Center for Public Resources ("CPR") then in effect, except where those rules conflict with these provisions, in which case these provisions control. If either Party brings action under the provisions of this Section 23, the mediation shall be conducted in New York, New York and in each such case shall be attended by an officer

with authority to resolve the dispute from each of the operating companies that are parties.

(i) Mediator. The mediator shall be an attorney specializing in business litigation who has at least 15 years or experience as a lawyer with a law firm of over 25 lawyers or was a judge of a federal Court or a state appellate Court of general jurisdiction and who shall be appointed from the list of neutrals maintained by CPR.

(ii) Selection. The parties shall promptly confer in an effort to select a mediator by mutual agreement. In the absence of such an agreement, the mediator shall be selected from a list generated by CPR with each party having the right to exercise challenges for cause and two peremptory challenges within 72 hours of receiving the CPR list.

(iii) Prompt Conclusion. The mediator shall confer with the Parties to design procedures to conclude the mediation within no more than 45 days after initiation.

(iv) Tolling. Each Party agrees to toll all applicable statutes of limitation during the mediation process and not to use the period or pendency or the mediation to disadvantage the other Party procedurally or otherwise. No statements made by either side during the mediation may be used by the other during any subsequent proceeding.

(v) Court Relief. Each Party has the right to pursue provisional relief from any court, such as attachment, preliminary injunction, replevin, etc., to avoid irreparable harm, maintain the status quo, or preserve the subject matter of the arbitration, even though mediation has not been commenced or completed.

(d) Special Rules for Reallocation Proceeds. With respect to a dispute between the Parties regarding Section 5.6(d), the following special rules shall apply:

(x) The meeting process set forth in Section 23(b) shall apply.

(y) Each party shall promptly select and retain an independent nationally recognized investment bank (within 10 days of completion of the Section 23(b) process). Each such bank shall review the compensation to be paid in connection with the relevant Reallocation Decision and such banks shall in good faith attempt to agree on the appropriate amount of compensation or the Parties. If no agreement is reached (by the banks or the relevant Parties) within 30 days after completion of the Section 23(b) process, the two banks shall together select a mutually acceptable third nationally recognized investment bank. Such third bank will review the positions of the first two banks and shall select the position taken by one of the banks, but may not "split the decision." The decision of the third bank shall be made in writing, shall be rendered within fifteen (15) days of its engagement and shall be binding upon the Parties and may not be appealed. The Parties shall cooperate reasonably with the efforts of the investment banks to determine the compensation amount. Each Party, shall bear the costs associated with the determination made by the bank appointed by such Party, and Clearwire on the

one hand, and the relevant Alliance Member or Members on the other hand, shall each bear one-half of the costs associated with the determination of the third bank, if any.

SECTION 24. Litigation and Special Costs. (a) If and to the extent that there is any litigation between Clearwire on the one hand and any or all of the Alliance Members or the Alliance on the other hand, with respect to any matter arising from the terms of this Agreement (other than pursuant to an Individual Use Agreement or Renewal Agreement), the non-prevailing Party or Parties in a final court ruling shall be responsible for immediately paying the legal fees and expenses of the prevailing party. The "prevailing party" means the Party determined by the court or mediator to have most nearly prevailed, even if such party did not prevail in all matters, and, if such court determination is not made, shall include the Party who obtains substantially the relief sought.

(b) Once Clearwire enters into an Individual Use Agreement with respect to a Market Area, during the term of such agreement, Clearwire shall be responsible for all litigation costs, including reasonable attorney's fees, and any directly related judgments (collectively, the "Litigation Costs"), incurred following execution of such Individual Use Agreements or Renewal Agreements directly related to whether the Market Area was Available at the time of execution, including any litigation brought by a third party, which, if successful, would have caused such Market Area to not be Available, except to the extent that there exists any fraud or intentional misrepresentation or omissions of any of any of the Alliance Members or the Alliance to Clearwire in connection with such Individual Use Agreement or the Market Area related therein.

(c) Any Alliance Member claiming that Clearwire must assume the Litigation Costs with respect to a particular Individual Use Agreement or Renewal Agreement or with respect to Litigation Costs related to Availability of a Market Area shall promptly (a) notify Clearwire of the Litigation Cost claim (the "Litigation Cost Claim") and (b) transmit to Clearwire a written notice ("Litigation Cost Notice") describing in reasonable detail the nature of the Litigation Cost Claim, a copy of all papers served with respect to such Litigation Cost Claim (if any), the Alliance Member's estimate of the amount of damages attributable to the Litigation Cost Claim and the basis of the Alliance Member's request for indemnification under this Agreement. Failure to provide such Litigation Cost Notice shall not affect the right of the Alliance Member's indemnification hereunder except to the extent Clearwire is materially prejudiced thereby.

