**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **NORTH AMERICAN CATHOLIC EDUCATIONAL PROGRAMMING FOUNDATION, INC.,** | : | |
| ***Plaintiff,*** | : | |
| **v.** | : | **No.: 1:06-cv-00492-S-LDA** |
| **GERRY CARDINALE, ROB GHEEWALLA, JACK DALY, GOLDMAN SACHS GROUP, INC., GS CAPITAL PARTNERS III, L.P., GS CAPITAL PARTNERS III OFFSHORE, L.P and GOLDMAN, SACHS & CO. VERWALTUNGS GmbH** | : | |
| ***Defendants*.** | : | |

**OBJECTION TO THE MOTION TO DISMISS THE COMPLAINT PURSUANT TO RULES 12(b)(2) AND 12(b)(5) AND, IN THE ALTERNATIVE TO STAY THE ACTION BY DEFENDANTS THE GOLDMAN SACHS GROUP, INC., GERRY CARDINALE, ROB GHEEWALLA AND JACK DALY**

Plaintiff, North American Catholic Educational Programming Foundation, Inc., hereby objects to the motion to dismiss the Complaint pursuant to Rule 12(b)(2) and 12 (b)(5) of the Federal Rules of Civil Procedure and, in the alternative, to stay the action, brought by Defendants the Goldman Sachs Group, Inc,, Gerry Cardinale, Rob Gheewalla and Jack Daly on the grounds that each of the Defendants was properly served, this Court has personal jurisdiction over each of the Defendants, and that there is no factual or equitable basis for this Court to exercise its discretion to issue a stay of this proceeding.

In support of its objection, Plaintiff relies on the accompanying Memorandum of Law with exhibits, and the Affidavit of John Primeau and exhibits attached thereto.

North American Catholic Educational
Programming Foundation, Inc.
By its Attorneys,

/s/ Matthew T. Oliverio
Matthew T. Oliverio (#3372)
Christine M. Curley (#4529)
OLIVERIO & MARCACCIO LLP
55 Dorrance Street, Suite 400
Providence, RI 02903
(401) 861-2900
(401) 861-2922 Fax
mto@om-rilaw.com

Dated: March 16, 2007

**CERTIFICATION**

I hereby certify that the foregoing was filed electronically with the United States District Court for the District of Rhode Island and is available for viewing and downloading from the Electronic Case Filing system. The following attorneys received service by electronic means on this 16th day of March, 2007.

Brian J. Lamoureux, Esquire
bjl@brownrudnick.com

William J. Dolan, III, Esquire
wdolan@brownrudnick.com

Wayne F. Dennison, Esquire
wdennison@brownrudnick.com

Douglas H. Flaum, Esquire
flaumdo@friedfrank.com

Lara Turcik, Esquire
turcila@friedfrank.com

/s/ Matthew T. Oliverio

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **NORTH AMERICAN CATHOLIC EDUCATIONAL PROGRAMMING FOUNDATION, INC.,** | : | |
| ***Plaintiff,*** | : | **C.A. No. 06-492S** |
| **v.** | : | |
| **GERRY CARDINALE, ROB GHEEWALLA, JACK DALY, GOLDMAN SACHS GROUP, INC., GS CAPITAL PARTNERS III, L.P., GS CAPITAL PARTNERS III OFFSHORE, L.P and GOLDMAN, SACHS & CO. VERWALTUNGS GmbH** | : | |
| ***Defendants.*** | : | |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS OBJECTION TO THE MOTION TO DISMISS THE COMPLAINT PURSUANT TO RULE 12(B)(2) AND 12(B)(5) OF THE FEDERAL RULES OF CIVIL PROCEDURE BROUGHT BY DEFENDANTS THE GOLDMAN SACHS GROUP, INC., GERRY CARDINALE, ROB GHEEWALLA AND JACK DALY**

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... iv

INTRODUCTION ..... 1

STATEMENT OF FACTS ..... 3

I. PARTIES ..... 3

II. CLAIMS ..... 4

A. Fraud in the Negotiation of the Master Agreement ..... 4

B. Fraud and Tortious Interference in Context of Business Dealings. ..... 8

1. Fraud in Failing to Use Assets to Develop a Wireless Network and to Purchase Spectrum. ..... 8

2. Interference with Alliance's Prospective Opportunity to License Spectrum with Third Parties. ..... 9

3. Interference with the Alliance and its Acquisitions. ..... 10

C. Fraud and Breach of Fiduciary Duties in Context of C Round Financing. ..... 11

III. RELATED LAWSUITS ..... 15

LEGAL ARGUMENT ..... 17

I. THE INDIVIDUAL DEFENDANTS HAVE BEEN PROPERLY SERVED IN ACCORDANCE WITH RULE 4 OF THE FEDERAL RULES OF CIVIL PROCEDURE. ..... 17

II. THIS COURT HAS PERSONAL JURISDICTION OVER EACH OF THE DEFENDANTS. ..... 18

A. Standard of Review ..... 18

B. Basic Tenets of Personal Jurisdiction Jurisprudence. ..... 19

C. This Court Has General Jurisdiction Over Goldman Sachs Group, Inc. ..... 21

1. Goldman Sachs Group, Inc. Maintains Continuous and Systematic Contacts with the State of Rhode Island. ..... 21

2. Consideration of the "Gestalt factors" Supports the Exercise of Jurisdiction Over Goldman Sachs Group, Inc. .................... 21

a. GS Group's Burden of Appearing Does Not Prevent the Exercise of Jurisdiction. .................... 21

b. Rhode Island's Interest in Adjudicating the Dispute Supports the Exercise of Jurisdiction. .................... 22

c. Plaintiff's Interest in Obtaining Convenient and Effective Relief Favors the Exercise of Jurisdiction. .................... 23

d. The Judicial System's Interest in Obtaining the Most Effective Resolution of the Controversy Supports Jurisdiction. .................... 23

e. The Common Interests of all Sovereigns in Promoting Substantive Social Policies Supports the Exercise of Jurisdiction. .................... 24

D. This Court Has Specific Jurisdiction Over the Individual Defendants. .................... 24

1. Each of the Individual Defendants has Sufficient Minimum Contacts with the State of Rhode Island which are Related to Plaintiff's Claims. .................... 25

2. The Individual Defendants' Contacts With the State Were Such that Jurisdiction in Rhode Island Was Foreseeable. .................... 31

3. This Court's Exercise of Personal Jurisdiction Over the Individual Defendants is Reasonable. .................... 34

a. The Individual Defendants' Burden of Appearing Does Not Prevent the Exercise of Jurisdiction. .................... 35

b. Rhode Island's Interest in Adjudicating the Dispute Supports the Exercise of Jurisdiction. .................... 35

c. Plaintiff's Interest in Obtaining Convenient and Effective Relief Favors the Exercise of Jurisdiction. .................... 36

d. The Judicial System's Interest in Obtaining the Most Effective Resolution of the Controversy Supports Jurisdiction. .................... 36

e. The Common Interests of All Sovereigns in Promoting Substantive Social Policies Supports the Exercise of Jurisdiction. .................... 36

4. This Court Should Exercise Jurisdiction Over All Claims Asserted Against the Individual Defendants. .................... 36

III. THERE IS NO LEGAL OR EQUITABLE BASIS FOR THIS COURT TO STAY THIS ACTION UNTIL THE RESOLUTION OF THE PENDING DELAWARE ACTIONS. 37

CONCLUSION ........................................................................................................................ 42

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Century Prods., Co.*, 943 F. Supp. 137 (D.N.H. 1996)...................................... 22, 33

*Boateng v. InterAmerican University, Inc.*, 210 F.3d 56 (1st Cir. 2000)......................................15

*Boit v. Gar-Tec Products, Inc.*, 967 F.2d 671 (1st Cir. 1992) .............................................. 18, 19

*Borschow Hospital & Medical Supplies, Inc. v. Burdick-Siemens Corp.*, 143 F.R.D. 472 (D.P.R. 1992) ............................................................................................................................26

*Brian Jackson & Company v. Eximias Pharmaceutical Corp.*, 248 F. Supp. 2d 31 (D.R.I. 2003) ........................................................................................................................ 29, 41

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 105 S. Ct. 2174 (1985)................... 29, 32, 33, 34

*Buy-Rite Costume Jewelry, Inc. v. Albin*, 676 F. Supp. 433 (D.R.I. 1988).................................. 41

*Calder v. Jones*, 465 U.S. 783, 104 S. Ct. 1482, 79 L.Ed.2d 804 (1984).................................... 33

*Cambridge Literacy Properties v. Goebel Porzellanfabrik*, 295 F.3d 59 (1st Cir. 2002) ............ 25

*Cesario v. Bergquist*, 2006 WL 587598 (D.R.I. 2006)................................................................15

*Cody v. Ward*, 954 F. Supp. 43 (D. Ct. 1997)................................................................... 30

*Crellin Technologies, Inc. Equipmentlease Corp.*, 18 F. 3d 1 (1st Cir. 1994) ................. 23, 24, 41

*Cruz v. Melecio*, 204 F. 3d 14 (1st Cir. 2000) ................................................................. 41

*Currie v. Group Ins. Comm'n*, 290 F.3d 1 (1st Cir. 2002)......................................................... 38

*CVS Corporation v. Taubman Centers, Inc.*, 225 F. Supp.2d 120 (D.R.I. 2002)......................... 18

*Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.C.*, 290 F. 3d 42 (1st Cir. 2002)........ 24, 28

*Dupont Tire Serv. Center, Inc. v. North Stonington Auto-Truck Plaza, Inc.*, 659 F. Supp. 861 (D.R.I. 1987)......................................................................................................... 19

*E.F. Hutton & Co., Inc. v. Tourism and Development Corp.*, 455 F. Supp. 981 (D.R.I. 1978) ... 29

*Ealing Corp. v. Harrods, Ltd*, 790 F. 2d 978 (1st Cir. 1986) ............................................... 30, 33

*Elmendorf Grafica, Inc. v. D.S. America (East), Inc.*, 48 F.3d 46 (1st Cir. 1995) ........................ 39

*Flynn v. Al-Amir*, 811 A.2d 1146 (R.I. 2002) .................................................................... 17

*Foster-Miller, Inc. v. Babcock & Wilcox, Canada*, 46 F.3d 138 (1st Cir. 1995)............. 20, 23, 25

*Gonzalez v. Cruz*, 926 F.2d 1 (1st Cir. 1991) .................................................................. 40

*Gorman v. Ameritrade Holding Corp.*, 293 F.3d 506 (D.C. 2002) ............................................. 30

*Guzman-Ruiz v. Hernandez-Colon*, 406 F.3d 31 (1st Cir. 2005).................................................15

*Hasbro, Inc. v. Mikohn Gaming Corp.*, 2006 WL 2035501 (D.R.I. 2006)...................................15

*Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 104 S. Ct. 1868, 80 L.Ed.2d 404 (1984)........................................................................................................... 20

*Home Owners Funding Corp. of America v. Century Bk.*, 695 F. Supp. 1343 (D.Mass. 1988)... 37

*Hugel v. McNell*, 886 F.2d 1 (1st Cir. 1989)........................................................................ 33

*International Shoe Co. v. Washington*, 326 U.S. 310, 66 S. Ct. 154 (1945) .......................... 19, 20

*Jet Wine & Spirits, Inc. v. Bacardi & Company, Ltd.*, 298 F. 3d 1 (1st Cir. 2002)..... 18, 24, 31, 32

*Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 104 S. Ct. 1473, 79 L.Ed.2d 790 (1984)......... 22

*Lantor, Inc. v. Nicassio Corp.*, 2007 WL 204015 (D.R.I. 2007)........................................... 29, 32

*Liberty Mutual Ins. Co., v. Foremost-McKesson, Inc.*, 751 F.2d 475 (1st Cir. 1985).................. 40

*M & I Eastpoint Tech., Inc. v. Mid-Med Bank*, 2000 U.S. Dist. LEXIS 1146 (D.N.H. 2000) 23, 35

*Mass. School of Law at Andover, Inc. v. American Bar Ass'n*, 142 F.3d 26 (1st Cir. 1998)........ 25

*McAleer v. Smith*, 728 F. Supp. 857 (D.R.I. 1990)............................................................. 18

*Microfibres v. Squires Hightech Corp.*, 2006 WL 305975 (D.R.I. 2006) .................................. 32

*Microfibres, Inc. v. McDevitt-Askew*, 20 F. Supp.2d 316 (D.R.I. 1998) ..................................... 19

*Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 103 S. Ct. 927, 74 L.Ed.2d 765 (1983)........................................................................................................... 39

*Murphy v. Erwin-Wasey, Inc.*, 460 F.2d 661 (1st Cir. 1972)..................................................... 37

