**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **NORTH AMERICAN CATHOLIC EDUCATIONAL PROGRAMMING FOUNDATION, INC.,** | : | |
| ***Plaintiff,*** | : | |
| **v.** | : | **No.: 1:06-cv-00492-S-LDA** |
| **GERRY CARDINALE, ROB GHEEWALLA, JACK DALY, GOLDMAN SACHS GROUP, INC., GS CAPITAL PARTNERS ITI, L.P., GS CAPITAL PARTNERS III OFFSHORE, L.P and GOLDMAN, SACHS & CO. VERWALTUNGS GmbH** | : | |
| ***Defendants.*** | : | |

**AFFIDAVIT OF JOHN PRIMEAU**

1. I am the President of Plaintiff North American Catholic Educational Foundation, Inc. ("NACEPF") and have personal knowledge of the facts set forth herein based upon the business records of NACEPF and my personal experience. NACEPF is a nonprofit, independent lay organization that is incorporated under the laws of Rhode Island with a principal place of business in Johnston, Rhode Island. The mission of NACEPF is to provide educational and religious oriented programming to nonprofit agencies, such as schools, churches, religious organizations and governmental entities.

2. Beginning in 2000, NACEPF, together with the Hispanic Information and Telecommunications Network, Inc. ("HITN") and Instructional Telecommunications Foundation, Inc. and its various affiliates ("ITF"), which consisted of three of the largest networks of educational licensees for the use of Instruction Television Fixed Service "ITFS"

spectrum, formed the ITFS Spectrum Development Alliance, Inc. (the "Alliance"), to market and develop its ITFS licenses.

3. In 2000, NACEPF and the Alliance had discussions with various potential investors. The Alliance began searching for investors to purchase the lease rights for its licenses as its ancillary analog ITFS leases expired and they became available to those investors who would also provide the Alliance members with the opportunity to retain an equity interest in the licenses and the developing wireless broadband service.

4. In the Spring of 2000, NACEPF and the Alliance began negotiations with Goldman Sachs regarding their proposal to invest in ITFS spectrum. Over the course of the next six (6) months and through the execution of a letter of intent ("Letter") in December 2000, Gerry Cardinale and Rob Gheewalla conveyed that they were the agents and representatives of Goldman Sachs.

5. On June 7, 2000, Gerry Cardinale on behalf of the "Goldman Sachs Team" sent a memorandum ("Cardinale's Memorandum") to the Alliance, which included NACEPF, a Rhode Island entity. This memo was also addressed[1] to me and I read it from NACEPF's office in Johnston, RI. The memo represented to me among other things, that Goldman Sachs was "absolutely prepared"[2] and intent in its capacity to invest its resources in Alliance ITFS spectrum to effectuate funding upwards[3] of $363,000,000 for acquisition costs for the Alliance entire spectrum portfolio of which about a third was NACEPF's. Goldman Sachs represented that it had not only the financial wherewithal to finance a $344,000,000 to $363,000,000 cash scenario but also the expertise to create the management that would effectuate the venture. A true and accurate copy of said memorandum is attached hereto as *Exhibit 1*

---

[1] The Memo was addressed "To: ITFS Alliance (Primeau / Rodriguez / Schwartz )". Jose Rodriguez was the President of HITN and John Schwarz was the head of ITF.

[2] "we (Goldman Sachs) are **absolutely prepared** to not only pay competitive market prices for the assets which you can deliver but also finance the acquisition costs for your entire portfolio of spectrum …140 million channel POPs." Cardinale Memorandum, page 1 (emphasis added).

[3] See the copy of Cardinale's Memorandum "Scenario 4", page 14 that arrived at NACEPF's office in Rhode Island.

6. When NACEPF received Cardinale's Memorandum, and during the course of the subsequent negotiations of what would become the Master Use and Royalty Agreement referred to in the instant action (the "Master Agreement"), I understood that the "Goldman Sachs Team" referred to Gerry Cardinale and Rob Gheewalla who were employees and representatives of the investment company Goldman Sachs. Later in the negotiation process leading up to the Letter, Jack Daly came to be involved as another key player on what I understood was the "Goldman Sachs Team[4]". It was also my understanding that Goldman Sachs meant and included each of the Goldman Sachs Defendants in this action.

7. Thereafter and upon the signing of the Letter in December 2000 and in reliance upon these representations and assurances and similar statements made in the course of the negotiations, I began negotiating on behalf of the Alliance and NACEPF in particular the terms of the Master Agreement with Goldman Sachs. Goldman Sachs emphasized that it had not only the ability to fund the venture but also to create the management that would facilitate it.

