December 4, 2000

ITFS Spectrum Development Alliance, Inc.
c/o ING Barings
55 East 52nd Street
New York, NY 10055
Attention: Mike Powell

The purpose of this letter (the "Term Sheet"), is to set forth the terms upon which we have agreed in connection with the proposed leases of Instructional Television Fixed Service spectrum (the "ITFS Spectrum") between organizations belonging to the ITFS Spectrum Development Alliance, Inc. (the "Alliance") and a company in which GS Capital Partners III, L.P ("Goldman"), James Mansour and SpectrumLink Networks, Inc. (the foregoing being the "Investors") and each of the members of the Alliance listed on the signature page below under the heading "Members" (the "Members" and collectively with the Investors, the "Parties" and each individually a "Party") will have continuing interests. By signing this letter, each Member, severally and not jointly, agrees that upon a satisfactory visit to Clearwire Technologies, Inc. ("Clearwire") and completion of a due diligence review satisfactory to the Alliance and its advisors, it agrees to the terms set forth in this letter and it will move toward entering (i.e. negotiate in good faith and use its reasonable best efforts) into definitive documentation.

Subject to the foregoing and the additional terms hereof, we have agreed as follows:

1. The Members will lease the ITFS Spectrum, as contemplated herein, to a holding company of Clearwire Technologies, Inc. ("Clearwire Holdings") as set forth more fully in paragraph 9 hereof.

2. Each Member will enter into a separate master agreement (the "Master Agreements") with the payment terms described below with respect to spectrum identified on a schedule to be agreed upon, which schedule shall set forth the number of Channel POPs held, as set forth in the next sentence, by such Member as of the date of execution of the Master Agreements other than those Channel POPs with respect to which any of the Members are prohibited from negotiating or entering into any of the transactions contemplated by this letter (the "Other Spectrum"). The schedule shall include all ITFS Spectrum for which the Members hold FCC licenses, other than the Other Spectrum and other than the ITFS Spectrum for the Puerto Rico market which shall not be subject to any of the Master Agreements (the "Excluded Spectrum"). The Members will be obligated to deliver

the Channel POPs set forth on the schedule to the Master Agreements and any other Channel POPs associated with the channels listed in the schedule to the Master Agreements ("Additional Channel POPs"), as provided in paragraph 3 below, immediately at the time such Channel POPs become Available. "Available" means any Channel POP in a market in which the delivered Channel POP is not encumbered by a prior lease or contractual obligation of the Member (excluding any interference consents to which the use of the Channel POP may be subject) and is licensed by the FCC to the Member or an affiliate thereof at the time the lease provided for in paragraph 3 is executed. In all cases, the payment terms are intended to generate an aggregate price of $0.90 per Channel POP (the "Aggregate Amount") through a combination of a cash commitment fee, equity in Clearwire Holdings valued as set forth in paragraph 2.2 below, an earnout, and recurring usage payments as illustrated in Exhibit A, subject to increase or decrease as set forth in paragraphs 2.4 and 2.6 below. Notwithstanding any other provision hereof, payments under the Master Agreements and Individual Leases (as defined below) shall be made only with respect to Channel POPs listed on the schedule to the Master Agreements, and no payments, including without limitation any Usage Payments, shall be made with respect to Additional Channel POPs, if any.

2.1 Commitment Fee: Each Member will be paid 10% of the Aggregate Amount in cash (the "Commitment Fee") upon execution of the definitive agreements reflecting the terms set forth in this letter (the "Closing"). The Commitment Fee is based upon the Alliance's commitment to deliver, pursuant to the Master Agreements, all Channel POPs held by the Members, other than the Excluded Spectrum and the Other Spectrum, as such Channel POPs become Available which will be verified by the Investors during their due diligence review of the Alliance and reflected in an agreed schedule to the Master Agreements. The Commitment Fee will equal 9 cents per Channel POP.

2.2 Equity: Each Member will receive 20% of the Aggregate Amount (the "Equity Fee") in the form of shares of preferred stock of Clearwire Holdings (the "Preferred Stock"), which will be valued for these purposes at the same price per share as is being paid by the Investors to Clearwire Holdings for their shares of preferred stock of Clearwire Holdings stock (the "Valuation Price"). The shares of this Preferred Stock will be issued to each Member, upon the execution of Individual Leases (as defined below), pro rata with respect to the Available Channel POPs delivered pursuant to such Individual Leases. The Equity Fee will equal 18 cents per Channel POP.

