UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

```
_____
                                )
NORTH AMERICAN CATHOLIC          )
EDUCATIONAL PROGRAMMING          )
FOUNDATION, INC.,                )
          Plaintiff,             )
                                 )
     v.                          )    C.A. No. 06-492-S
                                 )
GERRY CARDINALE, ROB GHEEWALLA,  )
JACK DALY, GOLDMAN SACHS         )
GROUP, INC., GS CAPITAL PARTNERS,)
III, L.P., GS CAPITAL PARTNERS,  )
III OFFSHORE, L.P. and GOLDMAN   )
SACHS & CO. VERWALTUNGS GmbH,    )
          Defendants.            )
_____ )
```

**DECISION AND ORDER**

WILLIAM E. SMITH, United States District Judge.

Before the Court are Defendants' Motions to Dismiss Plaintiff's Complaint in the above-captioned matter pursuant to Federal Rules of Civil Procedure 12(b)(2) (lack of personal jurisdiction), 12(b)(5) (insufficient service of process), and 12(b)(6) (failure to state a claim upon which relief can be granted). For the reasons stated herein, Plaintiff's Complaint is dismissed pursuant to Federal Rule of Civil Procedure 12(b)(2). Defendants' Motions to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(5) and 12(b)(6) consequently are denied as moot.

I.   <u>Background</u>

   A.   The Parties

   Plaintiff, North American Catholic Educational Programming Foundation, Inc. ("Plaintiff" or "NACEPF"), is an independent, nonprofit, Catholic lay organization incorporated and operating in Rhode Island.   NACEPF describes its mission as providing "educational and religious oriented programming to nonprofit agencies, such as schools, nonprofit agencies and other government entities."

   Defendant Goldman Sachs Group, Inc. ("GS Group") is a Delaware corporation with its principal place of business in New York. Defendant GS Capital Partners III, L.P. ("GS Capital Partners"), which is registered in Delaware, and Defendant GS Capital Partners III Offshore, L.P. ("GS Offshore"), which is registered in the Cayman Islands, are both "investment partnerships affiliated with GS Group."   Defendant Goldman Sachs & Co. Verwaltungs GmbH ("GS Verwaltungs"), which is registered in Germany, is the nominee of a German investment partnership affiliated with GS Group.   These entities collectively will be referred to as the "Goldman Shareholder Defendants."

   Defendants Gerry Cardinale ("Cardinale"), Rob Gheewalla ("Gheewalla"), and Jack Daly ("Daly") are employed by affiliates of GS Group in New York and London, and reside in New York.   These

2

individuals collectively will be referred to as the "Individual Defendants."

B.   The Dispute

This litigation arises, not surprisingly, from the ashes of a failed business relationship.  During the 1990s, as the internet came into its own as an instrument useful to businesses and individuals alike, several companies explored the possibility of developing a wireless internet network not unlike that which had already been deployed with great success for wireless telephones. One of these was a company called Clearwire Holdings, Inc. ("Clearwire").  Clearwire was created to acquire wireless radio licenses, more commonly known as "spectrum rights," and to use those licenses to develop a wireless internet network.  Initially, two seemingly insurmountable obstacles prevented Clearwire and other companies like it from implementing a viable wireless network.  First, the radio wave spectrum used by existing wireless phone networks was discovered to be too limited to effectively transmit the exponentially higher levels of data ordinarily transferred over the internet.  Second, it would be very difficult to obtain the issuance, by the Federal Communications Commission ("FCC"), of new licenses in the radio wave spectrum.

By 2000, it became apparent that certain existing spectrum, known as "Instruction Television Fixed Service" spectrum or "ITFS spectrum," could successfully be used to facilitate the creation of

3

a wireless internet network. ITFS spectrum traditionally was used for educational television programming. In anticipation of ITFS spectrum's potentially lucrative value as a conduit for wireless internet signals, large communications companies such as Sprint and Worldcom engaged in strategic high-volume acquisition campaigns to obtain the rights to use existing ITFS spectrum.

In the meantime, sensing that ITFS spectrum licenses were increasingly in demand, educational groups began to lease their spectrum rights to fledgling wireless internet companies and, later, to established communications companies like the aforementioned Sprint and Worldcom. In 2000, in a bid to protect and leverage their valuable spectrum rights, NACEPF and two other ITFS licensees formed the ITFS Spectrum Development Alliance, Inc. (the "Alliance") to market and develop their ITFS spectrum licenses.[1] Later that year, the Alliance undertook a search for investors to purchase the lease rights for its licenses. Beginning in the Spring of 2000, and continuing for nearly a year, the Alliance engaged in negotiations with Goldman Sachs. The parties are in agreement that none of these meetings took place in Rhode

---

[1] The Alliance included NACEPF, the Hispanic Information and Telecommunications Network, Inc. ("HITN"), and the Instructional Telecommunications Foundation, Inc. ("ITF"). The record does not reveal the Alliance's state of incorporation. However, the Master Agreement (see discussion, infra) lists the Alliance's primary contact as being located in Colorado and its legal counsel in Connecticut. In any event, Plaintiff does not contend that the Alliance is incorporated in Rhode Island.

Island, but they disagree about who initiated the meetings. In any event, a memorandum from the "Goldman Sachs Team" (but sent by Defendant Cardinale) to "ITFS Alliance," dated June 7, 2000, indicates that talks between the parties were well underway by the summer of that year. By the end of 2000, Goldman Sachs had sent the Alliance a letter of intent, outlining the present state of their negotiations.