Clearwire shall defend, at its sole cost and expense, such Litigation Cost Claim by all appropriate proceedings, which proceedings shall be prosecuted diligently by Clearwire to a final conclusion or settled at the discretion of Clearwire in accordance with this Section 24. Clearwire shall have full control of such defense and proceedings, including any compromise or settlement thereof; provided that that Clearwire shall not enter into any settlement agreement if it is reserving the right to contest its liability to the Alliance Member under this Section 24. The Alliance Member may participate in, but not control, any defense or settlement or any Litigation Cost Claim controlled by Clearwire pursuant to this Section 24, and the Alliance Member shall bear its own costs and expenses with respect to such participation.

SECTION 25. Confidentially. Except as set forth in Section 25 and except to the extent that disclosure may be requested by FCC Rules, law, regulation or the rules or regulations of any securities exchange, the Parties agree, for themselves and on behalf of their agents, employees and advisors, that any and all non-public information disclosed about the activities, agreements and operations of the other Party, including Clearwire's business and technology, and in the case of each Alliance Member, any and all non-public information about the leases and licenses thereof and the state of any past or present discussions by any of the Alliance Members with current or prospective lessees thereof, will be kept confidential by each Party and its respective directors, officers, partners, employees, affiliates and agents (each, a "Representative"). In addition, and subject to the exceptions provided in the previous sentence, each Party hereto shall, and shall cause its Representatives to, keep confidential all information contained herein, including any information relating to prior written or oral communications between the Alliance Members and Clearwire, until such time as the Alliance Members and Clearwire agree upon the language and timing of the disclosure of any such information.

SECTION 26. Publicity. No public release, announcement or other form of publicity concerning this Agreement or the Documents, shall be issued by any Party without the prior consent of the other Party, except as such release or announcement may be required by law, regulation or the rules or regulations of any securities exchange, in which case the Party required to make the release or announcement shall, to the extent possible, allow the other party reasonable time to comment on such release or announcement in advance of such issuance. The Parties shall use reasonable efforts to consult in good faith with each other with a view to agreeing upon any press release or public announcement relating to the transactions contemplated hereby prior to the consummation thereof.

SECTION 27. Expiration. This Agreement shall expire on the last day of the last term under the last Individual Use Agreement or Renewal Agreement executed pursuant to this Agreement.

IN WITNESS WHEREOF, the Parties hereto have duly executed this Master Royalty and Use Agreement as of the date first above written.

CLEARWIRE HOLDINGS INC.

By: ______________________
Name: James M. Mansour
Title: Chairman of the Executive Committee

ITFS SPECTRUM DEVELOPMENT ALLIANCE, INC.

BY: ______________________
Name: John Primeau
Title:

BY: ______________________
Name: John Schwartz
Title:

BY: ______________________
Name: José Luis Rodriguez
Title:

NORTH AMERICAN CATHOLIC EDUCATIONAL PROGRAMMING FOUNDATION, INC.

By: ______________________
Name: John Primeau
Title: President

HISPANIC INFORMATION AND TELECOMMUNICATIONS NETWORK, INC.

By: ______________________
Name: José Luis Rodriguez
Title: President

IN WITNESS WHEREOF, the Parties hereto have duly executed this Master Royalty and Use Agreement as of the date first above written.

CLEARWIRE HOLDINGS INC.

By: ______________________
Name: James M. Mansour
Title: Chief Executive Officer

ITFS SPECTRUM DEVELOPMENT ALLIANCE, INC.

BY: ______________________
Name: John Primeau
Title:

BY: ______________________
Name: John Schwartz
Title: Director

BY: ______________________
Name: José Luis Rodriguez
Title:

NORTH AMERICAN CATHOLIC EDUCATIONAL PROGRAMMING FOUNDATION, INC.

By: ______________________
Name: John Primeau
Title: President

HISPANIC INFORMATION AND TELECOMMUNICATIONS NETWORK, INC.

By: ______________________
Name: José Luis Rodriguez
Title: President

INSTRUCTIONAL TELECOMMUNICATIONS FOUNDATION, INC.

By: ______________________________
Name: John Schwartz
Title: President

PORTLAND REGIONAL EDUCATIONAL TELECOMMUNICATIONS CORPORATION

By: ______________________________
Name: John Schwartz
Title: President

DENVER AREA EDUCATIONAL TELECOMMUNICATIONS CONSORTIUM, INC.

By: ______________________________
Name: John Schwartz
Title: President

CHICAGO INSTRUCTIONAL TECHNOLOGY FOUNDATION, INC.

By: ______________________________
Name: John Schwartz
Title: President

TWIN CITIES SCHOOLS' TELECOMMUNICATIONS GROUP, INC.

By: ______________________________
Name: John Schwartz
Title: President