*Nicholas v. Buchanan*, 806 F. 2d 305 (1st Cir. 1986).............................................................. 30

*Nicholson v. Buehler*, 612 A.2d 693 (R.I. 1992) ..................................................................... 30

*Noonan v. Winston Company*, 135 F.3d 85 (1st Cir. 1998)......................................................... 20

*Northeastern Land Services, Ltd. v. Schulke*, 988 F. Supp. 54 (D.R.I. 1997) ................. 25, 32, 34

*Northern Laminate Sales, Inc. v. Davis*, 403 F.3d 14 (1st Cir. 2005) ........................................ 33

*Phillips Exeter Acad. v. Howard Phillips Fund, Inc.*, 196 F. 3d 284 (1st Cir. 1999).... 20, 21, 24, 25, 31

*Pritzker v. Yari*, 42 F.3d 53 (1st Cir. 1994) ........................................................................ 21, 35

*Quill Corp. v. North Dakota By and Through Heitkamp*, 504 U.S. 298, 112 S. Ct. 1904 (1992) ........................................................................................................................................ 29

*Rio Grande Community Health Center, Inc. v. Rullan*, 397 F.3d 56 ( 1st Cir. 2005) ................. 37

*Rojas-Hernandez v. Puerto Rico Elec. Power Auth.*, 925 F.2d 492 (1st Cir. 1991).................... 40

*Rose v. Firstar Bank*, 819 A.2d 1247 (R.I. 2003)........................................................................ 20

*Salpoglou v. Shlomo Widder, M.D., P.A.*, 899 F. Supp. 835 (D.Mass. 1995) ............................ 37

*Sawtelle v. Farrell*, 70 F.3d 1381 (1st Cir. 1995).................................................... 19, 24, 29, 31

*Ticketmaster-New York, Inc. v. Alioto*, 26 F.3d 201 (1st Cir. 1994)..................................... 20, 34

*United Elec., Radio and Machine Workers of America v. 163 Pleasant Street Corp.*, 960 F.2d 1080 (1st Cir. 1992)........................................................................................................ 21, 31

*Val Leasing, Inc. v. Hutson*, 674 F. Supp. 53 (D.Mass. 1987) ................................................... 37

*Villa Marina Yacht Sales, Inc. v. Hatteras Yachts* ( *Villa Marina I* ), 915 F.2d 7 (1st Cir. 1990) ................................................................................................................................... 33, 38

*Violet v. Picillo*, 613 F. Supp. 1563 (D.R.I. 1985)...................................................................... 19

*Women & Infants Hospital of Rhode Island v. Community Health Network of Connecticut, Inc.*, 394 F. Supp. 2d 488 (D.R.I. 2005)........................................................................... 31, 33

*Young v. Lepone*, 305 F. 3d 1 (1st Cir. 2002) ............................................................................. 22

**Statutes**

R.I. Gen. Laws § 9-5-33 ........ 19

**Treatises**

4A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure: Civil 3d 1074 at 359 (2002) ........ 17

Restatement (Third) of Agency § 1.01 Comment c ........ 27

*Am.Jur.2d § 820* ........ 27

## INTRODUCTION

In their Rule 12(b) motions, Defendants Goldman Sachs Group, Inc. ("GS Group"), Gerry Cardinale, Rob Gheewalla, and Jack Daly (collectively, the "Individual Defendants") attempt to portray Plaintiff North American Catholic Educational Programming Foundation, Inc. ("NACEPF") as a litigious entity with no right to obtain justice in the courts against them. This portrayal is diametrically opposed to the actual circumstances of this case; those which demonstrate a pattern by these Defendants to evade review of their deceitful, fraudulent and tortious conduct directed to Plaintiff and others in any court. Confident that this Court will not be swayed by the Defendants' unwarranted and hyperbolic characterizations, as they are not germane to the instant motion, NACEPF will instead focus on the substantive procedural issues before this Court.[1]

As a threshold matter, all but one of the corporate Defendants and each of the Individual Defendants have been properly and timely served. *See* Court Document Numbers 4, 11, 28, 29, 33. Although at the time the Defendants' motion to dismiss was filed, service on two of the corporate defendants had not been effectuated, there is no obligation under the Federal Rules of Civil Procedure to serve *all* defendants at the same time.

Second, each of the Individual Defendants had repeated, substantive contacts, including telephonic, facsimile and e-mail communications with NACEPF through its President John Primeau over the course of several years. At all relevant times, the Individual Defendants were

---

[1] By way of explanation only, the initial suit brought by NACEPF in the Delaware Superior Court against Clearwire on November 20, 2003 was dismissed because it appeared ***at the time*** that Clearwire had no assets and was therefore judgment proof. The second action was filed by NACEPF against Cardinale, Gheewalla and Daly in the Delaware Superior in their capacities as Directors of Clearwire. After this case was consensually dismissed by the Delaware Superior Court for lack of subject matter jurisdiction, it was refiled in the Delaware Chancery Court. Unlike the present action, NACEPF brought suit solely in its capacity as a creditor. The Individual Defendants moved to dismiss this case for lack of personal jurisdiction under Delaware law. The Chancery Court dismissed the case, finding the Court could not exercise jurisdiction over the Individual Defendants. Although this ruling was appealed and recently argued before the Delaware Supreme Court, NACEPF is not precluded from bringing suit in Rhode Island, which asserts additional claims against additional defendants, and where there exists personal jurisdiction over the Individual and corporate Defendants. Likewise, the fact that the Delaware firm that represents NACEPF brought an action in Delaware against these same Defendants on behalf of other plaintiffs is of no consequence to NACEPF's right to bring this case in Rhode Island.

directing their communications to Rhode Island and knowingly and voluntarily engaging in communications to further a business relationship with a Rhode Island entity.

Third, GS Group has not contested this Court's general jurisdiction, as it maintains a designated agent for service of process in Rhode Island, and it must concede its substantial involvement with Rhode Island investments and bond issues.[2] As such, there is simply no equitable basis for this Court to decline jurisdiction. Moreover, in applying the "Gestalt factors" to the GS Group, "the richest, shrewdest and most powerful investment bank in the world" cannot credibly assert that it is unduly burdensome for it to defend this action in this jurisdiction. *See* Forbes, "Goldman Sachs: Too Big, Too Powerful, Too Bad" published January 29, 2007 attached hereto as *Exhibit A*.

Finally, there is no reason this Court should stay this action in favor of the pending Delaware cases. With respect to the Delaware *NACEPF* action, that suit never progressed beyond the initial motion to dismiss filed by these same Individual Defendants because the trial court found that the Delaware Courts had no personal jurisdiction over them. Although a decision on NACEPF's appeal has yet to be rendered, no discovery has commenced nor have substantive issues been addressed or litigated. With respect to the pending Delaware *Stritzinger a*ction, the fact that a case involving similar claims has been brought against these Defendants *by other parties* does not provide a legal or equitable basis for the issuance of a stay by this Court. Further, the court docket in *Stritzinger* reveals no filing of a substantive pleading or brief beyond the initial complaint and a one-page motion to dismiss.

In the context of examining the procedural roadblocks constructed by the Defendants in their various motions, it is necessary to understand the history and relationship between the parties which when unraveled, demonstrates a classic example of corporate greed, scheming and insider self-dealing on the part of the Defendants. The facts also warrant a finding by this Court that it possesses the requisite personal jurisdiction over all of the Defendants herein.

---

[2] A brief search of the *Providence Journal* archives reveals that Goldman Sachs has been involved in various bond issues and investments on behalf of public and quasi-public agencies within the State of Rhode Island.

## STATEMENT OF FACTS

### I. PARTIES

NACEPF is a nonprofit, independent lay organization that is incorporated under the laws of the State of Rhode Island with a principal place of business in Johnston, Rhode Island. The mission of NACEPF is to provide educational and religious oriented programming to nonprofit agencies, such as schools, churches, religious organizations and governmental entities. (Compl. ¶ 3).

Defendants Rob Gheewalla ("Gheewalla"), Gerry Cardinale ("Cardinale") and Jack Daly ("Daly") at all relevant times were officers and/or members of the Board of Directors of Clearwire Holdings, Inc., a corporation formed under the laws of Delaware that is a holding company for various subsidiaries (collectively "Clearwire" or "Holdings"). (Compl. ¶ 5, 6, 7). Defendants Goldman Sachs Group, Inc. ("GS Group"), GS Capital Partners III, L.P., GS Capital Partners III, Offshore L.P. and Goldman, Sachs & Co. Verwaltungs GmbH (collectively "Goldman Sachs") at all relevant times were the primary investors in Clearwire and its majority stockholder, and as such, exercised direct and indirect influence and control over the Clearwire Board of Directors and directly participated in the management of Clearwire. (Compl. ¶ 8). Goldman Sachs invested $47 million in Holdings, representing 84% of the total sums invested in Holdings in March 2001. (Compl. ¶ 12(a)).

Defendants Gheewalla, Cardinale and Daly are employees of Goldman Sachs. (Compl. ¶ 9). GS Group has acknowledged that Defendants Gheewalla, Cardinale and Daly are "employed by affiliates of GS Group in New York and London." (Memorandum in Support of Motion to Dismiss Complaint Pursuant to Rule 12(b) (2) and 12 (b) (5), p. 5) (hereinafter "GS Memo.").[3]

[3] To the extent that a different Goldman Sachs entity apart from GS Group employs the Individual Defendants, the Plaintiff requests the opportunity to conduct discovery and to amend its Complaint to name the appropriate corporate entity if needed after discovery. However, for the purpose of this motion, Plaintiff shall refer to the entity that employs the Individual Defendants as GS Group and all of the Goldman Sachs Defendants as "Goldman Sachs."

Cardinale Decl. ¶ 3, 4; Gheewalla Decl., ¶ 3, 4; Daly Decl. ¶ 3, 4.[4] The Individual Defendants were involved in Goldman Sachs' efforts to finance Clearwire. (GS Memo, p. 5). Thus, upon information and belief, the Individual Defendants acted as the agents and representatives of the Goldman Sachs investors. Affidavit of John Primeau ¶ 4 (hereinafter "Primeau Aff."). Defendants Gheewalla, Cardinale and Daly had direct personal involvement in the actions and fraudulent conduct alleged in the Complaint, which is causally related to the substantial damages effected and sustained by NACEPF in Rhode Island. Thus, they are liable individually and/or as agents of Goldman Sachs and the GS Group. Upon information and belief, GS Group acted as agent for each of the Goldman Sachs entities that invested in Clearwire.[5] Primeau Aff. ¶¶ 4, 6, 9.

The claims asserted in the Complaint pertain to three aspects of the business relationship between NACEPF, the Individual Defendants, and Goldman Sachs: first, fraudulent misrepresentations that induced the execution of the Master Use and Royalty Agreement; second, fraudulent misrepresentations and tortious interference with respect to the Alliance, NACEPF and potential third party purchasers; and third, fraudulent misrepresentations and breach of fiduciary duties related to the "C Round Financing" and the McCaw/Flux deal.

## II. CLAIMS

### A. Fraud in the Negotiation of the Master Agreement

Clearwire is a company that was created to acquire wireless radio licenses, with the intent to develop a wireless internet access network. (Compl ¶ 1). Clearwire was created to take

[4] The Declarations of Cardinale, Gheewalla and Daly were filed by the Defendants in Support of their Motion to Dismiss the Complaint.

[5] The references to the various Goldman Sachs entities is admittedly confusing, but this confusion is caused primarily by the Goldman Sachs Defendants' structuring itself by the use of subsidiaries and affiliates to insulate themselves from liability. It is submitted that the Goldman Sachs Defendants cannot have it both ways: they cannot refer to themselves as a collective and then assert lack of jurisdiction based upon their purported separate corporate status. *See* GS Memo, p. 1 (referring to "Goldman Sachs" as making an investment in Clearwire); p. 5 (referring to the "Goldman Shareholder Defendants" as collectively investing approximately $47 million in Clearwire, and referring to the fact that the "Individual Defendants were involved in the Goldman Shareholder Defendants' efforts to finance Clearwire" without differentiating between them).

advantage of the business opportunity in providing internet access without the use of wires or cables. In effect, Clearwire intended to do for internet users what cell telephones have done for making telephone communications. Clearwire intended to provide internet access by using electronic signals, broadcast much like radio or television signals, over a range of wavelengths known as "spectrum." (Compl. ¶ 20).

The "wireless" internet business faced many technological and regulatory obstacles when Clearwire was formed in the 1990s. At that time, the necessary technology was still under development to permit access to the internet without a physical connector to an internet service provider. Furthermore, because of the amount of data transmitted by persons accessing the internet, use of the narrow wave spectrum typically utilized by wireless telephone systems was not practical. (Compl. ¶ 21).