8. These negotiations were with, among others, Defendants Rob Gheewalla, Gerry Cardinale and Jack Daly of the Goldman Sachs team which continued to emphasize that funding for Alliance spectrum was not an obstacle, rather the acquisition of spectrum was imperative [5] and to that end they intended to structure the deal with tens of millions of dollars of incentives that would necessitate the delivery of spectrum as a condition of obtaining the price points of the deal. *See* Letter, attached hereto as *Exhibit 2,* Section 2.3 "EARNOUTS" and the Master Agreement, Section 1.3(d) (i), (ii).

9. Portions of the Clearwire/Spectrum Working Group List prepared by Fried Frank are attached hereto as *Exhibit 3*. This list clearly shows that Gheewalla, Cardinale and Daly, as representatives of Goldman Sachs, were substantially involved in the negotiation of the Master Agreement.

---

[4] There were others on staff but these three Defendants became and were the Goldman Sachs appointments to the board of directors of the entity that would be chosen by Goldman Sachs to effectuate their investment.

[5] "we (Goldman Sachs) are absolutely prepared ... (to pay for the Alliance portfolio)... as well as any additional affiliated channel POPs which you can deliver." Cardinale Memorandum, page 1.

10. During the course of the negotiations, and at all pertinent times as alleged in the Complaint, Goldman Sachs, Gheewalla, Cardinale and Daly were represented by attorneys Fried, Frank, Harris, Shriver & Jacobson ("Fried Frank"). Dan Ronnen was the primary contact with respect to the negotiations. *Exhibit 3*.

11. For example, after the Master Agreement was executed, Dan Ronnen of Fried Frank prepared a memorandum presenting an overview of the Master Agreement to Gerry Cardinale, clearly establishing the agency relationship between Fried Frank and Goldman Sachs, Gheewalla, Cardinale and Daly. *Exhibit 4*.

12. The memorandum, *Exhibit 4*, referred to the Goldman Sachs funds collectively as "Goldman" and further detailed that "Goldman" had the right to appoint 3 of 10 members of the Clearwire Board [now Clearwire Holdings, Inc. ("Clearwire Holdings", "Clearwire" or "Holdings") ], listing Rob Gheewalla, Gerry Cardinale and Jack Daly as the duly appointed Goldman Board members. Thus, Goldman Sachs never distinguished between its various corporate entities with respect to its role in negotiating the Master Agreement or its subsequent relationship with Clearwire, the Alliance and NACEPF.

13. Based upon a search of NACEPF's computer records, during 2001, prior to the execution of the Master Agreement, I had numerous e-mail communications with Dan Ronnen, at least fourteen, most if not all of which were copied or sent directly to Jack Daly and Gerry Cardinale, with respect to the terms of the Master Agreement. A spreadsheet listing some of these e-mail communications, derived from my search of NACEPF's computer records, is attached hereto as *Exhibit 5*. All these communications passed through Rhode Island servers and most if not all occurred while I was in Rhode Island.

14. Based upon a search of NACEPF's computer records, during 2001, prior to the execution of the Master Agreement, I had several e-mail communications with other individuals at Fried Frank, most if not all of which were copied or sent directly to Jack Daly and Gerry Cardinale, with respect to the terms of the Master Agreement. *See Exhibit 5*. All these

communications passed through Rhode Island servers and most if not all occurred while I was in Rhode Island.

15. Based upon a search of NACEPF's computer records, during 2001, prior to and after the execution of the Master Agreement, I had many e-mail communications directly with Jack Daly and Gerry Cardinale with respect to the terms of the Master Agreement as outlined in *Exhibit 5*. All these communications passed through Rhode Island servers and most if not all occurred while I was in Rhode Island.

16. During this time frame, based upon my review of NACEPF's telephone records, I had various telephone conversations with Jack Daly, while at NACEPF's offices in Rhode Island. A spreadsheet listing many of these telephone communications, derived from my search of NACEPF's telephone records, is attached hereto as *Exhibit 6*. The majority of these communications occurred while I was in Rhode Island.

17. During this time frame, based upon my review of NACEPF's telephone records, I had numerous telephone conversations with Dan Ronnen and other attorneys at Fried Frank, while at NACEPF's offices in Rhode Island as outlined in *Exhibit 6*. The majority of these communications occurred while I was in Rhode Island.