2.3 Earnout: 25% of the Aggregate Amount (the "Earnout") will be paid to the Members in the following manner: Upon the delivery of the first 40 million Available Channel POPs pursuant to the Master Agreements, 10% of the Aggregate Amount will be paid with respect to those Channel POPs. A

payment equal to 10% of the Aggregate Amount, with respect to all Available Channel POPs delivered thereafter, will be added to the Usage Payment. Upon the delivery of the first 80 million Available Channel POPs pursuant to the Master Agreements, 15% of the Aggregate Amount will be paid with respect to those Channel POPs. A payment equal to 15% of the Aggregate Amount (in addition to the 10% payment described above), with respect to all Available Channel POPs delivered thereafter, will be added to the Usage Payment.

2.4 Usage Payments. The remaining unallocated portion of the Aggregate Amount, after reduction for each of the Commitment Fee and the Equity Fee and, with respect to the first 80 million Available Channel POPs, after reduction of the Earnout, will be paid (the "Usage Payments") in two forms: (i) 25% of the Usage Payments will be paid to a Member upon the execution of a new lease (each such lease, an "Individual Lease") by such Member with respect to newly-available Available Channel POPs; and (ii) the remaining 75% of the Usage Payments (the "Remaining Payments"), with respect to newly-available Available Channel POPs, will be paid in monthly installments which will be calculated based upon the assumption that Clearwire Holdings will have continued use of all Channel POPs for a 30-year period pursuant to the Individual Leases entered into in accordance with the Master Agreements or renewals thereof; provided, however that the amounts paid with respect to the Remaining Payments in respect of existing Individual Leases and the Remaining Payments for future Individual Leases as they are entered into thereafter, will be subject to adjustment as follows: if upon the earlier of (a) five years from Closing, (b) the sale or exchange of all or substantially all of the outstanding stock of Clearwire or all or substantially all of Clearwire's assets, in each case in a transaction in which more than 50% of the consideration received by Clearwire's shareholders is cash or (c) the occurrence of an IPO of Clearwire Holdings or Clearwire (the "Revaluation Date"), the fair market value of the Preferred Stock (or the common stock into which the Preferred Stock is convertible upon an IPO) is not at least 300% of the Valuation Price, then the Remaining Payments under all existing Individual Leases, and the Remaining Payments on each future Individual Lease as it is executed, will be recalculated, and increased but not decreased, on the basis of the Aggregate Amount for each Channel POP set forth on the schedule to the Master Agreements which is subject to an Individual Lease being equal to 85% of the amount equal to (i) the then Fair Market Value of all Channel POPs subject to an Individual Lease, divided by (ii) the number of Channel POPs subject to an Individual Lease. "Fair Market Value" will be the value determined in accordance with reasonable and customary valuation procedures. The Parties shall first attempt to agree upon what constitutes Fair Market Value in accordance with such procedures, and if no agreement is reached by the Parties within

30 days following the Revaluation Date, the value shall be determined by a neutral arbitrator.

2.5 Initial Available Channel POPs: With respect to the first 20 million Available Channel POPs that are delivered by the Members at the Closing, the Members will be paid the entire Usage Payment upfront with respect to such Channel POPs.

2.6 Performance Adjustment: Usage Payments shall be adjusted as set forth in Exhibit B hereto for the period beginning on the first day after the 15th anniversary of Closing, which Exhibit B reflects a projection that the market value of the Preferred Stock issued to the Members pursuant to paragraph 2.2 will range from $380 to $570 million during the first 15 years following the Closing; provided, however, that Usage Payments previously made by Clearwire Holdings shall not be increased or decreased retroactively. The "Multiplying Factor" described in Exhibit B shall only apply to Usable Channel POPs. A "Usable Channel POP" is any Available Channel POP that can be reached for a data application in a two-way digital environment using the best available technology in common use at that time that can be then employed to reach that Channel POP.

2.7 Swap Transactions. Clearwire and the Members will cooperate in connection with swaps of ITFS channels to de-interleave Member ITFS channels and swaps of the excess capacity for commercial use of the ITFS Spectrum licensed to the Members, consistent with the needs of the Members to satisfy FCC educational requirements and to maintain service to educational and non-profit institutions with respect to spectrum licensed to the Members as set forth in paragraph 7. In addition, Clearwire shall have the right to enter into swap or other transactions with third parties pursuant to which the excess capacity for commercial use associated with any ITFS Spectrum licensed to a Member is made available for use by a third party, whether by sublease, wholesale capacity arrangement or other means (any such transaction referred to as a "Swap Transaction"), and the Members agree to be a party to any such agreement if and to the extent requested by Clearwire, provided that any such Swap Transaction (i) provides for the payment by Clearwire of the consideration provided for in this paragraph 2 as if the ITFS Spectrum involved had been delivered under an Individual Lease for any affected Channel POPs to the extent that such Channel POPs have not already been delivered pursuant to an Individual Lease (ii) provides all other benefits provided for under the form of Individual Lease attached to the Master Agreements to the Member whose ITFS Spectrum is the subject of the Swap Transaction, and (iii) would not cause the Member to be in breach of any contractual provision of a Preexisting Lease, as defined below. To the extent that any cash or cash equivalents, including