In early 2001, a deal between NACEPF and Goldman Sachs was taking on a final shape. That March, the Goldman Shareholder Defendants collectively invested about $47 million in Clearwire. On March 13, each of the Alliance members, including Plaintiff NACEPF, signed a Master Royalty and Use Agreement ("Master Agreement") with Clearwire.[2] The Master Agreement provided that the Alliance members would lease their ITFS spectrum licenses to Clearwire as leases with other companies, such as Sprint and Worldcom, expired. Each of the Individual Defendants were involved in orchestrating the Goldman Shareholder Defendants' investment in Clearwire and, after the Master Agreement was executed, became members of Clearwire's board of directors.

After the collapse of WorldCom amidst a widely publicized accounting scandal, the value of ITFS spectrum was significantly diluted as Worldcom's spectrum holdings flooded the marketplace.

---

[2] None of the defendants in the instant action were parties to the Master Agreement.

All of the Alliance members (with the exception of NACEPF) released Clearwire of any pending obligations under the Master Agreement through cash settlements.  According to NACEPF, Defendant Daly met with Mr. Primeau, the president of NACEPF, in Rhode Island on at least one occasion in Spring 2003 in an attempt to induce NACEPF to settle its claims under the Master Agreement.

At around the same time, on May 6, 2003, in the wake of the Alliance settlements, Clearwire sent an "Investor Update" to all of its shareholders, a group which included NACEPF.  The Investor Update informed the shareholders that settlements had been reached with the Alliance members, and discussed recent meetings between Clearwire and potential investors, including UBS Warburg, intended to raise badly needed capital.  Later that year, in August 2003, Clearwire sent letters to its shareholders, including Plaintiff NACEPF, in which it offered the opportunity to invest in "emergency bridge financing," the purpose of which was to "provide the Corporation with additional time to pursue a new round of financing and to pursue other strategic alternatives, which may include a sale or merger of the company."  The first offer, dated August 15, 2003, was for the sale of debt instruments known as "Convertible Notes," but limitations imposed by certain state regulations necessitated the issuance of a second offer, dated August 20, 2003, that replaced the first offer with a pure equity deal in which shares of "C" Series preferred stock were sold.  Many of

Clearwire's shareholders, but not NACEPF, took advantage of the opportunity to purchase the "C" Series stock offered by Clearwire.

After Clearwire succeeded in curing its financial woes in November 2003, it entered into an agreement with Flux U.S. Corporation ("Flux"), a company owned by investor Craig McCaw ("McCaw"). Under the agreement, Clearwire agreed to sell Flux -- which would later change _its_ name to Clearwire -- two of its subsidiaries in exchange for cash and stock in Flux. Several days after the Flux deal was finalized, NACEPF filed a declaratory judgment action against Clearwire in the Superior Court of Delaware, claiming that Clearwire breached the Master Agreement. A few weeks later NACEPF voluntarily dismissed the contract claim against Clearwire, but filed a new action against each of the Individual Defendants, _i.e._ Messrs. Cardinale, Gheewalla, and Daly. The Superior Court dismissed the case without prejudice for lack of subject matter jurisdiction. Several months later, on June 24, 2005, NACEPF re-filed its complaint against the Individual Defendants in the Delaware Court of Chancery. This action, in which NACEPF alleged nearly identical claims as in the present case, but as a creditor of Clearwire and not a shareholder, was dismissed for lack of personal jurisdiction. The Chancery Court's decision was affirmed by the Supreme Court of Delaware. N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla, 930 A.2d 92 (Del. 2007).

7

While the Delaware appeal was pending, NACEPF filed this action. The parties are largely the same, with the addition of the Goldman Shareholder Defendants. Plaintiff alleges the following claims against all seven defendants: (I) fraudulent inducement, (II) fraud, (III) interference with prospective business opportunity (sale of Alliance licenses), (IV) interference with prospective business opportunity (Alliance acquisitions), (V) breach of fiduciary duties of loyalty and care (bridge financing), (VI) breach of fiduciary duty of disclosure (bridge financing), (VII) unjust enrichment, and (VIII) fraud/misrepresentation (bridge financing). Essentially, Plaintiff contends that the Individual Defendants (and through them, the Goldman Shareholder Defendants), even though they comprised less than a majority of Clearwire's board of directors, were able to control Clearwire because its only source of funding was Goldman Sachs. According to Plaintiff, they exploited that control to favor Goldman Sachs' agenda in derogation of their fiduciary duties as directors of Clearwire. Plaintiff also asserts that the Individual Defendants fraudulently induced it to enter into the Master Agreement with Clearwire and that the Individual Defendants tortiously interfered with NACEPF's business opportunities.

II. <u>Standard of Review</u>

When personal jurisdiction is contested, the plaintiff bears the burden of establishing that the court may exercise such

jurisdiction.  Daynard v. Ness, Motley, Loadholt, Richardson &
Poole, P.A., 290 F.3d 42, 49 (1st Cir. 2002).  Allegations of
jurisdictional facts are construed in the plaintiff's favor,
Kowalski v. Doherty, Wallace, Pillsbury & Murphy, 787 F.2d 7, 9
(1st Cir. 1986), and, if the court proceeds based upon the written
submissions of the parties without an evidentiary hearing, the
plaintiff need only make a prima facie showing that jurisdiction
exists.  Kowalski, 787 F.2d at 8; Boit v. Gar-Tec Prods., Inc., 967
F.2d 671, 674-75 (1st Cir. 1992).  In other words, most frequently,
the inquiry for the district court is limited to whether the
plaintiff "has proffered evidence that, if credited, is enough to
support findings of all facts essential to personal jurisdiction."
Id. at 675.  Nevertheless, the plaintiff's demonstration of
personal jurisdiction must be based on specific facts set forth in
the record in order to defeat a defendant's motion to dismiss.
And, "[i]n reviewing the record before it, a court 'may consider
pleadings, affidavits, and other evidentiary materials without
converting the motion to dismiss to a motion for summary
judgment.'"  VDI Techs. v. Price, 781 F. Supp. 85, 87 (D.N.H. 1991)
(quoting Lex Computer & Mgmt. Corp. v. Eslinger & Pelton, P.C., 676
F. Supp. 399, 402 (D.N.H. 1987)).