By 2000 it was apparent that some of the technological problems with wireless internet could be solved by the use of radio wave spectrum if more spectrum became available from the FCC. This spectrum, known as "Instruction Television Fixed Service" or "ITFS" spectrum, was used by various educational entities. Some commercial entities also had licenses for use of the spectrum and used it for "wireless" cable television before the advent of satellite television. (Compl. ¶ 24).

Companies like Sprint and WorldCom realized the potential future value of the ITFS spectrum and began an aggressive acquisition campaign in 1999 to acquire rights to use existing licenses to operate in that spectrum from license holders who could not afford to continue operating their unsuccessful wireless businesses. Sprint and WorldCom did not generally own the spectrum rights directly, but rather held the spectrum through lease arrangements with owners. (Compl. ¶ 23).

In March 2000, NACEPF, together with the Hispanic Information and Telecommunications Network, Inc. (“HITN”) and Instructional Telecommunications Foundation, Inc. (“ITF”) and various affiliates of ITF formed the ITFS Spectrum Development Alliance, Inc. (the "Alliance"), to market and develop its ITFS licenses. Primeau Aff. ¶ 2.

NACEPF, HITN and ITF consisted of three of the largest networks of educational licensees for the use of ITFS spectrum.

In the Spring of 2000, the Alliance began searching for investors to purchase its license as the leases expired and they became available while still providing the Alliance members with the opportunity to retain an equity interest in the licenses and the developing wireless network. Primeau Aff. ¶ 3).

On June 7, 2000, Defendant Cardinale on behalf of the "Goldman Sachs Team" sent a memo to the Alliance, including NACEPF in Rhode Island that, *inter alia*, stated:

> As part of our proposal, we wanted to reiterate again our philosophy in partnering with the alliance to meet the objectives of both sides, alleviate any material upfront concerns, and provide as much assurance as possible that the partnership going forward represents the best interests of the Alliance and its constituencies. As we tried to articulate in our last two meetings, we take a long-term view to wealth creation in these type of projects.
>
> ***
>
> As we mentioned in our meeting, we believe in being fair and are absolutely prepared to not only pay competitive market prices for the assets which you can deliver but also finance the acquisition cost for your entire portfolio of spectrum (i.e., all 140 million channel POPs, as well as any additional affiliated channel POPs which you can deliver).
>
> ***
>
> This results in upfront cash payment to the Alliance of $8 million (assuming 20 million channel POPs), which together with our funding of the engineering study and related legal/upfront development costs to be determined, establishes our commitment to the Alliance of a long-term partnership for the development of the ITFS spectrum via an ongoing, fully funded operating vehicle.
>
> ***
>
> [A Goldman Sachs affiliate], with the assistance of Jimmy Mansour and Goldman Sachs, will manage the engineering project and ensure timely completion under FCC guidelines.
>
> ***
>
> Based on our current projections, the purchase and build-out costs associated with the delivery and operationalization of 140 million channel POPs will require approximately $350 million over the build-out period.
>
> (Emphasis added.)

(Compl. ¶ 31); Primeau Aff. ¶ 5, *Exh.* 1.[6] During the course of the ensuing negotiations, the "Goldman Sachs Team" consisted primarily of Cardinale, Gheewalla and Daly. Primeau Aff. ¶ 8; *Exh. 3*.

In March 2001, Clearwire, through the efforts of Goldman Sachs, consummated a deal with the Alliance, the terms of which are contained in a Master Use and Royalty Agreement between Clearwire and the members of the Alliance (the "Master Agreement") (Compl. ¶ 26).[7]

Goldman Sachs' stated intention, through Clearwire, was to develop the spectrum assets into an operating national system of wireless connections to the internet. (Compl. ¶ 26). The Goldman Sachs Defendants directed the negotiations with the Alliance members and Clearwire was the conduit Goldman Sachs used to further its objectives. (Compl. ¶ 27). Throughout the negotiations with the Alliance from 2000 into March 2001, the Goldman Sachs Defendants emphasized that Goldman Sachs was committed through Clearwire to providing adequate capital and management to develop the spectrum assets of the Alliance members into an operating, national system of wireless connections to the internet. (Compl. ¶ 30). This stated commitment of Goldman Sachs to develop the wireless network using the licenses of the Alliance members was important to and relied upon by NACEPF when it signed the Master Agreement in March 2001. (Compl. ¶ 32).

These statements were false when made as the Goldman Sachs Defendants never intended to do the build out that they had promised to the Alliance members and publicly proclaimed as the business plan of Clearwire. Instead, the undisclosed plan of Goldman Sachs was to leverage the Alliance's spectrum licenses when the market for spectrum improved as

---

[6] Although the memorandum and the allegation in the Complaint refers to Goldman Sachs, the Goldman Sachs Defendants acknowledge that the memorandum was sent on behalf of the GS Group. *See* GS Memo, p. 16, n. 11. To the extent that the entity or entities that comprise "Goldman Sachs" is unclear, Plaintiff should be permitted to clarify this issue through jurisdictional discovery. *Sunview Condominium Association v. Flexel International, Ltd.*, 116 F. 3d 962 (1st Cir. 1997); *Group of Former Employees of Sprague Caribe v. American Annuity Group, Inc.*, 388 F. Supp. 2d 3 (D.P.R. 2005).

[7] A copy of the Master Agreement was filed with the Defendants Rule 12(b)(6) Motion to Dismiss as Exhibits C1 and C2.

demand for internet access increased, while maintaining the pretense of an industry participant. (Compl. ¶ 37).

Upon the execution of the Master Agreement, Cardinale, Gheewalla and Daly became Directors of Clearwire. (Compl. ¶ 5-7; Cardinale Decl. ¶ 8, Daly Decl. ¶ 8; Gheewalla Decl. ¶ 8). The Individual Defendants, acting on behalf and at the direction of Goldman Sachs, controlled the Clearwire Board of Directors even when the three of them constituted a minority of the Board, because Clearwire was dependent upon Goldman Sachs to make additional investments to fund its operations for the foreseeable future; Goldman Sachs was virtually Clearwire's sole source of investment banking advice, contacts with potential acquisition candidates and legal advisors; and it was understood at all times by all members of the Clearwire Board of Directors that unless the instructions of Goldman Sachs were followed, Clearwire would cease to receive the assistance from Goldman Sachs that it needed to continue to function. (Compl. ¶ 12). Consequently, the fraudulent misrepresentations and tortious conduct of Clearwire are attributable to the Goldman Sachs Defendants.

**B. Fraud and Tortious Interference in Context of Business Dealings.**

**1. <u>Fraud in Failing to Use Assets to Develop a Wireless Network and to Purchase Spectrum.</u>**

The business plan reflected in the terms of the Master Agreement involved Clearwire obtaining the rights to use the Alliance members' ITFS spectrum licenses when those licenses became available for transfer to Clearwire. At the time the Master Agreement was signed, most of the Alliance member licenses were already licensed to third parties, such as Sprint. The transfers to Clearwire were to occur when those licenses expired if the then current licensees did not exercise their rights of first refusal. (Compl. ¶ 29).

To the extent the representations of the Defendants were stated as their intent of what Clearwire would do after the Master Agreement was signed, they did not actually hold those intentions at the time. For example, the Defendants knew that: (1) Clearwire would not acquire

NACEPF's spectrum licenses as they became available or build out an operating wireless network because it lacked the resources to do so and Goldman Sachs did not intend to provide the funding required, and (2) Clearwire's equipment subsidiary (that was to supply the technology it needed) was for sale. (Compl. ¶ 63).

The Defendants acted fraudulently to induce Plaintiff to continue its business relationship with Clearwire with respect to the ITFS spectrum, notwithstanding the fact that Defendants had no intention of permitting Clearwire funds to be utilized to purchase additional spectrum from NACEPF at any time. (Compl. ¶ 66). The Defendants acted fraudulently toward NACEPF by: (1) not utilizing the assets of Clearwire for its benefit and that of its creditors, and (2) holding on to NACEPF's ITFS license rights when Clearwire would not use them, solely to keep Goldman Sachs' investment "in play." (Compl. ¶ 67).

### 2. <u>Interference with Alliance's Prospective Opportunity to License Spectrum with Third Parties.</u>

After March 2001 and until June 2002, NACEPF had the opportunity to convey its licenses to use wireless spectrum to a number of companies that sought to acquire that spectrum. (Compl. ¶ 70); Primeau Aff. ¶ 25. From the initial Alliance closing in March 2001 until May 2002, the Goldman Sachs Defendants caused Clearwire to continue to assert to the Alliance members that Clearwire had the right to acquire from them any of their spectrum licenses that became available. This had the effect of precluding Alliance members generally and NACEPF specifically, from offering those licenses to third parties or extending the term of any expiring licenses. Throughout this period there were ready, willing and able acquirers for those expiring licenses, but none of those potential acquisitions went forward because of the Defendants' continued misrepresentations. (Compl. ¶ 38); Primeau Aff. ¶ 25.

The Defendants' representations regarding Clearwire's claims were false. The Defendants directed Clearwire to continue to claim entitlement to those licenses to pressure Sprint, WorldCom and others to agree to cooperate with Clearwire in dividing the wireless

market. The Goldman Directors directed Clearwire to make its claims to the Alliance's ITFS spectrum, while knowing that Clearwire lacked the funding to acquire and use that spectrum and that Goldman Sachs would not provide that funding. (Compl. ¶ 39).

The Defendants' actions were not justified by any legitimate business interest of Clearwire. The Defendants used Clearwire to speculate on the value of spectrum licenses by holding the Alliance's licenses captive under an improper claim of right under the Master Agreement. When the Defendants determined that Clearwire financially could not pursue development of the wireless network that the Master Agreement contemplated, then it had no legitimate right to hold on to NACEPF's license rights. (Compl. ¶ 73).

### 3. **Interference with the Alliance and its Acquisitions.**

On or about the summer of 2002, Clearwire began separate negotiations with the individual members of the Alliance to end Clearwire's obligations to the members. Clearwire failed in this attempt and on September 11, 2002, effectuated a Board of Directors resolution that caused Clearwire to breach the Master Agreement by denying the consideration due the Alliance members for delivered spectrum. (Compl. ¶ 41); Primeau Aff. ¶ 27, *Exh. 9.*

Thereafter, the Goldman Directors had Clearwire, in its Board book of February 12, 2003, outline explicitly a scheme to invert Clearwire with a subsidiary of Holdings to allow the Goldman Directors to eradicate the claims of the Alliance against its investment in Clearwire. Primeau Aff. ¶ 28, *Exh. 10*. This explicit threat fragmented the Alliance so that eventually Clearwire paid over $2 million to HITN and ITF to settle their claims and limiting its payments to that amount by otherwise threatening to file for bankruptcy protection. These settlements left NACEPF as the sole remaining member of the Alliance. (Compl. ¶ 42); Primeau Aff. ¶¶ 29-32.

The Defendants, by their fraudulent conduct and misrepresentations, fragmented the Alliance and destroyed its collective value. In so doing, the Defendants prevented Plaintiff from obtaining the benefits to which it was entitled under the Master Agreement and further caused Plaintiff to lose substantial opportunities the Alliance provided, as well as opportunities to

acquire additional spectrum at low cost with a high rate of return, by reducing its leverage in the market. (Compl. ¶ 43).

**C. Fraud and Breach of Fiduciary Duties in Context of C Round Financing.**

Plaintiff is also a shareholder who owned Preferred shares of Clearwire on or about August 15, 2003, the date of the initial "C" round offering ("the C Round Financing"), through and including November 14, 2003, the date of Clearwire's sale of a majority of its assets to Flux U.S. Corporation, a Craig O. McCaw-related entity (the "McCaw Sale"). (Compl. ¶ 3). According to Clearwire's records, NACEPF owned approximately 1% of the outstanding stock of Clearwire on or about August 15, 2003. (Compl. ¶ 4).[8]

In a memorandum to investors dated May 6, 2003 (the "Investor Update"), Clearwire notified the shareholders that it had engaged UBS Warburg to assist Clearwire in raising additional capital. The memorandum warned that "the capital markets remain very tight and there are no assurances that we will be successful in our efforts. In connection with any fund raising into Holdings we will notify you with the specifics of an investment and provide you the opportunity to invest. The Company's cash position at the date of this letter is approximately $3.6 million and we anticipate needing to conclude on our capital raising efforts within the next 30-60 days." Primeau Aff. ¶ 39, *Exh. 14*. In light of the memorandum, the shareholder investors clearly understood Clearwire's financial position to be critical. (Compl. ¶ 46).