18. During the course of the negotiations, and at all pertinent times as alleged in the Complaint, Goldman Sachs, Gheewalla, Cardinale and Daly, as well as Dan Ronnen and Fried Frank were fully aware that NACEPF was a Rhode Island corporation, that I was a Rhode Island resident and the assets they were seeking to acquire were owned by a Rhode Island corporation. *See Exhibit 3*; *Exhibit 8*.

19. In the preceding weeks leading to the closing of the Master Agreement in 2001, Rudy Rodriguez and Alberta Schwartz of Fried Frank spent two days at NACEPF's offices in Rhode Island performing due diligence, reviewing and copying documents on behalf of Goldman Sachs, Gheewalla, Cardinale and Daly.

20. During the course of negotiations from June 2000 until the Master Agreement was signed, Goldman Sachs, through Cardinale and Daly continued to represent that Goldman Sachs

would be able to effectuate the necessary investments in Clearwire to acquire the NACEPF and Alliance licenses as they became available and to develop a wireless broadband service.

21. On or about March 5, 2001, Cardinale, Daly and Gheewalla were appointed as directors of Clearwire by Goldman Sachs. In addition, the Master Agreement provided that "Goldman" had the right to cast the tie breaking vote on the Clearwire Board. *See Exhibit 4*; *see also* Schedule 9.2(e) of the Master Agreement attached hereto as *Exhibit 7*.

22. Subsequent to the closing on March 13, 2001, Fried Frank, as agents for Goldman Sachs, caused five volumes of closing documents to be delivered by courier to NACEPF in Rhode Island.

23. According to the notice provision of the Master Agreement, Gerry Cardinale, as the representative of GS Capital Partners III, L.P., was to continue as an agent of Goldman Sachs with respect to the Master Agreement and the ongoing business relationship with NACEPF and the Alliance. *See* Section 15 of the Master Agreement attached hereto as *Exhibit 8*.

24. After the execution of the Master Agreement and throughout 2001, I had numerous e-mail and telephone communications with Gerry Cardinale and Jack Daly. (*See Exhibits 5 and 6*). Implicit in these communications was the performance of the obligations of Clearwire under the Master Agreement, as well as Goldman Sachs' commitment to invest in the leases and develop the wireless broadband service to customers as previously represented, such that Cardinale and Daly, as agents of Goldman Sachs, who controlled Clearwire and the Clearwire Board, continued to posture both compliance with the terms of the Master Agreement and the capacity to perform its obligations. As a result, Clearwire's continued assertion of its interests and rights under the Master Agreement constituted representations that were false when made, as Goldman Sachs, through the Clearwire venture, never pursued the promised development and investment strategy to implement a wireless internet system. NACEPF reasonably relied on these misrepresentations in continuing to perform its obligations under the Master Agreement.

25. After March 2001 and until June 2002, NACEPF had the opportunity to convey its licenses to use wireless spectrum to a number of companies that sought to acquire that spectrum. Throughout this period there were ready, willing and able acquirers for those expiring licenses, but none of those potential acquisitions went forward because of the Defendants' continued misrepresentations that it, by virtue of their control of the Clearwire venture, intended to and had the capacity to purchase said licenses.

26. On or about May 1, 2002, all the members of the Alliance met with Cardinale and Gheewalla in New York to discuss Clearwire's finances. At this meeting, Gheewalla conveyed to us that Clearwire, (which we knew to be controlled by Goldman Sachs), would not be able to acquire the spectrum pursuant to the terms of the Master Agreement.

27. On September 11, 2002, the Clearwire Board, at the direction of Goldman Sachs, passed a resolution denying further payments to the Alliance for pending scheduled markets. This action repudiated the very basis for the Master Agreement while destroying what would be many millions of dollars due for the EARNOUT payments referenced in *Exhibit 2* that were due the Alliance Members. *Exhibit 9.*

28. On February 12, 2003, the Clearwire Board, at the direction of Goldman Sachs, outlined a scheme to invert Clearwire to subordinate the claims of the Alliance through a series of inter corporate maneuvers by which, to the benefit of the Goldman Defendants, would invert Clearwire Holdings into a subsidiary that could be bankrupted leaving the Defendants and Clearwire Holdings free from the claims of the Alliance and its Members. *Exhibit 10.*

29. Thereafter, Goldman Sachs, through Daly, began indemnifying an Alliance member against their fellow Members and the Alliance itself, in return for cash payments in order to obtain the release of Clearwire and Goldman Sachs from the obligations under the Master Agreement, thereby attempting to break up the Alliance, in violation of the Master Agreement.