without limitation, any securities, in addition to the consideration provided for in this letter is payable to a Member as a result of any such Swap Transaction, all such cash or cash equivalents shall be paid or otherwise transferred to Clearwire.

3. Lease Terms: All new Individual Leases with Clearwire Holdings to be entered into pursuant to the Master Agreements will be for 15 years following the date on which the ITFS Spectrum subject to the Master Agreements can be delivered to Clearwire Holdings on an Available basis. The Members shall deliver all Channel POPs in the ITFS Spectrum on an Available basis as soon as possible after the date hereof. Each Individual Lease will provide Clearwire Holdings with a right of first refusal upon the expiration of such initial 15-year Individual Lease term. In addition, if Clearwire Holdings exercises its right of first refusal and enters into a new Individual Lease or, if Clearwire Holdings does not exercise its right of first refusal and a Member enters into a new lease with a third party (a "Third Party Lease") upon expiration of the initial 15-year Individual Lease term, the Alliance will, for the following 15-year period (for each such Third Party Lease term or Individual Lease term, the "Second Period"), assign to Clearwire Holdings all proceeds that are greater than the Usage Payments in order to fully align the economic incentives of the Members and the Investors. Following the end of the Second Period with respect to each Individual Lease and Third Party Lease, Clearwire Holdings will be offered a right of first refusal on any subsequent lease or license of the ITFS Spectrum or any part thereof. All proceeds derived from new leases entered into upon the expiration of the Second Period will be kept by the Members.

4. Tax Exempt Status: Investors will take into consideration the Alliance Members not-for-profit status under the Internal Revenue Code in structuring the transaction contemplated by this Term Sheet, and the Investors shall seek, but not be obligated, to structure payments contemplated hereunder as income which is not subject to the Unrelated Business Income Tax.

5. Not-for Profit Status: To insure against the loss of the FCC licenses held by each Member, each Member will covenant to the Investors that such Member will maintain its eligibility to hold all FCC licenses that are the subject of the Individual Leases or for which the Members have been paid a Commitment Fee but have not yet entered into a Individual Lease. The Alliance will work in good faith with the Investors to implement mechanisms (the "Mechanisms"), including, without limitation, agreeing to assign any affected license, in the event any Member fails to maintain its FCC eligibility, to a qualified party designated by Clearwire. Each Member will covenant to use its best efforts to facilitate implementation of the Mechanisms.

6. Network Design and Build Out: Clearwire will, in consultation with the Members, use reasonable efforts to prepare FCC applications for re-engineering of each

Member's Channel POPs that are to be delivered pursuant to the Master Agreements for two-way facilities as soon as possible, subject to Clearwire's overall business development plans approved by the Board (as defined below) and consistent, to the extent reasonably achievable, with the educational broadband objectives of the Alliance Members. The Members will use reasonable efforts to file and prosecute such applications at Clearwire's expense as soon as possible. Clearwire will consult with the Alliance in developing plans to build out high-capacity two-way facilities for each Member's Channel POPs that are delivered pursuant to the Master Agreements, including those referred to in paragraph 7 below. The timing of such build out of Channel POPs will be at Clearwire's discretion, provided that the build out will always be consistent with FCC rules, including the build out of markets to satisfy minimum requirements required to keep FCC authorizations in good standing with the FCC and in accordance with the applicable filings with respect to such spectrum. Clearwire and the Members shall use reasonable best efforts to maximize protection of the Members' licensed ITFS Spectrum from interference and the foreclosure of service to Channel POPS, including, without limitation, by making FCC filings in opposition to third party applications, consistent with FCC rules and the Parties' contractual and legal obligations. Recognizing the provisions of the next paragraph, each of the Members, Clearwire and each of the other Parties hereto recognizes their common interest in maximizing the commercial value of the joint enterprise contemplated by this letter and each intends to work together to maximize that value. To this end, it is contemplated that specific tasks, processes or additional provisions related thereto will be agreed upon in the definitive agreements to facilitate accomplishing this common goal.