     In order to establish that the court has personal jurisdiction
over a defendant, the plaintiff must overcome two hurdles.  First,
he must show that the forum state has a long arm statute that

enables the court to exercise jurisdiction over a non-resident defendant. Daynard, 290 F.3d at 52 (citing Foster-Miller, Inc. v. Babcock & Wilcox Canada, 46 F.3d 138, 144 (1st Cir. 1995)). Second, he must show that asserting jurisdiction over the defendant comports with the due process requirements of the Fourteenth Amendment. Id. Because Rhode Island's long-arm statute has been held to extend to the constitutional limits of the Fourteenth Amendment, see Brian Jackson & Co. v. Eximias Pharm. Corp., 248 F. Supp. 2d 31, 34-5 (D.R.I. 2003) (citing Almeida v. Radovsky, 506 A.2d 1373, 1374 (R.I. 1986)), a federal court sitting in Rhode Island may proceed directly to the due process analysis.

To comport with the minimum requirements of due process, NACEPF must show that the Defendants had certain "minimum contacts" with Rhode Island. Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945). Minimum contacts are established by satisfying a three-pronged inquiry:

> First, an inquiring court must ask whether the claim that undergirds the litigation directly relates to or arises out of the defendant's contacts with the forum. Second, the court must ask whether those contacts constitute purposeful availment of the benefits and protections afforded by the forum's laws. Third, if the proponent's case clears the first two hurdles, the court then must analyze the overall reasonableness of an exercise of jurisdiction in light of a variety of pertinent factors that touch upon the fundamental fairness of an exercise of jurisdiction.

Phillips Exeter Acad. v. Howard Phillips Fund, Inc., 196 F.3d 284, 288 (1st Cir. 1999); see also Sawtelle v. Farrell, 70 F.3d 1381,

1389 (1st Cir. 1995).  Bearing in mind that the relative strength of Plaintiff's showing on the first two elements bears upon the third element, an affirmative finding on each of the three elements of the test is required to support a finding of specific jurisdiction.  <u>Phillips Exeter Acad.</u>, 196 F.3d at 288.

III. <u>Discussion</u>

The Court initially notes that Plaintiff does not appear to premise specific jurisdiction over the Goldman Shareholder Defendants on any in-forum contacts by those defendants.  None of these entities are based in Rhode Island and it appears that none is alleged to have undertaken any action in Rhode Island that relates to Plaintiff's claims.[3]  Plaintiff instead argues that contacts by the Individual Defendants and law firms should be imputed to the Goldman Shareholder Defendants.  The defendants question whether such contacts may indeed be imputed; however, the Court need not reach the issue because the contacts alleged, in any event, are insufficient to establish personal jurisdiction.

---

[3] Defendant GS Group does have a registered agent for service of process in Rhode Island.  However, Plaintiff has not made any allegation against GS Group, instead predicating GS Group's liability, if any, on the activities of the Individual Defendants. Given that the Court lacks personal jurisdiction over the Individual Defendants, as explained in detail in this opinion, the Court sees no justification to allow the action to proceed against GS Group.  Should Plaintiff refile its Complaint in an appropriate forum, the Individual Defendants and GS Group will presumably be required to defend themselves in that forum.

A.    Relatedness

The  Court's  first  consideration  under  the  three-prong

jurisdictional analysis is whether any of NACEPF's claims arise out

of,  or  relate  to,  the  Defendants'[4]  Rhode  Island  activities.

Sawtelle, 70 F.3d at 1389.  In explaining the application of the

"relatedness" prong of the test, the First Circuit has:

> suggested an analogy between the relatedness requirement
> and the binary concept of causation in tort law under
> which both elements - cause in fact (i.e., the injury
> would not have occurred "but for" the defendant's
> forum-state activity) and legal cause (i.e., the
> defendant's in-state conduct gave birth to the cause of
> action) - must be satisfied to find causation sufficient
> to support specific jurisdiction.

United Elec., Radio & Machine Workers of Am. v. 163 Pleasant St.

Corp., 960 F.2d 1080, 1089 (1st Cir. 1992).

NACEPF  claims  that  the  following  occurrences  satisfy  the

"relatedness" requirement: (i) Defendant Cardinale sent a memo on

June  7,  2000  to  the  Alliance;  (ii)  some  of  the  Individual

Defendants made telephone calls or sent e-mails to Plaintiff; (iii)

attorneys representing the Defendants sent e-mails and documents to

Plaintiff, and traveled to Rhode Island to conduct due diligence;

(iv) Defendant Daly traveled to Rhode Island to attend a settlement

meeting with Plaintiff; and (v) non-party Clearwire sent letters

(the so-called Investor Update and Bridge Financing Offer letters)

---

[4] The  majority  of  contacts  that  Plaintiff  points  to  were
alleged to have been made by the Individual Defendants; however,
for convenience, the Court will simply refer to the Defendants as
a group.

to Plaintiff in connection with the C-Round financing.   Plaintiff
concludes that "[t]he Individual Defendants' minimum contacts are
sufficiently related to Plaintiff's claims inasmuch as 'the
claim(s) underlying the litigation . . . directly arise out of, or
relate to, the defendant's [sic] forum-state activities.'"