Around the same time of the Investor Update, in or about the Spring of 2003, the Individual Defendants began discussing a possible sale of Clearwire, or a sale of substantially all of Clearwire's assets, with the McCaw Group (the McCaw Sale"). Craig O. McCaw, described by industry media as "one of the most celebrated of the telco tycoons" and "the wireless industry's most prominent entrepreneur," became well known in the mid-1990s for his creation

---

[8]NACEPF maintains that it is entitled to a much larger equity interest in Clearwire by virtue of the unpaid monies that were due and owing under the terms of the Master Agreement.

of the first national wireless network, which he later sold to AT&T for a substantial sum. (Compl. ¶ 47) *See Exhibit A.*

The negotiations for the McCaw Sale led to a scheme concocted by the Defendants, which was consummated in or about November 2003, whereby Clearwire agreed to sell the common shares of Clearwire's subsidiaries, CTI, CCI and Clearwire Spectrum Corp., to Flux, which later changed its name to Clearwire. Defendants recognized the significant and immediate impact a transaction with McCaw was likely to have, and undertook to develop a scheme which would allow them to capture the benefit of the McCaw Sale for themselves. (Compl. ¶ 48).

Despite having been in negotiations for the McCaw Sale, on or about August 15, 2003 (the "August 15, 2003 Notice"), Clearwire announced a proposal to raise emergency bridge financing (the "Bridge Financing") in the form of convertible notes (the "Original Offer"). Primeau Aff. ¶ 41, *Exh. 15*. Significantly, the August 15, 2003 Notice did not mention the McCaw Sale, but rather pointed to failed negotiations with AT&T as the reason for the emergency financing, and stated that "[t]he Bridge Financing will provide the Corporation with additional time to pursue a new round of financing and to pursue other strategic alternatives, which may include a sale or merger of the Corporation." (Compl. ¶ 49).

On or about August 20, 2003, Clearwire sent a second notice to shareholders (the "August 20, 2003 Notice") terminating the Original Offer and replacing it with the new Preemptive Rights Offer. Primeau Aff. ¶ 42, *Exh. 16*. The Defendants with the intent to give themselves a major liquidation preference in the upcoming McCaw Sale amended the Preemptive Rights Offer. (Compl. ¶ 50, 51).

Neither the Original Offer nor the Preemptive Rights Offer disclosed the pending McCaw Sale or any details of that transaction to the minority shareholders. Even after NACEPF filed a formal action for Books & Records under Delaware law, the records and information produced did not disclose the potential McCaw sale. Primeau Aff. ¶ 40. Participation by investors, including the Defendants, in the C Round of financing raised a mere $600,000. Given the monthly burn rate of $2.1 million, this was an inconsequential sum, not intended or able to

continue the operations of Clearwire. As the McCaw name was withheld, little reason existed to participate on the part of the shareholders. (Compl. ¶ 53).

The purported bridge financing was in fact part of a scheme to defraud the minority stockholders by diluting certain stockholder interests and by limiting participation in the C Round Financing to Goldman Sachs and the Individual Defendants in anticipation of the pending McCaw Sale so that they might obtain the benefits of that transaction for themselves.

Without information or notice of the pending McCaw Sale, many of the existing shareholders, including the Plaintiff, did not participate in the C Round Financing in reliance on the representations set forth in the Investor Update, the C Round offerings and other related materials regarding Clearwire's dim financial picture. Primeau Aff. ¶ 47. Without knowledge or understanding that Clearwire's business was about to engage in the McCaw Sale, the stockholders would not have seen anything favorable in the recent history of Clearwire to warrant further investment. Defendants, of course, knew that to be the case and capitalized upon it. (Compl. ¶ 54).

Information of the pending McCaw Sale was, however, shared with a few limited investors, including members of the management team and their immediate families. These selected few received additional shares of stock by subscribing into the Series C Round, thereby diluting the existing shareholders. This evident self-dealing and failure to disclose the pending McCaw Sale to *all* shareholders served to bolster the ownership position of Clearwire's controlling shareholders, the management team and their families. The $600,000 was, in fact, not necessary to be raised in order to keep Clearwire afloat for the couple of months needed to get to a closing with McCaw. There were other means available, such as deferring exorbitant executive compensation. Instead, the Series C Round was undertaken as a means to dilute existing stockholders for the benefit of the insiders. (Compl. ¶ 55).

Defendants disseminated the materially false and misleading statements and material omissions as described herein with the knowledge that the statements would be reviewed and

relied upon by Plaintiff in deciding whether or not to participate in the C Round Financing. (Compl. ¶ 97).

At the time of these material misrepresentations and omissions, Plaintiff reasonably and justifiably relied upon the misstatements and omissions, and upon the superior knowledge and expertise of Defendants in connection with the financial condition of Clearwire. Primeau Aff. ¶ 48. If the Defendants had made full and adequate disclosures, Plaintiff would have participated and was entitled to a participation of substantially more than the books controlled by Clearwire indicated. Primeau Aff. ¶ 49. As a result of Defendants' fraudulent scheme to dilute certain shareholders and to bolster their ownership position in Clearwire, Plaintiff was deceived as to the benefits of participating in light of the pending McCaw Sale. (Compl. ¶ 98).

Upon information and belief, on or about November 14, 2003, the Board of Directors approved the long awaited McCaw Sale, and related transactions. As noted, the transaction involved the sale of Clearwire's ownership in CTI, Clearwire's operating entity, in exchange for a combination of cash and stock in Flux (now Clearwire), and the creation of a new Holdings entity. Clearwire has never notified its shareholders, including Plaintiff of the sale of assets. Moreover, the shareholders, including Plaintiff, have received no information concerning the details of the McCaw Sale or the distribution of stock and consideration from that sale. To date, Holdings appears to have taken no steps to liquidate Clearwire or distribute the consideration received in the McCaw Sale. (Compl. ¶ 56)

The filing of a complaint by other minority shareholders against the Defendants and other officers and directors of Clearwire in the Delaware Court of Chancery on August 11, 2006 placed in the public domain the fact of the McCaw Sale and the scheming by the Defendants. (Compl. 57; GS Memo, Exh. F).

## III. RELATED LAWSUITS[9]

On or about November 20, 2003, NACEPF filed suit against Clearwire in the Delaware Superior Court alleging breach of Master Agreement. This lawsuit was voluntarily dismissed because at the time NACEPF was unaware of the McCaw Sale and believed that Clearwire had no value. Consequently, NACEPF filed an action against Gheewalla, Cardinale and Daly in Delaware Superior Court for fraudulent inducement, breach of fiduciary duty and interference with prospective business opportunities in their capacities as directors of Clearwire. After the Defendants argued that only the Delaware Court of Chancery had subject matter jurisdiction over them as fiduciaries, NACEPF consented to dismissal and the transfer of the action to the Delaware Chancery Court. At this time, NACEPF was still unaware of the McCaw deal and the fact Clearwire had value in the form of shares of McCaw/Flux stock. As a result, the breach of fiduciary duty claims in the Delaware action involved primarily the failure of the Defendants to preserve assets for the benefit of its creditor, NACEPF.[10]

After the case was transferred, Defendants continued to argue that they were not subject to jurisdiction in the Delaware Chancery Court and filed a motion in support of dismissal on or about September 16, 2005. After extensive briefing by both parties, the Delaware Chancery Court dismissed the action in September 2006. The Court found it lacked personal jurisdiction over the Defendants. In the absence of personal jurisdiction, neither of the other claims was addressed on the merits.

Although NACEPF has appealed this decision to the Delaware Supreme Court (recently argued and decision pending), it is significant that despite the fact the case has been pending for

---

[9] Apart from the actual complaint and decision in the *NACEPF* Delaware action, none of the other pleadings or briefs attached by Defendants as Exhibits A-G are even marginally relevant to the factual allegations in the Complaint and should not be considered by this Court. *Hasbro, Inc. v. Mikohn Gaming Corp.*, 2006 WL 2035501 (D.R.I. 2006); *See Boateng v. InterAmerican University, Inc*., 210 F.3d 56 (1st Cir. 2000) (considering complaint and judgment in prior court action to determine whether res judicata was applicable to pending case); *and Cesario v. Bergquist*, 2006 WL 587598 (D.R.I. 2006) (prior court decisions) *and Guzman-Ruiz v. Hernandez-Colon*, 406 F.3d 31 (1st Cir. 2005) (refusing to take judicial notice of another case involving similarly situated plaintiffs).

[10] This remains a viable claim in the Delaware action, and these claims are not inconsistent, as Defendants assert. Until the McCaw deal, Clearwire failed to preserve and utilize its assets for the benefit of NACEPF as creditor.

almost two years, no discovery as to the merits of NACEPF's claims has begun such that the case is still at the most preliminary of stages.

After the Delaware action was filed, other shareholders of Clearwire filed suit against many of the same defendants in this case, alleging breach of fiduciary duty, fraud and unjust enrichment with respect to the C Round financing and failure to disclose the fact of the pending McCaw sale.[11] *See* Stritzinger Complaint, GS Memo, Exh. F.[12] The filing of this action prompted NACEPF to consider whether it could assert similar claims, as the *Stritzinger* Complaint contained allegations that confirmed NACEPF's suspicions regarding the fraud, misrepresentations, breach of fiduciary duty and tortious conduct of Goldman Sachs and the Individual Defendants.

Accordingly, NACEPF elected to file one suit in the United States District Court for the District of Rhode Island, containing all of its claims against Goldman Sachs and the Individual Defendants, a forum where NACEPF was incorporated and located, where the fraudulent misrepresentations were directed and where the effects of the fraudulent and tortious conduct were sustained.[13]

Despite the Defendants' asseverations to the contrary, the Individual Defendants have only defended one other action brought by NACEPF, which was dismissed on personal jurisdiction grounds, subject to appellate review. Certainly, this does not equate to multiple or vexatious litigation. While the Goldman Sachs Defendants are parties to a similar case brought in Delaware by other named Plaintiffs, NACEPF cannot be tagged with pursuing a "scorched

---

[11] As readily ascertained from a review of the *Stritzinger* Complaint, this action was not brought as a class action and NACEPF was not required to participate in said action. GS Memo, Exh. F, ¶ 1 and 2 (referring to Plaintiffs as a group of shareholders).

[12] Defendants make much of the fact that another partner in the law firm that represents NACEPF filed this complaint. This coincidence is of no moment to the issues in this case.

[13] The Complaint was dated and filed on November 14, 2006 as indicated on the date stamped copy obtained from the Court. *See Exhibit B* (first page of the Complaint) attached hereto.

earth litigation strategy" simply because it chose to bring its own action in the forum where it is located and maintains its principle place of business.[14]

## LEGAL ARGUMENT

### I. THE INDIVIDUAL DEFENDANTS HAVE BEEN PROPERLY SERVED IN ACCORDANCE WITH RULE 4 OF THE FEDERAL RULES OF CIVIL PROCEDURE.

Federal Rule of Civil Procedure 4(e) provides that service may be effectuated "(1) pursuant to the law of the state in which the district court is located." Under Rhode Island state law, service may be accomplished by certified mail where a defendant is otherwise subject to personal jurisdiction in Rhode Island. R.I. Rules of Civil Procedure 4(f)(1). "Service by registered or certified mail should be regarded as equally efficacious [as personal service] from a constitutional perspective to invoke personal jurisdiction since the return receipt normally guarantees that the defendant or someone related or associated with him has received the process, although it is obviously not constitutionally required." *Flynn v. Al-Amir*, 811 A.2d 1146, 1151 (R.I. 2002) (quoting from 4A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure: Civil 3d 1074 at 359-60 (2002)).

On or about February 8, 2007, Rob Gheewalla was served a Summons and Complaint by certified mail at his home address, as evidenced by the signed return receipt. *See* Affidavit of Service Pursuant to Rule 4, Court Document 32. On or about February 5, 2007, Jack Daly was served a Summons and Complaint by certified mail at his home address, as evidenced by the signed return receipt. *See* Affidavit of Service Pursuant to Rule 4, Court Document 28. On or about February 9, 2007, Gerry Cardinale was served a Summons and Complaint by certified mail

[14] Interestingly, as they have done in this Court, Defendants GS Capital Partners III Offshore, L.P. and Goldman Sachs & Co. Verwaltungs GmbH have moved to dismiss the complaint for lack of personal jurisdiction in the *Stritzinger* action and the other defendants have moved to dismiss the complaint pursuant to Rule 12(b)(6) and Rule 9(b) of the Chancery Court Rules. *See Exhibit C* attached hereto. Although that motion was filed on October 25, 2006, no briefing schedule or hearing date has been set.

at his home address, as evidenced by the signed return receipt. *See* Affidavit of Service Pursuant to Rule 4, Court Document 33.

Accordingly, since the Individual Defendants are subject to personal jurisdiction in Rhode Island, as argued *infra*, service of process upon the Individual Defendants by certified mail was proper and the Complaint may not be dismissed for insufficient service of process.