30. Thereafter, in the Spring of 2003, I had various communications, via telephone and e-mails, with Jack Daly regarding amending, modifying or terminating the Master

Agreement with respect to NACEPF. *See*, for example *Exhibit 11*; *Exhibit5; Exhibit 6.* These communications occurred while I was in Rhode Island.

31. In March 2003 Daly traveled to NACEPF's offices in Rhode Island and under the impending threat of bankruptcy, Daly attempted to extract from me NACEPF's capitulation of the rights and revenue due NACEPF under the Master Agreement.

32. In April 2003 Goldman Sachs, through its agent Daly, by using threats of Clearwire's impending bankruptcy, procured a separate agreement from HITN to release Clearwire from its obligations under the Master Agreement, indemnifying HITN against its fellow Members and the Alliance itself, and thereby fragmenting the Alliance in violation of the Master Agreement. However, Goldman Sachs retained its rights to the HITN spectrum under an agreement they signed.

33. In May 2003, again by using threats of Clearwire's impending bankruptcy, Goldman Sachs, through its agent Daly, procured a separate agreement with ITF to release Clearwire from its obligations under the Master Agreement and indemnifying ITF against its fellow Member NACEPF and the Alliance itself, further fragmenting the Alliance down to a sole remain entity, NACEPF, in violation of the Master Agreement.

34. NACEPF refused to be bought off by Goldman Sachs' threats and deceit, despite receiving a telephone call from Daly on May 8, 2003, stating that actions would be taken against NACEPF if a new agreement could not be reached.

35. On or about the morning that Alliance member(s) ITF (et al) transmitted their signature pages by facsimile to Holdings, Defendant Daly called NACEPF to inform it that it would be "served papers" by Holdings for breaches of "implied" warranties among other claims. In fact only a FedEx and facsimile arrived the following day with an obviously pre-drafted letter. The Goldman Defendants used Clearwire Holdings to threaten NACEPF with a lawsuit against NACEPF (and its president personally) if NACEPF did not execute a release of Holdings (and thereby the Goldman Defendants) forthwith. *Exhibit 12.* NACEPF refused to bend under such extortionate and tortuous pressure.

36. Upon information and belief, in the Spring of 2003, Goldman Sachs, through Defendants Cardinale, Daly and Gheewalla, began discussing a possible sale of Clearwire or a sale of substantially all of its assets with the group representing the telecommunications legend Craig McCaw (the "McCaw Group"). It was Craig McCaw's sale of his telecommunication business to AT&T for $11.5 billion dollars that elevated McCaw into a legendary figure in the industry[6]. *See* Stritzinger Complaint attached to the GS Memo as Exh. F ¶ 27. Upon information and belief, these negotiations took place with the Goldman Defendants, Cardinale, Daly and Gheewalla.

37. These ongoing negotiations were not disclosed to NACEPF.

38. These ongoing negotiations were not disclosed to other minority shareholders nor to non-insider (Goldman Sachs related) directors of Clearwire. *See* Stritzinger Complaint attached to the GS Memo as Exh. F. For example, neither Edward "Rusty" Rose nor James F. Gero, members of the Clearwire Board, were aware of the McCaw negotiations at the time of the August 2003 C Round financing. *See* Plaintiffs' Original Petition filed by other shareholders, including Edward "Rusty" Rose and James F. Gero, in Dallas County, Texas attached hereto as *Exhibit 13*.

39. In a memorandum to investors dated May 6, 2003, Clearwire notified the shareholders and NACEPF in Rhode Island that it had engaged UBS Warburg to assist Clearwire in raising additional capital. The memorandum warned that "the capital markets remain very tight and there are no assurances that we will be successful in our efforts. In connection with any fund raising into Holdings we will notify you with the specifics of an investment and provide you the opportunity to invest. The Company's cash position at the date of this letter is approximately $3.6 million and we anticipate needing to conclude on our capital raising efforts within the next 30-60 days." In light of the memorandum, NACEPF clearly understood Clearwire's financial position to be critical, especially in light of the fact that I had no knowledge

[6] See Forbes, 09.21.2006, 400 Richest Americans http://www.forbes.com/lists/2006/54/biz_06rich400_Craig-O-McCaw_CA8T.html

of the McCaw negotiations. A true and accurate copy of a portion of the May 6, 2003 memorandum is attached hereto as *Exhibit 14*.