7. <u>Educational Use</u>: The Parties recognize that the Members intend to offer for sale directly to educational and not-for-profit institutions broadband network services, utilizing the portions of the ITFS Spectrum described below, on a nationwide basis in a manner consistent with the Clearwire business plan. Pursuant to the Master Agreements and applicable law, each Member will reserve 5% of the capacity associated with such Member's leased ITFS Spectrum in each market for provision by such Member and its affiliates of broadband services directly to educational institutions and other non-profit organizations (consistent with current FCC rules). Clearwire will provide the Members with at least the generally available and prevailing facilities, technology and functionality that Clearwire uses in a market at no cost to the Member whose ITFS Spectrum is leased in such market and Clearwire will build out the Channel POPs related to such 5% capacity (and all additional capacity to be made available hereunder), as described in paragraph 6. Another 10% of the capacity associated with a Member's leased ITFS Spectrum in each market ("<u>Intermediate Capacity</u>") will be available for provision of service by that Member directly to educational institutions and other non-profit organizations, on terms equal to 85% of the lowest cost terms offered by Clearwire to any third party in such market. In addition to the foregoing, Clearwire will provide such Member the right to obtain, for provision of service by that Member directly to

educational institutions and other non-profit organizations, an additional 10% of the capacity (the "Excess Capacity") associated with that Member's leased ITFS Spectrum in each market at the lowest cost terms offered by Clearwire to any third party in such market; provided that, if the Excess Capacity is presently being utilized by Clearwire such Excess Capacity will not be made available to the Member for up to one (1) year to permit Clearwire to reroute or otherwise provide alternative service to its customers. In order to exercise its rights under this paragraph with respect to any Intermediate Capacity or Excess Capacity, the Member shall be required to enter into a binding agreement with Clearwire to accept and pay for any such capacity, in accordance with the most favorable terms and conditions applicable to comparable orders of capacity. If, at the time a Member has accessed any of the capacity to which it is entitled under this paragraph 7, Clearwire has created a branded service, such Member will use its reasonable best efforts to incorporate that brand in its provision of the services contemplated hereunder utilizing such capacity. If Clearwire leases ITFS Spectrum from more than one Member in a market, each Member shall have the foregoing rights with respect to the specified percentages of the capacity associated with its leased ITFS Spectrum.

8. Board of Directors: The Alliance will have the right to appoint 1 director to the Clearwire Holdings Board of Directors (the "Board"); provided, however, this right will terminate (x) if the number of shares of Clearwire Holdings stock collectively held by the Members falls below 50% of the total number of shares of Clearwire Holdings stock acquired by the Members pursuant to the Equity Fee or (y) upon the initial public offering of Clearwire Holdings or Clearwire. In addition, each Member will have the right to appoint 1 member to the Spectrum Advisory Committee of the Board and 1 member to the Non-Profit Advisory Committee. The Spectrum Advisory Committee will work to advise the Board on all issues related to the acquisition and management of spectrum for commercial purposes and monitoring federal government policy changes in respect of spectrum. The Non-Profit Advisory Committee will work to advise the Board on all matters related to the commercial relationship between Clearwire and non-profit organizations.

9. Holding Company Structure: The transaction will be effected through a holding company structure in a manner which protects Alliance Members from the effects of a possible bankruptcy of Clearwire in a form and substance satisfactory to the Investors, the Alliance Members, and their respective legal counsel, subject to bankruptcy, tax and other legal review which is currently underway.

10. Stockholders Agreement. The Members will each be a party to a Stockholders Agreement with Clearwire Holdings that will contain the typical right of first refusal, tag along, pre-emptive rights and such other provisions in support of the foregoing as the Parties may determine useful. The shares of Clearwire Holdings held by the

members will contain anti-dilution provisions similar to that of the Investors.

11. Definitive Agreements. The Members agree that they will visit Clearwire (the "Clearwire Visit") to meet with Clearwire's management team and learn about Clearwire's business. Goldman agrees to use its reasonable best efforts to cause Clearwire to supply Members with information needed for them to complete their due diligence review of Clearwire, including information concerning Clearwire's: facilities and technology; current operations; business plans; current capital structure; and future capitalization plans (including plans for both equity and debt financing). A Member may include expert consultants in making the site visit and/or conducting the due diligence review. The Members will use their reasonable best efforts to supply the Investors and Clearwire with such information as is necessary to complete their due diligence with respect to the transactions contemplated herein. Each Party will, subject to such Party's satisfactory completion of its due diligence, move expeditiously toward entering (i.e. negotiate in good faith and use its reasonable best efforts) definitive documentation on the terms set forth herein.