Generally then, Plaintiff argues that the Individual
Defendants directed communications to Plaintiff in Rhode Island and
caused harm that Plaintiff suffered in Rhode Island, all of which
leads to the conclusion that the Defendants submitted themselves to
the jurisdiction of this Court.   However, not only did the harmful
acts alleged by Plaintiff occur primarily, if not entirely, outside
Rhode Island, but the harm itself also occurred primarily outside
Rhode Island.

  1. The June 7, 2000 Memorandum

Aside from the assertion of counsel at the hearing on the
motions to dismiss, there is no evidence that the June 7, 2000
memorandum was ever actually sent to Rhode Island.   The document
itself is addressed to the ITFS Alliance which, the record shows,
is not headquartered in Rhode Island.[5]

However, even if the memorandum was sent to Primeau in Rhode
Island, the memorandum's relation to the one claim it appears to

---

[5] The memorandum was specifically addressed to "ITFS Alliance
(Primeau/Rodriguez/Schwartz)."   Primeau was, of course, the
president of NACEPF.   Jose Rodriguez was the president of HITN and
John Schwartz was the president of ITF.

support -- NACEPF's claim for fraudulent inducement -- is tenuous at best.  The memorandum was not a binding proposal, but rather a preliminary document that subsequently gave way to further negotiations and correspondence, none of which is purported to have taken place in Rhode Island.  Indeed, the third sentence of the memorandum states that "some details to our current response may still need to be worked out."  Even clearer evidence of the preliminary nature of the June 7, 2000 memorandum can be found in a letter sent by the G.S. Capital Partners III, L.P. to "ITFS Spectrum Development Alliance, Inc." on December 4, 2000.  In this "Term Sheet" the details of the proposed relationship between the Alliance and Clearwire were thoroughly laid out in final form and confirmed by the signatures of the parties.  While Plaintiff thus might prefer to rely on this Term Sheet as a jurisdictional contact, the document was sent to the Alliance, not Plaintiff, care of ING Barings in New York City.  In sum, the June 7, 2000 memorandum simply has not been shown to be an in-forum contact that relates to Plaintiff's claims in this action.

> 2.   Telephone and E-mail Communications

Information conveyed to a forum by telephone or e-mail may be a contact for jurisdictional purposes.  <u>Sawtelle</u>, 70 F.3d at 1389-90.  Plaintiff alleges that Defendants Cardinale and Daly "participated in <u>numerous</u> correspondences and communications <u>directed</u> toward NACEPF in Rhode Island related to the allegations

set forth herein." First, there is no allegation that Gheewalla made any communications prior to the execution of the Master Agreement. Second, with respect to Cardinale and Daly, an examination of the telephone and e-mail logs supplied by Plaintiff shows that the communications were not so numerous as Plaintiff suggests.[6] In fact, the majority of the communications logged by Plaintiff are <u>from</u> Plaintiff <u>to</u> the Defendants <u>outside</u> of Rhode Island.

Plaintiff also failed to provide the content of any of the e-mail correspondences originating with the defendants,[7] which makes it impossible for the Court to determine if any such "contacts" are actually related to any of the claims. <u>Escude Cruz v. Ortho Pharm. Corp.</u>, 619 F.2d 902, 908 (1st Cir. 1980); <u>see also</u> <u>Platten v. HG Bermuda Exempted Ltd.</u>, 437 F.3d 118, 137 (1st Cir. 2006) (holding that conclusory allegations of misrepresentation are insufficient to assert personal jurisdiction where "plaintiffs failed to provide any details . . . including any misrepresentations that were made at that time, who may have made them, and in what capacity").

---

[6] The Court notes that Plaintiff did not provide copies of the actual e-mails or telephone records, but rather provided logs that were apparently created specifically for the purpose of opposing the Defendants' motions to dismiss. The Court leaves aside the question of whether the logs are even admissible under the Federal Rules of Evidence, because the jurisdictional analysis arrives at the same end point whether the logs are considered or not.

[7] It appears that content has been provided for only one e-mail; however, the e-mail in question originated with Primeau.

Further, the authorities cited by Plaintiff do not actually go so far as to state that isolated e-mail communications or telephone calls, without more, are sufficient to justify the exercise of jurisdiction over a defendant.[8]   On the other hand, the First Circuit, in <u>Sawtelle</u>, held that e-mail and telephone communications sent by a law firm to its clients' home state of New Hampshire were only tenuously related to the claims in that case:

> The communications sent into New Hampshire were ancillary to the allegedly negligent non-forum activities, and because those communications were the only relevant contacts with the forum for purposes of the Sawtelles' malpractice claim, we conclude that the plaintiffs' showing of relatedness should be characterized as tenuous at best.  It hangs, as it were, by a thread.