## II. THIS COURT HAS PERSONAL JURISDICTION OVER EACH OF THE DEFENDANTS.

### A. Standard of Review

In considering a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, a district court must construe the facts from the pleadings and affidavits in the light most favorable to the plaintiff. *Boit v. Gar-Tec Products, Inc.*, 967 F.2d 671, 675-676 (1st Cir. 1992). Moreover, until a full evidentiary hearing or a trial on the merits is held, a plaintiff need only set forth prima facie evidence of personal jurisdiction. *McAleer v. Smith*, 728 F. Supp. 857, 861 (D.R.I. 1990). A court may look to extraneous materials outside the pleadings to determine whether a basis for jurisdiction exists. *Id.* at 860. The First Circuit has described a plaintiff's burden of proof under this prima facie standard as "generous" and "light" when analyzing whether the requirements for specific jurisdiction have been met. *Jet Wine & Spirits, Inc. v. Bacardi & Company, Ltd.*, 298 F. 3d 1, 7, 8 (1st Cir. 2002).

The First Circuit enumerated the requirements of the prima facie standard in *Boit v. Gar-Tec Products, Inc.*, 967 F.2d 671, 675-676 (1st Cir. 1992). Under this standard a plaintiff is required to proffer evidence that, if believed, would support the findings of all facts essential to jurisdiction under both the long-arm statute and the due process clause. *Id.* at 675. The district court does not act as a fact finder but accepts the evidence proffered by the plaintiff, and all reasonable inferences to be drawn therefrom, as true. *Id*. Once a plaintiff has provided affirmative evidence of the propriety of jurisdiction, the court must accept those facts for the purposes of the motion, even if the movant disputes them. *CVS Corporation v. Taubman*

*Centers, Inc.*, 225 F. Supp.2d 120, 123 (D.R.I. 2002). Thus, in applying the prima facie standard, this Court is required to accept Plaintiff's affidavit as true. *Boit v. Gar-Tec Products, Inc.*, 967 F.2d at 679.

**B. Basic Tenets of Personal Jurisdiction Jurisprudence.**

Two inquiries frame the jurisdictional dispute: 1) whether the forum state's long arm statute has been satisfied, and 2) whether the assertion of jurisdiction satisfies the Fourteenth Amendment's due process clause. *See Sawtelle v. Farrell*, 70 F.3d 1381, 1387 (1st Cir. 1995); *Microfibres, Inc. v. McDevitt-Askew*, 20 F. Supp.2d 316, 320 (D.R.I. 1998). A federal court must look to the forum state's general jurisdictional or long-arm statute to determine whether in personam jurisdiction exists over a nonresident defendant. *Dupont Tire Serv. Center, Inc. v. North Stonington Auto-Truck Plaza, Inc.*, 659 F. Supp. 861 (D.R.I. 1987). In this regard, R.I. Gen. Laws § 9-5-33 provides: "[e]very foreign corporation, every individual not a resident of this state . . . that shall have the necessary minimum contacts with the State of Rhode Island, shall be subject to the jurisdiction of the State of Rhode Island . . . in every case not contrary to the provisions of the constitution or laws of the United States." Since R.I. Gen. Laws § 9-5-33 has been interpreted to mean that Rhode Island courts may exercise jurisdiction up to the constitutional limitation, only the constitutional limits constrain this Court's jurisdiction.

The well-established constitutional limit permits the exercise of in personam jurisdiction where a defendant has "minimum contacts" with the state sufficient to insure that suit against him there does not offend "traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S. Ct. 154, 158 (1945). The fundamental question is whether "the defendant's conduct and connection with the forum state are such that he should reasonably anticipate being haled into court there." *Violet v. Picillo*, 613 F. Supp. 1563, 1574 (D.R.I. 1985). This fact sensitive analysis focuses on the relationship among the defendant, the forum and the litigation to determine whether there is some act by which the defendant purposely availed itself of the privilege of conducting activities within the forum state,

thus invoking the benefits and protections of its laws. *Ticketmaster-New York, Inc. v. Alioto*, 26 F.3d 201 (1st Cir. 1994).

Courts recognize two strains of personal jurisdiction that satisfy the minimum contacts standard. A defendant who maintains systematic and continuous contacts with the forum state may be subject to a court's *general* jurisdiction, whether or not the underlying lawsuit is related to those contacts. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414-16, 104 S. Ct. 1868, 80 L.Ed.2d 404 (1984). When a nonresident defendant subjects itself to the general jurisdiction of the forum's courts, it does so with respect to *all* claims, regardless of whether they relate to or arise out of the nonresident's contacts with the forum. *Phillips Exeter Acad. v. Howard Phillips Fund, Inc.*, 196 F.3d 284, 288 (1st Cir.1999); *Rose v. Firstar Bank*, 819 A.2d 1247, 1250 (R.I. 2003) (citing to *International Shoe Co*., 326 U.S. at 318, 66 S. Ct. 54)). In the absence of systematic and continuous contacts, a court may exercise *specific* jurisdiction when the underlying action arises from or is related to a significant subset of contacts between the defendant and the forum. *Phillips Exeter Acad. v. Howard Phillips Fund, Inc.*, 196 F.3d at 288.

Whether the basis for this Court's jurisdiction is general or specific jurisdiction, the Court must determine whether the actual exercise of jurisdiction over a defendant is reasonable. *Noonan v. Winston Company*, 135 F.3d 85, 89 (1st Cir. 1998). Reasonableness is determined by weighing what has been termed by this Circuit as the "gestalt factors" which touch upon the fundamental fairness of an exercise of jurisdiction, as follows:

> (1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies.

*Foster-Miller, Inc. v. Babcock & Wilcox, Canada*, 46 F.3d 138, 150 (1st Cir. 1995).

### C. This Court Has General Jurisdiction Over Goldman Sachs Group, Inc.

#### 1. Goldman Sachs Group, Inc. Maintains Continuous and Systematic Contacts with the State of Rhode Island.

"General jurisdiction exists when the litigation is not directly founded on the defendant's forum-based contacts, but the defendant has nevertheless engaged in continuous and systematic activity, unrelated to the suit, in the forum state." *United Elec., Radio and Machine Workers of America v. 163 Pleasant Street Corp.*, 960 F.2d 1080, 1088 (1st Cir. 1992). Once obtained, general jurisdiction permits a Defendant to be sued in the forum on any claim.

Defendant GS Group has properly conceded that this Court may exercise general jurisdiction over it based upon the fact that it has a registered agent for service of process within the State of Rhode Island. GS Memo, p. 14. Accordingly, this Court need only confirm that the exercise of jurisdiction over GS Group is reasonable for each of the claims asserted in this case to proceed against GS Group. *Phillips Exeter Acad. v. Howard Phillips Fund, Inc.*, 196 F.3d at 288.

#### 2. Consideration of the "Gestalt factors" Supports the Exercise of Jurisdiction Over Goldman Sachs Group, Inc.

##### a. GS Group's Burden of Appearing Does Not Prevent the Exercise of Jurisdiction.

First, although there may be some burden on the GS Group to litigate in Rhode Island, the same burdens of travel or inconvenience would be incurred on the part of the Plaintiff in the likely alternative forum, New York. In addition, this purported burden must be looked on with skepticism, as GS Group has six attorneys enter their appearance on its behalf.[15] Most importantly, since defending in a foreign jurisdiction almost always presents some measure of inconvenience, this factor only becomes meaningful where a party can demonstrate a "special or unusual burden." *Pritzker v. Yari,* 42 F.3d 53, 64 (1st Cir. 1994). The GS Group has not met this

---

[15] Indeed, this asserted burden borders on the preposterous in light of Goldman Sach's acknowledged stature as a billion dollar investment company. *See Exhibit A.*

burden. In this regard, although GS Group argues that it faces the burden of defending in two forums, the Delaware action in which GS Group is a defendant was not brought by NACEPF and therefore has no bearing on this analysis. Furthermore, as indicated earlier in this memorandum, although the Defendants in the *Stritzinger* action have filed identical motions to those filed in this action, the case is at a virtual standstill with no briefing schedule set as of the date of this response.

**b. Rhode Island's Interest in Adjudicating the Dispute Supports the Exercise of Jurisdiction.**

Rhode Island has a substantial interest in adjudicating this dispute. The source of the parties' dispute is a business relationship to which one of the parties is a Rhode Island corporation, which as a result of tortious actions of GS Groups' agents and employees, namely, fraudulent misrepresentations, tortious interference and breach of fiduciary duty, has sustained injuries in Rhode Island. When the state defines rights against tortious conduct, it is publicly proclaiming its will to deter that specific conduct, and when ignored by individuals engaging in proscribed conduct, the state has a heightened interest in judicially redressing any injurious effects felt within its border. *See Anderson v. Century Products Co.*, 943 F. Supp. 137, 146 (D.N.H. 1996). As the Supreme Court has stated:

> A state has an especial interest in exercising judicial jurisdiction over those who commit torts within its territory. This is because torts involve wrongful conduct which a state seeks to deter, and against which it attempts to afford protection, by providing that a tort-feasor shall be liable for damages which are the proximate result of his torts.

*Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 776, 104 S. Ct. 1473, 1479, 79 L.Ed.2d 790 (1984). Defendants cavalierly state that Delaware law governs this action, citing to *Young v. Lepone*, 305 F. 3d 1, 13 (1st Cir. 2002), which did not address the applicable law on the merits, but remanded the case to the district court. Nevertheless, because Plaintiff's claims are based upon fraudulent conduct and tortious interference, in addition to the breach of fiduciary duty

counts, it is clear that Rhode Island law would be applicable to those claims, at a minimum. *See Crellin Technologies, Inc. v. Equipmentlease Corp.*, 18 F. 3d 1, 11-13 (1st Cir. 1994).

Furthermore, in determining Rhode Island's interest in adjudication, this Court should assess its legitimacy and not compare its interest to that of some other jurisdiction. *Foster-Miller, Inc. v. Babcock & Wilcox, Canada*, 46 F.3d at 151. Consequently, Rhode Island has an interest in resolving this dispute, which warrants the exercise of jurisdiction.

**c. Plaintiff's Interest in Obtaining Convenient and Effective Relief Favors the Exercise of Jurisdiction.**

Plaintiff has an interest in obtaining relief through the Rhode Island courts, the court of its own state, as demonstrated by its choice to bring suit here. As to this factor, the First Circuit has repeatedly observed that a plaintiff's choice of forum must be accorded a degree of deference with respect to the issue of its own convenience. *See, e.g., Foster-Miller, Inc. v. Babcock & Wilcox, Canada*, 46 F.3d at 151. In this regard, although GS Group argues that witnesses are located elsewhere, the GS Group has not identified these witnesses and, accordingly, this bare assertion cannot be considered by this Court as a basis to deny jurisdiction.

**d. The Judicial System's Interest in Obtaining the Most Effective Resolution of the Controversy Supports Jurisdiction.**

GS Group argues that the existence of two other similar cases pending in Delaware factors into the jurisdictional picture. As a factual and procedural matter, these cases are not relevant, to wit: the *Stritzinger* Delaware action was brought by separate plaintiffs and has not been designated a class action. The *NACEPF* Delaware action presently on appeal to the Delaware Supreme Court does not involve the same claims or GS Group as a named defendant. Moreover, the case GS Group cites to support its contention that parallel litigation constitutes a basis to decline jurisdiction, *M & I Eastpoint Tech., Inc. v. Mid-Med Bank,* 2000 U.S. Dist. LEXIS 1146 (D.N.H. 2000) is inapposite. In *M & I Eastpoint Tech., Inc.*, the motion to dismiss for lack of personal jurisdiction was *denied* by the Court. In so ruling, the Court stated that it

was "mindful" that the personal jurisdiction factors and the forum non-conveniens factors should not be conflated into the same analysis.

In short, this factor does not provide grounds for this Court to decline jurisdiction.

**e. The Common Interests of all Sovereigns in Promoting Substantive Social Policies Supports the Exercise of Jurisdiction.**

The common interests in promoting relevant state substantive social policies permits the exercise of personal jurisdiction in this case inasmuch as "the most prominent policy implicated is the ability of a state to provide a convenient forum for its residents to redress injuries inflicted by out-of-forum actors." *Sawtelle v. Farrell,* 70 F.3d 1381, 1395 (1st Cir. 1995).

This case involves considerable activity directed at a Rhode Island Plaintiff, which effects were sustained in Rhode Island. Most, if not all, of the claims will be governed by Rhode Island law. *Crellin Technologies, Inc. Equipmentlease Corp.*, 18 F. 3d at 11-13.[16] As such, GS Group's continued harping that this case involves no activity in Rhode Island belies the facts and the extensive communications between the Plaintiff and the Defendants in Rhode Island.[17]

In summary, the "gestalt factors" support the conclusion that this Court may constitutionally exercise personal jurisdiction over Defendant GS Group in this action.