40. Although the Alliance had a contractual right to a board seat on Clearwire's Board, Gheewalla, Cardinale and Daly would not allow NACEPF, the sole remaining member of the Alliance, to assume its board seat, and denied NACEPF access to board books, minutes and notices of board meetings. Accordingly, by virtue of its stock holder status, NACEPF in July 2003, NACEPF filed a formal request for Books & Records. All these materials were delivered to NACEPF in Rhode Island.

41. On or about August 15, 2003, Clearwire, at the behest of Goldman Sachs, announced a proposal to raise emergency bridge financing (the "Bridge Financing") in the form of convertible notes. The August 15, 2003 Notice did not mention the on going discussion with McCaw nor the potential for a McCaw Sale, but rather pointed to failed negotiations with AT&T as the reason for the emergency financing, and stated that "[t]he Bridge Financing will provide the Corporation with additional time to pursue a new round of financing and to pursue other strategic alternatives, which may include a sale or merger of the Corporation." A true and accurate copy of the August 15, 20003 Offer is attached hereto as *Exhibit 15*. This announcement to stockholders came to NACEPF in Rhode Island.

42. On or about August 20, 2003, Clearwire, at the behest of Goldman Sachs, sent a second notice to shareholders (the "August 20, 2003 Notice") terminating the original offer and replacing it with the new Preemptive Rights Offer. The Preemptive Rights Offer did not disclose the on going discussion with McCaw nor the potential for a McCaw Sale, or any details of such a transaction to the minority shareholders. A true and accurate copy of the August 20, 2003 Offer is attached hereto as *Exhibit 16*. This announcement to stockholders came to NACEPF in Rhode Island.

43. In August 2003, John Schwartz who headed ITF called me to relate his conversation with Daly on the pending Bridge Financing. He stated that the main deal with AT&T failed, and that Daly discussed other potential parties which included Earthlink, the

Clarity Group, Nextwave, IPCOM, TELMEX and Nextel. No mention was made of the McCaw Group.

44. In August 2003, I telephoned James Kirkland, attorney for Clearwire, to obtain additional information regarding the "C Round" Preemptive Rights Offer. He reiterated to me what was generally related to me by John Schwartz, namely that the failed AT&T deal was referenced in some detail as was some potential smaller entities as Earthlink, the Clarity Group, Nextwave, IPCOM, TELMEX and Nextel. The critical discussions with the McCaw Group were not disclosed.

45. The list of the disclosures actually served to further the Defendants' fraudulent concealment of the McCaw Group as the extensive list left the impression that any efforts to obtain financing or investment with an entity that was at all noteworthy had been disclosed.

46. On August 29, 2003, my attorney communicated with Dan Ronnen, whose response was copied to NACEPF in Rhode Island, wherein he stated "on behalf of Goldman Sachs" that they would not accept a reservation of rights to assert claims with respect to the process of the C Round offering, requiring instead that a participant waive "any right to later assert claims and damages in connection with how the process was handled or with respect to any purported diminution in the rights of Series A and B shares by the GS Parties." A copy of the series of e-mails is attached to *Exhibit 17*. This communication establishes both the agency of Fried Frank in the context of the C Round financing as well as the fact that it was orchestrated by Goldman Sachs.

47. On the terms outlined above and without information or notice of the on going discussion with McCaw nor the potential for a McCaw Sale, NACEPF did not participate on the terms demanded by Goldman Sachs's Fried Frank attorney in the C Round Financing in reliance on the representations set forth in the Investor Update, the C Round offerings and other related materials regarding Clearwire's dim financial picture.

48. At the time of these material misrepresentations and omissions, NACEPF reasonably and justifiably relied upon the misstatements and omissions, and upon the superior

knowledge and expertise of the GS Defendants in connection with the financial condition of Clearwire.

49. If the Goldman Sachs Defendants had made full and adequate disclosures, NACEPF would have participated and was entitled to a participation of substantially more than the books controlled by Clearwire indicated.

50. After the C Round financing, the Goldman Sachs Defendants and related parties were disproportionately benefited by acquiring Series C preferred stock, in relation to the economic value provided to Clearwire under the circumstances, namely raising a mere $600,000 in additional capital.

51. I did not become aware of the fraudulently concealed McCaw deal until after November 15, 2003.

Further affiant sayeth not.

________________________
John Primeau

Subscribed and sworn to before me this 16th day of March, 2007.

Timothy E. Chodelka
________________________
Notary Public
My Commission Expires: 12-15-09

TIMOTHY E. CHODELKA NOTARY PUBLIC ID#57133 STATE OF RHODE ISLAND