12 Confidentiality: You and we agree, for ourselves and on behalf of our agents, employees and advisors, that any and all non-public information we each learn about activities, agreements and operations of the other and Clearwire, including without limitation, Clearwire's business and technology, and in the case of the Alliance and its Members, any and all non-public information about the leases and licenses thereof and the state of any past or present discussions by any of the Members with current or prospective lessees thereof, will be kept confidential by each Party and its respective directors, officers, partners, employees, affiliates and agents (each, a "Representative"). In addition, each Party hereto shall, and shall cause its Representatives to, keep confidential all information contained herein, including the existence of this letter and any information relating to prior written or oral communications between the Alliance and the Investors, and the Alliance and Clearwire, until such time as the Investors and the Alliance agree upon the language and timing of the disclosure of any such information.

13. Exclusivity; Ordinary Course: From the date of your acceptance of this letter (the "Acceptance Date") until January 31, 2001 (the "Exclusive Dealing Period"), and contingent upon Clearwire's payment to the Alliance of (x) $13,689.28 in legal expenses due to Mintz, Levin, Cohn, Ferris, Glovsky & Popeo and (y) $12,500 in the aggregate in legal fees and expenses to be used by the Alliance in connection with the Debate (as defined below): (i) the Alliance and its Members shall not, and shall cause its Representatives and any other person acting on its behalf not to, directly or indirectly, solicit, negotiate with respect to, facilitate, or accept any offers or proposals for the sale, transfer or lease of any of the ITFS Spectrum and (ii) the Alliance and its Members will terminate any existing activities or discussions concerning the ITFS Spectrum with any party other than the Investors and shall promptly advise the Investors of any inquiry or proposal relating thereto that may be

received, if such proposal or inquiry is with respect to 10,000,000 or more Channel POPs, including the terms of the proposal and the identity of the inquirer; provided that, the Exclusive Dealing Period may be extended by mutual agreement of the Parties for an additional 30 days at any time after 30 days from the Acceptance Date if each Party, in its reasonable judgment, believes that the other Party is proceeding in good faith to complete and execute mutually acceptable definitive agreements within the Exclusive Dealing Period as so extended.

14. Reimbursement. Clearwire will reimburse the Members for up to $87,500 in legal fees and expenses incurred by the Members in negotiating this letter and the definitive documentation and for expenses incurred in connection with the Alliance's effort to organize ITFS licensees to take part in the public policy debate (the "Debate") concerning third generation wireless spectrum (the "Reimbursement") provided that the Reimbursement will only be made if the Closing occurs on or prior to January 31, 2001.

15. Counterparts. This letter may be executed in one or more counterparts, all of which shall be considered one and the same agreement, and shall become effective when one or more such counterparts have been signed by each of the Members and delivered to the Investors.

16. Governing Law: This letter and the definitive documents shall be governed by New York law.

This letter shall not be construed as a binding agreement on the part of the Alliance, its Members, or any of the Investors, except with respect to paragraphs 12 through 16 above, all of which are binding. In addition, this letter shall not be construed as a commitment by any of the Investors, nor shall any discussions or course of conduct of the Parties impose any obligation or liability on any of the Investors. Except with respect to paragraphs 12 through 16 above, a binding agreement with respect to the proposed transaction will arise only after mutually satisfactory definitive agreements have been negotiated and executed.

As the Parties negotiate definitive documents, the Members shall prepare and revise drafts of the form of Individual Lease; Goldman shall prepare and revise drafts of a master participation agreement and/or each of the Master Agreements, stockholders agreement and collateral documents.

If you are in agreement with the foregoing we ask that you execute a copy of this letter and return it to the undersigned.
We look forward to working with you towards making our investment.

Yours truly,

GS CAPITAL PARTNERS III, L.P.

By: GS Advisors III, L.L.C.
Its General Partner

By: ______________________________
Name:
Title:

**AGREED AND ACCEPTED BY THE MEMBERS LISTED BELOW**

By: North American Catholic Educational Programming Foundation, Inc.

By: ______________________________
Name: John Primeau
Title: President

By: Hispanic Information and Telecommunications Network, Inc.

By: ______________________________
Name: Jose Rodriguez
Title: President

By: Instructional Telecommunications Foundation, Inc.

By: ______________________________
Name: John Schwartz
Title: President