---

[8] In <u>Gorman v. Ameritrade Holding Corp.</u>, 293 F.3d 506, 513 (D.C. Cir. 2002), the issue was whether the defendant, an online brokerage company, transacted enough business with forum residents to subject it to the <u>general jurisdiction</u> of the court.  But even before that question could be answered, the court noted that the "frequency and volume of the firm's transactions with District residents" would need to be evaluated.  <u>Id.</u>  In <u>Brian Jackson & Co. v. Eximias Pharm. Corp.</u>, 248 F. Supp. 2d 31, 36 (D.R.I. 2003), the contractual duties underlying the claim were to be performed in the forum at the request of the defendant.  This Court noted that the defendant "might well have anticipated that encouraging [plaintiff] to perform his contractual duties in Rhode Island substantially increased its ties to Rhode Island."  <u>Id.</u>  In <u>Lantor, Inc. v. Nicassio Corp.</u>, No. CA 06 46S, 2007 WL 204015, at *6-11 (D.R.I. Jan. 24, 2007), the defendant, over whom specific jurisdiction was established, had a course of dealing with the plaintiff including sending purchase orders to Rhode Island and placing several orders for materials to be manufactured in Rhode Island over the course of three years.  <u>Id.</u>  Lastly, in <u>E.F. Hutton & Co. v. Tourism & Dev. Corp.</u>, 455 F. Supp. 981, 984-85 (D.R.I. 1978), a Florida bank was subject to Rhode Island jurisdiction after agreeing to finance construction of a recreational facility in Rhode Island and accepting a down payment drawn on a Rhode Island bank by a Rhode Island entity.  <u>Id.</u>

Id. at 1390-91.  Likewise, in the instant case, the Defendants'
alleged misconduct apparently was not contained in any of the e-
mails or telephone calls, but rather occurred in New York or
Delaware, but not in Rhode Island.  The limited communications sent
into Rhode Island, the content and connection of which is unknown,
do not remotely rise to the level required to meet the requirements
of the relatedness prong.

    With respect to activities of the Defendants' New York-based
attorneys, the Court is even less persuaded that Plaintiff has met
the relatedness threshold.  Most of the alleged communications fail
the relatedness test because, like the communications made directly
by the Individual Defendants, the content of the communications is
undisclosed.  The few communications for which content has been
disclosed provide little support.  For example, Mr. Primeau's
affidavit includes a memorandum sent by Dan Ronnen, one of the
Defendants' New York-based attorneys, to Defendant Cardinale, also
located in New York.  The one e-mail for which content was
disclosed, although copied to Mr. Primeau, was a correspondence
between Mr. Rodriguez, the representative of another Alliance
member, and Mr. Ronnen.  Even assuming that being copied on an e-
mail is sufficient to constitute a jurisdictional contact, the
content of this e-mail does not suggest any wrongdoing by Mr.
Ronnen.  In the e-mail, Mr. Ronnen responded in the negative to a
query from Mr. Rodriguez about whether or not the Alliance members

could reserve or postpone claims regarding the C-Round financing. The e-mail was nothing more than a response to a question regarding the legal technicalities of the financing. It has no connection to the allegations regarding the omission of critical information regarding the alleged secret meetings between the Defendants and McCaw.

Thus, not only is Plaintiff asking the Court to impute an attorney's e-mail contact to _all_ the Defendants, but Plaintiff also expects the Court to consider the e-mail to be directly related to one or all of the C-Round claims because both deal with the same subject matter. Even under the _prima facie_ standard, this Court cannot conclude that the e-mail is sufficient to show a causal connection between the Defendants' alleged misconduct and Rhode Island.

### 3. Due Diligence Activities

With respect to the due diligence activities undertaken by the Defendants' attorneys at Plaintiff's offices in Rhode Island, Plaintiff has not shown how the activities are connected to any of its claims in this litigation.

The Court can similarly dispose of Plaintiff's allegation that the Defendants' attorneys made a relevant contact with the forum when they sent closing documents to the NACEPF's president. Again, the Court is at a loss to see how this "contact" is related to any of Plaintiff's claims. As matter of common sense, the closing

18

documents could not have induced Plaintiff to enter the agreement; by that point, Plaintiff had already completed negotiations with the Defendants and Clearwire and had only to execute the documents.

Likewise, the other claims cannot be viewed as being related to the closing documents. The Master Agreement makes no mention of the C-Round financing; indeed, the need for future bridge financing could not have been contemplated before the parties had even entered the agreement. Similarly, the Defendants could not have breached any fiduciary duty owed to Plaintiff or have been unjustly enriched before the deal had even been consummated. At best, this "contact" evinces the business relationship between Plaintiff and the Defendants but, as has already been discussed, it is not the relationship that establishes jurisdiction but the related contacts of the defendants within the forum. <u>Phillips Exeter Acad.</u>, 196 F.3d at 290 ("It is not the relationship itself, but the content of the parties' interactions that creates constitutionally significant contacts."). Thus, the alleged contacts of the Defendants' attorneys do little, if anything, to help Plaintiff meet the relatedness requirement.

4.   2003 Settlement Meeting

There is no dispute that Defendant Daly physically entered Rhode Island in March 2003 to meet with Primeau in an attempt to arrive at a settlement of Plaintiff's claims. Further, this meeting has been characterized from the start by Plaintiff as a

settlement meeting and nothing more.  In its Complaint, Plaintiff states that "Daly met with the President of NACEPF in Rhode Island on at least one occasion in Spring 2003, whereby Daly attempted to induce NACEPF to settle its claims under the Master Agreement." However, Plaintiff does not appear able to draw any concrete connection between the meeting and its claims in this action, instead vaguely asserting that the meeting "evinced both the business relationship and the dispute between the parties."  It goes without saying that evidence of a dispute is not sufficient to establish jurisdiction; if it was, then jurisdiction would be meaningless.  With respect to relational evidence, as already noted above, the First Circuit has stated that whether there are constitutionally significant contacts is not a question that turns on the existence of a relationship between parties.  Phillips Exeter Acad., 196 F.3d at 290.