**D. This Court Has Specific Jurisdiction Over the Individual Defendants.**

A court may exercise specific jurisdiction when the underlying action arises from or is related to contacts between the defendant and the forum. *Phillips Exeter Acad. v. Howard*

---

[16] The choice of law issue is more fully addressed in Plaintiff's Memorandum in Support of its Objection to Defendants' Rule 12(b)(6) Motion to Dismiss, which to the extent necessary is incorporated herein by reference.

[17] These communications will be addressed more fully *infra* with respect to the Individual Defendants. Suffice to say that for the purpose of the GS Group's contacts, it is well established that the acts of its agents, the Individual Defendants, may be imputed to GS Group for jurisdictional purposes. *See Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.C.*, 290 F. 3d 42 (1st Cir. 2002). As the First Circuit has aptly observed, where a corporation has directed its actions at the forum from outside the state, "it might frustrate the relevant state substantive social policies to insulate [said corporation] from the legal consequences of its actions." *Jet Wine & Spirits, Inc. v. Bacardi & Company, Ltd.*, 298 F. 3d at 12.

*Phillips Fund, Inc.*, 196 F. 3d 284, 288 (1st Cir. 1999). "Specific jurisdiction exists when there is a demonstrable nexus between a plaintiff's claims and a defendant's forum based activities." *Mass. School of Law at Andover, Inc. v. American Bar Ass'n*, 142 F.3d 26, 34 (1st Cir. 1998).

The three-pronged test for the exercise of specific jurisdiction is whether the litigation relates to the defendant's forum state activities, whether the defendant's contacts purposely invoked the protection of the state's laws, and whether the exercise of jurisdiction is reasonable. *Phillips Exeter Acad. v. Howard Phillips Fund, Inc.*, 196 F. 3d at 288; *Northeastern Land Services, Ltd. v. Schulke*, 988 F. Supp. 54 (D.R.I. 1997). Reasonableness is determined by weighing what has been termed by this Circuit as the "gestalt factors" which touch upon the fundamental fairness of an exercise of jurisdiction. *Foster-Miller, Inc. v. Babcock & Wilcox, Canada*, 46 F.3d 138, 150 (1st Cir. 1995).

The facts and circumstances of this case meet the three-tiered test for the exercise of specific jurisdiction over the Individual Defendants, as amply demonstrated below.

**1. <u>Each of the Individual Defendants has Sufficient Minimum Contacts with the State of Rhode Island which are Related to Plaintiff's Claims.</u>**

In this case it cannot be credibly disputed that the Individual Defendants in fact had substantial contacts with Plaintiff NACEPF and its President John Primeau in Rhode Island. For the purpose of specific jurisdiction, contacts are judged when the cause of action arose, regardless of a later lessening or withdrawal. *Cambridge Literacy Properties v. Goebel Porzellanfabrik*, 295 F.3d 59, 66 (1st Cir. 2002).

In the Complaint, Plaintiff has made the following allegations with respect to the Individual Defendants which illustrate the numerous and substantive contacts with this jurisdiction:

- Gheewalla directed substantial contacts toward NACEPF in Rhode Island related to the allegations set forth herein. (Compl. ¶ 5)

- Cardinale participated in numerous correspondences and communications directed toward NACEPF in Rhode Island related to the allegations set forth herein. (Compl. ¶ 6)

- Daly participated in numerous correspondences and communications directed toward NACEPF in Rhode Island related to the allegations set forth herein. (Compl. ¶ 7)

- Daly met with the President of NACEPF in Rhode Island on at least one occasion in Spring 2003, whereby Daly attempted to induce NACEPF to settle its claims under the Master Agreement. (Compl. ¶ 7)[18]

- Defendants Gheewalla, Cardinale and Daly had direct personal involvement in the actions and fraudulent conduct alleged herein which is causally related to the substantial damages sustained by NACEPF in Rhode Island. (Compl. ¶ 10)

- Defendants Gheewalla, Cardinale and Daly knowingly directed, actively participated in or made false statements intending that they be relied upon by NACEPF in Rhode Island. (Compl. ¶ 11)

- The [Individual] Defendants directed the negotiations with the Alliance members and Clearwire was the conduit Goldman Sachs used to further its objectives. (Compl. ¶ 27)

- On June 7, 2000, Defendant Cardinale on Goldman Sachs' behalf sent a memo to the Alliance that contained misrepresentations with respect to Goldman Sachs' investment with the Alliance. (Compl. ¶ 31)

These communications are further described and specified in the Affidavit of John Primeau, the President of NACEPF ("Primeau") filed herewith as follows:

- Portions of the Clearwire/Spectrum Working Group List prepared by Fried Frank (*Exhibit 2*), clearly shows that Gheewalla, Cardinale and Daly, as representatives of Goldman Sachs, were substantially involved in the negotiation of the Master Agreement. (Primeau Aff. ¶ 9)

- During the course of the negotiations, and at all pertinent times as alleged in the Complaint, Goldman Sachs, Gheewalla, Cardinale and Daly were

[18] Defendants contend that this contact should not be considered because it was undertaken for the purpose of settlement. However, this contact can be considered by this Court as it evinced both the business relationship and the dispute between the parties. *See Borschow Hospital & Medical Supplies, Inc. v. Burdick-Siemens Corp.*, 143 F.R.D. 472 (D.P.R. 1992) (finding jurisdictional requirements met when a foreign nonresident defendant sent letters and faxes addressing the subject matter of the dispute and visited the local forum to discuss resolution of the dispute).

represented by attorneys Fried, Frank, Harris, Shriver & Jacobson ("Fried Frank"). Dan Ronnen was the primary contact with respect to the negotiations. (Primeau Aff. ¶ 10; *Exh. 3*)[19]

- On or about March 13, 2001, Fried Frank, as agents for Goldman Sachs, caused five volumes of closing documents to be delivered by courier to NACEPF in Rhode Island. (Primeau Aff. ¶ 22)

- During 2001, Primeau had numerous e-mail communications with Dan Ronnen, at least fourteen, most if not all of which were copied or sent directly to Jack Daly and Gerry Cardinale, with respect to the terms of the Master Agreement. (Primeau Aff. ¶ 13)

- Primeau compiled a spreadsheet listing some of the e-mail communications between NACEPF, Dan Ronnen, Fried Frank, Cardinale and Daly, derived from a search of NACEPF's computer records, attached to his Affidavit as *Exh. 5*.

- During 2001, prior to the execution of the Master Agreement, Primeau had several e-mail communications with other individuals at Fried Frank, most if not all of which were copied or sent directly to Jack Daly and Gerry Cardinale, with respect to the terms of the Master Agreement. (Primeau Aff ¶ 14; *Exh. 5*)

- During 2001, prior to and after the execution of the Master Agreement, Primeau had several e-mail communications directly with Jack Daly and Gerry Cardinale with respect to the terms of the Master Agreement. (Primeau Aff ¶ 15; *Exh. 5*)

- . During this time frame, based upon a review of NACEPF's telephone records, Primeau had various telephone conversations with Jack Daly, while at NACEPF's offices in Rhode Island. (Primeau Aff ¶ 16; *Exh. 5*)

- Primeau compiled a spreadsheet listing some of these telephone communications, between NACEPF, Dan Ronnen, Fried Frank, Cardinale and Daly derived from his search of NACEPF's telephone records, is attached hereto as *Exh. 6*.

- During this time frame, based upon a review of NACEPF's telephone records, Primeau had various telephone conversations with Dan Ronnen

[19] It is beyond cavil that an attorney acts as an agent of his client for the purpose of factual statements and representations made to third parties. *See generally*, Restatement (Third) of Agency § 1.01 Comment c; *29 Am.Jur.2d §820* ("Statements made by an attorney concerning a matter within the scope of the attorney's representation of the client may be admitted against the client as substantive evidence under the rule of evidence admitting statements by agents and employees as admissions of party-opponent.")

and other attorneys at Fried Frank, while at NACEPF's offices in Rhode Island. (Primeau Aff. ¶ 17; *Exh. 6).*

- After the execution of the Master Agreement and throughout 2001, Primeau had numerous e-mail and telephone communications with Gerry Cardinale and Jack Daly regarding Goldman Sachs' performance of its obligations under the Master Agreement. (Primeau Aff. ¶ 24; *Exh. 5, Exh. 6*)

- In the Spring of 2003, Primeau had various communications, via telephone and e-mails, with Jack Daly regarding amending, modifying or terminating the Master Agreement with respect to NACEPF. (Primeau Aff. ¶ 30; *Exhibit 11*; *Exh. 5; Exh. 6)*

- In March 2003 Daly traveled to NACEPF's offices in Rhode Island to discuss the status of the Alliance Master Agreement. (Primeau Aff. ¶ 31)

- NACEPF refused to be bought off by Goldman Sachs' threats and deceit, despite receiving a telephone call from Daly on May 8, 2003, stating that suit would be filed against NACEPF if a new agreement could not be reached. (Primeau Aff. ¶ 34).

Furthermore, it is alleged that Goldman Sachs and the Individual Defendants directed the actions of Clearwire. (Compl. ¶ 12; ¶ 27). The Individual Defendants have not disputed this allegation. Thus, with respect to the C Round financing, including the sending of the offering letters and the failure to disclose the negotiations with McCaw, the communications by Clearwire alleged in the Complaint should be attributed to Goldman Sachs and the Individual Defendants. (Compl. ¶ 49, 50). *See Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.C.*, 290 F. 3d 42 (1st Cir. 2002).

As attested to in the Affidavit of John Primeau:

- On August 29, 2003, my attorney communicated with Dan Ronnen, whose response was copied to NACEPF in Rhode Island, wherein he stated "on behalf of Goldman Sachs" that they would not accept a reservation of rights to assert claims with respect to the process of the C Round offering, requiring instead that a participant waive "any right to later assert claims and damages in connection with how the process was handled or with respect to any purported diminution in the rights of Series A and B shares by the GS Parties." (Primeau Aff. ¶ 46; *Exhibit 17*)

This communication establishes both the agency of Fried Frank in the context of the C Round financing as well as the fact that the actions of Clearwire were orchestrated by Goldman Sachs. Thus, the May 6, 2003 Investor Update, the August 15, 2003 offer letter and the August 20, 2003 offer letter sent to NACEPF in Rhode Island should be considered as jurisdictional contacts of the Individual and Goldman Sachs Defendants.

When assessing the contacts of the Individual Defendants, it is well established that physical presence in the forum is not necessary for the exercise of jurisdiction. As reiterated by the United States Supreme Court in *Quill Corp. v. North Dakota By and Through Heitkamp***,** 504 U.S. 298, 112 S. Ct. 1904 (1992):

> Although territorial presence frequently will enhance a potential defendant's affiliation with a State and reinforce the reasonable foreseeability of suit there, it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted. So long as a commercial actor's efforts are 'purposefully directed' toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there."

*Id*. (citing to *Burger King Corp. v. Radzewicz,* 471 U.S. 462, 476, 105 S. Ct. at 2174, 2184 (1985)) (holding that specific jurisdiction "may not be avoided merely because the defendant did not *physically* enter the forum State).

Telephone communications, correspondence and e-mail communications are all relevant to the consideration of personal jurisdiction. *Sawtelle*, 70 F.3d at 1389-1390 ("The transmission of information into [the forum state] by way of telephone or mail is unquestionably a contact for purposes of [the jurisdictional analysis]"); *See Lantor, Inc. v. Nicassio Corp.*, 2007 WL 204015 (D.R.I. 2007) (considering communications including telephone calls and correspondence as jurisdictional contacts); *Brian Jackson & Company v. Eximias Pharmaceutical Corp.*, 248 F. Supp. 2d 31 (D.R.I. 2003) (considering defendant's representative's frequent correspondence with plaintiff in Rhode Island by e-mail, facsimile and telephone); *E.F. Hutton & Co., Inc. v. Tourism and Development Corp.*, 455 F. Supp. 981 (D.R.I. 1978) (finding personal jurisdiction

where defendant made repeated phone calls and sent correspondence to Rhode Island); *Cody v. Ward*, 954 F. Supp. 43 (D. Ct. 1997) (finding telephone calls and electronic mail messages containing fraudulent misrepresentations established sufficient minimum contacts for personal jurisdiction); *Gorman v. Ameritrade Holding Corp.*, 293 F.3d 506 (D.C. 2002) (finding personal jurisdiction where defendant engaged in electronic transmissions with forum resident).