At oral argument, Plaintiff's counsel backpedaled from its initial characterization of the settlement meeting by arguing that the meeting was a part of the alleged fraudulent scheme to acquire Plaintiff's spectrum rights.  Even bearing Plaintiff's qualification in mind, the Court does not agree that this meeting could possibly be related to any of Plaintiff's claims.  The meeting took place years after Plaintiff and Clearwire executed the Master Agreement, and the record indicates that the only matter discussed at the meeting was a dispute about ongoing obligations

20

under the Master Agreement.   Plaintiff has made no allegations (aside from its claim at oral argument that this meeting was "part of the fraudulent scheme" of Defendants) that anything was discussed at this meeting that would tie it to any of Plaintiff's actual claims.

The Court also has serious misgivings about construing an attempt at settlement within a particular forum as a jurisdictional contact.   Doing so would counter the law's preference that parties settle their claims without resorting to litigation.   Although the Court was unable to locate any First Circuit authority speaking to this issue, other courts have been reluctant to premise personal jurisdiction on attempts at settlement.   See, e.g., Red Wing Shoe Co. v. Hockerson-Halberstadt, Inc., 148 F.3d 1355, 1361 (Fed. Cir. 1998) (likening an offer for a license within a cease-and-desist letter as an offer of settlement not giving rise to personal jurisdiction); Digi-Tel Holdings, Inc. v. Proteq Telecomms., 89 F.3d 519, 524-25 (8th Cir. 1996) ("courts have hesitated to use unsuccessful settlement discussions as 'contacts' for jurisdictional purposes").   The result might be otherwise were this litigation intended to remedy a breach of a settlement agreement that had been negotiated or executed in Rhode Island by Primeau and Daly; however, as the negotiations were unsuccessful, that is not the situation before the Court.   See, e.g., Minn. Mining & Mfg. Co. v. Nippon Carbide Indus. Co., 63 F.3d 694, 698 (8th Cir. 1995)

(local court may exercise personal jurisdiction in action to enforce settlement agreement over party that entered forum state to negotiate and execute the agreement).

     5.   Investor Update and Bridge Financing Letters

Finally, the Court considers whether the Investor Update and Bridge Financing Offer letters satisfy the relatedness inquiry. Plaintiff does not actually claim that these alleged contacts were made by any of the named Defendants, but again relies upon agency theory in an attempt to tie the Defendants to Rhode Island. As discussed above, the Investor Update communications were sent by Clearwire to all of its shareholders, including Plaintiff. In the first place, these letters can only potentially support Plaintiff's bridge-financing claims; there is nothing in the communications to suggest that the content supports any of Plaintiff's other allegations. Further, Plaintiff claims that these alleged contacts support the bridge financing claims because they fail to mention the purportedly secret meetings with McCaw. However, Plaintiff has produced nothing beyond conclusory allegations to support its contention that such secret negotiations were indeed taking place when the Investor Updates were sent out. Even assuming that Clearwire or the Defendants were in the midst of meeting with McCaw during the time the letters were sent out, the communications clearly inform the shareholders that Clearwire was searching for investors and contemplating a merger or acquisition. For example,

in the May 6, 2003 Investor Update letter, Clearwire notified shareholders that it was meeting with investors and that it would "notify you with the specifics of an investment and provide you with the opportunity to invest." The first Bridge Financing offer letter followed this communication and, significantly, stated to shareholders that "[t]he Corporation is currently engaged in discussions with third parties regarding either a new financing round or a strategic transaction which could result in the acquisition of the Corporation."

Far from attempting to withhold information about these discussions, the letter stated the following: "If you wish to obtain further details about the potential investment or the potential strategic transaction, please contact Beau Paradowski at . . . ." Plaintiff does not allege that it made any attempt to inquire about such details or that any person who did inquire was not informed about the allegedly pending and secret meetings with McCaw. As discussed above, the subsequent letter, the final "C-Round offer," sent less than a week after the first, altered the terms of the bridge financing from a debt issuance to an equity deal. In addition to the language cited from the first letter, this communication significantly added the following:

> The terms of the potential strategic transaction are not
> definite at this time. Management of the Corporation is
> available to discuss in further detail the status of the
> potential investment or strategic transaction with any
> recipient of this letter prior to such recipient's

decision to either invest or not in the Series C Preferred Stock.

As with the first letter, Plaintiff has not claimed that it attempted to learn more about the potential transactions; perhaps if it had, it would have found Clearwire to be perfectly forthcoming about the potential for a deal with McCaw. We likely will never know because Plaintiff chose at the time to remain in the dark, did not participate in the offer, and now claims that the information was unavailable. Not only has Plaintiff failed to present evidence to suggest that there were any meetings pending during the time of these communications, but it apparently made no effort to accept Clearwire's invitation to learn about any such meetings or plans for any such meetings. Thus, the Court is hesitant to identify a causal relationship between these three communications, the bridge financing claims, and the State of Rhode Island. Once again, Plaintiff has failed to show how an alleged contact actually relates to or gives rise to any claims.