In *Gorman v. Ameritrade Holding Corp.*, the Court observed:

> "Cyberspace," however, is not some mystical incantation capable of warding off the jurisdiction of courts built from bricks and mortar. Just as our traditional notions of personal jurisdiction have proven adaptable to other changes in the national economy, so too are they adaptable to the transformations wrought by the Internet. In the last century, for example, courts held that, depending upon the circumstances, transactions by mail and telephone could be the basis for personal jurisdiction notwithstanding the defendant's lack of physical presence in the forum. There is no logical reason why the same should not be true of transactions accomplished through the use of e-mail or interactive websites. Indeed, application of this precedent is quite natural since much communication over the Internet is still transmitted by ordinary telephone lines.

*Id.* at 510-11.

Furthermore, the communications between NACEPF and the Individual Defendants spanned several years in furtherance of the business relationship between the parties and amounted to a consistent stream of reciprocal activities. These communications did not, as the Individual Defendants have inexplicably argued, equate to mere isolated contact. *Compare Nicholson v. Buehler*, 612 A.2d 693 (R.I. 1992) (nonresident's telephone calls and mailings to resident as part of business dealings were sufficient minimum contacts), *and Ealing Corp. v. Harrods, Ltd*, 790 F. 2d 978, 983-984 (1st Cir. 1986) (due process satisfied by numerous communications by telex, telephone and overnight letters back and forth between parties), *with Nicholas v. Buchanan*, 806 F. 2d 305 (1st Cir. 1986) (generalized reference to inter-state contacts, without more, insufficient to satisfy due process).

When the contacts of the Individual Defendants are measured in light of the controlling precedent, it is clear that the Individual Defendants have sufficient related minimum contacts for

this Court to assert personal jurisdiction over them. In this context, "relatedness" is intended to be a "flexible relaxed standard." *Sawtelle*, 70 F. 3d at 1389. The Individual Defendants' minimum contacts are sufficiently related to Plaintiff's claims inasmuch as "the claim(s) underlying the litigation [fraudulent misrepresentation, tortious interference, fraudulent concealment, breach of fiduciary duty] directly arise out of, or relate to, the defendant's forum-state activities." *United Elec., Radio and Machine Workers of America v. 163 Pleasant Street Corp.*, 960 F.2d at 1089. With respect to its tort claims, Plaintiff need only show a causal nexus between a nonresident defendant's contacts with the forum state and Plaintiff's tort claims. *Jet Wine & Spirits, Inc. v. Bacardi & Company, Ltd.*, 298 F. 3d at 11.

Here, the claims underlying the litigation directly relate to the Individual Defendants' contacts to Rhode Island because Plaintiff contends that the misrepresentations were contained in these communications, that the fraudulent concealment and breach of fiduciary duty was accomplished through correspondence to NACPEF in Rhode Island and the tortious interference was part of the entire fraudulent scheme directed toward NACEPF in Rhode Island. For the purpose of the Individual Defendants' motion to dismiss, Plaintiff's allegations must be accepted as true and, therefore, their motion to dismiss must be denied. *See Women & Infants Hospital of Rhode Island v. Community Health Network of Connecticut, Inc.*, 394 F. Supp. 2d 488 (D.R.I. 2005).

### 2. <u>The Individual Defendants' Contacts With the State Were Such that Jurisdiction in Rhode Island Was Foreseeable.</u>

The second prong of the jurisdictional test, whether the Individual Defendants purposely availed themselves of the jurisdiction of the Court, rests on the concepts of voluntariness and foreseeability. *Jet Wine & Spirits, Inc. v. Bacardi & Company, Ltd.*, 298 F. 3d at 11. A court must assess the voluntariness of a defendant's contacts and then determine whether suit within the forum as a result of those contacts was foreseeable. *Phillips Exeter Acad. v. Howard Phillips Fund, Inc.*, 196 F. 3d at 292. The requirement "depends upon the extent to which the defendants

voluntarily took action that made it foreseeable that they might be required to defend themselves in court in [the forum state]." *Id*. (citing *Jet Wine & Spirits, Inc. v. Bacardi & Company, Ltd.*, 298 F. 3d at 11). The issue of foreseeability "ensures that a defendant will not be haled into a jurisdiction solely as the result of random, fortuitous or attenuated contacts or of the unilateral activity of another party or a third person." *Burger King*, 471 U.S. at 475.

Significantly, the June 7, 2000 memorandum, establishes that Goldman Sachs, through the Individual Defendants, reached out to Primeau (and NACEPF) as a member of the Alliance. (Primeau Aff., *Exhibit 1*). *See Lantor, Inc. v. Nicassio Corp.*, 2007 WL 204015 (D.R.I. 2007) (finding second prong met where the Defendant voluntarily entered relationship and directed activities at the forum state which extended over three years); *Microfibres v. Squires Hightech Corp.*, 2006 WL 305975 (D.R.I. 2006). As alleged in the Complaint the fraudulent and tortious conduct was either directed toward NACEPF in Rhode Island or occurred in Rhode Island and, in either event, caused injury to NACEPF in Rhode Island. (Compl. ¶ 14). During the course of the negotiations, and at all pertinent times as alleged in the Complaint, Goldman Sachs, Gheewalla, Cardinale and Daly, as well as Dan Ronnen and Fried Frank were fully aware that NACEPF was a Rhode Island corporation, that Primeau was a Rhode Island resident, and that the assets they were seeking to acquire were owned by a Rhode Island corporation. (Primeau Aff. ¶ 18; *Exh. 3*; *Exh. 8*).

By reaching out beyond one state and creating continuing commercial relationships and obligations with the citizens of another state, one subjects himself to the jurisdiction of that other state for the consequences of one's activities. *Northeastern Land Services, Ltd. v. Schulke*, 988 F. Supp. 54 (D.R.I. 1997) (citing to *Burger King Corp.*, 471 U.S. at, 473, 105 S. Ct. at 2182-2183 (1985)). In addition, where the effects of fraudulent or tortious conduct are sustained within the state, the voluntariness and foreseeability requirement of due process is met. As the United States Supreme Court noted:

> Due process requires that a defendant have "fair warning" that his activity may render him amenable to suit in a foreign forum. The "fair warning" requirement is met if the defendant has "purposefully directed his activities at residents of the forum, and the litigation results from alleged injuries that arise out of or relate to those activities."

*Burger King*, 471 U.S. at 472, 105 S. Ct. at 2181-82. at 472-73, 105 S. Ct. at 2182 (internal citations and quotations omitted).

The general rule in the First Circuit holds that where a defendant's out-of-forum actions intentionally cause tortious injury in the forum, jurisdiction will obtain for claims arising from that injury. *Hugel v. McNell*, 886 F.2d 1, 4 (1st Cir. 1989) (discussing *Calder v. Jones*, 465 U.S. 783, 104 S. Ct. 1482, 79 L.Ed.2d 804 (1984)); *Ealing Corp. v. Harrods, Ltd*, 790 F. 2d 978, 983-984 (1st Cir. 1986) (asserting jurisdiction over defendant who knowingly sent false statement into state, intending that it be relied upon by a forum resident, comports with constitutional due process); *Villa Marina Yacht Sales, Inc. v. Hatteras Yachts* ( *Villa Marina I* ), 915 F.2d 7, 12 (1st Cir. 1990) (issue for jurisdiction purposes is not where statement was made but whether it was directed toward and had an effect within the forum); *Anderson v. Century Prods., Co.*, 943 F. Supp. 137, 143 (D.N.H.1996).

Recently, the First Circuit reaffirmed that personal jurisdiction may be exercised over an out of state defendant, with respect to injuries resulting from misrepresentations outside the forum, where the defendant could have foreseen that his misrepresentation would likely cause injury to the plaintiff in the forum. *Northern Laminate Sales, Inc. v. Davis*, 403 F.3d 14 (1st Cir. 2005).

Along these lines, in *Women & Infants Hospital of Rhode Island v. Community Health Network of Connecticut, Inc.,* 394 F. Supp. 2d 488 (D.R.I. 2005), this Court found that even a corporation that had no agents, employees, or officers in Rhode Island, was subject to personal jurisdiction in this forum where the plaintiff’s claim arose out of actions taken in reliance upon the defendant’s representations.

In this case, the Individual Defendants knowingly directed their fraudulent and tortious conduct toward a nonprofit corporation located in Rhode Island. As such, each of them had fair

warning that the effects of their conduct would be sustained in Rhode Island, thereby potentially subjecting them to suit in this forum. *Northeastern Land Services, Ltd. v. Schulke*, 988 F. Supp. at 59 (finding that the consequences of alleged misappropriation and tortious interference claims, even if effected exclusively from outside the forum, would necessarily effect this forum, thereby allowing the defendant to be haled into the forum to answer for the tortious injury flowing from such conduct).

In addition, the Individual Defendants knew from the outset that NACEPF was a Rhode Island corporation. The Individual Defendants made numerous calls and engaged in various e-mail communications with NACEPF in Rhode Island. The Individual Defendants, as agents of GS Group as well as the other Goldman Sachs Defendants, voluntarily sought a business relationship with NACEPF. Surely, being compelled to defend a suit for fraudulent misrepresentation and tortious interference in Rhode Island was foreseeable under these facts.

#### 3. **This Court's Exercise of Personal Jurisdiction Over the Individual Defendants is Reasonable.**

When a defendant who purposely has directed activities at a forum resident seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable. *Northeastern Land Services, Ltd. v. Schulke*, 988 F. Supp. 54 (D.R.I. 1997) (citing to *Burger King Corp.*, 471 U.S. at 476, 105 S. Ct. at 2184). With respect to the analysis of reasonableness, the First Circuit has consistently stated:

> [T]he reasonableness prong of the due process inquiry evokes a sliding scale: the weaker the plaintiff's showing on the first two prongs (relatedness and purposeful availment), the less a defendant need show in terms of unreasonableness to defeat jurisdiction. The reverse is equally true: an especially strong showing of reasonableness may serve to fortify a borderline showing of relatedness and purposefulness.

*Ticketmaster-New York, Inc. v. Alioto*, 26 F.3d 201, 210 (1st Cir. 1994).

Here, the other considerations weighed as part of the personal jurisdiction analysis, the "gestalt factors" do not alter, and indeed further support, the conclusion that the Individual Defendants are subject to the personal jurisdiction of this court.

**a. The Individual Defendants' Burden of Appearing Does Not Prevent the Exercise of Jurisdiction.**

First, although there may be some burden on the Individual Defendants to litigate in Rhode Island, it is readily apparent that they have had no difficulty finding adequate representation. As with the GS Group, this purported burden must be looked on with skepticism, as six attorneys have entered their appearance on their behalf and have vigorously defended this Complaint by filing numerous motions seeking its dismissal even before the scheduling of the Rule 16 conference. The Individual Defendants have not raised any "special or unusual burden" that would be constitutionally meaningful. *Pritzker v. Yari*, 42 F.3d 53, 64 (1st Cir. 1994).

While it is true that the Individual Defendants are presently named in a lawsuit brought by NACEPF in Delaware, the fact that thus far they have successfully challenged the personal jurisdiction of the Delaware court, weighs in favor of exercising jurisdiction in this forum, in order to give Plaintiff NACEPF its day in court to obtain an adjudication on the merits. Furthermore, the mere existence of other litigation (Plaintiff does not concede the *NACEPF* Delaware action is parallel) is not a pertinent factor in the personal jurisdiction equation. *M & I Eastpoint Tech., Inc. v. Mid-Med Bank*, 2000 U.S. Dist. LEXIS 1146 (D.N.H. 2000).

**b. Rhode Island's Interest in Adjudicating the Dispute Supports the Exercise of Jurisdiction.**

The arguments raised *supra* with respect to the GS Group are equally applicable to the Individual Defendants and amply justify the exercise of jurisdiction.

**c. Plaintiff's Interest in Obtaining Convenient and Effective Relief Favors the Exercise of Jurisdiction.**

The arguments raised *supra* with respect to the GS Group are equally applicable to the Individual Defendants and favor the exercise of jurisdiction.

**d. The Judicial System's Interest in Obtaining the Most Effective Resolution of the Controversy Supports Jurisdiction.**

Presumably, the Individual Defendants incorporate the arguments raised by the GS Group that the existence of two other similar cases pending in Delaware factors into the jurisdictional picture. The *Stritzinger* Delaware action has no bearing on jurisdictional issue in this case, as it was brought by separate plaintiffs and the Individual Defendants cannot cite to any case or rule requiring NACEPF to become a party to that action. Likewise, the *NACEPF* Delaware action presently on appeal to the Delaware Supreme Court, involving only a fraction of the claims asserted in this action, does not tilt the jurisdictional scale against jurisdiction, but rather weighs in favor of jurisdiction because NACEPF should have access to a forum for the resolution of its claims.

**e. The Common Interests of All Sovereigns in Promoting Substantive Social Policies Supports the Exercise of Jurisdiction.**

The arguments raised *supra* with respect to the GS Group are equally applicable to the Individual Defendants and favor the exercise of jurisdiction.