B.   Purposeful Availment

Although the Court finds that Plaintiff is unable to satisfy even the first prong of the jurisdictional test, it is worth adding a few words to show additionally that Plaintiff also has not shown that the Individual Defendants purposefully availed themselves of the laws of Rhode Island. In order to satisfy the purposeful availment prong of the jurisdictional test, NACEPF must show that the Individual Defendants voluntarily engaged in contact with Rhode

Island that made it foreseeable that they might be required to defend themselves in Rhode Island. <u>Phillips Exeter Acad.</u>, 196 F.3d at 292; <u>United Elec. Workers</u>, 960 F.2d at 1089-90. This requirement is intended to "assure that personal jurisdiction is not premised solely upon a defendant's random, isolated, or fortuitous contacts with the forum state." <u>Sawtelle</u>, 70 F.3d at 1391 (internal quotation marks omitted).

Plaintiff's essential argument[9] appears to be that the Individual Defendants purposefully availed themselves of the privileges afforded by Rhode Island law because they "knowingly directed their fraudulent and tortious conduct toward a nonprofit corporation located in Rhode Island." The Court cannot agree. It is not sufficient simply to assert that Plaintiff is located in Rhode Island. The alleged jurisdictional contacts must evidence a participation by the Individual Defendants in the economic life of the forum, not just the formation of a contract with the resident Plaintiff. <u>See</u> <u>Bond Leather Co. v. Q.T. Shoe Mfg. Co.</u>, 764 F.2d 928, 933 (1st Cir. 1985) ("We have held that the fact that a nonresident enters into a single commercial contract with a

_____

[9] As with the issue of relatedness, Plaintiff has failed to address how each of its purposeful availment arguments relates to each of its claims. This complicates the Court's evaluation of jurisdiction, because "'[q]uestions of specific jurisdiction are always tied to the particular claims asserted.'" <u>Hainey v. World AM Commc'ns, Inc.</u>, 263 F. Supp. 2d 338, 344 (D.R.I. 2003) (quoting <u>Phillips Exeter Acad. v. Howard Phillips Fund, Inc.</u>, 196 F.3d 284, 289 (1st Cir. 1999)).

resident of the forum state is not necessarily sufficient to meet the constitutional minimum for jurisdiction.") (citing <u>Whittaker Corp. v. United Aircraft Corp.</u>, 482 F.2d 1079, 1084 (1st Cir.1973)); <u>cf.</u> <u>McGee v. Int'l Life Ins. Co.</u>, 355 U.S. 220, 223 (1957) (holding it sufficient for purposes of due process that the defendant had participated in the economic life of the state and the contract had a substantial connection with the state). "Without evidence that the defendant[s] actually reached out to the plaintiff's state of residence to *create* a relationship - say, by solicitation - the mere fact that the defendant[s] willingly entered into a tendered relationship does not carry the day." <u>Phillips Exeter Acad.</u>, 196 F.3d at 292 (citation omitted).

Plaintiff argues that the "Individual Defendants made numerous calls and engaged in various e-mail communications with NACEPF in Rhode Island." However, telephone calls and mail communications are not necessarily sufficient to establish purposeful availment. <u>Sawtelle</u>, 70 F.3d at 1391; <u>see also</u> <u>Nicholas v. Buchanan</u>, 806 F.2d 305, 307 (1st Cir. 1986) (finding that even coupled with an oral contract, "generalized reference to inter-state contacts 'via telephone communications' and 'via U.S. mail,' without more, is [in]sufficient to satisfy due process requirements"); <u>Bond Leather</u>, 764 F.2d at 932-35 (finding insufficient contacts with forum state despite four letters sent by defendant to plaintiff in forum state). Even if such communications may sometimes be sufficient,

Plaintiff, as already discussed, initiated the majority. Given that jurisdiction must be premised on a defendant's actions, such unilateral communications by Plaintiff do not render the Individual Defendants amenable to suit in Rhode Island. See, e.g., Reynolds v. Int'l Amateur Athletic Fed'n, 23 F.3d 1110, 1119 (6th Cir. 1994); Sun Bank, N.A. v. E.F. Hutton & Co., 926 F.2d 1030, 1034 (11th Cir. 1991). The communications actually initiated by the Individual Defendants are few and, again, as already discussed, have been provided to the Court without the content necessary to establish any connection to Plaintiff's claims or to any activities in Rhode Island.

Looking beyond the issue of telephone and e-mail communications, Plaintiff's evidence suffers additional infirmities that doom the assertion of jurisdiction. For example, Plaintiff relies heavily upon the June 7, 2000 memorandum sent by Defendant Cardinale, insinuating that this document represents a unilateral "reaching out" to Plaintiff in Rhode Island. Even a cursory reading of the memorandum suggests otherwise. The first paragraph of the memorandum states the following:

> Thank you for your response to our discussion last Friday. We appreciate the time and effort you invested over the weekend to address the concerns and objectives of both the Alliance and Goldman Sachs/SpectrumLink. In the interest of time, we wanted to respond as quickly as possible to your proposal, which means that some of the details to our current response may still need to be worked out.

In other words, this was not the initial communication between the parties and was actually a response by Defendant Cardinale to an inquiry or communication from Plaintiff.   Indeed, the affidavit of Primeau all but states that the relationship between Plaintiff and the defendants arose as a result of Plaintiff's reaching out beyond the borders of Rhode Island:  "[i]n 2000, NACEPF and the Alliance had discussions with various potential investors.   The Alliance began searching for investors to purchase the lease rights for its licenses. . . ."

The December 2000 "term sheet" even more strongly shows that the defendants had no intention of voluntarily engaging in any business relationship in Rhode Island.   This, apparently the first document the parties jointly executed, included a choice of law provision stating that the relationship described therein would be governed by the law of New York.