In summary, the "gestalt factors" support the conclusion that this Court may constitutionally exercise personal jurisdiction over the Individual Defendants in this action.

**4. <u>This Court Should Exercise Jurisdiction Over All Claims Asserted Against the Individual Defendants.</u>**

It is anticipated that the Individual Defendants will argue that even assuming that this Court has jurisdiction over the fraud claims and tortious interference claims, the breach of fiduciary duty claims should be adjudicated in the Delaware courts. This contention is without merit.

The law is settled in the First Circuit that, in a multi-count complaint, if a court has personal jurisdiction over the defendant with respect to one count, it has personal jurisdiction over the defendant with respect to all counts. *See Murphy v. Erwin-Wasey, Inc.*, 460 F.2d 661, 663 (1st Cir. 1972) (observing that the defendants' argument that the contract in issue was made in New York and that the defendants had not committed any act in Massachusetts which would render them amenable to the personal jurisdiction of its courts in a suit was "wide of the mark because the complaint is framed as an action for fraud and deceit as well as in contract"); *Home Owners Funding Corp. of America v. Century Bk., 695* F. Supp. 1343 (D.Mass. 1988) ("in a multi-count complaint, if a court has personal jurisdiction over the defendant with respect to one count, it has personal jurisdiction ... with respect to all counts"); *Val Leasing, Inc. v. Hutson*, 674 F. Supp. 53, 56 (D.Mass. 1987) (when the plaintiff has established jurisdiction over a nonresident defendant with respect to one state law cause of action, courts of the Commonwealth will exercise jurisdiction over that defendant with respect to related state claims); *Salpoglou v. Shlomo Widder, M.D., P.A.*, 899 F. Supp. 835, 838 (D.Mass. 1995) (same).

Accordingly, a finding of personal jurisdiction over the Individual Defendants permits this Court to exercise jurisdiction over all of the claims brought by the Plaintiff.

## III. THERE IS NO LEGAL OR EQUITABLE BASIS FOR THIS COURT TO STAY THIS ACTION UNTIL THE RESOLUTION OF THE PENDING DELAWARE ACTIONS.

As an alternative to outright dismissal, the Defendants have asked this Court to stay this action pending the resolution of the two pending Delaware cases that are only tangentially related to this case. Defendants have proffered no credible factual or equitable basis for this Court to grant the extraordinary relief declining jurisdiction and staying these proceedings.

The parameters of this Court's limited discretion to abstain from adjudicating a case filed in the federal court where there is a pending state court action was recently reiterated by the First Circuit in *Rio Grande Community Health Center, Inc. v. Rullan,* 397 F.3d 56 (1st Cir. 2005):

> Given the "virtually unflagging obligation of the federal courts to exercise the jurisdiction given them," and absent the "weightier considerations" that animate the other abstention doctrines, the circumstances permitting abstention under *Colorado River* for reasons of "wise judicial administration" are quite "limited" and indeed "exceptional." *Id.* at 818, 96 S. Ct. 1236. "Only the clearest of justifications will warrant dismissal." *Id.* at 819, 96 S. Ct. 1236; *see also Currie v. Group Ins. Comm'n*, 290 F.3d 1, 10 (1st Cir.2002) ("There must be some extraordinary circumstances" in order for a federal court to abstain on *Colorado River* grounds). ***Thus, the district court's discretion whether to dismiss a case on Colorado River grounds should be heavily weighted against dismissal.***

*Id.* at 71. (Emphasis added). *See also Villa Marina Yacht Sales, Inc. v. Hatteras Yachts* ( *Villa Marina I* ), 915 F.2d 7, 12 (1st Cir. 1990) (There is a "heavy presumption favoring the exercise of jurisdiction.")

Courts have developed a list of factors for when *Colorado River* abstention might be appropriate including the following:

> (1) whether either court has assumed jurisdiction over a *res;* (2) the [geographical] inconvenience of the federal forum; (3) the desirability of avoiding piecemeal litigation; (4) the order in which the forums obtained jurisdiction; (5) whether state or federal law controls; (6) the adequacy of the state forum to protect the parties' interests; (7) the vexatious or contrived nature of the federal claim; and (8) respect for the principles underlying removal jurisdiction.

The first and eighth factors have no bearing on this case. As to the second factor, there is no demonstrable inconvenience of the federal forum to countenance a stay. With respect to the contention that the Clearwire witnesses are not subject to this Court's subpoena power, NACEPF has asserted and has proffered documents which establish that Goldman Sachs controls Clearwire and its officers and directors, making this a non-issue.

As to factors three (3) and four (4), the primary basis of the Defendants' request for a stay is premised upon what they collectively refer to as the "Pending Delaware Actions." This misnomer is misleading for the reasons previously argued, but bear repeating. Since the *Stritzinger* Delaware action was not brought by this Plaintiff, but other similarly situated parties, it should not be considered by this Court at all. It has no bearing on the resolution of Plaintiff's claims in this Court and further cannot serve as a basis for concluding that Plaintiff's action is vexatious or contrived merely because similar allegations are contained in both complaints.

As for the pending *NACEPF* Delaware action, which was brought against the Individual Defendants only, it has only minimal relevance because it only brought three claims, as opposed to the eight counts in this case, it does not contain allegations with respect to the C Round financing, and does not name the Goldman Sachs defendants. While complete identity of parties and claims may not be required for abstention to be considered, a level of identity to ensure that all of the claims will be adequately resolved by the state court is required. "When a district court decides to dismiss or stay under *Colorado River,* it must be able to conclude that the parallel state-court litigation will be an adequate vehicle for the complete and prompt resolution of the issues between the parties. If there is any substantial doubt as to this, it would be a serious abuse of discretion to grant the stay or dismissal at all." *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 16, 103 S. Ct. 927, 74 L.Ed.2d 765 (1983).

More importantly, although pending in different Delaware fora for over three years, the *NACEPF* Delaware action has not progressed beyond the preliminary stage of motions to dismiss. No discovery has been conducted or substantive issues addressed, and since grant of the motion to dismiss is presently on appeal before the Delaware Supreme Court, discovery is not likely to be scheduled in the near future. Thus, the fact that the Delaware case was filed before the federal case does not weigh in favor of a stay. In this regard, "the question of priority was meant to be looked at in a "pragmatic, flexible manner[,] with a view to the realities of the case at hand" and should focus on how much "progress has been made in the two actions." *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 16, 103 S. Ct. 927, 74 L.Ed.2d 765 (1983). Where, as here, the pending state action consisted of no more than a pending appeal, it does not equate to a case so strongly underway as to make it reasonable to await the outcome in the state case before proceeding in the federal court. *See Elmendorf Grafica, Inc. v. D.S. America (East), Inc.*, 48 F.3d 46 (1st Cir. 1995) (reversing district court's decision to stay federal case, concluding that if the dismissal for lack of personal jurisdiction in the state action were affirmed, there would be left in existence no state action whatsoever while if the lower court's

dismissal should be reversed on appeal, the parties will merely be back at the very beginning of the process of litigating the merits of their controversy).[20]

In addition, the First Circuit has determined that "[d]uplication, standing alone, is rarely an exceptional basis that warrants a stay or dismissal of the federal action." *Rojas-Hernandez v. Puerto Rico Elec. Power Auth.,* 925 F.2d 492, 496 (1st Cir. 1991). Rather, the narrow exception exists only where piecemeal adjudication gives rise to special complications. Applying the *Colorado River* doctrine, the First Circuit has distinguished between the problems created by piecemeal adjudication and the mere duplication of proceedings, giving most weight to this factor where piecemeal litigation could severely prejudice one of the parties. *Rojas-Hernandez v. Puerto Rico Elec. Power Auth.,* 925 F.2d at 496 (citing to *Liberty Mutual Ins. Co., v. Foremost-McKesson, Inc.,* 751 F.2d 475, 477 (1st Cir. 1985) (noting that inconsistent determinations in parallel proceedings could leave litigant "without sufficient insurance coverage after years of paying premiums"); *and Gonzalez v. Cruz,* 926 F.2d 1, 4 (1st Cir. 1991) (noting complications for insurer that might result from inconsistent determinations of liability in the federal suit against alleged tortfeasor and the commonwealth suit against insurance company)). The Defendants have made no such showing in this case.

Where dual proceedings in state and federal court do not create significant potential for prejudice from piecemeal litigation, but would simply result in a judgment in one case that may be res judicata in the other, consistency, not judicial ineconomy, would be the result of proceeding with the federal court action. Defendants' arguments to the contrary amount to no more than the ordinary burdens of any dual litigation, and since neither of the pending Delaware cases have even established a discovery schedule, Defendants' feigned concerns are purely and wildly speculative. As observed by this Court, "there is no danger that the federal court by exercising its jurisdiction will cause a burdensome fragmenting of litigation--the matter will

---

[20] Even if this Court were to consider the pending *Stritzinger* action, it likewise has no bearing on the request for a stay, inasmuch as the defendants therein have filed motions to dismiss and no briefing schedule or hearing date has been set on the court's docket.

essentially be tried in whichever court brings the matter to trial first." *Buy-Rite Costume Jewelry, Inc. v. Albin*, 676 F. Supp. 433, 436 (D.R.I. 1988). Consequently, the possibility of duplicative or piecemeal adjudication in the present case does not justify the surrender of federal jurisdiction, and factors three (3) and four (4) support the retention of jurisdiction.

The fifth factor is whether state or federal law controls. Defendants state, without citation to relevant authority, that Delaware law governs the claims in this case. To the contrary, at a minimum, Rhode Island law will likely govern Plaintiff's tort claims. *See Crellin Technologies, Inc. Equipmentlease Corp.*, 18 F. 3d at 11-13 (addressing choice of law issues with respect to fraud and tort actions). Even assuming, *arguendo*, Delaware law is applicable to the breach of fiduciary duty claims, there is no indication that Delaware law is so complex that this Court cannot capably apply it to the claims before it. *See Brian Jackson & Company v. Eximias Pharmaceutical Corp.*, 248 F. Supp. 2d at 39.

The sixth factor, which strongly counsels against a stay here, is whether the state forum can adequately protect the Plaintiff's rights. Since the Delaware state court has already dismissed the *NACEPF* Delaware action, there is no reason to conclude that the Plaintiff's rights will be protected in the absence of proceeding in this forum. Indeed, the only certainty is that the Defendants will continue to avoid discovery into their fraudulent actions and tortious conduct.

Finally, the fact that the *NACEPF* Delaware action was dismissed on personal jurisdiction grounds and not addressed on the merits, militates against any finding that the Plaintiff's election to file suit in this Court was in any way vexatious or contrived. *Compare Cruz v. Melecio*, 204 F. 3d 14, 23 (1st Cir. 2000) (finding that timing of federal action raised the specter of forum shopping, as plaintiff filed federal action when the Puerto Rico Supreme Court was poised to enter final judgment on the merits). Defendants also complain that the *NACEPF* Delaware action and the Rhode Island action contain inconsistent factual allegations. Whether or not this is the case, which NACEPF denies, Goldman Sachs' mantra that Plaintiff "should be called to explain in one court how it reconciles these divergent positions" (GS Memo, 25) rings

false and points to this Court retaining jurisdiction and denying a stay, inasmuch as this Court is the only court willing to exercise jurisdiction over these Defendants.

Accordingly, none of the enumerated *Colorado River* factors warrant the issuance of a stay in this case.

**CONCLUSION**

For the reasons set forth herein, Plaintiff requests that the motion to dismiss the Complaint pursuant to Rule 12(b)(2) and 12(b)(5) of the Federal Rules of Civil Procedure and, in the alternative, to stay the action, brought by Defendants the Goldman Sachs Group, Inc., Gerry Cardinale, Rob Gheewalla and Jack Daly be denied in all respects.

Plaintiff,
By its Attorneys,

/s/ Matthew T. Oliverio

Matthew T. Oliverio (#3372)
Christine M. Curley (#4529)
OLIVERIO & MARCACCIO LLP
55 Dorrance Street, Suite 400
Providence, RI 02903
(401) 861-2900
(401) 861-2922 Fax

Dated: March 16, 2007

**CERTIFICATION**

I hereby certify that the foregoing was filed electronically with the United States District Court for the District of Rhode Island and is available for viewing and downloading from the Electronic Case Filing system. The following attorneys received service by electronic means on this 16th day of March, 2007.

Brian J. Lamoureux, Esquire
bjl@brownrudnick.com

William J. Dolan, III, Esquire
wdolan@brownrudnick.com

Wayne F. Dennison, Esquire
wdennison@brownrudnick.com

Douglas H. Flaum, Esquire
flaumdo@friedfrank.com

Lara Turcik, Esquire
turcila@friedfrank.com

/s/ Matthew T. Oliverio