Defendant Daly's attempted settlement meeting with Mr. Primeau in Rhode Island falls woefully short of reflecting the Defendants' purposeful availment of the forum and its laws and protections.   In Gifford v. Bruce Strumpf, Inc., the First Circuit affirmed the district court's holding that:

> The fact that Defendants and their insurance carrier negotiated settlement discussions in Maine and conducted a certain amount of discovery in Maine does not establish that Defendants reasonably should have anticipated being sued in Maine at the time of the accident.   Plaintiff resides in Maine and therefore it was necessary for Defendants, in their efforts to conduct settlement discussions, to correspond with people in Maine.

Further, as Defendants argue, "The acceptance of
[Plaintiff's] . . . argument clearly would have a
chilling effect on pre-suit settlement of claims, . . ."

Gifford v. Bruce Strumpf, Inc., No. 97-70-B, 1997 U.S. Dist. LEXIS
11876, at *3-4 (D. Me. Aug. 7, 1997), aff'd 141 F.3d 1149 (1st Cir.
1998). Although the present case is admittedly more involved than
the average lawsuit arising from an automobile collision, the
principle is, and should be, the same: parties should not be
penalized for attempting to settle their claims outside of court.
This has similarities to the rule that a party cannot fraudulently
induce another to enter his preferred forum simply to serve process
upon him. Besides, it is illogical to suggest that a settlement
attempt years after the parties initiated their "relationship" --
such as it was pursuant to Plaintiff's allegation that the
Defendants were puppeteers controlling Clearwire's every move --
could serve as evidence of the Defendants' purposeful availment of
the forum.

The Investor Update and Bridge Financing Offer letters mailed
by Clearwire in connection with C-Round financing similarly do not
establish jurisdiction. First, the mailings were official
corporate communications from Clearwire, not the Individual
Defendants (or any Defendants), that were sent to all of
Clearwire's shareholders. That these happened to be mailed to a
Rhode Island address is not a sufficient justification for the
exercise of jurisdiction. See, e.g., W. Va. Laborers Pension Trust

Fund v. Caspersen, 829 N.E.2d 843, 851 (Ill. App. Ct. 2005)
("Mailing of the merger materials to stockholders and attending
several social dinners were not the types of acts by which
defendants purposefully availed themselves of the privileges of
conducting business in Illinois.") (citing Young v. Colgate-
Palmolive Co., 790 F.2d 567, 570 (7th Cir. 1986) ("Nor do mailings
to shareholders support the exercise of individual jurisdiction.
They simply are not the type of purposeful contacts recognized . .
. .")).   If the Court was to adopt Plaintiff's reasoning, any
corporation that ever sent a letter to Rhode Island updating or
making investment offers to its shareholders could be dragged into
the Rhode Island forum every time a shareholder had an occasion to
sue the corporation.

     Lastly, Plaintiff's allegation that the Individual Defendants
are alleged to have breached their fiduciary duties as directors of
Clearwire does not satisfy the purposeful availment prong.
Presumably, any allegedly tortious conduct took place at the
company board meetings in Texas, Delaware, or New York -- not Rhode
Island.   Phillips Exeter Acad., 196 F.3d at 291 ("breach of
fiduciary duty occurs where the fiduciary acts disloyally").
Likewise, none of the alleged misdeeds attributable to Clearwire
took place in Rhode Island.   Moreover, Clearwire formed a contract
with all the members of the Alliance, not just with NACEPF.

In sum, the thrust of Plaintiff's jurisdictional allegations rest on its experiencing, in Rhode Island, the <u>effects</u> of alleged negligent acts occurring elsewhere. But the First Circuit has already declined to find personal jurisdiction based on such effects: "We have wrestled before with this issue of whether the in-forum effects of extra-forum activities suffice to constitute minimum contacts <u>and have found in the negative</u>." <u>Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n</u>, 142 F.3d 26, 36 (1st Cir. 1998) (emphasis added); <u>cf.</u> <u>Hugel v. McNell</u>, 886 F.2d 1, 4-5 (1st Cir. 1989). Whatever the merits of Plaintiff's claims, this Court is constrained by the First Circuit Court of Appeals' delineation of the limits of the <u>Fourteenth Amendment</u>. Even as evaluated under the <u>prima facie</u> standard, the effects allegedly felt by Plaintiff do not amount to a purposeful availment by any of the Defendants of the laws of Rhode Island.

C.   Gestalt Factors

Given the Court's findings with respect to the first two prongs of the jurisdictional analysis, there is no need to address the third prong -- the so-called "Gestalt factors."[10]   See

---

[10] The Gestalt factors require consideration of:

The plaintiff's interest in obtaining convenient and effective relief; the burden imposed upon the defendant by requiring [them] to appear; the forum's adjudicatory interest; the interstate judicial system's interest in the place of adjudication; and the common interest of all affected sovereigns, state and federal, in promoting substantive social policies.

31

Ticketmaster-New York, Inc. v. Alioto, 26 F.3d 201, 210 (1st Cir. 1994) ("the weaker the plaintiff's showing on the first two prongs (relatedness and purposeful availment), the less a defendant need show in terms of unreasonableness to defeat jurisdiction").

III. Conclusion

For the foregoing reasons, Plaintiff NACEPF's Complaint is DISMISSED WITH PREJUDICE.


IT IS SO ORDERED.


_____
William E. Smith
United States District Judge
Date: 3/5/08

---

Donatelli v. Nat'l Hockey League, 893 F.2d 459, 465 (1st Cir. 1990) (citations omitted).